# EXHIBIT 4

ADRMOP,CONSOL

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:18-cv-02499-WHO

Colgate et al v. JUUL Labs, Inc. et al
Assigned to: Judge William H. Orrick
Demand: $75,000
Relate Case Cases:   3:18-cv-06776-WHO
                     3:18-cv-06808-WHO
Cause: 28:1346 Tort Claim

Date Filed: 04/26/2018
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Mr. Bradley Colgate**

represented by **Adam Gutride**
Gutride Safier LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
415-789-6390
Fax: 415-449-6469
Email: adam@gutridesafier.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
Migliaccio & Rathod LLP
412 H St. NE
Suite 302
Washington, DC 20002
202 470-3520
Fax: (202) 800-2730
Email: enafisi@classlawdc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth A. Safier**
Gutride Safier LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
415-271-6469
Fax: 415-449-6469
Email: seth@gutridesafier.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**

Gutride Safier LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
415-336-6545
Fax: 415-449-6469
Email: seth@gutridesafier.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Michael Kennedy**
Gutride Safier LLP
835 Douglass Street
San Francisco, CA 94114
415-789-6390
Email: todd@gutridesafier.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
Migliaccio and Rathod LLP
412 H St NE Suite 302
Washington, DC 20002
202-470-3520
Email: jrathod@classlawdc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
Gutride Safier LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 789-6390
Fax: (415) 449-6469
Email: marie@gutridesafier.com
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
Gutride Safier LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
214-502-2171
Email: matt@gutridesafier.com
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
Berger Montague PC
1818 Market Street
Suite 3600

Philadelphia, PA 19103
215-875-3025
Email: nmakhija@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas A Migliaccio**
Migliaccio & Rathod
412 H St NE Suite 302
Washington, DC 20002
202-470-3520
Fax: 202-800-2703
Email: nmigliaccio@classlawdc.com
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
BERGER and MONTAGUE PC
1622 LOCUST STREET
PHILADELPHIA, PA 19102
215-875-3000
Email: rpaul@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
Berger Montague PC
1818 Market Street
36th Floor
Philadelphia, PA 19103
215 875-3071
Fax: 215-875-4604
Email: ssavett@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
Gutride Safier LLP
835 Douglass Street
San Francisco, CA 94114
(415) 529-4995
Fax: 415-449-6469
Email: apatek@pateklaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kaytlin McKnight**                represented by   **Adam Gutride**
                                                     (See above for address)
                                                     *TERMINATED: 06/14/2019*
                                                     *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*TERMINATED: 06/14/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth A. Safier**
(See above for address)
*TERMINATED: 06/14/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Michael Kennedy**
(See above for address)
*TERMINATED: 06/14/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*TERMINATED: 06/14/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
Gutride Safier LLP
265 Franklin Street
Suite 1702
Boston, MA 02110
214-502-2171
Email: matt@gutridesafier.com
*TERMINATED: 06/14/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*TERMINATED: 06/14/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas A Migliaccio**

(See above for address)
*TERMINATED: 06/14/2019*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*TERMINATED: 06/14/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*TERMINATED: 06/14/2019*
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*TERMINATED: 06/14/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Smith**                    represented by   **Esfand Nafisi**
                                                      Migliaccio & Rathod LLP
                                                      388 Market Street
                                                      Suite 1300
                                                      San Francisco, CA 94111
                                                      (415) 489-7004
                                                      Fax: (202) 800-2730
                                                      Email: enafisi@classlawdc.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Jason Samual Rathod**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Matthew Thomas McCrary**
                                                      (See above for address)
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Neil Kailash Makhija**
                                                      (See above for address)
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Russell D. Paul**
                                                      (See above for address)
                                                      *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Langan**                    represented by    **Seth Adam Safier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
Gutride Safier LLP

100 Pine Street, Suite 1250

San Francisco, CA 94111

(415) 789-6390
Fax: (415) 449-6469
Email: marie@gutridesafier.com
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Corey Smith**                     represented by   **Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jennifer Hellman**                    represented by   **Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tommy Benham**                    represented by   **Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jill Nelson**                          represented by **Esfand Nafisi**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Jason Samual Rathod**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Matthew Thomas McCrary**
                                                        (See above for address)
                                                        *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lisa Commitante**                          represented by **Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M. H.**
*a minor, by her Mother and Natural Guardian, Jennifer Hellman appointed guardian ad litem*

represented by **Adam Gutride**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**L. B.**
*a minor, by her Mother and Natural Guardian, JIll Nelson appointed guardian ad litem*

represented by **Adam Gutride**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kacie Ann Lagun**                 represented by  **Adam Gutride**
*on behalf of themselves, the general*                (See above for address)
*public and those similarly situated*                 *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**A. U.**                              represented by   **Adam Gutride**
*a minor, by her Mother and Naturual*                  (See above for address)
*Guardian, Lisa Commitante appointed*                  *LEAD ATTORNEY*
*guardian ad litem*                                    *ATTORNEY TO BE NOTICED*

                                                       **Esfand Nafisi**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jason Samual Rathod**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Matthew Thomas McCrary**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Neil Kailash Makhija**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Russell D. Paul**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Seth Adam Safier**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Sherrie R. Savett**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Viscomi**                    represented by   **Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Barbara Yannucci**                   represented by   **Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Masessa**                     represented by **Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neil Kailash Makhija**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Paul**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrie R. Savett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hasnat Ahmad**                 represented by **Adam Gutride**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas A. Zimmerman , Jr.**
Zimmerman Law Offices, P.C.
77 West Washington Stgreet
Suite 1220
Chicago, IL 60602
312-440-0020
Fax: 312-440-4180
Email: tom@attorneyzim.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Liliana Andrade**                          represented by   **Adam Gutride**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Esfand Nafisi**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Jason Samual Rathod**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Marie Ann McCrary**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Matthew Thomas McCrary**
                                                              (See above for address)
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Seth Adam Safier**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Anthony J Patek**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Virginia Jose Angullo**                    represented by   **Adam Gutride**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Esfand Nafisi**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Jason Samual Rathod**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**B. C.**                                    represented by   **Adam Gutride**
*a minor, through his Parent and*                            (See above for address)
*Natural Guardian Mary Baker*                                *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Esfand Nafisi**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Marie Ann McCrary**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Thomas McCrary**
                                                             (See above for address)
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Seth Adam Safier**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Anthony J Patek**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Adam Banner**                              represented by

**Adam Gutride**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Q. C.**                                     represented by   **Adam Gutride**
*through his parent and natural*                              (See above for address)
*guardian Anjie Comer*                                        *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**D. C.**                          represented by  **Adam Gutride**
*and his mother and Natural Guardian*            (See above for address)
*Renee Deeter*                                   *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Esfand Nafisi**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Jason Samual Rathod**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Marie Ann McCrary**
                                                 (See above for address)
                                                 *PRO HAC VICE*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Matthew Thomas McCrary**
                                                 (See above for address)
                                                 *PRO HAC VICE*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Seth Adam Safier**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Anthony J Patek**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

                                 represented by

**D. D.**
*Minor through their Parent and Natural*
*Guardian Joseph DiGiancinto*

**Adam Gutride**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**C. D.**                                    represented by **Adam Gutride**
*minor, through their Parent and*                        (See above for address)
*Natural Guardian Joseph DiGiacinto*                     *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                             **Esfand Nafisi**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Jason Samual Rathod**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

                                             **Marie Ann McCrary**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**K. S.**                         represented by  **Adam Gutride**
*through his parent and Natural*               (See above for address)
*Guardian Rachelle Dollinger*                  *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Esfand Nafisi**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Jason Samual Rathod**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **Marie Ann McCrary**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **Matthew Thomas McCrary**
                                               (See above for address)
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*

                                               **Seth Adam Safier**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **Anthony J Patek**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

                                  represented by  **Esfand Nafisi**
                                               (See above for address)

**J. D.**
*through his parent and natural
guardian Nicole Dramis*

                                                     *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary ,**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jillian Furey**                      represented by   **Adam Gutride**
*Washington D.C.*                                       (See above for address)
                                                       *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Austin Hester**                    represented by    **Adam Gutride**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Esfand Nafisi**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jason Samual Rathod**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Marie Ann McCrary**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Matthew Thomas McCrary**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Seth Adam Safier**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Anthony J Patek**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edgar Kalenkevich**                represented by    **Adam Gutride**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Esfand Nafisi**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jason Samual Rathod**
                                                       (See above for address)

*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Kugler**                    represented by   **Adam Gutride**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tracie Kugler**                        represented by   **Adam Gutride**
*on behalf of her son, Z.K., a minor*                    (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Esfand Nafisi**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Jason Samual Rathod**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Marie Ann McCrary**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Matthew Thomas McCrary**
                                                         (See above for address)
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Seth Adam Safier**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Anthony J Patek**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kacie Ann Lagun**                      represented by   **Adam Gutride**
*(nee Durham) - Pennsylvania*                            (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Esfand Nafisi**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Jason Samual Rathod**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M. C.**                          represented by   **Adam Gutride**
*through his Parent and Natural*                     (See above for address)
*Guardian Jeanine Manning*                           *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Esfand Nafisi**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jason Samual Rathod**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Marie Ann McCrary**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Matthew Thomas McCrary**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Seth Adam Safier**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Anthony J Patek**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ron Minas**                          represented by   **Adam Gutride**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Esfand Nafisi**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Jason Samual Rathod**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Marie Ann McCrary**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Matthew Thomas McCrary**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Seth Adam Safier**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Anthony J Patek**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**S. G.**                              represented by   **Adam Gutride**
*through her Parent and Natural*                        (See above for address)
*Guardian Ashley Noble*                                 *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Esfand Nafisi**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Jason Samual Rathod**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Marie Ann McCrary**
                                                        (See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**D. O.**                          represented by   **Adam Gutride**
*through her mother and natural*                    (See above for address)
*guardian Atoyia Orders ("Orders")*                 *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                    **Esfand Nafisi**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Jason Samual Rathod**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Marie Ann McCrary**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Matthew Thomas McCrary**
                                                    (See above for address)
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Seth Adam Safier**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Anthony J Patek**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jack Roberts**                    represented by   **Adam Gutride**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Esfand Nafisi**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jason Samual Rathod**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Marie Ann McCrary**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Matthew Thomas McCrary**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Seth Adam Safier**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Anthony J Patek**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**W. T.**                           represented by   **Adam Gutride**
*both minors, through their parent and*              (See above for address)
*Natural Guardian Tonya Rowan*                       *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Esfand Nafisi**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jason Samual Rathod**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Marie Ann McCrary**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**A. R. T.**                        represented by   **Adam Gutride**
*both minors, through their parent and*                (See above for address)
*Natural Guardian Tonya Rowan*                         *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amber Royce**                     represented by   **Adam Gutride**
                                                       (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**D. S.**                          represented by   **Adam Gutride**
*a minor, through his Parent and*                   (See above for address)
*Natural Guardian Amber Selfridge*                  *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Esfand Nafisi**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Jason Samual Rathod**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Marie Ann McCrary**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Matthew Thomas McCrary**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Laura Staller**                              represented by   **Adam Gutride**
*Wisconsin*                                                    (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Esfand Nafisi**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Jason Samual Rathod**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Marie Ann McCrary**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Matthew Thomas McCrary**
                                                               (See above for address)
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Seth Adam Safier**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Anthony J Patek**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**T. B. T.**                                   represented by   **Adam Gutride**
*a minor, through his parent and*                             (See above for address)
*Natural Guardian Marlend Thomseth-*                          *LEAD ATTORNEY*
*Belcher*                                                      *ATTORNEY TO BE NOTICED*

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**O. V.**                            represented by   **Adam Gutride**
*a minor, through her parent and*                     (See above for address)
*natural guardian Tanya Viti*                         *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Esfand Nafisi**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Jason Samual Rathod**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Marie Ann McCrary**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Matthew Thomas McCrary**
                                                      (See above for address)
                                                      *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **S. W.**<br>*a minor, through his parent and natural guardian Joe Weibel* | represented by | **Adam Gutride**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Esfand Nafisi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Samual Rathod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marie Ann McCrary**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Thomas McCrary**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Adam Safier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J Patek**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Juul Labs, Inc.** | represented by | **Austin Van Schwing**<br>Gibson, Dunn & Crutcher LLP<br>555 Mission Street |

Suite 3000
San Francisco, CA 94105-0921
415-393-8200
Fax: 415 393-8306
Email: aschwing@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Joseph Stevens**
Gibson, Dunn Crutcher LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
415-393-8200
Fax: 415 393-8306
Email: cstevens@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Jessica Reed Culpepper**
Gibson, Dunn and Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7000
Fax: 213 229-7520
Email: jculpepper@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Joshua D. Dick**
Gibson Dunn & Crutcher LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
415 393-8200
Fax: 415 393-8306
Email: jdick@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Joshua David Dick**
Gibson Dunn & Crutcher
555 Mission Street, Suite 3000
San Francisco, CA 94105
415-393-8331
Fax: 415-374-8451
Email: jdick@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Kelsey John Helland**
Gibson, Dunn and Crutcher LLP
555 Mission Street

Suite 3000
San Francisco, CA 94105-0921
415-393-8309
Fax: 415-374-8481
Email: khelland@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Peter C. Squeri**
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200
Fax: (415) 393-8306
Email: psqueri@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Winston Y Chan**
Gibson Dunn Crutcher LLP
555 Mission Street Suite 3000
San Francisco, CA 94105-0921
415-393-8200
Fax: 415 393-8306
Email: wchan@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAX Labs, Inc.**
*TERMINATED: 07/12/2018*

**Defendant**

**Jonathan Mardis**                          represented by   **Adam Gutride**
*Mississippi*                                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Marie Ann McCrary**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Thomas McCrary**
                                                             (See above for address)
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Seth Adam Safier**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Anthony J Patek**

(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/26/2018 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400, receipt number 0971-12306422.). Filed byBradley Colgate. (Attachments: # 1 Appendix Appendices A & B)(Patek, Anthony) (Filed on 4/26/2018) (Entered: 04/26/2018) |
| 04/26/2018 | 2 | Proposed Summons. (Patek, Anthony) (Filed on 4/26/2018) (Entered: 04/26/2018) |
| 04/26/2018 | 3 | Civil Cover Sheet by Bradley Colgate, Kaytlin McKnight . (Patek, Anthony) (Filed on 4/26/2018) (Entered: 04/26/2018) |
| 04/26/2018 | 4 | NOTICE of Appearance by Anthony J Patek *for appearance by Adam Gutride, Seth Safier, Kristen Simplicio, and Todd Kennedy, as attorneys for plaintiff* (Patek, Anthony) (Filed on 4/26/2018) (Entered: 04/26/2018) |
| 04/26/2018 | 5 | Case assigned to Magistrate Judge Donna M. Ryu.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 5/10/2018. (srnS, COURT STAFF) (Filed on 4/26/2018) (Entered: 04/26/2018) |
| 04/27/2018 | 6 | Summons Issued as to JUUL Labs, Inc., PAX Labs, Inc. (jjbS, COURT STAFF) (Filed on 4/27/2018) (Entered: 04/27/2018) |
| 04/27/2018 | 7 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 8/8/2018. Initial Case Management Conference set for 8/15/2018 01:30 PM in Oakland, Courtroom 4, 3rd Floor. (jjbS, COURT STAFF) (Filed on 4/27/2018) (Entered: 04/27/2018)** |
| 05/11/2018 | 8 | CLERK'S NOTICE TO PLAINTIFFS Re: Consent or Declination: Plaintiffs shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 5/25/2018. (ig, COURT STAFF) (Filed on 5/11/2018) (Entered: 05/11/2018) |
| 05/17/2018 | 9 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Bradley Colgate.. (Safier, Seth) (Filed on 5/17/2018) (Entered: 05/17/2018) |

| 05/18/2018 | 10 | NOTICE of Appearance by Esfand Nafisi *for Plaintiffs Bradley Colgate and Kaytlin McKnight* (Attachments: # 1 Certificate/Proof of Service)(Nafisi, Esfand) (Filed on 5/18/2018) (Entered: 05/18/2018) |
|---|---|---|
| 05/22/2018 | 11 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (ig, COURT STAFF) (Filed on 5/22/2018) (Entered: 05/22/2018) |
| 05/22/2018 | 12 | **ORDER REASSIGNING CASE. Case reassigned to Judge William H. Orrick for all further proceedings. Magistrate Judge Donna M. Ryu no longer assigned to the case. This case is assigned to a judge who participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and http://cand.uscourts.gov/cameras. Signed by Executive Committee on 5/22/2018. (Attachments: # 1 Notice of Eligibility for Video Recording)(jmlS, COURT STAFF) (Filed on 5/22/2018) (Entered: 05/22/2018)** |
| 05/24/2018 | 13 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 0971-12380749.) filed by Bradley Colgate, Kaytlin McKnight. (Attachments: # 1 Exhibit Certificate of Good Standing) (Rathod, Jason) (Filed on 5/24/2018) Modified on 5/25/2018 (aaaS, COURT STAFF). (Entered: 05/24/2018) |
| 05/24/2018 | 14 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 0971-12381167.) filed by Bradley Colgate, Kaytlin McKnight. (Attachments: # 1 Exhibit Certificate of Good Standing) (Rathod, Jason) (Filed on 5/24/2018) Modified on 5/25/2018 (aaaS, COURT STAFF). (Entered: 05/24/2018) |
| 05/24/2018 | 15 | NOTICE of Appearance by Austin Van Schwing *and Charles J. Stevens, Winston Y. Chan, Joshua D. Dick, Peter C. Squeri and Jessica R. Culpepper* (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 5/24/2018) (Entered: 05/24/2018) |
| 05/24/2018 | 16 | Corporate Disclosure Statement by JUUL Labs, Inc. (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 5/24/2018) (Entered: 05/24/2018) |
| 05/24/2018 | 17 | |

| | | |
|---|---|---|
| | | Certificate of Interested Entities by JUUL Labs, Inc. (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 5/24/2018) (Entered: 05/24/2018) |
| 05/24/2018 | 18 | NOTICE by JUUL Labs, Inc. *Notice of Pendency of Other Action or Proceeding* (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 5/24/2018) (Entered: 05/24/2018) |
| 05/24/2018 | 19 | STIPULATION re 1 Complaint *to Enlarge Time to Respond to Complaint without Court Order Pursuant to Civil L.R. 6-1* filed by JUUL Labs, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 5/24/2018) (Entered: 05/24/2018) |
| 05/25/2018 | 20 | **CASE MANAGEMENT CONFERENCE ORDER - Case Management Conference set for 8/28/2018 02:00 PM in San Francisco, Courtroom 02, 17th Floor. Case Management Statement due by 8/21/2018. Signed by Judge William H. Orrick on 05/25/2018. (jmdS, COURT STAFF) (Filed on 5/25/2018) (Entered: 05/25/2018)** |
| 05/29/2018 | 21 | MOTION to Appoint Lead Plaintiff and Lead Counsel filed by Bradley Colgate, Kaytlin McKnight. Motion Hearing set for 7/11/2018 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Responses due by 6/12/2018. Replies due by 6/19/2018. (Attachments: # 1 Declaration of Adam Gutride iso Motion to Appoint Interim Lead Counsel, # 2 Exhibit Ex. A to Gutride Decl., # 3 Declaration of Nicholas Migliaccio iso Motion to Appoint Interim Lead Counsel, # 4 Exhibit Ex. A to Migliaccio Decl., # 5 Proposed Order Granting Motion to Appoint Interim Lead Counsel) (Patek, Anthony) (Filed on 5/29/2018) (Entered: 05/29/2018) |
| 06/11/2018 | 22 | STIPULATION WITH PROPOSED ORDER re 21 MOTION to Appoint Lead Plaintiff and Lead Counsel *To Enlarge Time To Respond* filed by JUUL Labs, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 6/11/2018) (Entered: 06/11/2018) |
| 06/11/2018 | 23 | **ORDER TO ENLARGE TIME TO RESPOND TO PLAINTIFFS' MOTION TO APPOINT GUTRIDE SAFIER LLP AND MIGLIACCIO & RATHOD LLP INTERIM LEAD COUNSEL by Judge William H. Orrick granting 22 Stipulation. Defendants shall file their response to Plaintiffs Motion on or before June 15, 2018. (jmdS, COURT STAFF) (Filed on 6/11/2018) (Entered: 06/11/2018)** |
| 06/12/2018 | 24 | FIRST AMENDED CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED; against All Defendants. Filed byKaytlin McKnight, Bradley Colgate, Anthony Smith, David Langan, Corey Smith, Jennifer Hellman, Tommy Benham, Jill Nelson, Lisa Commitante. (Attachments: # 1 Appendix) (Patek, Anthony) (Filed on 6/12/2018) Modified on 6/13/2018 (aaaS, COURT STAFF). (Entered: 06/12/2018) |
| 06/15/2018 | 25 | OPPOSITION/RESPONSE (re 21 MOTION to Appoint Lead Plaintiff and Lead Counsel ) *by JUUL Labs, Inc. and PAX Labs, Inc.* filed byJUUL Labs, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 6/15/2018) (Entered: 06/15/2018) |

| 06/19/2018 | 26 | REPLY (re 21 MOTION to Appoint Lead Plaintiff and Lead Counsel ) filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U.. (Patek, Anthony) (Filed on 6/19/2018) (Entered: 06/19/2018) |
|---|---|---|
| 06/22/2018 | 27 | STIPULATION *to Enlarge Time to Respond to First Amended Complaint Without Court Order Pursuant to Civil L.R. 6-1* filed by JUUL Labs, Inc.. (Schwing, Austin) (Filed on 6/22/2018) (Entered: 06/22/2018) |
| 06/22/2018 | 28 | MOTION to Appoint Guardian Ad Litem ad Litem *and Proposed Order* filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U.. (Patek, Anthony) (Filed on 6/22/2018) (Entered: 06/22/2018) |
| 06/25/2018 | 29 | **Order by Judge William H. Orrick granting 28 Motion to Appoint Guardian ad Litem. (jmdS, COURT STAFF) (Filed on 6/25/2018) (Entered: 06/25/2018)** |
| 06/27/2018 | 30 | STIPULATION WITH PROPOSED ORDER *to Vacate or Continue Hearing on Plaintiffs' Motion to Appoint Interim Lead Counsel* filed by JUUL Labs, Inc.. (Schwing, Austin) (Filed on 6/27/2018) (Entered: 06/27/2018) |
| 06/27/2018 | 31 | CERTIFICATE OF SERVICE by JUUL Labs, Inc. re 30 STIPULATION WITH PROPOSED ORDER *to Vacate or Continue Hearing on Plaintiffs' Motion to Appoint Interim Lead Counsel* (Schwing, Austin) (Filed on 6/27/2018) (Entered: 06/27/2018) |
| 06/28/2018 | 32 | **ORDER granting 30 STIPULATION to Vacate or Continue Hearing on Plaintiffs' Motion to Appoint Interim Lead Counsel. Motion Hearing as to 21 MOTION to Appoint Lead Plaintiff and Lead Counsel set for 8/28/2018 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Signed by Judge William H. Orrick on 06/28/2018. (jmdS, COURT STAFF) (Filed on 6/28/2018) (Entered: 06/28/2018)** |
| 06/29/2018 | 33 | **Order by Judge William H. Orrick granting 14 Motion for Pro Hac Vice by Nicholas A. Migliaccio. (jmdS, COURT STAFF) (Filed on 6/29/2018) (Entered: 06/29/2018)** |
| 06/29/2018 | 34 | **Order by Judge William H. Orrick granting 13 Motion for Pro Hac Vice by Jason S. Rathod. (jmdS, COURT STAFF) (Filed on 6/29/2018) (Entered: 06/29/2018)** |
| 07/02/2018 | 35 | STIPULATION WITH PROPOSED ORDER *Stipulation of Dismissal of PAX Labs, Inc. without Prejudices* filed by Bradley Colgate. (Patek, Anthony) (Filed on 7/2/2018) (Entered: 07/02/2018) |
| 07/12/2018 | 36 | **Order by Judge William H. Orrick granting 35 Stipulation of Dismissal of PAX Labs, Inc., Without Prejudice. (jmdS, COURT STAFF) (Filed on 7/12/2018) (Entered: 07/12/2018)** |
| 07/17/2018 | 37 | Joint MOTION for Leave to File *Excess Pages* filed by JUUL Labs, Inc.. (Schwing, Austin) (Filed on 7/17/2018) (Entered: 07/17/2018) |

| 07/17/2018 | 38 | STIPULATION WITH PROPOSED ORDER re 37 Joint MOTION for Leave to File *Excess Pages* filed by JUUL Labs, Inc.. (Attachments: # 1 Proposed Order)(Schwing, Austin) (Filed on 7/17/2018) (Entered: 07/17/2018) |
| 07/18/2018 | 39 | **Order by Judge William H. Orrick granting 37 Motion for Leave to File Excess Pages. (jmdS, COURT STAFF) (Filed on 7/18/2018) (Entered: 07/18/2018)** |
| 07/24/2018 | 40 | MOTION to Dismiss *Plaintiffs' First Amended Complaint; Memorandum of Points and Authorities in Support Thereof* filed by JUUL Labs, Inc.. Motion Hearing set for 9/5/2018 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Responses due by 8/14/2018. Replies due by 8/28/2018. (Attachments: # 1 Declaration of Austin V. Schwing, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Proposed Order)(Schwing, Austin) (Filed on 7/24/2018) (Entered: 07/24/2018) |
| 07/24/2018 | 41 | MOTION to Strike *Plaintiffs' Nationwide Class Allegations; Memorandum of Points and Authorities in Support Thereof* filed by JUUL Labs, Inc.. Motion Hearing set for 9/5/2018 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Responses due by 8/14/2018. Replies due by 8/28/2018. (Attachments: # 1 Proposed Order)(Schwing, Austin) (Filed on 7/24/2018) (Entered: 07/24/2018) |
| 08/03/2018 | 42 | STIPULATION WITH PROPOSED ORDER re 41 MOTION to Strike *Plaintiffs' Nationwide Class Allegations; Memorandum of Points and Authorities in Support Thereof,* 40 MOTION to Dismiss *Plaintiffs' First Amended Complaint; Memorandum of Points and Authorities in Support Thereof* filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun. (Safier, Seth) (Filed on 8/3/2018) (Entered: 08/03/2018) |
| 08/07/2018 | 43 | **Order granting 42 STIPULATION - Deadlines reset as to 40 MOTION to Dismiss and 41 MOTION to Strike. Responses due by 8/22/2018. Replies due by 9/12/2018. Motion Hearing reset for 9/26/2018 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Signed by Judge William H. Orrick on 08/07/2018. (jmdS, COURT STAFF) (Filed on 8/7/2018) (Entered: 08/07/2018)** |
| 08/14/2018 | 44 | ADR Clerk's Notice re: Non-Compliance with Court Order (ewh, COURT STAFF) (Filed on 8/14/2018) (Entered: 08/14/2018) |
| 08/15/2018 | 45 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *ADR Certificatoin by Plaintiff Bradley Colgate* (Patek, Anthony) (Filed on 8/15/2018) (Entered: 08/15/2018) |
| 08/15/2018 | 46 | REQUEST for ADR Phone Conference re 45 ADR Certification (ADR L.R. 3-5 b)of discussion of ADR options *Joint ADR Phone Conference Request* (Patek, Anthony) (Filed on 8/15/2018) (Entered: 08/15/2018) |
| 08/15/2018 | 47 | ADR Clerk's Notice Setting ADR Phone Conference on 8/23/2018 at 10:30 AM Pacific time. Please note that you must be logged into an ECF account of |

| | | counsel of record in order to view this document. (cmf, COURT STAFF) (Filed on 8/15/2018) (Entered: 08/15/2018) |
|---|---|---|
| 08/17/2018 | 48 | CERTIFICATE of Counsel *of Service of CMC Order* by Seth Adam Safier on behalf of L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan (Safier, Seth) (Filed on 8/17/2018) (Entered: 08/17/2018) |
| 08/20/2018 | 49 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *by Defendant JUUL Labs, Inc.* (Schwing, Austin) (Filed on 8/20/2018) (Entered: 08/20/2018) |
| 08/21/2018 | 50 | JOINT CASE MANAGEMENT STATEMENT *NO. 1* filed by JUUL Labs, Inc.. (Schwing, Austin) (Filed on 8/21/2018) (Entered: 08/21/2018) |
| 08/22/2018 | 51 | OPPOSITION/RESPONSE (re 41 MOTION to Strike *Plaintiffs' Nationwide Class Allegations; Memorandum of Points and Authorities in Support Thereof* ) filed byL. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U.. (Safier, Seth) (Filed on 8/22/2018) (Entered: 08/22/2018) |
| 08/22/2018 | 52 | **\*\*\* REFER TO DOCUMENT 55 . \*\*\*** OPPOSITION/RESPONSE (re 40 MOTION to Dismiss *Plaintiffs' First Amended Complaint; Memorandum of Points and Authorities in Support Thereof* ) *Plaintiffs' Opposition to Motion to Dismiss* filed byL. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U.. (Patek, Anthony) (Filed on 8/22/2018) Modified on 8/29/2018 (fff, COURT STAFF). (Entered: 08/22/2018) |
| 08/23/2018 | 53 | ADR Remark: ADR Phone Conference held on 8/23/2018 by Howard Herman. (cmf, COURT STAFF) (Filed on 8/23/2018) *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Entered: 08/23/2018) |
| 08/28/2018 | 54 | **\*\*\* REFER TO DOCUMENT 55 . \*\*\*** OPPOSITION/RESPONSE (re 40 MOTION to Dismiss *Plaintiffs' First Amended Complaint; Memorandum of Points and Authorities in Support Thereof* ) *Plaintiff's Opposition to Mot. to Dismiss, CORRECTION OF DOCKET # 52* filed byL. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U.. (Patek, Anthony) (Filed on 8/28/2018) Modified on 8/29/2018 (fff, COURT STAFF). (Entered: 08/28/2018) |
| 08/28/2018 | 56 | **Minute Entry for proceedings held before Judge William H. Orrick: Case Management Conference and Motion Hearing re: 21 Motion to Appoint Lead Plaintiff and Lead Counsel held on 8/28/2018. Motion granted. FTR Time: 2:31-2:46. Plaintiff Attorneys: Seth Safier and Anthony J. Patek. Defendant Attorneys: Joshua D. Dick, Austin V. Schwing, and Peter** |

| | | |
|---|---|---|
| | | Squeri. (jmdS, COURT STAFF) (Date Filed: 8/28/2018) (Entered: 08/29/2018) |
| 08/29/2018 | 55 | OPPOSITION/RESPONSE (re 40 MOTION to Dismiss *Plaintiffs' First Amended Complaint; Memorandum of Points and Authorities in Support Thereof* ) *Plaintiff's Opposition to Mot. to Dismiss, CORRECTION OF DKT. # 52* filed byL. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U.. (Patek, Anthony) (Filed on 8/29/2018) (Entered: 08/29/2018) |
| 09/12/2018 | 57 | REPLY (re 40 MOTION to Dismiss *Plaintiffs' First Amended Complaint; Memorandum of Points and Authorities in Support Thereof* ) filed byJUUL Labs, Inc.. (Attachments: # 1 Declaration of Peter C. Squeri, # 2 Exhibit A) (Schwing, Austin) (Filed on 9/12/2018) (Entered: 09/12/2018) |
| 09/12/2018 | 58 | REPLY (re 41 MOTION to Strike *Plaintiffs' Nationwide Class Allegations; Memorandum of Points and Authorities in Support Thereof* ) filed byJUUL Labs, Inc.. (Attachments: # 1 Declaration of Austin V. Schwing, # 2 Exhibit A, # 3 Exhibit B)(Schwing, Austin) (Filed on 9/12/2018) (Entered: 09/12/2018) |
| 09/25/2018 | 59 | Proposed Order re 56 Motion Hearing,, Case Management Conference - Initial,, Order on Motion to Appoint Lead Plaintiff and Lead Counsel, by Bradley Colgate. (Gutride, Adam) (Filed on 9/25/2018) (Entered: 09/25/2018) |
| 09/25/2018 | 60 | Proposed Order re 59 Proposed Order, 56 Motion Hearing,, Case Management Conference - Initial,, Order on Motion to Appoint Lead Plaintiff and Lead Counsel, *(Revised Proposed Order)* by Bradley Colgate. (Gutride, Adam) (Filed on 9/25/2018) (Entered: 09/25/2018) |
| 09/26/2018 | 61 | **Minute Entry for proceedings held before Judge William H. Orrick: Motion Hearing held on 9/26/2018 re 41 MOTION to Strike and 40 MOTION to Dismiss. Total Time in Court: 37 minutes. Court Reporter: Belle Ball. Plaintiff Attorneys: Adam Gutride and Esfand Nafisi. Defendant Attorneys: Austin Schwing, Joshua D. Dick, and Peter Sueri. (jmdS, COURT STAFF) (Date Filed: 9/26/2018) (Entered: 09/26/2018)** |
| 09/26/2018 | 62 | ***PLEASE DISREGARD; DUPLICATE ENTRY***Minute Entry for proceedings held before Judge William H. Orrick: Motion Hearing held on 9/26/2018 re 41 MOTION to Strike and 40 MOTION to Dismiss. Motions taken under submission; written order to follow. Total Time in Court: 37 minutes. Court Reporter: Belle Ball. Plaintiff Attorneys: Adam Gutride and Esfand Nafisi. Defendant Attorneys: Austin Schwing, Joshua D. Dick, and Peter Sueri. (jmdS, COURT STAFF) (Date Filed: 9/26/2018) Modified on 10/9/2018 (jmdS, COURT STAFF). (Entered: 09/27/2018) |
| 09/27/2018 | 63 | **ORDER APPOINTING GUTRIDE SAFIER LLP AND MIGLIACCIO & RATHOD LLP INTERIM LEAD COUNSEL. Signed by Judge William H. Orrick on 09/27/2018. (jmdS, COURT STAFF) (Filed on 9/27/2018) (Entered: 09/27/2018)** |
| 09/28/2018 | 64 | |

| | | TRANSCRIPT ORDER for proceedings held on 09/26/2018 before Judge William H. Orrick by JUUL Labs, Inc., for Court Reporter Belle Ball. (Schwing, Austin) (Filed on 9/28/2018) (Entered: 09/28/2018) |
|---|---|---|
| 10/10/2018 | 65 | Transcript of Proceedings held on September 26, 2018, before Judge William H. Orrick. Court Reporter Belle Ball, CSR, CRR, RDR, telephone number (415)373-2529, belle_ball@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 64 Transcript Order ) Release of Transcript Restriction set for 1/8/2019. (Related documents(s) 64 ) (ballbb15S, COURT STAFF) (Filed on 10/10/2018) (Entered: 10/10/2018) |
| 10/30/2018 | 66 | **ORDER PARTIALLY GRANTING 40 MOTION TO DISMISS AND DENYING 41 MOTION TO STRIKE by Judge William H. Orrick. (jmdS, COURT STAFF) (Filed on 10/30/2018) (Entered: 10/30/2018)** |
| 11/14/2018 | 67 | Certificate of Interested Entities by JUUL Labs, Inc. identifying Other Affiliate Gemini Insurance Company, Other Affiliate Underwriters At Lloyd's, London, Other Affiliate RSUI Indemnity Company, Other Affiliate National Union Fire Insurance Company of Pittsburgh, Pa., Other Affiliate Starr Indemnity & Liability Company, Other Affiliate Lexington Insurance Company, Other Affiliate Endurance Risk Solutions Assurance Co., Other Affiliate RSG Underwriting Managers Europe Limited t/a Startpoint for JUUL Labs, Inc.. re 17 Certificate of Interested Entities *(Supplemental)* (Schwing, Austin) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/21/2018 | 68 | ADMINISTRATIVE MOTION to Relate and Consolidate Cases *(Unopposed)* filed by JUUL Labs, Inc.. Responses due by 11/26/2018. (Attachments: # 1 Certificate/Proof of Service)(Schwing, Austin) (Filed on 11/21/2018) (Entered: 11/21/2018) |
| 11/21/2018 | 69 | STIPULATION WITH PROPOSED ORDER *recommending cases be related and consolidated* filed by JUUL Labs, Inc.. (Attachments: # 1 Exhibit (Viscomi Complaint), # 2 Exhibit (JY Complaint), # 3 Exhibit (JY Transfer Order), # 4 Exhibit (Viscomi Transfer Order))(Schwing, Austin) (Filed on 11/21/2018) (Entered: 11/21/2018) |
| 11/23/2018 | 70 | AUDIO RECORDINGS ORDER (re: 56 Motion Hearing,, Case Management Conference - Initial,, Order on Motion to Appoint Lead Plaintiff and Lead Counsel, ), by Bradley Colgate. Court will send to Esfand Nafisi at enafisi@classlawdc.com a link to the files requested in this order. ( Filing fee $ 31, receipt number 0971-12870393). (Nafisi, Esfand) (Filed on 11/23/2018) (Entered: 11/23/2018) |
| 11/27/2018 | 71 | **ORDER TO RELATE ACTIONS PURSUANT TO CIVIL LOCAL RULES 3-12 AND 7-11 AND TO CONSOLIDATE ACTIONS by Judge William H. Orrick granting 69 Stipulation ( 68 Administrative Motion found to be moot). Case Nos. 3:18cv6776-JCS and 3:18cv6808-LB found to** |

| | | |
|---|---|---|
| | | be related; the cases shall be consolidated under the case In re: JUUL Labs, Inc. Products Litigation, Case No. 3:18-cv-2499-WHO. A consolidated amended complaint shall be filed by 1/7/2019; defendant responses shall be due 2/22/2019. (jmdS, COURT STAFF) (Filed on 11/27/2018) (Entered: 11/27/2018) |
| 01/04/2019 | 72 | STIPULATION WITH PROPOSED ORDER re 71 Order on Administrative Motion per Civil Local Rule 7-11,,, Order on Stipulation,, *Joint Stipulation to Extend Time and Page Limits, with Proposed Order* filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U.. (Patek, Anthony) (Filed on 1/4/2019) (Entered: 01/04/2019) |
| 01/07/2019 | 73 | NOTICE by JUUL Labs, Inc. *Notice of Filing of Notice of Related Case* (Schwing, Austin) (Filed on 1/7/2019) (Entered: 01/07/2019) |
| 01/09/2019 | 74 | **Order by Judge William H. Orrick granting 72 Stipulation to Extend Time and Page Limits. (jmdS, COURT STAFF) (Filed on 1/9/2019) (Entered: 01/09/2019)** |
| 01/14/2019 | 75 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice *for Neil K. Makhija* ( Filing fee $ 310, receipt number 0971-13002213.) filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U., Michael Viscomi, Barbara Yannucci, DAVID MASESSA%20. (Makhija, Neil) (Filed on 1/14/2019) Modified on 1/16/2019 (aaaS, COURT STAFF). (Entered: 01/14/2019) |
| 01/14/2019 | 76 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice *for Russell D. Paul* ( Filing fee $ 310, receipt number 0971-13002337.) filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, DAVID MASESSA, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U., Michael Viscomi, Barbara Yannucci. (Paul, Russell) (Filed on 1/14/2019) Modified on 1/16/2019 (aaaS, COURT STAFF). (Entered: 01/14/2019) |
| 01/15/2019 | 77 | **Order by Judge William H. Orrick granting 76 Motion for Pro Hac Vice by Russell Paul. (jmdS, COURT STAFF) (Filed on 1/15/2019) (Entered: 01/15/2019)** |
| 01/15/2019 | 78 | **Order by Judge William H. Orrick granting 75 Motion for Pro Hac Vice by Neil Makhija. (jmdS, COURT STAFF) (Filed on 1/15/2019) (Entered: 01/15/2019)** |
| 01/22/2019 | 79 | NOTICE of Appearance by Kelsey John Helland *on behalf of Defendant JUUL Labs, Inc.* (Helland, Kelsey) (Filed on 1/22/2019) (Entered: 01/22/2019) |
| 01/25/2019 | 80 | Corporate Disclosure Statement by JUUL Labs, Inc. identifying Other Affiliate Altria Group, Inc. for JUUL Labs, Inc.. (Schwing, Austin) (Filed on 1/25/2019) (Entered: 01/25/2019) |
| 01/25/2019 | 81 | |

| | | |
|---|---|---|
| | | **ERRONEOUSLY E-FILED: PLEASE SEE DOCKET NUMBER 82 & DOCKET 83 FOR THE CORRECTIONS** AMENDED COMPLAINT *Consolidated Amended Class Action Complaint* against All Defendants. Filed byMichael Viscomi, L. B., Jill Nelson, Kaytlin McKnight, Kacie Ann Lagun, Bradley Colgate, Jennifer Hellman, Lisa Commitante, Corey Smith, David Langan, DAVID MASESSA, M. H., Anthony Smith, A. U., Barbara Yannucci, Tommy Benham. (Attachments: # 1 Appendix App'x A - Plaintiff Allegations by Individual, # 2 Appendix App'x B - JUUL Data Charts, # 3 Appendix App'x C - JUUL Ads (pt 1), # 4 Appendix App'x C - JUUL Ads (pt 2), # 5 Appendix App'x D -FAL/Deceptive Practice Laws by State, # 6 Appendix App'x E - Unfair/Unlawful Practice Laws by State, # 7 Appendix App'x F - Express Warranty Laws by State, # 8 Appendix App'x G - Implied Warranty Laws by State)(Patek, Anthony) (Filed on 1/25/2019) Modified on 1/30/2019 (aaaS, COURT STAFF). (Entered: 01/25/2019) |
| 01/30/2019 | 82 | AMENDED COMPLAINT *Consolidated Amended Complaint (correction of Dkt 81)* against All Defendants. Filed byMichael Viscomi, L. B., Jill Nelson, Kaytlin McKnight, Kacie Ann Lagun, Bradley Colgate, Jennifer Hellman, Lisa Commitante, Corey Smith, David Langan, DAVID MASESSA, M. H., Anthony Smith, A. U., Barbara Yannucci, Tommy Benham. (Attachments: # 1 Exhibit Ex. A Jackler Article (omitted from Dkt. 81), # 2 Appendix App'x A Individual Plaintiff Allegations (correction of Dkt 81-1), # 3 Appendix App'x F Express Warranty Laws by State (correction of Dkt. 81-7))(Patek, Anthony) (Filed on 1/30/2019) (Entered: 01/30/2019) |
| 01/30/2019 | 83 | ERRATA re 81 Amended Complaint,,, 82 Amended Complaint,, *Errata Correcting Consolidated Amended Complaint (Dkt Nos. 82-82)* by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, DAVID MASESSA, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U., Michael Viscomi, Barbara Yannucci. (Patek, Anthony) (Filed on 1/30/2019) (Entered: 01/30/2019) |
| 02/04/2019 | 84 | APPLICATION AND [PROPOSED] ORDER TO APPOINT GUARDIANS AD LITEM, FOR MINOR PLAINTIFFS; filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, DAVID MASESSA, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U., Michael Viscomi, Barbara Yannucci. (Patek, Anthony) (Filed on 2/4/2019) Modified on 2/5/2019 (aaaS, COURT STAFF). (Entered: 02/04/2019) |
| 02/20/2019 | 85 | **Order by Judge William H. Orrick granting 84 Motion to Appoint Guardian ad Litem ad Litem. (jmdS, COURT STAFF) (Filed on 2/20/2019) (Entered: 02/20/2019)** |
| 02/22/2019 | 86 | STIPULATION WITH PROPOSED ORDER *TO ENLARGE TIME PURSUANT TO CIVIL L.R. 6-2* filed by JUUL Labs, Inc.. (Schwing, Austin) (Filed on 2/22/2019) (Entered: 02/22/2019) |
| 02/27/2019 | 87 | **Order to Enlarge Time by Judge William H. Orrick granting 86 Stipulation. (jmdS, COURT STAFF) (Filed on 2/27/2019) (Entered: 02/27/2019)** |
| | | |

| 03/02/2019 | 88 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice *for Sherrie R. Savett* ( Filing fee $ 310, receipt number 0971-13138118.) filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, DAVID MASESSA, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U., Michael Viscomi, Barbara Yannucci. (Makhija, Neil) (Filed on 3/2/2019) Modified on 3/4/2019 (aaaS, COURT STAFF). (Entered: 03/02/2019) |
|---|---|---|
| 03/05/2019 | 89 | **Order by Judge William H. Orrick granting 88 Motion for Pro Hac Vice by Sherrie R. Savett. (jmdS, COURT STAFF) (Filed on 3/5/2019) (Entered: 03/05/2019)** |
| 03/06/2019 | 90 | STIPULATION WITH PROPOSED ORDER *Joint Stipulation to Proposed Protective and ESI Orders* filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, DAVID MASESSA, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U., Michael Viscomi, Barbara Yannucci. (Attachments: # 1 Exhibit Proposed Stipulated Protective Order, # 2 Exhibit Proposed Stipulated ESI Order)(Patek, Anthony) (Filed on 3/6/2019) (Entered: 03/06/2019) |
| 03/13/2019 | 91 | **Protective Order by Judge William H. Orrick granting 90 Stipulation. (jmdS, COURT STAFF) (Filed on 3/13/2019) (Additional attachment(s) added on 4/23/2019: # 1 Corrected Image (dated)) (jmdS, COURT STAFF). (Entered: 03/13/2019)** |
| 03/13/2019 | 92 | **ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION granting 90 STIPULATION. Signed by Judge William H. Orrick on 03/13/2019. (jmdS, COURT STAFF) (Filed on 3/13/2019) (Entered: 03/13/2019)** |
| 03/15/2019 | 93 | NOTICE of Appearance by Esfand Nafisi (Nafisi, Esfand) (Filed on 3/15/2019) (Entered: 03/15/2019) |
| 03/15/2019 | 94 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice *for Thomas A. Zimmerman* ( Filing fee $ 310, receipt number 0971-13175667.) filed by L. B., Tommy Benham, Bradley Colgate, Lisa Commitante, M. H., Jennifer Hellman, Kacie Ann Lagun, David Langan, DAVID MASESSA, Kaytlin McKnight, Jill Nelson, Anthony Smith, Corey Smith, A. U., Michael Viscomi, Barbara Yannucci. (Attachments: # 1 Certificate of Good Standing) (Nafisi, Esfand) (Filed on 3/15/2019) Modified on 3/19/2019 (aaaS, COURT STAFF). (Entered: 03/15/2019) |
| 03/15/2019 | | Electronic filing error. This filing will not be processed by the clerks office. Re: 93 Notice of Appearance filed by Tommy Benham, DAVID MASESSA% 20, A. U., Anthony Smi th, Kacie Ann Lagun, L. B., Jill Nelson, Jennifer Hellman, M. H., Michael Viscomi, Bradley Colgate, Lisa Commitante, Barbara Yannucci, David Langan, Kaytlin McKnight, Corey Smith **Hasnat Ahmad is not a Party/Plaintiff to this case** (aaaS, COURT STAFF) (Filed on 3/15/2019) (Entered: 03/19/2019) |
| 03/18/2019 | 95 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice *Matt McCrary* ( Filing fee $ 310, receipt number 0971-13178688.) filed by Bradley |

|            |     | Colgate. (Attachments: # 1 Certificate/Proof of Service Certificate of Good Standing)(McCrary, Matthew) (Filed on 3/18/2019) Modified on 3/19/2019 (aaaS, COURT STAFF). (Entered: 03/18/2019) |
|------------|-----|---|
| 03/18/2019 | 96  | NOTICE of Appearance by Marie Ann McCrary (McCrary, Marie) (Filed on 3/18/2019) (Entered: 03/18/2019) |
| 03/26/2019 | 97  | *NOTICE OF ERRATA to Consolidated 82 Amended Complaint* against JUUL Labs, Inc.; Filed by Bradley Colgate. (McCrary, Marie) (Filed on 3/26/2019) Modified on 3/27/2019 (aaaS, COURT STAFF). (Entered: 03/26/2019) |
| 03/26/2019 | 98  | MOTION to Compel *Arbitration* filed by JUUL Labs, Inc.. Motion Hearing set for 5/22/2019 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Responses due by 4/9/2019. Replies due by 4/16/2019. (Attachments: # 1 Proposed Order, # 2**Please See Docket Number 101 for Correction** Declaration of J. Honig, # 3 Exhibit A, Honig Decl'n, # 4 Exhibit B, Honig, # 5 Exhibit C, Honig, # 6 Exhibit D, Honig Declaration, # 7 **Please See Docket Number 100 -1 for Correction**Exhibit A, Dick Decl'n) (Schwing, Austin) (Filed on 3/26/2019) Modified on 3/27/2019 (aaaS, COURT STAFF). Modified on 3/27/2019 (aaaS, COURT STAFF). Modified on 3/27/2019 (aaaS, COURT STAFF). (Entered: 03/26/2019) |
| 03/26/2019 | 99  | MOTION to Dismiss filed by JUUL Labs, Inc.. Motion Hearing set for 5/22/2019 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Responses due by 4/16/2019. Replies due by 5/3/2019. (Attachments: # 1 Proposed Order, # 2 Declaration of A. Schwing, # 3 Exhibit A, Schwing Decl'n, # 4 Exhibit B, Schwing Decl'n, # 5 Exhibit C, Schwing Decl'n, # 6 Exhibit D, Schwing Decl'n)(Schwing, Austin) (Filed on 3/26/2019) (Entered: 03/26/2019) |
| 03/26/2019 | 100 | Declaration of JOSHUA D. DICK in Support of 98 MOTION to Compel *Arbitration* filed byJUUL Labs, Inc.. (Attachments: # 1 Exhibit A, of J. Dick) (Related document(s) 98 ) (Schwing, Austin) (Filed on 3/26/2019) (Entered: 03/26/2019) |
| 03/26/2019 | 101 | Declaration of J. HONIG in Support of 98 MOTION to Compel *Arbitration (replaces 98-2)* filed byJUUL Labs, Inc.. (Related document(s) 98 ) (Schwing, Austin) (Filed on 3/26/2019) (Entered: 03/26/2019) |
| 04/01/2019 | 102 | MOTION & [PROPOSED] ORDER for leave to appear in Pro Hac Vice *Thomas A. Zimmerman* ( Filing fee $ 310, receipt number 0971-13175667.) Filing fee previously paid on 3/15/2019 filed by Hasnat Ahmad. (Attachments: # 1 Certificate/Proof of Service Certificate of Good Standing)(Nafisi, Esfand) (Filed on 4/1/2019) Modified on 4/2/2019 (aaaS, COURT STAFF). (Entered: 04/01/2019) |
| 04/01/2019 | 103 | NOTICE of Appearance by Esfand Nafisi *for Thomas A. Zimmerman* (Nafisi, Esfand) (Filed on 4/1/2019) (Entered: 04/01/2019) |
| 04/02/2019 | 104 | **Order by Judge William H. Orrick granting 102 Motion for Pro Hac Vice by Thomas A. Zimmerman, Jr. (jmdS, COURT STAFF) (Filed on 4/2/2019) (Entered: 04/02/2019)** |
|            |     | |

| 04/02/2019 | 105 | **Order by Judge William H. Orrick granting 95 Motion for Pro Hac Vice by Matthew Thomas McCrary. (jmdS, COURT STAFF) (Filed on 4/2/2019) (Entered: 04/02/2019)** |
|---|---|---|
| 04/02/2019 | 106 | STIPULATION WITH PROPOSED ORDER *TO ENLARGE TIME PURSUANT TO CIVIL L.R. 6-2* filed by Hasnat Ahmad, Liliana Andrade, L. B., Adam Banner, Tommy Benham, D. C., M. C., Q. C., Bradley Colgate, Lisa Commitante, C. D., D. D., J. D., Jillian Furey, S. G., M. H., Jennifer Hellman, Austin Hester, Virginia Jose Angullo, Edgar Kalenkevich, David Kugler, Tracie Kugler, Kacie Ann Lagun((nee Durham) - Pennsylvania), Kacie Ann Lagun(on behalf of themselves, the general public and those similarly situated), David Langan, DAVID MASESSA, Kaytlin McKnight, Ron Minas, Jill Nelson, D. O., Jack Roberts, Amber Royce, D. S., K. S., Anthony Smith, Corey Smith, Laura Staller, A. R. T., T. B. T., W. T., A. U., O. V., Michael Viscomi, S. W., Barbara Yannucci. (Rathod, Jason) (Filed on 4/2/2019) (Entered: 04/02/2019) |
| 04/16/2019 | 107 | **ORDER granting 106 STIPULATION re: 99 MOTION to Dismiss and 98 MOTION to Compel Arbitration. Response due by 4/30/2019. Reply due by 5/23/2019. Motion Hearing set for 6/12/2019 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Signed by Judge William H. Orrick on 04/16/2019. (jmdS, COURT STAFF) (Filed on 4/16/2019) (Entered: 04/16/2019)** |
| 04/30/2019 | 108 | OPPOSITION/RESPONSE (re 99 MOTION to Dismiss ) filed byHasnat Ahmad, Liliana Andrade, L. B., Adam Banner, Tommy Benham, B. C., D. C., M. C., Q. C., Bradley Colgate, Lisa Commitante, C. D., D. D., J. D., Jillian Furey, S. G., M. H., Jennifer Hellman, Austin Hester, Virginia Jose Angullo, Edgar Kalenkevich, David Kugler, Tracie Kugler, Kacie Ann Lagun((nee Durham) - Pennsylvania), Kacie Ann Lagun(on behalf of themselves, the general public and those similarly situated), David Langan, David Masessa, Kaytlin McKnight, Ron Minas, Jill Nelson, D. O., Jack Roberts, Amber Royce, D. S., K. S., Anthony Smith, Corey Smith, Laura Staller, A. R. T., T. B. T., W. T., A. U., O. V., Michael Viscomi, S. W., Barbara Yannucci. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(McCrary, Matthew) (Filed on 4/30/2019) (Entered: 04/30/2019) |
| 04/30/2019 | 109 | OPPOSITION/RESPONSE (re 98 MOTION to Compel *Arbitration* ) filed byHasnat Ahmad, Liliana Andrade, L. B., Adam Banner, Tommy Benham, B. C., D. C., M. C., Q. C., Bradley Colgate, Lisa Commitante, C. D., D. D., J. D., Jillian Furey, S. G., M. H., Jennifer Hellman, Austin Hester, Virginia Jose Angullo, Edgar Kalenkevich, David Kugler, Tracie Kugler, Kacie Ann Lagun ((nee Durham) - Pennsylvania), Kacie Ann Lagun(on behalf of themselves, the general public and those similarly situated), David Langan, David Masessa, Kaytlin McKnight, Ron Minas, Jill Nelson, D. O., Jack Roberts, Amber Royce, D. S., K. S., Anthony Smith, Corey Smith, Laura Staller, A. R. T., T. B. T., W. T., A. U., O. V., Michael Viscomi, S. W., Barbara Yannucci. (Attachments: # 1 Declaration Minas Declaration, # 2 **Erroneously E-filed: Please See Docket Number 110 For Correction** Declaration Kennedy Declaration, # 3 Declaration Ahmad Declaration, # 4 Declaration Masessa Declaration, # 5 Declaration Roberts Declaration, # 6 Exhibit Roberts Exhs. A-B, # 7 |

| | | |
|---|---|---|
| | | Declaration Viscomi Declaration, # 8 Declaration Nafisi Declaration, # 9**Erroneously E-filed" Please See Docket Number 111** Exhibit Nafisi Exh. A, # 10 Exhibit Nafisi Exh. B, # 11 Exhibit Nafisi Exh. C, # 12 Exhibit Nafisi Exh. D, # 13 Exhibit Nafisi Exh. E, # 14 Exhibit Nafisi Exh. F, # 15 Exhibit Nafisi Exh. G)(Nafisi, Esfand) (Filed on 4/30/2019) Modified on 5/14/2019 (aaaS, COURT STAFF). (Entered: 05/01/2019) |
| 05/06/2019 | 110 | ERRATA re 109 Opposition/Response to Motion,,,,, *Errata Correcting Declarations of Jack Roberts and Esfand Nafisi* by Jack Roberts. (Attachments: # 1 Exhibit Correction of Docket # [109-5], # 2 Exhibit Correction of Docket #[109-8])(Nafisi, Esfand) (Filed on 5/6/2019) (Entered: 05/06/2019) |
| 05/06/2019 | 111 | ERRATA re 109 Opposition/Response to Motion,,,,, *ERRATA Correcting Declaration of Esfand Nafisi Docket # [109-8]* by Jack Roberts. (Nafisi, Esfand) (Filed on 5/6/2019) (Entered: 05/06/2019) |
| 05/23/2019 | 112 | REPLY (re 99 MOTION to Dismiss ) *Plaintiffs' Consolidated Amended Complaint* filed byJUUL Labs, Inc.. (Schwing, Austin) (Filed on 5/23/2019) (Entered: 05/23/2019) |
| 05/23/2019 | 113 | REPLY (re 98 MOTION to Compel *Arbitration* ) filed byJUUL Labs, Inc.. (Schwing, Austin) (Filed on 5/23/2019) (Entered: 05/23/2019) |
| 05/28/2019 | 114 | Letter Brief *Joint Discovery Dispute Letter* filed byHasnat Ahmad, Liliana Andrade, L. B., Adam Banner, Tommy Benham, B. C., D. C., M. C., Q. C., Bradley Colgate, Lisa Commitante, C. D., D. D., J. D., Jillian Furey, S. G., M. H., Jennifer Hellman, Austin Hester, Virginia Jose Angullo, Edgar Kalenkevich, David Kugler, Tracie Kugler, Kacie Ann Lagun((nee Durham) - Pennsylvania), Kacie Ann Lagun(on behalf of themselves, the general public and those similarly situated), David Langan, David Masessa, Kaytlin McKnight, Ron Minas, Jill Nelson, D. O., Jack Roberts, Amber Royce, D. S., K. S., Anthony Smith, Corey Smith, Laura Staller, A. R. T., T. B. T., W. T., A. U., O. V., Michael Viscomi, S. W., Barbara Yannucci. (Patek, Anthony) (Filed on 5/28/2019) (Entered: 05/28/2019) |
| 05/28/2019 | 115 | Administrative Motion to File Under Seal *Mot. to Seal Joint Discovery Ltr* filed by Hasnat Ahmad, Liliana Andrade, L. B., Adam Banner, Tommy Benham, B. C., D. C., M. C., Q. C., Bradley Colgate, Lisa Commitante, C. D., D. D., J. D., Jillian Furey, S. G., M. H., Jennifer Hellman, Austin Hester, Virginia Jose Angullo, Edgar Kalenkevich, David Kugler, Tracie Kugler, Kacie Ann Lagun((nee Durham) - Pennsylvania), Kacie Ann Lagun(on behalf of themselves, the general public and those similarly situated), David Langan, David Masessa, Kaytlin McKnight, Ron Minas, Jill Nelson, D. O., Jack Roberts, Amber Royce, D. S., K. S., Anthony Smith, Corey Smith, Laura Staller, A. R. T., T. B. T., W. T., A. U., O. V., Michael Viscomi, S. W., Barbara Yannucci. (Attachments: # 1 Proposed Order Proposed Order on Mot to Seal, # 2 Declaration Decl. Anthony Patek iso Mot to Seal, # 3 Exhibit Ex. 1 Redacted Joint Discovery Ltr, # 4 Exhibit Ex. 2 Nonredacted Joint Discovery Ltr)(Patek, Anthony) (Filed on 5/28/2019) (Entered: 05/28/2019) |
| 06/03/2019 | 116 | |

| | | |
|---|---|---|
| | | Administrative Motion to File Under Seal *DECLARATION OF AUSTIN V. SCHWING IN SUPPORT OF ADMINISTRATIVE MOTION TO SEAL JOINT DISCOVERY LETTER* filed by JUUL Labs, Inc.. (Attachments: # 1 Proposed Order, # 2 [REDACTED] Decl. of Austin V. Schwing iso Dkt. 115, # 3 [UNREDACTED] Decl. of Austin V. Schwing iso Dkt. 115)(Schwing, Austin) (Filed on 6/3/2019) (Entered: 06/03/2019) |
| 06/03/2019 | 117 | Declaration of Austin V. Schwing in Support of 115 Administrative Motion to File Under Seal *Mot. to Seal Joint Discovery Ltr [Redacted]* filed by JUUL Labs, Inc.. (Related document(s) 115 ) (Schwing, Austin) (Filed on 6/3/2019) (Entered: 06/03/2019) |
| 06/03/2019 | 118 | CERTIFICATE OF SERVICE by JUUL Labs, Inc. re 116 Administrative Motion to File Under Seal *DECLARATION OF AUSTIN V. SCHWING IN SUPPORT OF ADMINISTRATIVE MOTION TO SEAL JOINT DISCOVERY LETTER* (Dick, Joshua) (Filed on 6/3/2019) (Entered: 06/03/2019) |
| 06/08/2019 | 119 | CASE MANAGEMENT STATEMENT filed by JUUL Labs, Inc.. (Schwing, Austin) (Filed on 6/8/2019) (Entered: 06/08/2019) |
| 06/11/2019 | 120 | MOTION to Withdraw as Attorney *for Kaytlin McKnight* filed by Bradley Colgate. Motion Hearing set for 6/17/2019 02:00 PM in San Francisco, Courtroom 02, 17th Floor before Judge William H. Orrick. Responses due by 6/25/2019. Replies due by 7/2/2019. (Attachments: # 1 Declaration McCrary Declaration ISO Motion to Withdraw as Counsel for Kaytlin McKnight, # 2 Proposed Order [Proposed] Order Granting Motion to Withdraw as Counsel) (McCrary, Marie) (Filed on 6/11/2019) (Entered: 06/11/2019) |
| 06/11/2019 | 121 | MOTION to Relate Case *and Consolidate Action 19-cv-02466-EMC* filed by JUUL Labs, Inc.. (Attachments: # 1 Stipulation In Support Of Unopposed Administrative Motion, # 2 Proposed Order)(Schwing, Austin) (Filed on 6/11/2019) (Entered: 06/11/2019) |
| 06/12/2019 | 122 | OPPOSITION/RESPONSE (re 120 MOTION to Withdraw as Attorney *for Kaytlin McKnight* ) filed by JUUL Labs, Inc.. (Schwing, Austin) (Filed on 6/12/2019) (Entered: 06/12/2019) |
| 06/12/2019 | 124 | **Minute Entry for proceedings held before Judge William H. Orrick: Motion Hearing held on 6/12/2019 re 98 MOTION to Compel and 99 MOTION to Dismiss. Motions taken under submission; written order to follow. Total Time in Court: 1 hour, 6 minutes. Court Reporter: JoAnn Bryce. (jmdS, COURT STAFF) (Date Filed: 6/12/2019) (Entered: 06/13/2019)** |
| 06/13/2019 | 123 | TRANSCRIPT ORDER for proceedings held on 06/12/2019 before Judge William H. Orrick by JUUL Labs, Inc., for Court Reporter Jo Ann Bryce. (Schwing, Austin) (Filed on 6/13/2019) (Entered: 06/13/2019) |
| 06/13/2019 | 125 | TRANSCRIPT ORDER for proceedings held on 06.12.2019 before Judge William H. Orrick by Bradley Colgate, for Court Reporter Jo Ann Bryce. (McCrary, Marie) (Filed on 6/13/2019) (Entered: 06/13/2019) |
| 06/14/2019 | 126 | |

| | | CERTIFICATE OF SERVICE by Juul Labs, Inc. re 121 MOTION to Relate Case *and Consolidate Action 19-cv-02466-EMC* (Schwing, Austin) (Filed on 6/14/2019) (Entered: 06/14/2019) |
|---|---|---|
| 06/14/2019 | 127 | **Order by Judge William H. Orrick granting 120 Motion to Withdraw as Attorney. McKnight is ordered to show cause why her case should not be dismissed for failure to prosecute within two weeks. (jmdS, COURT STAFF) (Filed on 6/14/2019) (Entered: 06/14/2019)** |
| 06/15/2019 | 128 | Transcript of Proceedings held on 6/12/19, before Judge William H. Orrick. Court Reporter Jo Ann Bryce, telephone number 510-910-5888, email: joann_bryce@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction after 90 days. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 123 Transcript Order ) Release of Transcript Restriction set for 9/13/2019. (Related documents(s) 123 ) (jabS, COURTSTAFF) (Filed on 6/15/2019) (Entered: 06/15/2019) |
| 06/18/2019 | 129 | **Order by Judge William H. Orrick granting (121) Motion to Relate Case and Consolidate Cases into case 3:18-cv-02499-WHO. Associated Member Cases: 3:18-cv-06776-WHO and 3:18-cv-06808-WHO. (jmdS, COURT STAFF) (Filed on 6/18/2019) (Entered: 06/18/2019)** |
| 07/23/2019 | 130 | *Amended* STIPULATION WITH PROPOSED PROTECTIVE ORDER filed by Juul Labs, Inc.. (Schwing, Austin) (Filed on 7/23/2019) Modified on 7/24/2019 (slhS, COURT STAFF). (Entered: 07/23/2019) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/29/2019 08:25:11 | | | |
| **PACER Login:** | gd0026LA:2553426:4036719 | **Client Code:** | 46522-00004 |
| **Description:** | Docket Report | **Search Criteria:** | 3:18-cv-02499-WHO |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**GUTRIDE SAFIER LLP**
Adam J. Gutride (State Bar No. 181446)
Seth A. Safier (State Bar No. 197427)
Todd Kennedy (State Bar No. 250267)
Anthony Patek (State Bar No. 228964)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469
adam@gutridesafier.com
seth@gutridesafier.com
todd@gutridesafier.com
anthony@gutridesafier.com

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio, admitted *pro hac vice*
Jason Rathod, admitted *pro hac vice*
Esfand Nafisi (State Bar No. 320119)
388 Market Street, Suite 1300
San Francisco, CA 94111
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
enafisi@classlawdc.com

(additional counsel on signature page)
*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: JUUL LABS, INC. PRODUCT LITIGATION | CASE NO.  3:18-cv-2499 |
| | Honorable William H. Orrick |
| | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (CORRECTED) |
| | JURY TRIAL DEMANDED |

### **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 5

II.    PARTIES .............................................................................................................. 7

    **A.**   Plaintiffs ....................................................................................................... 7

    **B.**   Defendant .................................................................................................... 7

III.    JURISDICTION AND VENUE ......................................................................... 8

IV.    ALLEGATIONS OF FACT ................................................................................. 8

    **A.**   Using Big Tobacco Practices as a Guide, JUUL Labs, Inc. Developed the JUUL e-Cigarette to Recreate the "Luxury" of Tobacco. ........................................................... 8

        **1.**   Like Cigarettes, the JUUL's Purpose is to Foster and Maintain Nicotine Addiction. ..... 12

        **2.**   Young Adults Are at Greater Risk of Both Nicotine Addiction and Lifelong Consequences of that Addiction. ................................................................................ 13

        **3.**   JUUL Manipulates Its Nicotine Formulation To Make It Attractive to Youth and Non-Smokers and More Potent and Addictive than Cigarettes. ...................................... 14

    **B.**   JUUL Has Deceptively Marketed Its JUUL E-Cigarette as an Alternative to Cigarettes, When It is More Potent and More Addictive Than Cigarettes. ................................. 22

        **1.**   JUUL Falsely Represents that Each JUULpod Contains the Nicotine Equivalent of a Pack of Cigarettes, when They Actually Deliver a Particularly Potent Dose of Nicotine. ..... 22

        **2.**   JUUL Intends to Continue to Deceive Consumers As to Nicotine Content. .................. 24

        **3.**   JUUL's "Switch" campaign suggests that JUUL is a smoking cessation device and that JUUL use is a cost-effective alternative to smoking. ........................................... 26

        **4.**   Defendant Falsely Markets, Advertises and Sells E-Cigarette "Autoship" Services as "Cancel Anytime" Service, Without Disclosing the Products' Highly Addictive Nature. ..... 27

    **C.**   JUUL Deployed a Viral Marketing Campaign That Continued the Tobacco Industry's Long-Standing Campaign of Deceptive Advertising and Unfair Business Practices. ............... 28

        **1.**   Overview of Viral Marketing Campaigns and Online Marketing ................................. 28

        **2.**   The Tobacco Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products. ................................................... 30

        **3.**   Because of The Role of Advertising in Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors............................................. 34

Consolidated Amended Class Action Complaint

**4.** JUUL's Marketing Leveraged Banned Strategies Perfected by Tobacco Companies to Induce Minors and Young Non-Smokers to Purchase JUUL Products ................................ 35

**i.** JUUL Advertising Used Imagery that Exploited the Psychological Vulnerabilities of Youth ................................................................................................................................. 37

**ii.** JUUL's Launch Campaign Was Targeted to Create Buzz Among Young Consumers. 37

**iii.** JUUL Gave Away Free Products to Get New Consumers Hooked .......................... 40

**iv.** JUUL Portrayed Its Products as Status Symbols. ...................................................... 41

**v.** JUUL Used Flavors and Food Imagery to Attract Non-Smoking Teenagers and Adults 43

**vi.** JUUL Developed Point-of-Sale Advertising That Emphasized the Products' Positive Image Without Adequately Disclosing Its Nature and Risks ............................................... 48

**5.** JUUL Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products ........................................................................ 49

**i.** JUUL Paid Third Party Influencers and Affiliates to Amplify Its Message to a Teenage Audience. .............................................................................................................. 52

**ii.** JUUL Utilized Viral Marketing Tools to Turn Consumers, Especially Teenagers, Into JUUL Promoters ................................................................................................................... 59

**iii.** JUUL Used Non-Age-Restricted Emails to Promote and Track Its Products ........... 62

**iv.** JUUL Allowed Third Parties to Use Its Trademark to Promote the Products to Underage Consumers .......................................................................................................... 62

**v.** JUUL Tracked the Efficacy of Its Youth Marketing. ................................................. 64

**vi.** JUUL Amplified Its Message using Off-Line Advertising to Ensure Consumers Were Blanketed With Non-Stop Messaging About Its Products ..................................................... 64

**vii.** JUUL Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth. .................................................................................................................... 65

(1) JUUL's Pricing Model Entices New Users, Including Youth and Non-Smokers. 65

(2) JUUL Sought Out Retail Locations That Were Frequented by Its Target Audience And Displayed the Products in Arms' Reach. ......................................................................... 66

(3) JUUL Failed to Monitor Its Distributors, Fostering Unrestricted Sales to Minors 67

(4) JUUL Sold Its Products Through Its Website and Offered Enticing Discount Subscription Services. ........................................................................................................... 68

**6.** JUUL's Actions Have Created a Youth Vaping Epidemic ......................................... 69

Consolidated Amended Class Action Complaint

i.   JUUL Was Able to Undo Decades of Progress Reducing Teen Smoking by Exploiting Regulatory Loopholes ................................................................................ 77

**D.**   JUUL's Deal With Altria Reveals that JUUL's Goal Was Always About Increasing the Rates of Nicotine Addiction. ................................................................................ 78

**E.**   Defendant Misled Class Members, Including Minors, Into Becoming Addicted to Nicotine Salts. ................................................................................ 79

V.   CLASS ALLEGATIONS ................................................................................ 79

VI.   CAUSES OF ACTION ................................................................................ 84~~85~~

1.     Plaintiffs listed in Appendix A (collectively, "Plaintiffs") hereby bring this Second Amended Class Action Complaint against Defendant JUUL Labs, Inc. ("Defendant" or "JUUL"), on behalf of themselves and those similarly situated. Except for the allegations set forth in Appendix A, the following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

## I.     INTRODUCTION

2.     The JUUL e-cigarette and JUULpods—a product introduced in 2015—is so addictive that it created the "*largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S.*"[1] In a mere two years, Defendant undid over a decade of reduction in teenage nicotine addiction, increasing the prevalence of nicotine use in teenagers to levels not seen since the early 2000s. The FDA has described the increase in e-cigarette consumption as an "epidemic."

3.     This epidemic is driven by Defendant's illegal conduct, which it based on decades of research by the tobacco industry about how to manipulate nicotine to maximize addiction and how to market tobacco products to youth—the sole source of new business for the tobacco industry.  Tobacco industry documents became available to JUUL's founders because they were ordered to be made public in 1997 through the Master Settlement Agreement between dozens of states' attorneys general and the four largest U.S. cigarette manufacturers.  When the tobacco industry continued to violate the settlement by marketing to minors, a federal district court issued a RICO judgment in *U.S. v. Phillip Morris* and Congress enacted of the Family Smoking Cessation & Tobacco Control Act of 2009, which imposed additional restrictions on youth advertising and banned flavored cigarettes.  The litigation and regulation of the tobacco industry caused the youth smoking rate to plummet from 28% in 1997 to 5.5%.

4.     JUUL's founders knew that these regulatory changes had caused the rapid decline of cigarette smoking among youth. But they also knew that the cigarette is one of the "most successful products" ever created, so they set out to reinvent the cigarette and restore its status as

---

[1] http://monitoringthefuture.org/pressreleases/18drugpr.pdf (emphasis added).

a "luxury" product that had broad consumer appeal and to hook an entire new generation of users. Using tobacco industry documents made available in the tobacco litigation as a playbook, JUUL recreated the industry's well-honed (and subsequently banned) methods to seduce new smokers, by using candy-like flavors and advertising that exploited the psychological vulnerabilities of adolescents.

5.      Knowing that cigarettes' cough-inducing "throat hit" deters new users, Defendant chemically manipulated its JUUL Pods to deliver almost no throat hit while also delivering massive doses of nicotine. The lack of "throat hit" was not necessary for those who already smoke, as they already are tolerant of the sensation and associate it with smoking and nicotine satisfaction.  JUUL then packaged its nicotine delivery system in an easily concealable small device that was branded to appeal to tech-savvy youth, and hired young models to tout the device on social media, restoring the image of "coolness" and style that cigarettes once enjoyed. The combination of JUUL's chemically manipulated nicotine and device results in a product that provides higher doses of nicotine than the most potent cigarettes. Indeed, JUUL's pre-filled cartridges of nicotine solution, called "JUULpods," contain three times more nicotine than the legal limit in the European Union.

6.      When Defendant launched the JUUL e-cigarette, it said nothing about any of the myriad problems that are likely to occur from the use of the products, particularly by youth and nonsmokers, including long-term nicotine addiction; increased risk of heart disease and stroke; changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions; decreased functionality of the endocrine system; heightened risk of cancer; and negative effects on fertility. As one of the San Francisco engineers who invented the JUUL e-cigarette stated: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[2] Released in 2015, JUULs are now pervasive in the nation's schools and adolescent use is rampant. JUUL not only dominates the $3 billion e-cigarette market, it has expanded the size of that market significantly—

---
[2] https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul

mostly on the backs of adolescent, non-smokers. And the tobacco company Altria (formerly known as Philip Morris) a few months ago acquired a 35% stake in JUUL for $12.8 billion (giving JUUL a $35 billion valuation) giving Altria access to the new generation of customers JUUL has groomed.

7. In 2018, after the FDA opened an investigation and this lawsuit was filed, JUUL set out to rewrite its history. It has removed from its website and much of the internet images of glamorous young models seductively exhaling clouds of vapors. [3] JUUL's website now pictures middle-aged adults in non-glamorous settings and suggests that JUUL exists solely for the benefit of adult smokers looking for an alternative. Although JUUL markets its product as a smoking cessation device ("Switch to JUUL"), it has not received FDA approval as modified risk tobacco product or as a nicotine replacement therapy, and the JUUL e-cigarette has not participated in any FDA approval process. [4] Defendant's attempt to distance itself from its wrongful conduct is superficial; indeed the viral marketing campaign and memes that JUUL instigated continue to live on and to seduce new users. Nor has JUUL actually changed its fundamentally unscrupulous business model. JUUL's e-cigarettes are still as addictive as they ever were, are still sold in candy-like flavors, and can still be ordered with a subscription service on JUUL's website, and JUUL continues to hide the truth about the actual nicotine content and addictiveness of its devices.

## II. PARTIES

### A. Plaintiffs

8. Details of the residences and experiences of each plaintiff are listed in Appendix A.

### B. Defendant

---

[3] The JUUL advertising images below, and the associated image galleries referenced herein, represent only the social media content that survived multiple waves of content deletion by JUUL.
[4] The FDA's 2018 decision to delay the premarket approval process last year appears to be a direct result of JUUL's lobbying efforts.

9.      Defendant JUUL Labs, Inc. ("JUUL") is, and at all times alleged in this Class Action Complaint was, a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc., and a new company was spun out as Pax Labs, Inc. A substantial portion of the conduct discussed herein occurred while JUUL was operating as PAX Labs, Inc.

## III.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one or more claims herein arise under federal law. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this Court under 28 U.S.C. § 1391 because (1) Defendant is headquartered in this District; and (2) Defendant regularly transacts and solicits business in this District.

## IV.    ALLEGATIONS OF FACT

### A.      Using Big Tobacco Practices as a Guide, JUUL Labs, Inc. Developed the JUUL e-Cigarette to Recreate the "Luxury" of Tobacco.

12.     Defendant JUUL Labs, Inc. and former Defendant PAX Labs, Inc. began as Ploom, Inc. in 2007. The company's founders, Adam Bowen ("Bowen") and James Monsees ("Monsees"), both product designers by education and experience, invented the Ploom, a cigarette-shaped device into which pre-filled pods of ground tobacco were inserted and vaporized at lower-than-combustion temperatures using an electrical heating element.

13.     In 2014, Bowen, Monsees and others applied for a patent for the JUUL device, a self-regulating vaporization device and cartridge, which used a nicotine solution derived from tobacco.

14.     Around 2015, PAX announced the JUUL e-cigarette and raised nearly $50 million

in funding from Fidelity Investments and other investors, presumably to aid in the manufacturing and marketing of JUUL e-cigarettes.

15.    In 2017, PAX Labs, Inc. was renamed JUUL Labs, Inc., which retained the tobacco-related business and spun off its marijuana-related business into a new entity, also called PAX Labs, Inc.

16.    Bowen and Monsees remained at JUUL, where Bowen is now JUUL's Chief Technology Officer and Monsees is JUUL's Chief Product Officer. That same year, JUUL became the dominant e-cigarette company in the United States, growing revenues by 700%. As of March 2018, market reports from Nielsen indicate that JUUL represents 54.6% of the e-cigarette traditional retail market. See Appendix B, Chart 1.

17.    Statements by JUUL's founder and employees make clear JUUL's intent to develop a highly addictive product to sell to a new audience of non-smokers.  James Monsees, one of JUUL's founders, described the cigarette as "the most successful consumer product of all time . . . . an amazing product." Because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category." (emphasis added)

18.    Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." With a focus on recreating the "ritual and elegance that smoking once exemplified," Monsees and Bowen set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with — or don't necessarily want to be associated with — cigarettes."[5]

19.    JUUL used the tobacco industry's prior practices as a playbook. Monsees has publicly admitted that JUUL began by looking at tobacco industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the tobacco industry, governmental officials, and injured smokers. "It became a very intriguing space for us to investigate because we had so much information that you wouldn't

_____

[5] http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees/

1  normally be able to get in most industries. And we were able to catch up, right, to a huge, huge

   industry in no time. And then we started building prototypes."

2      20.    JUUL's research included documents about how tobacco companies had

3  chemically manipulated nicotine content to maximize delivery: "We started looking at patent

4  literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened

5  historically in the tobacco industry." Among the documents JUUL would have found were those

6  documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-

7  friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks

8  of nicotine abuse and addiction, as detailed further below.

9      21.    JUUL also used tobacco industry advertisements—which were created to lure non-

10 smoking youth--as a guide to JUUL's own advertising campaigns. In a 2018 interview, "Monsees

11 indicated that the design of JUUL's advertising had been informed by traditional tobacco

12 advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been

13 quite useful to them." Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years*

14 *on the Market* (Jan. 21, 2019), attached hereto as Exhibit A.

15     22.    Defendant's JUUL e-cigarette is about the size and shape of a pack of chewing

16 gum. The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a

17 magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each

18 JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a

19 coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction

20 on the JUULpod, the battery in the JUUL device activates the heating element, which in turn

21 converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine,

22 benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a

23 battery level indicator and lights up in a "party mode" display of rainbow of colors when the

24 device is waved around.

25     23.    The physical design of the JUUL device (including its circuit board) and JUULpod

26 determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature,

27 maximum puff duration, or airflow, among other things, Defendant can finely tune the amount of

28

nicotine vapor the JUUL delivers.

24.     The JUUL e-cigarette's defective design poses unprecedented risks of abuse and addiction. The JUUL device does not have a manual or automatic "off" switch. On information and belief, neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery. As a result, the JUUL is able to facilitate consumption of levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted to nicotine.

25.     JUUL manufactures and distributes its nicotine formulation as JUULpods, which contain JUUL's nicotine liquid. JUUL exclusively sells its pods in four-packs, in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. According to a recent survey of more than 1,000 12 to 17 year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% of users most recently used fruit medley, mango, cool mint, or crème brulee.[6]

26.     As set forth below, despite its founder's clear intent to create a "luxury" consumer product for people who do not smoke that is as addictive as cigarettes, JUUL has consistently marketed itself as an "alternative" to cigarettes, causing people to choose JUUL on the belief that it is less addictive and less dangerous than cigarettes. JUUL failed to disclose that: (1) contrary to JUUL's representations, there is a higher concentration of nicotine per pod than a pack of cigarettes; (2) even if the nicotine concentration were comparable, the unique way in which a JUUL vaporizer dispenses nicotine renders it more harmful and more addictive than cigarettes, which is problematic for everyone, but particularly for minors; and (3) for non-smokers who take up JUUL use, a significant likelihood exists of later migrating to cigarette smoking.[7]

---

[6] http://www.publichealthlawcenter.org/sites/default/files/JUUL-Webinar-Slides-Apr262018.pdf
[7] *See, e.g.*, Office of the United States Surgeon General, *Surgeon General's Advisory on E-Cigarette Use Among Youth*, 2 (December 18, 2018), available at https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf (last visited January 25, 2019).

**1. Like Cigarettes, the JUUL's Purpose is to Foster and Maintain Nicotine Addiction.**

27.     All leading health authorities support the three major conclusions of a 1988 report by the Surgeon General of the United States regarding nicotine and tobacco:

      a.   Cigarettes and other forms of tobacco are addictive;

      b.   Nicotine is the drug in tobacco that causes addiction;

      c.   The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

28.     Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and a relaxant, nicotine affects the central nervous system; increases in blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.

29.     The neurological changes caused by nicotine create addiction.  Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.

30.     Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors – and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression

and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.

31.     Although framed as a safe alternative to smoking, Defendant's JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.[8] Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders.  Aside from its use as a stimulant, the only other known use of nicotine is as an insecticide.[9] Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoke. Vaping also triggers immune responses associated with inflammatory lung diseases.

32.     With respect to JUUL products in particular, one recent study found that "the concentrations of nicotine and some flavor chemicals (e.g. ethyl maltol) are high enough to be cytotoxic in acute in vitro assays, emphasizing the need to determine if JUUL products will lead to adverse health effects with chronic use."[10]

**2.     Young Adults Are at Greater Risk of Both Nicotine Addiction and Lifelong Consequences of that Addiction.**

33.     Nicotine affects neurological development in adolescents, and exposure to nicotine

---

[8] See Mishra, A., et al., HARMFUL EFFECTS OF NICOTINE, Indian J. Med. Paediatr. Oncol., 36(1): 24–31 (Jan.-Mar. 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.
[9] See Mishra, supra.
[10] Esther E. Omaiye, MS et al., *Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations* (Dec. 2018), available at: https://www.biorxiv.org/content/biorxiv/early/2018/12/09/490607.full.pdf.

during adolescence produces an increased vulnerability to nicotine addiction. [11] Adolescent nicotine addiction causes "substantial neural remodeling" including those parts of the brain governed by dopamine or acetylcholine, which play central roles in reward functioning and cognitive function, including executive function mediated by the prefrontal cortex. A "clear-cut relationship" between adolescent smokers and diminished neural responses has been observed such that addicts exhibit diminished sensitivity to non-drug rewards (e.g., financial rewards). This relationship becomes even more severe in adolescents who smoke more than 5 cigarettes a day. In sum, "the use of extremely rewarding drugs, such as nicotine, may decrease the pleasure obtained from non-drug rewards." *Id.* These changes occur in "early phases of smoking." *Id.* Other brain changes from nicotine include increased sensitivity to other drugs and heightened impulsivity.[12]

34.     "Brain imaging on adolescents suggest that those who begin smoking regularly at a young age have markedly reduced activity in the prefrontal cortex and perform less well on tasks related to memory and attention compared to people who don't smoke."

### 3.     JUUL Manipulates Its Nicotine Formulation To Make It Attractive to Youth and Non-Smokers and More Potent and Addictive than Cigarettes.

35.     According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[13] The cigarette industry has long known that "nicotine is the addicting agent in cigarettes"[14] and that "nicotine satisfaction is the dominant desire" of nicotine addicts. [15]

36.     For this reason, tobacco companies spent decades manipulating nicotine in order to

---

[11] Arain, M., et al., MATURATION OF THE ADOLESCENT BRAIN, Neuropsychiatric Disease and Treatment, 9, 449–461 (Apr. 25, 2013), http://doi.org/10.2147/NDT.S39776.

[12] Erin Brodwin, Business Insider, *Experts are calling out a vape pen with 'scary' nicotine levels that teens love — here's how it affects the brain*, (Apr. 19, 2018, 7:46 am) (citing Musso F. et al., *Smoking impacts on prefrontal attentional network function in young adult brains*, 191(1) Psychopharmacology 159-69 (Mar. 2007).

1.     [13] See https://www.ncbi.nlm. nih.gov/books/NBK53018/#ch4.s92

[14] Brown & Williamson official A.J. Mellman, 1983 https://www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine%20Addiction.pdf

[15] R.J. Reynolds Tobacco Co. marketing memo, 1972.

foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "*Cigarette concept to assure RJR a larger segment of the youth market*," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'." [16] This kick was attributed to increased nicotine absorption associated with lower pH.[17]

37.     JUUL knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL e-cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

38.     In a 2015 interview, Ari Atkins, a JUUL research & development engineer and one of the inventors of the JUUL device said this about the role of acids: "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it …" He pauses. "I've got to choose the words carefully here: Appropriate for inhalation."[18]

39.     JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat. A recent study found that JUUL's e-

---

[16] 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."
[17] Neal Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Nicotine Psychopharmacology, 22-29, Handbook of Experimental Pharmacology, vol 192.
[18] D. Pierce, "This Might Just Be the First Great E-Cig," Wired (Apr. 2015), https://www.wired.com/2015/04/pax-juul-ecig/

liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine. J.H. Lauterbach, *One More Time: Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There?*, https://www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf. Other studies have confirmed the low ratio of freebase nicotine in JUUL products. See Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431 (2018). The Duell study indicates that the vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a non-salt e-liquid with one-twentieth the amount of nicotine as a JUUL (3 mg/mL compared to the JUUL's 59 mg/mL). *Id*. The Duell study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." *Id*., 431–434.

40. Chart 6 in Appendix B illustrates the vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a nearly nicotine-free 3 mg/mL e-liquid. See Appendix B, Chart 6 (Duell, Fig. 3).

41. The same chart further shows that the Duell Study authors found that the low free-base fraction in its aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." Anna K. Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431-434 (2018). At the same time, JUULpods actually contain far higher concentrations of nicotine than the other nicotine solutions tested. The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth." *Id*. 433 (citing Willett, J. G., et al., *Recognition, use and perceptions of JUUL among youth and young adults*, Tobacco Control, 054273 (2018)). The authors further concluded that JUUL's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health." *Duell,* at 431. Finally, the authors noted that "tobacco company documents suggest that products [like JUUL] with high nicotine levels but a low [percentage of freebase nicotine] will yield vape aerosols of

much reduced harshness as compared to products with even only moderate nicotine levels" but high percentages of freebase nicotine. *Id.*

42.     JUUL's creation of a product with low levels of harshness and minimal throat "hit" is consistent with the goal of producing a product for non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation.  The design also shows that JUUL's intention was to recruit nonsmokers, not existing smoker, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix.  Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers, but is crucial to luring a new generation of users.

43.     JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful.  Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation. Reducing or removing this feedback impairs the user's ability to ascertain that she is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction.

44.     JUUL sells products that contain relatively low amounts of throat-irritating freebase nicotine, yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine. Chart 2 in Appendix B provides a visual comparison of: (1) the nicotine concentration of American cigarettes (expressed in milligrams of nicotine per gram of nicotine), (2) the EU 20 mg/mL cap on ENDS nicotine concentration; (3) JUUL's "5% labeling" claim; and (4) independent tests of JUUL's nicotine content.

45.     Blood plasma studies in the '895 patent show that vaping nicotine benzoate increases nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional

Consolidated Amended Class Action Complaint

cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min). JUUL's data also indicates that nicotine salt solutions produce a higher heart rate in a shorter amount of time (a 50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette). Nicotine salts also cause a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

46. JUUL's '895 patent shows that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("Cmax") of approximately 15 ng/mL, compared to a Cmax of 11 ng/mL for a Pall Mall cigarette. (To make it more readable, JUUL's 4% nicotine benzoate data is highlighted in red, and the Pall Mall data is highlighted in blue.) See Appendix B, Chart 3.

47. As high as the reported nicotine dose reported for JUULpods is, the actual dose is likely higher. Though the strongest benzoic acid concentration mentioned in the '895 patent is 4% (i.e., 40 mg/mL of benzoic acid), one study tested four flavors of JUULpods and found a 4.5% benzoic acid ($44.8 \pm 0.6$) solution.[19] That study found that JUULpods contained a concentration of 6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised. JUULpods containing an absolute nicotine concentration 1.2% higher than the stated 5% on the label (a relative increase of over 20%) coupled with more benzoic acid than listed in the '895 patent produce higher nicotine absorption than expected for the advertised formulation. Other studies, such as the Reilly study cited above, have reported even higher actual concentrations of nicotine in JUULpods.

48. In any event, JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg

---

[19] Pankow JF, et al., Benzene formation in electronic cigarettes, PLoS ONE 12(3): e0173055 (2017). See https://doi.org/10.1371/journal.pone.0173055 (last visited June 4, 2018).

of nicotine).”[20] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a JUULpod will easily exceed the nicotine dose of a traditional cigarette. As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."[21] As a result, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and Israel is seeking to do the same.[22]

49.     Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes." Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 3 (the "Reilly study"). The Reilly study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per puff. Reilly et al. Free Radical. See Appendix B, Chart 7. Reilly's findings were based on a puff volume of 75/mL. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 μg/puff. M.J. Schroeder and A.C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, Tobacco Control 2014; 23:ii30-ii35. Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 μg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

---

[20] E-Cigarettes, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited June 4, 2018) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).
[21] Ronny Linder Ganz, HAARETZ, *JUUL Warns it Will Fight Israel Over Its Potential Ban on E-Cigarettes* (June 3, 2018, 9:52 p.m.), https://www.haaretz.com/israel-news/business/juul-warns-it-will-fight-israel-over-potential-ban-on-its-e-cigarettes-1.6140058 (last visited June 7, 2018).
[22] Julia Belluz, Vox, *JUUL, the Vape Device Teens are Getting Hooked On, Explained* (June 6, 2018), https://www.vox.com/science-and-health/2018/5/1/17286638/juul-vaping-e-cigarette (last visited June 8, 2018).

50.     Because "nicotine yield is strongly correlated with tobacco consumption,"[23] a JUULpod with more nicotine *will* strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL. A study of smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels." UCSF Library, 1003285443-5443 (US 85421).

51.     Despite the above data, Defendant has failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

52.     For example, prior to the JUUL's release in June 2015, several press outlets were given JUUL products and provided information about the JUUL device and its nicotine content. TechCrunch, a popular technology website, and a handful of other sites providing pre-release articles about the JUUL, posted the following chart (the "PAX Chart") of a PAX (i.e., JUUL, under its original name) "commissioned study" comparing JUUL's blood-nicotine levels to traditional combustion cigarette and other e-cigarettes. The chart—provided to TechCrunch by Defendant—compares the results for two versions of the JUUL device, one of which used computer-modeled results, a generic "combustion cigarette" and a generic "traditional e-liquid." https://beta.techcrunch.com/wp-content/uploads/2015/04/pax-evaluation.png.  See Appendix B, Chart 4. When JUUL's website debuted in 2015, it included a similar chart (the "JUUL chart") See Appendix B, Chart 5:

53.     Both charts are inconsistent with the results reported in JUUL's '895 Patent.  The patent indicates that a 4% benzoic acid concentration coupled with a 5% concentration of nicotine salts causes nicotine-blood levels approximately 30% higher than a Pall Mall cigarette. In contrast, both the PAX chart and the JUUL chart claim that, at its peak, the JUUL delivers approximately 25% less nicotine to the blood than a cigarette, creating the false impression that the JUUL is less addictive than a combustible cigarette.

54.     In sum, Defendant has either misrepresented the pharmacokinetic effect of its

---

[23] Martin J. Jarvis et al., *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI: Journal of the National Cancer Institute, 134–138 Volume 93, Issue 2, 17 (January 2001), available at: https://academic.oup.com/jnci/article/93/2/134/2906355

1    products or altered the composition and, hence, pharmacokinetic effects of its products without

     disclosing that material fact to consumers.

2         55.    Because JUUL's nicotine salts actually increase the rate and magnitude of blood

3    plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is

4    higher for JUUL e-cigarettes than traditional cigarettes. Thus, far from helping smokers quit, the

5    JUULs simply increase their level of addiction to nicotine. Further, JUULpods are foreseeably

6    exceptionally addictive when used by persons without prior exposure to nicotine—a fact not

7    disclosed by Defendant.

8         56.    At the same time, as discussed above, the throat "hit" from nicotine salts is much

9    lower than that for combustible tobacco products, making it more easy to inhale. According to

10   researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily

11   inhalable nicotine vapor is "likely to be particularly problematic for public health." Anna K.

12   Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR*

13   *Spectroscopy*, 431 (2018).

14        57.    JUUL has fraudulently concealed material information about the addictive nature

15   of its e-cigarettes. Defendant necessarily is in possession of all of this information. Plaintiffs'

16   claims arise out of Defendant's fraudulent concealment of material facts concerning the JUUL e-

17   cigarette and Defendant's representations about the JUUL e-cigarettes' nicotine content, potency,

18   benzoic acid content, and physiological effects of JUUL e-cigarettes. To the extent that Plaintiffs'

19   claims arise from Defendant's fraudulent concealment, there is no one document or

20   communication, and no one interaction, upon which Plaintiffs bases their claims.

21        58.    Plaintiffs allege that at all relevant times, including specifically at the time they

22   purchased or used JUUL e-cigarettes, Defendant knew that JUUL e-cigarettes' were not safe

23   under any circumstances for non-smokers, and posed a risk of aggravating nicotine addiction in

24   those already addicted to cigarettes. Defendant also knew that JUUL's nicotine solution could

25   deliver more nicotine into the bloodstream than a cigarette, and did so more quickly than a

26   cigarette. Defendant was under a duty to disclose this material information based upon its

27   exclusive knowledge of it, and its concealment of it; and Defendant never disclosed the Defect to

28

Plaintiff or the public at any time or place or in any manner.

**B.** **JUUL Has Deceptively Marketed Its JUUL E-Cigarette as an Alternative to Cigarettes, When It is More Potent and More Addictive Than Cigarettes.**

    **1.** **JUUL Falsely Represents that Each JUULpod Contains the Nicotine Equivalent of a Pack of Cigarettes, when They Actually Deliver a Particularly Potent Dose of Nicotine.**

59. JUUL repeatedly represented that a single JUULpod contains an amount of nicotine equivalent to about a pack of cigarettes. For example, some JUUL advertisements and JUUL's website currently provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." This falsehood is recast in JUUL advertisements, and on JUUL's website, into the claim that a JUUL delivers about as much nicotine as a cigarette.

60. This statement is false and seriously misleading because, as JUUL knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Defendant knows that benzoic acid affects pH and "absorption of nicotine across biological membranes."[24]

61. Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod. If, as JUUL claims, this is equivalent to one pack of cigarette (or 20 cigarettes), that implies 2 mg of nicotine per cigarette. JUUL's equivalency claim further assumes 10 puffs per cigarette (i.e., 200 puff per pack), or 0.2 mg (200 µg) of nicotine per puff.

62. Typically, a cigarette that delivers around one milligram of nicotine in smoke retains "about 14-20 milligrams of nicotine in the unsmoked rod," *USA v. Philip Morris*, p. 597, for an overall delivery of 5-7% of the cigarette's actual nicotine content. A study by the Center for Disease Control found that in "commercial cigarette brands, nicotine concentrations ranged

---

[24] Neil L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Handbook of Experimental Pharmacology 1982: 29-60 (Oct. 13, 2010), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

from 16.2 to 26.3 mg nicotine/g tobacco (mean 19.2 mg/g; median 19.4 mg/g)." [25] Assuming an average of 19 milligrams of nicotine per cigarette, an average pack of cigarettes contains 380 milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each JUULpod. Yet the average pack would be expected to deliver only 5-7% (19-27 mg) of its nicotine content to the user. In line with this expectation, a study of thousands of smokers found smokers intaking between 1.07 to 1.39 milligrams per cigarette (21.4-27.8 mg per pack). [26] This is less than half of the amount of nicotine contained in a JUULpod (i.e., 2 mg per "cigarette" based on JUUL's stated concentration, or 200 μg per puff assuming 100% delivery). Even with the slightly lower efficiency of delivery demonstrated in studies like Reilly (about 82%, for averages of 164 μg per puff), this amounts to a substantially higher amount of nicotine that a human will absorb from a JUULpod than from smoking a pack of cigarettes.

63.     JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the amount of nicotine *contained* in the JUULpod is perhaps six times less than in a pack of cigarettes, but actual amount of nicotine *consumed* via JUULpod is as much as twice as high as that via cigarettes.

64.     Further, while a pack of cigarettes contains 20 cigarettes which each have to be separately lit, the JUUL can be inhaled continuously, and often can be used indoors without detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks. Thus, the device design leads users to intake far more nicotine than would occur with cigarettes.

65.     The above data indicate that each JUULpod delivers significantly more nicotine than a pack of cigarettes, both per pack and per puff. JUUL's products thus have the foreseeable effect of luring youth, who like a strong nicotine "kick," and exacerbating nicotine addiction and

---

[25] Tameka Lawler et al., *Surveillance of Nicotine and pH in Cigarette and Cigar Filler*, 3 (Supp. 1) Tob. Regul. Sci., 101-116 (Apr. 2017).
[26] Martin J. Jarvis et al., *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI: Journal of the National Cancer Institute, Volume 93, Issue 2, 17 January 2001, Pages 134–138.

other adverse health effects associated with nicotine consumption when compared to cigarettes.

**2.    JUUL Intends to Continue to Deceive Consumers As to Nicotine Content.**

66.     From JUUL's pre-release announcements to this day, JUUL has continuously represented that each pod contains as much nicotine as a pack of cigarettes. These claims, which JUUL repeats widely in advertisements, press releases, and its web site, have been echoed by reputable and widely reliable sources. See https://truthinitiative.org/news/6-important-facts-about-juul, https://www.businessinsider.com/juul-e-cigarettes-are-taking-over-high-schools-2018-3; https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/?utm_term=.56732db226e8; https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts.

67.     Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUULpods away from children and pets, but contained no warnings specifically about the known effects, or unknown long-term effects, of nicotine or vaping/inhaling nicotine salts. Many of JUUL's advertisements, particularly prior to November 2017, also lacked a nicotine warning.

68.     Furthermore, JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength.  As discussed above, JUULpods contain more than 5% nicotine by volume, and deliver it in a form that is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with industry standard of reporting concentration by volume, leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUULpods in fact contain slightly more nicotine than a solution that is 6% nicotine by volume.

69.     JUUL's "5% strength" statement misrepresents the most material feature of its

product—the nicotine content—and has misled consumers to their detriment. JUUL's "5% strength" statement has also confused resellers of JUULpods, who assume that "5% strength" means "50mg/mL" nicotine by volume. These resellers then compound confusion among by consumers by stating that JUULpods contain "50 mg/mL," which they do not.[27]

70. If JUUL did not know when it released JUULpods in 2015 that its "5% strength" representation was misleading, it quickly learned that there was widespread confusion about the pods' nicotine content. JUUL did nothing to stop or correct this confusion about the nicotine content of its JUULpods.

71. JUUL's "5% strength" statement is also misleading because JUULpods routinely contain more than even the 59 mg/mL JUUL claims on its website. At least two independent studies testing multiple varieties of JUULpods have found significantly higher concentrations of nicotine than JUUL's label represents.

---

[27] *See, e.g.* https://www.tracyvapors.com/collections/starter-kit/products/juul-starter-kit (JUUL is "manufactured with 50mg nicotine salts"); https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); https://ecigone.com/e-cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); https://westcoastvapesupply.com/products/juul-pods-cool-mint-4-pack ("50MG or 0.50%"); Vapor4Life, How Much Nicotine is In a JUUL? ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter)."), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/.

72.

### 3. JUUL's "Switch" campaign suggests that JUUL is a smoking cessation device and that JUUL use is a cost-effective alternative to smoking.

73.     The JUUL has not been approved as a smoking cessation therapy nor has it been approved as a modified risk tobacco product.

74.     Through the Switch campaign, JUUL urges smokers to switch to JUUL. Though the Switch advertisements do not say as much, the tacit message of the Switch campaign is "switch because, unlike cigarettes, JUUL is harmless to your health."

75.     The Switch campaign suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL will "switch" a smoker to a non-smoker.

76.     JUUL knows that a large number of smokers who use JUUL products do not end up switching but end up smoking *and* JUULing, worsening their preexisting addiction.

77.     JUUL has advertised cost-savings calculators as part of its switch campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine as he or she did as a smoker (i.e., a pack a day smoker is presumed to consume one JUULpod a day).  JUUL knows that its calculator is misleading because smokers who switch to JUUL typically increase their nicotine intake or end up consuming cigarettes and JUUL products, rendering JUUL's calculator misleading at best.

78. The Switch campaign does not disclose or warn about the risks of multiple tobacco product use or that the JUUL is not a smoking cessation product.

79. In addition to the heightened risks of addiction multiple tobacco product use poses, one recent study found that persons who use ENDS and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that ENDS and cigarettes generate individually.

**4. Defendant Falsely Markets, Advertises and Sells E-Cigarette "Autoship" Services as "Cancel Anytime" Service, Without Disclosing the Products' Highly Addictive Nature.**

80. Defendant intentionally misrepresents and omits information about the highly addictive nature of nicotine from the JUUL purchase process (and advertisements) because they know that consumers will have an impaired ability to cease using JUUL e-cigarettes and JUULpods once they are addicted, making their ability to "cancel anytime" illusory. Defendant never discloses to consumers that JUUL e-cigarettes and JUULpods are at least as addictive as if not more addictive than traditional cigarettes. Instead, Defendant markets the JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are less addictive than traditional cigarettes and safe to use.

81. JUUL also offers "Autoship" as a service that provide "pods at your door and savings in your pocket. 15% off every order. Cancel anytime."

82. The "Cancel anytime" representation is materially misleading. While it is true that consumers are not obligated to purchase additional JUULpods, there is no disclosure of the fact that use of the JUUL e-cigarettes and JUULpods is likely to result in nicotine addiction, thereby interfering with the user's ability to "cancel anytime."' Defendant, in fact, knows (and preys upon the fact) that once a consumer begins using JUUL products, they will become addicted to those products and continue to purchase them, often in increasing amounts in order to achieve the same "high" as their tolerance to nicotine increases.

83. The highly addictive nature of the JUUL products also means that the consumers of the JUUL products, including Plaintiffs and Class Members, will continued to suffer economic

injury far into the future, as they will have to keep buying additional JUUL products if they want to avoid the physically and mentally difficult effects of nicotine withdrawal. Defendant intends its products to "hook" its consumers, including children, into becoming long-term or life-long customers, which inures to Defendant's benefit.

84.     Although Defendant contends that it need not disclose these facts because the products are only designed for existing cigarette smokers, and that its products are purportedly safer than regular cigarettes, the contention is belied by Defendant's own knowledge, marketing plan and intentions, which is to grow a new group of consumers of nicotine products, not just to market to the shrinking number of existing cigarette smokers..

**C.     JUUL Deployed a Viral Marketing Campaign That Continued the Tobacco Industry's Long-Standing Campaign of Deceptive Advertising and Unfair Business Practices.**

85.     As described further below, Defendant has used the same strategies perfected by big tobacco to sell JUUL products to minors and young adults, to great success.  In particular, JUUL has both exploited regulatory loopholes and relied heavily on social media and other viral advertising tools to hook people, and in particular minors, on its addictive e-cigarettes.

86.     To accomplish this, JUUL adopted the same themes used by Philip Morris and other Big Tobacco companies in the cigarette industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

**1.     Overview of Viral Marketing Campaigns and Online Marketing**

87.     "Viral marketing" is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[28] Viral marketing is a form of word-of-mouth

---

[28] N. Deepa, *Viral Marketing as an On-Line Marketing Medium*, http://www.iosrjournals.org/iosr-jbm/papers/ncibppte-volume-2/1115.pdf; Datta, P.R., Chowdhury, D.N. & Chakraborty, B. R. (2005). "Viral Marketing: New form of word-of-mouth through Internet." *Business Review (Federal Reserve Bank of Philadelphia)*, 3(2), 75.

recommendation that harnesses the network effect of the internet to rapidly reach a large number of people. Because the goal in a viral marketing campaign is to turn customers into salespeople who repeat a company's representations on its behalf, a successful viral marketing campaign may look like millions of disconnected, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaign.

88.     Companies may use different media to transmit their viral messaging, but generally, all viral marketing campaigns tend to share similar features, including (1) a simple message—typically implied by an image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message.

89.     Typically, a viral marketing campaign will begin with a "push" by the company seeking to advertise the product, and since the advent of social media, that push is typically done through the creation of new content on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform ("Social Medial Platforms").[29] A company that wants to push an ad on Social Media Platforms has a few options available to it. First, the company can solicit followers to its social media pages, so that when the company posts to its feed, the content would be delivered to those followers and to those who visited the company page. Second, the company can purchase paid advertisements that were delivered to specified target audiences. Then, to amplify a message, companies can utilize other tools, such as paid influencers and strategic use of promotions and hashtags, to blanket the targeted demographic with advertisements across social media.

---

[29] By way of background, most Social Media Platforms work as follows: Any consumer, even those under age 18, can create an account, and then select other accounts to "follow." Consumers typically follow the accounts set up by their friends and families, celebrities and bloggers that interest them, and companies that sell products they like. Anyone with an account can create a post, i.e. put up information or a photo to share with their followers. Followers can engage with a post by "liking" it, posting a comment on it, or sharing it with their networks. When consumers log into a Social Media Platform, they see the information and photos that their followers shared, along with advertising. They can also visit the account page for any person or business on the Social Media Platform to see that accountholder's recent posts.

90.     Companies seeking to advertise new products or reach a new demographic have discovered the power of the "like" and "share" features on social media, which allow users to promote content to their own audiences. As Mark Zuckerberg, founder and Chief Executive Officer of Facebook explained: "Nothing influences people more than a recommendation from a trusted friend…A trusted referral is the Holy Grail of advertising." https://www.ft.com/content/01341240-8cbd-11dc-b887-0000779fd2ac (last accessed Dec. 13, 2018). *See also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1210 (N.D. Cal. 2014) ("One of the principal reasons such viral marketing is superior to other forms of marketing is the source: viral marketing comes from a friend or contact with whom the recipient is familiar and trusts as opposed to an unfamiliar or untrusted source.").

91.     With the advent of social media, viral marketing campaigns have become a particularly effective way to reach young people, particularly teenagers. Teenagers tend to use social media far more than adults, and tend to be more susceptible to peer pressure. 95% of teens report having use of a smart phone.  http://www.pewinternet.org/2018/05/31/teens-technology-appendix-a-detailed-tables/. 45% report being online "constantly." *Id.* 85% use YouTube. *Id.* 72% use Instagram, and 69% use Snapchat. *Id.* Adolescents also have a far stronger herding instinct than adults. The desire to fit in and look cool means that adolescents drive new trends online. As many businesses know, young people are often skeptical of traditional advertising and the tactics of large corporations. Thus, by pushing a viral marketing campaign, these businesses can reach consumers who might ignore typical advertising and are more likely to respond to an advertisement that does not look or feel like an advertisement, but instead is a message shared by a friend, a peer, or some other person influential to the viewer.

92.     Companies can also take viral messaging off-line. By running simple, catchy ads with minimal text and graphic visuals, and displaying those ads in various forms, companies generate buzz and discussion, which is reinforced through social media.

**2.     The Tobacco Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products.**

93.     To remain profitable, the tobacco industry must continue to woo new customers: some existing customers wean themselves from addiction and the others eventually die, so replacement customers are needed.  In recent years, tobacco usage in the United States has fallen dramatically, with particularly large decreases in the youth smoking rates, which tobacco companies have been vigorously trying to counteract.  The tobacco industry knows that the younger a person starts smoking, the longer they will have a customer. Historically, tobacco companies fought to increase share penetration among the 14-24 age group because "young smokers have been the critical factor in the growth" of tobacco companies, and "the 14-18 year old group is an increasing segment of the smoking population."[30] The importance of the youth market was illustrated in a 1974 presentation by RJR's Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume - for at least the next 25 years."[31]

94.     Though no single-source causative factor can describe the complex link between marketing and youth smoking, the overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation." *USA v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006). Because teenagers are at a stage in their psychosocial development when they are struggling to define their own identities, they are particularly vulnerable to image-heavy advertisements providing cues for the "right" way to look and behave amongst peers. *Id*. at 578. Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation. *Id.*, 570 and 590. By making smoking a signifier of a passage into adulthood, tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers. *Id.* at 1072

95.     The landmark *USA v. Philip Morris* case revealed that tobacco companies targeted

---

[30] http://legacy.library.ucsf.edu/tid/lve76b00 (last visited June 5, 2018)
[31] https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (last visited Apr. 25, 2018).

adolescents for decades by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers." No. 99-cv-2396, ECF 5732, ¶ 2682 (D.D.C. 2008). In terms of images and themes that cater to adolescents, the court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool.'" *Id,* ¶ 2674.

96. Thus, the industry has long used viral marketing campaigns to push its products on children, teens, and young adults. Prior to the advent of the Internet, tobacco companies engaged in "viral advertising" or "influential seeding" by paying "cool people" to smoke in select bars and clubs, with the "idea being that people will copy this fashion, which would then spread as if by infection." *Golden Holocaust*, 119 (citing Ted Bates and Co., *Copy of a Study of Cigarette Advertising Made by J.W. Burgard; 1953*, (Lorillard), n.d., Bates 04238374-8433. By simply paying some attractive, stylish third parties to use the product in trendy public places, tobacco companies were able to create buzz and intrigue. As word spread, the public would develop a strong association in people's minds that smoking was what young, cool adults were doing.

97. Today, cigarette manufacturers like Altria are limited in their ability to advertise in the United States, but actively use viral marketing techniques outside of the United States. For example, Japan Tobacco International, one of JUUL's early investors, launched social media campaigns including a "Freedom Music Festival" promoting Winston cigarettes in Kazakhstan, Kyrgyzstan, and Jordan. Similarly, Phillip Morris International, a spin-off of Altria, JUUL's largest stakeholder, has used influencer campaigns in multiple countries. A campaign in Indonesia called "I Decide To" has been viewed more than 47 million times online. A hashtag marketing campaign called #NightHunters in Uruguay used paid influencers to pose with menthol cigarettes and was seen by nearly ten percent of Uruguay's population.

98. An influencer paid to promote Philip Morris brands stated that Philip Morris targets a "super young profile" for its influencers . . . . the people they selected are always the

youngest. They look for young people that have large groups of friends so [the social media promotional message] gets expanded more and more." *Id*. Another influencer allegedly stated that "we had a training session with the person of charge of marketing in Marlboro, she talked to us about how difficult it was for them to advertise due to all the laws in place. She also talked to us about . . . [linking] the brand to certain colors or situations." *Id*. (brackets in original).

99. A study carried out by the campaign for tobacco-free kids, reported that "tobacco companies are secretly paying social media stars to flood your newsfeed with images of their cigarette brands." *Id*. In a nutshell, "young social media stars are paid to make smoking look cool." *Id*. A gallery of influencer posts is available at:

https://www.takeapart.org/wheretheressmoke/gallery/.

100. Similarly, in 1988 the R.J. Reynolds Tobacco Company introduced the infamous Joe Camel cartoon campaign, which faced instant criticism due to how appealing the cartoon animal was to children and teens. Joe Camel was drawn as sleek, metropolitan figure, typically wearing sunglasses or a tuxedo, or was depicted driving convertibles, gambling, or playing pool. The ads often used the phrase "Smooth Character," which to teenagers, meant he had a slick, cool personality. That in turn led to an association between smoking and coolness in the minds of young people. To ensure that message stuck, R.J. Reynolds put up billboards featuring Joe Camel near schools, and printed Joe Camel shirts, hats, and other paraphernalia, ensuring the campaign would be carried far and wide, and that kids would constantly be exposed to it. Only three years after the campaign began, in 1991, the Journal of the American Medical Association published a study showing that by age six nearly as many children could correctly respond that "Joe Camel" was associated with cigarettes as could respond that the Disney Channel logo was associated with Mickey Mouse, and it alleged that the "Joe Camel" campaign was targeting children, despite R. J. Reynolds' claim (similar to the claim of Defendants here) that the campaign was directed only to adults who were already smokers of other brands. Paul M. Fischer, MD, et al, Brand Logo Recognition by Children Aged 3 to 6 Years, Journal of the American Medical Association, Dec. 11, 1991. At that time researchers estimated that 32.8% of all cigarettes sold illegally to underage buyers were Camels. DiFranza JR, et al., RJR Nabisco's cartoon camel promotes camel cigarettes

to children. Journal of the American Medical Association, Dec. 11, 1991. (The JUULs represent an even higher percentage of all cigarettes and e-cigarettes sold to minors.) The Joe Camel campaign ended under the pressure of an impending civil trial brought by the City Attorney in San Francisco, Congressional investigation, and public pressure. See https://en.wikipedia.org/wiki/Joe_Camel#cite_note-8 (last visited Apr. 25, 2018).

101.    Tobacco companies have also known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson internal memorandum titled "Youth Cigarette – New Concepts," observed that "it's a well known fact that teenagers like sweet products." A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth. A 2004 study found that 17-year-old smokers were more than three times as likely as those over the age of 25 to smoke flavored cigarettes, *and they viewed flavored cigarettes as safer.* Tobacco companies also used advertisements that paired cigarettes with foods, to make it seem like cigarettes were part of a healthy meal.

### 3.    Because of The Role of Advertising in Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors

102.    Most of the activities described in the section above are now recognized as against public policy, and thus forbidden for tobacco companies.

103.    Under the Tobacco Master Settlement Agreement ("MSA"), reached in 1998, participating manufacturers agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State." MSA, § III(a). They are also prohibited from

a.    using outdoor advertising such as billboards,

b.   sponsoring events,

c.   giving free samples,

d.   paying any person "to use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media," which includes "any motion picture, television show, theatrical production or other live performance," and any "commercial film or video,"[32]; and

e.   paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

104.   In 2009, the FDA banned flavored cigarettes pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009.  Then-FDA commissioner Dr. Margaret A. Hamburg announced the ban because "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[33]

105.   The Tobacco Control Act of 2009 also prohibited sales of cigarettes to minors, tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

106.   A study of the cigarette flavor ban in 2017 found that the flavor ban was effective in lowering the number of smokers and the amount smoked by smokers, but also was associated with an increased use of menthol cigarettes.[34]  The same study reported that 85% of adolescents who use e-cigarettes use flavored varieties.

4.   **JUUL's Marketing Leveraged Banned Strategies Perfected by Tobacco Companies to Induce Minors and Young Non-Smokers to Purchase JUUL Products**

107.   Following the successful model of its predecessors, since 2015, JUUL has been

---

[32] The MSA provides exceptions, but only for media that is educational, not for public display, or guaranteed to be limited to adult-only facilities.

[33] Gardiner Harris, New York Times, *Flavors Banned From Cigarettes to Deter Youths*, (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html (last visited Jan. 20, 2019).

[34] Charles J. Courtemanche, PhD, *Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use*, 52(5) Am J Prev Med. e139–e146 (May 2017).

operating a long term viral marketing campaign aimed at teenagers and young adults. This campaign extends and expands upon deceptive advertising tropes used by tobacco companies to exploit the psychological needs of consumers—especially youth—to convert them into smokers.

108.   JUUL's admitted reliance on tobacco industry documents is apparent in a collection of 82 JUUL advertisements compared to historical cigarette advertisements on Stanford's Research into Impact of Tobacco Advertising ("SRITA") website.  The side-by-side comparison of numerous JUUL advertisements shows that its imagery directly parallels that adopted by cigarette manufacturers, including imagery relating to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.  See Appendix C, Ads 9-50.

109.   Because of social media, JUUL has been able to operate an even more pervasive, insidious, and successful viral marketing campaign than its predecessors in this industry. As set forth below, JUUL developed and oversaw a long-term viral marketing campaign with the intent to convince minors to purchase its products. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

110.   JUUL carried this campaign out by (i) intentionally designing a campaign that was simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) utilizing third party influencers to amplify its message around the internet; (v) utilizing other social media tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within reach of youth. JUUL's advertisements consistently withheld material information about the dangers of the product. Through this long term advertising campaign, JUUL was able to persuade consumers, and in particular teenagers and young adults that its product was cool, while hiding from them the dangers associated with using the product. And because of the viral nature of JUUL's marketing, JUUL promotions continue to reach youth, despite JUUL's deactivation of its social media accounts.

### i. JUUL Advertising Used Imagery that Exploited the Psychological Vulnerabilities of Youth.

111.    Throughout the class period, JUUL ran a consistent, simple message on social media that communicated to people, and in particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (i.e., an idealized version of an adolescent's future self) while failing to adequately and conspicuously disclose the nature or risks of the products.

112.    In designing the campaign, JUUL knew that to increase the chances that content goes viral amongst the teen demographic, it needed to design a campaign that was simple, would generate an emotional response that would resonate with teenagers, and obscured the fact that the product was unsafe and addictive.

113.    To help it design these ads, JUUL relied on various social media marketing companies. In 2015, JUUL worked with Cult Collective, instructing Cult Collective to design an ad campaign that would catch fire and reach customers who had "heard it all before." At the time, JUUL was a young company, competing with big, established tobacco companies with large advertising budgets and high brand loyalty. The solution JUUL and Cult Collective reached was to position JUUL as a modern product that represented a better way of life for young people. That campaign was highly effective.

### ii. JUUL's Launch Campaign Was Targeted to Create Buzz Among Young Consumers.

114.    To announce the JUUL's release in June 2015, JUUL launched the "Vaporized" advertising campaign that was aimed at a youth audience.[35] The campaign used young, stylish models, bold colors, and memorable imagery. The models were often using hand gestures or poses that mimicked underaged teenagers. One such example appears in Appendix C, Advertisement 1.  JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products

---

[35] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, ADAGE (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (last visited June 5, 2018).


115.   The Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool." In other words, the Vaporized campaign targeted youth using the exact template established by Big Tobacco decades earlier.

116.   Often the Vaporized ads contained the phrase "Smoking Evolved," so that consumers, and in particular youth, would associate JUUL with high tech and the latest generation of cool products, like iPhones and MacBooks. (More examples of these ads appears in images 1, 3, 12, and 14 of Appendix C.)

117.   The color scheme chosen was similar to colors used by Natural Americans Spirit Cigarettes, a leading brand of cigarettes among teenagers. See Appendix C, Advertisements 15-18.

118.   Nowhere in the Vaporized ads did JUUL include any visible or prominent disclaimers about the dangers of nicotine described above.

119.   As the Cult Collective creative director explained, "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy *that aligned perfectly with those we knew would be our best customers*." Cult Creative JUUL case study. http://cultideas.com/case-study/juul (accessed September 21, 2018) (emphasis added).

120.   As part of the Vaporized campaign, JUUL advertised on a 12-panel display over Times Square. Appendix C, image 14. Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement reached between 46 states' attorneys general and tobacco companies, but JUUL took advantage of that agreement's failure to foresee the rise of vaping products to advertise its nicotine products in a manner that had already been deemed against public policy for other nicotine products.

121.   To ensure that its message would spread, JUUL utilized several other tools to put its product in front of young people. First, it ran the Vaporized campaign in the front spread of Vice magazine's cover issue. Notably, Vice bills itself as the "#1 youth media brand" in the

world[36] and is known for running edgy content that appeal to youth. JUUL also implemented a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers. Again, this is an activity which would have been prohibited by law for a cigarette company on the ground that it was against public policy.

122.    JUUL's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product." Declan Harty, AdAge, JUUL Hopes to Reinvent Cigarette Ads with 'Vaporized' Campaign, (June 23, 2015), https://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (last accessed Jan. 24, 2018). This reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously cigarette smokers to purchase JUUL products, to make the use of JUUL appear fun and without long-term negative consequences, to position the JUUL e-cigarette as the e-cigarette of choice for young adults, and to introduce youth to the "illicit pleasure" of using the JUUL products.

123.    Images from JUUL's Vaporized campaign are attached hereto in Appendix C, and additional images and videos are available at the following link: https://inrejuul.myportfolio.com (also available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php) (last accessed January 25, 2019).

124.    JUUL promoted the Vaporized campaign on Facebook, Instagram, and Twitter. The Vaporized campaign included the largest ENDS smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year and generated over 400 unique promotions.

125.    JUUL also sponsored at least 25 live social events for its products in California, Florida, New York and Nevada. As pictured in Appendix C, Advertisements 78-81, the invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers,

---

[36] https://upload-assets.vice.com/files/2016/01/15/1452894236compressed.pdf.

contained nicotine or was addictive. Instead, the invitations traded on PAX's reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties. Photographs from these events indicate that they drew a youthful crowd. Use of sponsored events was a long-standing practice for tobacco companies, but is now forbidden.

126. John Schachter, director of state communications for Campaign for Tobacco-Free Kids, expressed "concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Mr. Schachter said "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships and various flavors."

127. To the extent that the Vaporized advertisements disclosed that JUUL products contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, if the same ads had been touting cigarettes, they would have been required to display a health warning in high contrast black and white in a box comprising 30% of the image.

### iii. JUUL Gave Away Free Products to Get New Consumers Hooked

128. JUUL distributed free starter packs at the live social events described above in paragraph 125—conduct forbidden for a tobacco company under the Tobacco Master Settlement Agreement due to its role in fostering cigarette and nicotine addiction. BeCore, one of the firms responsible for designing and implementing JUUL's live events reported that "on average, BeCore exceeded the sampling goals set by JUUL . . . average number of samples/event distributed equals 5,000+." (emphasis added). At these events, BeCore distributed the appropriately-named JUUL "Starter Kits," which contain a JUUL and 4 JUULpods of varying flavors. If BeCore indeed gave away 5,000 Starter Kits per event, JUUL effectively distributed the nicotine equivalent of 20,000 packs of cigarettes at each of the 25 events described above--or the equivalent of 500,000 packs of cigarettes at all 25 events.

129. Though JUUL publicly acknowledged in October 2017 that it is unlawful to

distribute free samples of its products at live events, JUUL continued to do so, sometimes through $1 "demo events." Notably, promotions of this kind are prohibited for tobacco companies by the MSA.

130. The effect—and purpose—of JUUL's Vaporized giveaways was to flood major cities with free product which by its addictive nature would hook tens or hundreds of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media. Similar campaigns have long been used by drug cartels. This campaign unconscionably flooded cities with free samples of an addictive product, with distribution focusing on the youth market. As a foreseeable result, JUUL products ended up in the hands of non-smokers and youth, who used the products and became addicted to nicotine.

### iv. JUUL Portrayed Its Products as Status Symbols.

131. As tobacco companies have long known, young people—and adolescents in particular—find security and a sense of identity in status symbols. Even after the "Vaporized" campaign, JUUL's later advertisements mimicked the look and feel of the "Vaporized" ads to foster the image of JUUL e-cigarettes and JUULpods as sleek, stylish, status symbol. For example, JUUL developed and ran a series of advertisements that were simple images of stylish young people using JUUL: See Appendix C, Advertisement 2.

132. More examples are featured in Appendix C, Advertisements 7, 8, 12, 20, 36, 38, 42, 44, 48. All of these ads communicated to teenagers that JUUL was a product being used by cool, modern young people, which JUUL, like all tobacco companies, knows is a powerful message. None of these ads prominently disclosed the dangers of using JUUL.

133. Other JUUL advertisements relied on graphic images with the look and feel of advertisements by Apple, Google, and similar tech companies with progressive and modern reputations. See Appendix C, Advertisement 3.

134. More examples are featured in Appendix C, Advertisements 4, 9, 28. Again, these ads resonated with teenagers as well, as they made JUUL, and especially the flavored pods, look

like cool gadgets or software, something akin to an iPhone or a hot new app to download. Like the other ads, none prominently disclosed the dangers of using JUUL.

135.    JUUL also consistently compared the JUUL to the iPhone through statements like "the iPhone of e-cigarettes," which JUUL posted on its website, distributed through social media, and disseminated through its email campaign.  The iPhone is the most popular smartphone among adolescents, with 82% of teenagers preferring Apple's phone over the competition.  JUUL's advertising images frequently include pictures of iPhones and other Apple devices, including iPads, Beats Headphones, MacBook laptops. Through these images, JUUL presented its image a "must have" technology product and status symbol, instead of a nicotine delivery system.  See Appendix C, Advertisement 51.

136.    Beyond triggering an emotional response in teenagers, all of JUUL's social media advertising had three additional things in common. First, through the use of clean lines, artistic arrangements, minimal text, and eye-catching graphics, JUUL ensured that the advertisements would jump out to distracted teenagers who scrolled crowded social media pages on their phones and browsers.

137.    Second, all of JUUL's advertisements reflect an understanding that social media users in general, and teenagers in particular, do not typically read long blocks of text on social media, and rely more heavily on imagery instead of text to convey a message. As shown in Appendix C, many of the ads did not include any warning about the dangers of JUUL or suggest to teenagers that the product contained nicotine.

138.    Moreover, where JUUL's advertisements appeared to contain such a disclaimer, this disclaimer was not typically seen when viewing social media due to the way the posts appear in phones and browsers. In particular, Facebook and Instagram typically only present to users the image and a couple lines of text, and viewers who want to see the entire post must click on it to open it up and read the rest.  See, e.g., Appendix C, Advertisement 3.

139.    JUUL's Instagram advertisements obscure those nicotine warnings by placing them in a location that requires the user to open up the post and read it. As can be seen in JUUL's Instagram ads, the company consistently used brief text at the beginning of a post so that it would

appear to be a complete sentence with no further content. (see, e.g., Appendix C, Advertisements 59; https://inrejuul.myportfolio.com/instagram). Thus, the disclaimer was never visible to anyone viewing the posts in their main feed, and it was only seen by a limited number of people who elected to open the post and then read what was there.  Notably, on Twitter, a Social Media Platform that is geared towards reading text, and on Facebook, where some users do read text, JUUL typically did not include the disclaimer in its advertisements.  *See, e.g.*, Appendix C, Advertisement 65; https://inrejuul.myportfolio.com/twitter-1.

140.    Third, JUUL's advertisements were typically creative, giving them the look and feel of "art."  Thus, teenagers were drawn to the advertisements, holding their gaze on the ads for longer periods of time, and being more inclined to share the advertisement with others in their networks, thus accomplishing JUUL's goal: turning consumers into salespeople.

141.    Even JUUL's newer "alternative for adult smokers" tagline suggests to adolescents that JUUL-use is a symbol of status as an adult, which happens to be an advertising theme cigarette companies peddled to youth for decades.

### v.    JUUL Used Flavors and Food Imagery to Attract Non-Smoking Teenagers and Adults

142.    JUUL sells its JUULpods in a variety of sweetened flavors.  It even advertised some of its flavors as though they were desserts in themselves.  For example, it advertised its crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon."  JUUL used imagery that looked like ads for a trendy coffee shop or restaurant, such as the one at Appendix C, Advertisement 4.

143.    More examples appear at Advertisements 22, 24, and 32 of Appendix C.  Again, none of these advertisements prominently disclosed that JUUL was addictive and unsafe.

144.    The tobacco industry has long known that sweetened cigarettes attracted young smokers. As discussed above, the FDA banned flavored cigarettes for that reason.

145.    The use of flavors that appeal to youth has a marked effect on e-cigarette adoption by underage "vapers." A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that

85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like." See Ambrose, BK, et al., "Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014," Journal of the American Medical Association, published online October 26, 2015. Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their nonvaping peers, a new study has found." Primack, B.A., et al., "Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults," Volume 131, Issue 4, Pages 443.e1–443.e9, available at https://www.amjmed.com/article/S0002-9343(17)31185-3/fulltext (last visited April 26, 2017).

146.    Research also shows that when youth see flavored ENDS liquids advertisements, they believe the advertisements and products are intended for them.  *See e.g.,* McKelvey K et al., *Youth say ads for flavored e-liquids are for them*, Addict Behav. 2018 Aug 29. pii: S0306-4603(18)30957-2. doi: 10.1016/j.addbeh.2018.08.029.

147.    The use of attractive flavors foreseeably increases the risk of nicotine addiction, as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction. See https://www.ncbi.nlm.nih. gov/books/NBK53018/#ch4.s92.  Worse still, adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was tobacco-flavored.

148.    JUUL's kid-friendly flavors included Mango, "Cool" Mint, and Menthol. 74% of youth surveyed in a recent study indicated that their first use of a JUUL was of a flavored pod. Karma McKelvey, PhD; Mike Baiocchi, PhD; Bonnie Halpern-Felsher, PhD, *Adolescents and young adults use in perceptions of pod-based electronics cigarettes.* More than half of teens in a nationwide survey by the Wall Street Journal stated that they use ENDS because they like the flavors.

149.    In 2017, JUUL released what are now the two most popular flavors among youth: Mango and "Cool" Mint ("Cool Mint").  JUUL then promoted those flavors on Instagram,

Twitter, YouTube and Facebook—all of which are skewed toward young audiences.

150. JUUL's Mango pods quickly became the runaway favorite among youth. The Mango pods are so popular that, incredibly, they noticeably increased the use of the word "mango" on the internet as a whole. Starting in early 2017, Google Trends reports a nearly five percent increase in year-over-year use of the word "mango" online.
https://trends.google.com/trends/explore?date=2014-06-01%202018-12-05&geo=US&q=mango.

151. "Cool" Mint became youths' second youth favorite flavor. The 2018 Duell Study found 94 mg/mL nicotine in a JUUL "Cool" Mint pod – nearly double the amount on JUUL's "5% strength" label would suggest. In addition to its nicotine content, the "Cool" Mint pods pose additional risks. The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette smoke." Stephen Proctor, *Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition*, 500. Mint could also "facilitate deeper and more prolonged inhalation," resulting in "greater smoke intake per cigarette." *Id*. 500-501.

152. JUUL's advertising emphasized the flavors of its sweetened nicotine pods. Leveraging the flavors, JUUL advertised JUULpods as part of a meal, to be paired with other foods. In late 2015, JUUL began a food-based advertising campaign called "Save Room for JUUL." A play on the expression "save room for dessert," JUUL's campaign focused on the JUULpods' sweet flavors, and pairing them with foods. JUUL described its crème brulee nicotine pods as "the perfect evening treat," using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." In one 2016 email, JUUL bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee." JUUL similarly promoted the Fruit Medley pods using images of ripe berries. JUUL described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint," and in a Facebook advertisement dated July 10, 2017, JUUL urged customers to "start your week with cool mint juulpods." https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/recEYkrXbuSCdZB0h. Along

with the bright green caps of the "Cool" Mint JUULpods, the Facebook ad included an image of a latte and an iPad. *Id.*

153.    JUUL even hired celebrity chefs to provide pairing suggestions for JUUL flavors. See Appendix C, Advertisement 5. On Instagram and Twitter, JUUL boasted about "featured chef" Bobby Hellen creating a "seasonal recipe to pair with our bruule pod."  On Facebook, JUUL posted a link to an article on porhomme.com about "what our featured chefs created to pair with our pod flavors." Facebook_10, https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/rec0vT9owbjQeVUuY.  JUUL tweeted repeatedly about its flavors and encouraged its social media followers to share their preferred pairings.

154.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.  See Appendix C, Advertisements 4, 24, and 53.  JUUL's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee. But unlike coffee, which can create a "mild physical dependence" but is not addictive, JUUL use can cause compulsive behaviors as well as physical withdrawal symptoms.

155.    JUUL's use of flavors unfairly targeted not only youth, but unsuspecting adults as well.  By positioning JUULpods as a delicious treat rather than a system for delivering a highly addictive drug, JUUL unfairly led consumers to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

156.    By modeling its nicotine pods' flavor profiles on sweets, naming its nicotine pods after those sweets, and using images of the sweets in JUULpod advertisements, JUUL conditioned viewers of its advertisements to associate JUUL with those foods. Through this conditioning process, Defendant sought to link the sight or mention of JUUL products to mental images of the fruits and desserts in JUUL's advertising, which would in turn trigger food-based physiological arousal including increased salivation and heart rate. These physiological responses, in turn, would make JUUL use appealing for reasons relating to flavor—and not

1  switching from smoking—while simultaneously clouding viewers' ability to assess the risks of JUUL's flavored pods.

2  157.    At least as early as 2017, JUUL knew without any question that the foreseeable

3  risks posed by fruit and candy-flavored e-liquids had materialized. A significant fraction of

4  JUUL's customers included adolescents who overwhelmingly preferred Fruit Medley and Crème

5  Brulee over Tobacco or Menthol. *See* Truth Initiative, *JUUL fails to remove all of youth's*

6  *favorite flavors from stores*, (Nov. 15, 2018), available at: https://truthinitiative.org/news/juul-

7  fails-remove-all-youths-favorite-flavors-stores (last visited Jan. 23, 2018). Instead of taking

8  corrective action or withdrawing the sweet flavors, JUUL capitalized on youth enthusiasm for its

9  products.

10  158.    JUUL disingenuously asserts that it did not intend its flavors to appeal to underage

11  consumers.  After 11 senators sent a letter to JUUL questioning its marketing approach and kid-

12  friendly e-cigarette flavors like Fruit Medley, Creme Brulee and Mango, JUUL visited Capitol

13  Hill and told senators that it never intended its products to appeal to kids and did not realize they

14  were using the products, according to a staffer for Sen. Dick Durbin (D-Ill.).  JUUL's statements

15  to Congress—which parallel similar protests of innocence by tobacco company executives—were

16  false.

17  159.    In November 2018, in response to litigation such as this one and other mounting

18  public pressures, JUUL announced that it had "stopped accepting retail orders" for many of its

19  flavored JUULpods, such as mango, crème brulee, and cucumber.[37] But JUUL's promise is

20  misleading. JUUL has only refused to sell them directly to retailers, but it still manufactures and

21  sells the JUULpods. The pods can be purchased on its website, and JUUL still sells them in retail

22  shops in Canada.  JUUL also continues to sell "Cool" Mint in gas stations knowing that the flavor

23  is incredibly popular with youth and will become the de facto favorite if access to other flavors is

24  removed.

25  160.    While JUUL maintains that it has strict age verification procedures on its website

26

27  [37] https://newsroom.juul.com/2018/11/13/juul-labs-action-plan/ (last accessed January 17, 2019).

28

and limits purchases to users who are 21 and older, *it continues to permit consumers to purchase up to 60 flavored JUULpods every month*, which is, at a minimum, the equivalent of sixty packages of cigarettes, and likely much more. JUUL knows that its JUULpods are likely to make their ways into the hands of teenagers, either through entrepreneurial young people purchasing the JUULpods and in excess and re-selling them, or from the JUULpods making their way into the United States from Canada.

161.     The only solution to prevent flavored JUULpods from getting into the hands of children is to stop manufacturing them.

### vi.     JUUL Developed Point-of-Sale Advertising That Emphasized the Products' Positive Image Without Adequately Disclosing Its Nature and Risks.

162.     The tobacco industry spends $8.6 billion a year in point-of-sale ("POS") promotions—or almost $990,000 every hour. See https://truthinitiative.org/sites/default/files/Point-of- Sale-2017_0.pdf, 2. In a 2009 study of adult daily smokers, unintended cigarette purchases were made by 22 percent of study participants, and POS displays caused nearly four times as many unplanned purchases as planned purchases. *Id*. at 4.  Younger smokers, in particular, are more likely to make unplanned tobacco purchases in the presence of POS advertising. *Id*.

163.     Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to POS tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed. Frequent exposure to tobacco product advertising and marketing at retail normalizes tobacco and smoking for youth over time and makes them more likely to smoke.  POS marketing is also associated with youth brand preference. Research shows that young adult smokers prefer the tobacco brands marketed most heavily in the convenience store closest to their schools.

164.     Before its launch in 2015, JUUL and Cult Collective developed innovative packaging and creative in-store displays that would carry their message through into stores.  In

particular, they designed bright, white packages. The packaging looked similar to iPhone
packaging, which JUUL knew would resonate with young people, and because it was solid white,
the packaging stood out and caught people's eyes when displayed in store shelves. This
packaging buttresses Defendant's online marketing of JUUL e-cigarette as "the i-Phone of E-
cigs," thereby framing them as a cool, fashionable item to own and use. JUUL posters and signs
at the point of sale also promoted JUUL's flavors.

165.  From 2015 through late 2018, JUUL promoted JUUL products and JUUL flavors
at the point of sale without disclosing that the products contained nicotine or warning that the
products could lead to addiction. Instead, JUUL's promotions displayed the colorful JUULpod
caps and their food-based names while omitting the most material feature of the JUUL – that it
delivers nicotine.

166.  For many, JUUL's POS materials provided an introduction to the brand. Because
JUUL's POS materials omitted the most material features of JUUL's product—that it is an
addictive nicotine delivery system—adolescents who saw JUUL's POS and were later offered a
JUUL would have no reason to think that what they were being offered JUUL contained nicotine
or posed risks of addiction.

**5.  JUUL Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products**

167.  JUUL not only designed its advertising with an eye to what might be appealing to
young people but set about disseminating those ads to ensure that young people see them. JUUL
set out to advertise on at least three major Social Media Platforms: Instagram, Facebook, and
Twitter, and disseminated the information in various ways across the platforms.

168.  On information and belief, JUUL maintains active accounts on most social media
platforms, including Instagram, Facebook, and Twitter, where JUUL tweeted nearly 5,000 times
in 2017 alone. As of 2016, 76 percent of American teens age 13-17 used Instagram, 66 percent of
teens use Facebook, and 44 percent of teens use Twitter.[38] While JUUL continues to maintain its

[38] http://apnorc.org/projects/Pages/HTML%20Reports/instagram-and-snapchat-are-most-popular-social-networks-for-teens.aspx

Twitter page, it deleted nearly all content from its Instagram and Facebook pages around November of 2018, in response to this lawsuit.

169.    JUUL was able to deliver content directly on social media using two approaches. First, it could post its advertisements, such as those in Appendix C, directly to its own page, where it would be viewed by those who followed JUUL, and those who shared its posts ("Unpaid Advertising"). And it could engage in paid advertising, whereby it could target specific demographics of people to ensure they received its advertisements ("Paid Advertising").

170.    With respect to Unpaid Advertising, Instagram was the centerpiece of JUUL's teen-focused advertising blitz. Instagram is used overwhelmingly by teenagers. At least 72% of teenagers in the United States have an Instagram account, and at least 63% of teenagers between the ages of 13 and 17 use Instagram every day. See http://www.pewinternet.org/2018/05/ 31/teens-social-media-technology-2018/; https://blog.hootsuite.com/instagram-statistics/ (last accessed Dec. 17, 2018). While increasingly more adults are using Instagram, this has been a recent development, and as such, advertisers typically only use Instagram if they are interested in marketing to young people, especially teenagers.

171.    Because of the way Instagram delivers content, Instagram allowed for fast, effective delivery and sharing of its graphic, simple messages. Users would see these images simply by scrolling through their feeds.

172.    JUUL also disseminated Unpaid Advertising across social media through its use of hashtags. Hashtags are simple phrases preceded by a #, and they operate as a way of cataloguing posts. Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks. On most social media platforms, users can find information by doing a search for a hashtag with that key word. Thus, people interested in JUUL, could enter into the search bar on most Social Media Platforms "#JUUL" to find posts that include that hashtag. Instagram takes it one step farther and allows users to set up their accounts so that posts with a certain hashtag are automatically delivered to their feed.

173.    JUUL's hashtag marketing played a central role in the viral spread of JUUL between teenagers. The use of hashtags in social media advertisements "can be used to get your

content in front of a bigger audience, raise awareness about your brand, target a very specific group of people, boost your SEO, and use hot trends and topics to your advantage." Olivia Ryan, Hashtag Marketing: How to Use Hashtags for Better Marketing Campaigns, https://mention.com/blog/hashtag-marketing-how-to-use-hashtags-for-better-marketing-campaigns/.  Hashtags are "the best weapon in your arsenal, aside from influencer marketing" for getting content "in front of its intended audience." *Id*. Through hashtag marketing, brands can join in on trending topics, engaging "an insane amount of readers" by using "hashtags which aren't closely related to your industry" by, e.g., using holiday-related hashtags. *Id*. By using "branded hashtags" that include the company's name or a specific product, advertisers can monitor the performance of specific campaigns. Another advantage of branded hashtags is user-generated content: "Every time a user puts one of your branded hashtags inside one of their posts, they are increasing your presence on social media" by promoting the branded hashtag, and the related content, to the user's followers. *Id*. (emphasis added). Through successful hashtag marketing campaign, brands can create communities through which "followers will not only be able to communicate via chat or messages, but also connect with each other by using your hashtag." *Id*. (emphasis in original).

174.    From 2015 through 2018, JUUL used hashtag marketing consistently on Twitter, Instagram, and Facebook to promote its products.  In various posts, JUUL would slip in hashtags so that their posts would be found by young people. For example: See Appendix C, Advertisement 6. This post is not a paid advertisement, but a post to JUUL's Instagram feed. JUUL used #TBT, which is an acronym for "Throwback Thursday." Throwback Thursday is a popular meme on social media, and teenagers are especially likely to understand it and use it. Thus, any teenager who had elected to follow the hashtag TBT would see this post when they logged into Instagram that day. Moreover, no one would see the warning regarding nicotine unless they actually opened the post. As can be seen in Appendix C, JUUL frequently used other hashtags that would be used by teenagers to push their product to them across social media, such as #icymi ("in case you missed it"). (JUUL's use of hashtags to turn customers into salespeople is discussed in more detail in section IV.C.5.)

175.     In disseminating Paid Advertising, the Social Media Platforms allow companies like JUUL to engage in micro-targeting, i.e., to select precisely what demographics of people should be exposed to its advertising. Social Media Platforms create internal profiles for the consumers that use them, tracking their online activity to determine their likes, habits, and purchasing power. When advertisers pay to disseminate ads, they can choose to target those ads so that they are received only by people whose digital footprint suggests an interest or predisposition to the product. JUUL would have had the option to exclude teenagers. It also could have elected to narrow its target audience to people with an interest in tobacco products, if it wanted to reach and convert non-smokers. Or it could target a broader audience of people whose digital footprints did not reveal that they were smokers.

176.     While JUUL's precise targeting methods are unknown, on information and belief, minors are known to have been exposed to JUUL's Paid Advertising while on social media, suggesting that JUUL did not narrow its target audience to adult smokers. The Plaintiffs in this matter have subpoenaed Facebook and Instagram for JUUL's demographic targeting information.

177.     Moreover, regardless of to whom JUUL targeted paid advertisements, JUUL's use of Paid Advertising was aggressive, and had the inevitable result of reaching teenagers. Paid advertising can be shared and liked just as Unpaid Advertising. JUUL relentlessly advertised to its targeted audience, across all Social Media Platforms. As described in more detail in Appendix A, many of the Plaintiffs in this matter saw the advertising on a near daily basis, regardless of what platform they used. The continual use of Paid Advertising increased the pressure to buy, and it made quitting harder due to the fact that those trying to quit were exposed to the advertising all day long unless they simultaneously chose to quit social media.

**i.     JUUL Paid Third Party Influencers and Affiliates to Amplify Its Message to a Teenage Audience.**

178.     To broaden the reach of its campaign, JUUL used "influencers" to push the product to young people. Influencers are "high-social net worth" individuals who have developed large social media followings – i.e., the "cool kids" of the social media world. People follow influencers because they tend to deliver lots of high quality, interesting photos and content, and

because they are known to be trend-setters.

179.     Viewed as tastemakers and trendsetters by their followers, influencers are prized sources of brand promotion on social media networks. Companies seeking to market products often will pay influencers to advertise their products, similar to the ways in which they utilize "product placement" in movies. They seek out influencers with large amounts of followers in their target demographic, and will offer these influencers money or other deals to promote their products. The influencer then will create various posts on social media using the product. Typically, these posts are images of them using the product, but sometimes these posts will include videos, longer written reviews, or other information about the product. Influencers often include in these posts company-endorsed hashtags or links to the company's website to try to direct their followers to learn more. The company gets the benefit of having word-of-mouth advertising, and the influencer is able to attract more followers because those followers want to stay in the loop about new products and deals. While influencers operate on all Social Media Platforms, most of them rely primarily on Instagram.

180.     JUUL relied on influencers to carry out its viral marketing campaign. JUUL's reliance on influencers appears to have begun around June 2015, when JUUL listed a position on its website for a three-month Influencer Marketing Intern. See https://www.internships.com /marketing/influencer-marketing-intern-i7391759 (accessed Nov 14, 2018). JUUL described the position as follows: "The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements. . . to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of - mouth and social media channels, etc." (Id.). JUUL's efforts to solicit influencers appears to have been underway for years; until December 2018, JUUL's website still called for individuals to "Join the JUUL influencers." Applicants were required to disclose their profile information for Instagram, Twitter, and Facebook, as well as various other blog and vlog platforms, suggesting that JUUL was interested in understanding whether the influencers could help JUUL reach its targeted youth demographic.

181.     JUUL's outreach had its desired impact, as it was able to line up influencers to

promote its products to teenagers, while spreading pictures of cool, young people using JUUL. For example, Christina Zayas (@christinazayas on Instagram) is a Brooklyn-based influencer with over 57,700 followers, many of whom are under 18. Under JUUL's direction, a marketing firm invited Zayas to join a JUUL campaign in September 2017, asking her to "try JUUL's premium e-cigarette and share your experience" with her many followers. (https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html). JUUL no doubt knew that Zayas could be a powerful advertiser for its brand; her Instagram feed and blog show reveal that she is a stylish young woman, who showcases fashionable clothing, makeup trends, and a hip urban lifestyle. Indeed, Zayas herself stated that her primary appeal to JUUL was that she attracted a younger market, in line with JUUL's previously aggressive targeting of underage individuals. And Zayas also lists herself as vegan, and includes "Spiritual Wellness" in her bio, and thus was a logical target for JUUL marketing teams looking to distance the company from the harms typically associated with smoking and convince young people that the product was safe. Zayas was paid $1,000 for one blog post and one Instagram post, seen here: See Appendix C, Advertisement 7. Zayas reported that she wanted to talk about her struggle with addiction in her JUUL-promoted posts but and was told to instead promote the positive characteristics of the JUUL.

182. Like JUUL's own advertising on its own site, the Instagram post did not contain any information about the safety of JUUL and worked to convince young people that using JUUL was a thing that cool, Brooklyn fashionistas were doing. The Instagram post would have been seen by many, if not all, of Zayas' 57,000 thousand followers, as well as by any users searching the hashtag "#JUULmoment." At least 1,509 people "liked" the post and 46 more commented on it. As Instagram provides a way for users to see posts that their friends engaged with, for each person who "liked" or commented on the post, the number of people who would see it increased exponentially.

183. JUUL also worked with Maggie Scenna (@maggiescenna on Instagram), a 2015 graduate of Boston University, and who works as a Senior Marketing Associate for Her Campus, an online community for women in college (https://www.hercampus.com/author/maggie-scenna).

While Scenna has only 1,805 Instagram followers, her young age and professional connection to a college age community means that a good deal of her followers are under 18. In October 2018, Scenna posted a picture of herself leisurely lying on Miami Beach holding a JUUL pod, with the tag line "sponsored by @juulvapor #juulmoment" as her tagline. See Appendix C, Advertisement 8.

184.    As Scenna admits her ad was sponsored by JUUL, JUUL or an affiliate of JUUL likely approached Scenna on or around the same time as Zayas, above, and offered to pay her for making such a post. And again, JUUL's work was successful.  Unsurprisingly, several of the users interacting with the above photo were underage at the time it was posted. While Scenna's photo garnered 233 likes and 9 comments, it would have been seen by many more of her followers, as well as many of the friends of those who engaged with the post.

185.    JUUL benefited from influencers on other Social Media Platforms as well. On information and belief, JUUL encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly— to hire affiliates and influencers to promote JUUL's brand and products ("Third Party JUUL Promoters"). Even if  not paid directly by JUUL, these Influencers profited from the promotion of JUUL products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-compatible products. JUUL knew of these third party promotional practices, and it monitored the specific JUUL promotions being distributed by these Third Party JUUL Promoters.

186.    For example, on YouTube, user Donnysmokes (Donny Karle, age 21) created a JUUL "unboxing" YouTube video in 2017, in which he opened up a box of JUUL products and described them for his audience, garnered roughly 52,000 views, many of which were from users under 18. (Jackler p. 12). Since that time, Karle has begun making a series of videos in which he tries various e-cigarette products, especially JUUL products. While Karle recently claimed that he that "knows for a fact that JUUL is way too cheap to pay what I charge for a review," Karle has admitted to earning approximately $1200 a month from unspecified sources simply from posting vaping videos, especially of JUUL products, online, suggesting that JUUL has, at a minimum, approached him, and may have at one point paid him, or that he is paid by third-party resellers of

JUUL products, to which resellers he regularly links in his posts.

https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month-vaping-on-youtube.

187.    Like the JUUL influencers described above, Karle is young and attractive, and uses teenage slang. He looks and sounds like a cool kid with whom teens would identify.  His latest video, as of December 18, 2018, features him smoking a JUUL "wax pod," and has 106,269 views. In the description of the video, Karle writes, "I got mad lit in this video and really enjoyed filming it, I hope you guys enjoyed watching it and seshing along!!! Btw these wax pods are fire." https://www.youtube.com/watch?v=kc8WvvbfgdQ (last accessed Dec, 20, 2018). Tens of thousands of teenagers are likely among the people who watched this video. It is no surprise why JUUL would seek to hire this person to influence even more people.

188.    DonnySmokes also created a number of JUUL videos on YouTube, including the JUUL Challenge, which is a play on the viral Ice Bucket Challenge. In the JUUL Challenge, the goal is to suck down as much nicotine as possible within a predetermined amount of time. The JUUL Challenge, which promotes nicotine abuse and adolescent use of JUUL products, like the Ice Bucket Challenge it mimicked, went viral. Soon, youth across the country were posting their own JUUL Challenge videos – a practice that continues to this day on YouTube, Instagram, Snapchat and other social media platforms. In one recent JUUL Challenge on YouTube, which has received nearly 500,000 views, the two teenagers filming themselves discuss the hundreds of thousands of views their prior JUUL Challenge received and comment upon the "virality" of their JUUL Challenge content. Nate420, *JUUL Challenge* (Apr. 22, 2018), https://youtu.be/gnM8hqW_2oo (last visited Dec. 13, 2018).

189.    Another popular YouTube Influencer, OG Nick, promotes JUUL on YouTube. The graphical component of many of his videos consists of recorded video gram footage, presumably so that the adolescent viewer can put on headphones and conceal the nature of content being consumed from adults within eyeshot. OG Nick maintains accounts on YouTube, Instagram and Snapchat. OG Nick's JUUL videos have generated well in excess of one million views.

190.    Collectively, OG Nick and DonnySmokes' JUUL-promoting videos and posts have generated millions of views, and the viral content their posts have spawned have almost certainly generated many millions of additional views. Even if not directly affiliated with JUUL, OG Nick and DonnySmokes are frequently sponsored by websites that sell JUUL products. DonnySmokes personal website also links to a webstore that sells JUULpods. JUUL thus profits not only from the brand awareness of Third Party JUUL Promoters like DonnySmokes and OG Nick, but also from JUUL sales generated directly through JUUL-selling retailers that sponsor these young influencers..

191.    JUUL knowingly accepted the benefits of these promotional activities, both in terms of brand awareness and in terms of sales generated through sponsored links on Third Party JUUL Promoters' advertisements. JUUL generated significant profits from the promotional activities of young Third Party JUUL Promoters like OG Nick and DonnySmokes. At no time did JUUL take independent action to remove the Third Party JUUL Promoters' unlawful advertising content or to discipline the JUUL-selling sponsors of Third Party JUUL Promoters. Only in response to FDA scrutiny in 2018 did JUUL take action to remove the unlawful JUUL promotions such as the JUUL Challenge. By that time, the viral content had spread, nullifying the effect of removing the original post.

192.    As discussed earlier in section IV.C.3 and in respect to affiliate and influencer ads, tobacco companies are prohibited from conducting any of the practices described above under the Tobacco Master Settlement Agreement.  Activities such as product placement in performances and professional videos have been identified as against public policy for nicotine products.

193.    To further spread its message, JUUL also offered to influencers and other bloggers on social media the option to make additional money by posting links to JUUL's website. JUUL used at least two companies to manage its affiliate marketing programs, Commission Junction and Impact Radius (the "Affiliate Services"). Under the terms of these programs, bloggers and influencers could receive payment if they referred individuals to JUUL's website, who in turn purchased the products. The programs had the effect of encouraging even more people to post and advertise about JUUL on the internet and social media, exposing even more teenagers to the

campaign.

194.    Each affiliate received a unique hyperlink to embed in the affiliate's promotions. The Affiliate Services also provided the affiliates with analytics services, sales tracking, and a bank of graphics, logos, and other promotional materials for use in affiliate promotions, including the Pax pharmacokinetic chart.  See Appendix B, Chart 4.  On information and belief, affiliates and other third party promoters used the Pax pharmacokinetic chart in online promotions of JUUL's product.

195.    In or around 2017, Impact Radius began managing JUUL's affiliate program.  The Impact Radius application indicated that JUUL "auto-approve[d]" applications.  The Impact Radius application did not ask the affiliate's age or require affiliates to confirm that they are at least 18 years old. JUUL actively courted would-be affiliates through its Twitter account, inviting nearly 20 individuals to join the program through public messages.

196.    JUUL's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter. JUUL's affiliates routinely failed to disclose or adequately disclose that the affiliate had a commercial relationship with JUUL and was being paid to promote JUUL products.

197.    Many of the apparently user-generated advertisements JUUL posted to its accounts pictured models or influencers being paid by JUUL without disclosure of the commercial relationship between JUUL and the model.

198.    Many of JUUL's model-driven posts, including an January 25, 2018 Instagram post (see Appendix C, Advertisement 52), encouraged users to share their own #JUULmoment in furtherance of JUUL's viral marketing campaign.

199.    These posts were misleadingly presented without disclosure of the payment to the party posting them.  By presenting JUUL advertisements featuring compensated models as unsolicited "#JUULmoment" posts, JUUL led its target audience to believe that JUUL use was more widely used than it was, that attractive, popular people used JUUL, and that these same attractive, popular people endorsed creating and posting JUUL-related social media content on Instagram and other platforms. JUUL also led consumers to believe these endorsements were

unsolicited, when they were in fact bought and paid for. To the extent that JUUL's affiliates and influencers disclosed that they were being paid, JUUL subverted these disclosures by reposting the images to JUUL's timeline without disclosing that the image was from a paid advertiser.

200. JUUL also used celebrities to promote JUUL use. In 2016, JUUL's social media accounts promoted multiple images of pop star Katy Perry with a JUUL. By including Perry's Twitter handle in its post, JUUL sought to introduce the JUUL, and Ms. Perry's apparent affinity for the JUUL, to Ms. Perry's 107,000,000 followers on Twitter, and to JUUL's followers on its social media accounts. Ms. Perry has a large youth audience.

201. In September 2018, Vapor Vanity posted that JUUL was canceling payments to vape reviewers. Vanity Vapor posted an email it had purportedly received from JUUL indicating that as of October 21, 2018 "JUUL Labs" affiliate program which is operated by Impact Radius and any other affiliate efforts will be on hold indefinitely until further notice." https://www.vaporvanity.com/juul-labs-cancels-payments-vape-reviewers-email-they-sent/.

202. While JUUL publicly announced that it was officially halting all social media activity in late 2018, it continued to call for applications for social media influencers for at least one month after its public cessation of internet advertising. It was not until a day or two after CNN published a negative news article about JUUL's advertising practices on December 15, 2018 that JUUL removed from its website its advertisement seeking influencers.

203. As discussed earlier in section IV.C.3, tobacco companies are prohibited from conducting any of the affiliate and influencer practices described above under the Tobacco Master Settlement Agreement. These activities have been identified as against public policy for nicotine products.

        **ii.**     **JUUL Utilized Viral Marketing Tools to Turn Consumers, Especially Teenagers, Into JUUL Promoters**

204. Another key feature of JUUL's viral marketing campaign is the way in which JUUL effectively turned its customers into salespeople, multiplying exponentially the number of teenagers it was able to influence.

205. Within a few months of the JUUL's commercial release in June 2015, a former

JUUL executive reportedly told the New York Times that JUUL "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."

206.    To drive consumer participation in its ad campaign, JUUL peppered its advertising and social media posts with hashtags, including those referencing JUUL and vaping (e.g. #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc.

207.    While JUUL typically used a few different hashtags in all of its posts on Instagram and Twitter, JUUL nearly always included #juul as one of those hashtags. JUUL also encouraged or instructed its influencers and those in its affiliate program to use the #juul hashtag when posting about JUUL. Thus, by consistently using that hashtag in all parts of its viral marketing campaign, JUUL not only branded its posts, but invited its consumers to do the same.

208.    One prominent campaign promoted by JUUL from 2015 through 2018, #JUULmoment, featured what facially appeared to be user-generated content relating to JUUL products and invited users to generate their own content. Many of these social media posts were actually placed by models and/or influencers acting at JUUL's behest, including the January 25, 2018 Instagram post above. See Appendix C, Advertisement 52.

209.    By inviting the creation of user-generated content related to JUUL's age restricted product, JUUL invited the indiscriminate promotion of its ENDS on youth-filled social media platform. An 18-year-old who posted a #JUULmoment, for example, would likely have followers who were under the legal age to purchase tobacco products, resulting in the sharing of a #JUULmoment—and the promotion of JUUL—to minors.

210.    JUUL created hashtag marketing campaigns for each nicotine flavor it sells. For example, in 2017, JUUL launched its Mango nicotine pods and its "Make it a Mango Monday" campaign, which JUUL promoted with "#MangoMonday." That same year, JUUL launched a #coolmint hashtag campaign for JUUL's "Cool" Mint pods.

211.    JUUL's plan worked. JUUL users began taking photos of themselves using JUUL and putting them on social media, with the hashtag #juul. As JUUL intended by designing this

viral campaign, their customers turned themselves into salespeople. They were creating JUUL ads that looked and felt like real JUUL ads; they featured young people having fun, and using JUUL. And they triggered the same emotional response that the JUUL ads and the JUUL influencer ads triggered; people saw their friends participating in a trendy activity and they became interested.

212.    For example, the flavor-based #MangoMonday and #coolmint campaigns generated hundreds of thousands of user-generated posts.  During the same period, Mango and Mint pods quickly became the most popular flavors among 12 to 17 year olds.

213.    Because JUUL was almost certainly monitoring the uses of its hashtags, JUUL would have seen the tens of thousands of posts being made by minors using things like #juul and #juulmoment since 2015. JUUL knew that kids were picking up on its campaign and mimicking it, and thus, advertising JUUL to their underage friends. But at no time however did JUUL take any serious steps to discourage the use of the JUUL hashtag by teenagers.

214.    Because JUUL is a trademark, JUUL could have stepped in and attempted to stop the use of its mark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL" with respect to such posts, and it could have shut down infringing accounts such as @doit4juul and @JUULgirls.  It did not do so.

215.    In a similar vein, Defendant used the #JUUL branded hashtag in a significant number of its hashtagged posts on Instagram and Twitter, leading #JUUL to become the most popular JUUL-related hashtag.  Though JUUL has stopped marketing on social media platforms, the #JUUL branded hashtag it launched continues to spread and be used by JUUL users on social media platforms. Today, the #JUUL hashtag spreads images of youth using JUULs and youth-oriented JUUL content and is used to promote sellers of JUUL products and JUUL accessories.

216.    JUUL also created a community called JUUL Talk for its customers. According to an email JUUL sent to Plaintiff Jack Roberts, who is 18 years old, JUUL Talk is "an exclusive insights community,"  and "any information or innovation shown is confidential (subject to the non-disclosure agreement) and not to be shared with others." When JUUL announced its "action plan" to cut back on youth sales of its products, it asked its JUUL Talk members, including Plaintiff Roberts, who was 18 at the time, to respond to a survey about "how some of these

changes may impact you."

### iii.    JUUL Used Non-Age-Restricted Emails to Promote and Track Its Products

217.    Between 2015 and 2018, JUUL sent around 200 email promotions to customers and potential customers. JUUL's email subscription list was not age-restricted and, until recently, users who failed the age verification requirements on JUUL's purchase page were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a Starter Kit.  The JUUL emails promoted retail locations, flavors, discounts, and "refer a smoker" programs.  The emails also promoted JUUL's find-a-store locator.

218.    JUUL also used emails to distribute surveys. Because JUUL's emails were not age-restricted, neither were their surveys.  On information and belief, JUUL thus collected data from minors.  JUUL paid customers, including youth, up to $30 to complete some surveys. ttps://www.reddit.com/r/juul/comments/8c7tzf/juul_30_visa_card_surveys/.

### iv.    JUUL Allowed Third Parties to Use Its Trademark to Promote the Products to Underage Consumers

219.    In 2017, an account named @JUULnation was established on Instagram. "JUULnation" includes Defendant's trademark "JUUL."

220.    @JUULnation's Instagram posts included tips on how to conceal JUUL devices in school supplies. The account also ridiculed efforts to combat JUUL use in schools, promoted videos of JUUL influencers, promoted videos glorifying drug-like behaviors with JUUL devices, including the JUUL Challenge (inhaling as much JUUL nicotine vapor as possible in a fixed period of time).  See Appendix C, Advertisement 54.

221.    @JUULnation also promoted the sale of JUULpods directly through Instagram.

222.    @JUULnation used a branded hashtag to promote its posts: "#JUULnation." Like the account name "JUULnation," this hashtag contains the JUUL trademark.

223.    Because Defendant closely monitored its own hashtags and hashtag marketing, Defendant knew that @JUULnation was promoting its hashtags. Defendant therefore also knew that @JUULnation was overtly promoting the unlawful purchase and use of JUUL products by

minors, and that a significant portion of @JUULnation's followers were under the legal age to purchase tobacco.

224. Instead of putting an end to JUULnation's youth-targeting activity, Defendant repeatedly promoted @JUULnation's hashtag, "#JUULnation," on Instagram in JUUL content.

225. For example, on August 4, 2017, JUUL included "#JUULnation" on a post promoting JUUL's Cool Mint pods.

226. On August 8, 2017, JUUL again promoted "#JUULnation" in a post highlighting the JUUL device's "party mode" lighting through the use of time-lapse photography.

227. A few days after these promotions, JUUL announced that it was increasing the age of purchase on its website to 21, consistent with its goal of helping adult smokers.

228. By promoting #JUULnation, JUUL effectively directed its followers to an entity that would continue to deliver youth marketing and youth access to JUULpods at a time when JUUL was being pressured to tone down its marketing and take steps to restrict youth sales.

229. @JUULnation and a handful of JUUL-promoting accounts generated under @JUULnation's control generated over 650,000 followers on Instagram, which @JUULnation-controlled accounts bombarded with content and images that unlawfully promoted the use of tobacco products by minors and promoted unlawful sales of JUUL products to minors, either through @JUULnation's account or other sites selling JUUL products and furthered JUUL's campaign of distorting and concealing the risks JUUL's products posed.

230. Although @JUULnation has been deleted from Instagram, the #JUULnation hashtag campaign continues to promote JUUL use, unlawful sales of JUULpods, and drug-like uses of JUUL products, as #JUULnation posts from January 20, 2019 demonstrate: See Appendix C, Advertisements 53-54.

231. Through its promotion of "#JUULnation" hashtag, Defendant ratified JUULnation's conduct, creating a principal-agency relationship in which Defendant was the principal and @JUULnation was the agent. As a principal of @JUULnation, JUUL had a duty to ensure that @JUULnation did not unlawfully promote or sell JUUL products. JUUL breached this duty.

### v.   JUUL Tracked the Efficacy of Its Youth Marketing.

232.   Tracking the behaviors and preferences of youth under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers. *USA v. Philip Morris*, 1006.

233.   As early as 1953, Philip Morris was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over." Commenting on these data, George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest strength in the 15-24 age group." *Philip Morris*, 449 F. Supp. 2d at 581.

234.   Traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were limited, however, in that often failed to capture data from certain subsets of the target market. As a Philip Morris employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military *and those under 18 years of age*)." (emphasis added). *USA v. Philip Morris*, 1007.

235.   Taking a page from the Big Tobacco playbook, JUUL has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products. Moreover, modern technology has removed many of the hurdles that made youth tracking a difficult matter in decades past. With e-mail, social media and online forums, JUUL can track and monitor its target audience anywhere and at any time.

### vi.   JUUL Amplified Its Message using Off-Line Advertising to Ensure Consumers Were Blanketed With Non-Stop Messaging About Its Products.

236.   JUUL did not limit its aggressive viral marketing to the internet. To ensure that consumers – teenagers and adults – were constantly exposed to its ad campaign, JUUL placed its simple, consistent ads in numerous public spaces.

237.   For example, JUUL bought advertisements in magazines such as Vice, including

the one described in paragraph 121. JUUL placed advertisements in public places, such as Times Square, as described in paragraph 120. (See also Appendix C, image 14; https://inrejuul.myportfolio.com/vaporized.)   Under the Tobacco Master Settlement Agreement, outdoor advertisements such as these would have been forbidden as promotion of a harmful, addictive product in a manner that is against public policy.

238.    JUUL also provided retailers with large posters to display in their store windows. Because JUUL took steps to ensure its products would be sold at gas stations and convenience stores, people would be presented with massive posters mimicking the simple, clean advertisements JUUL displayed on social media when engaging in routine activities, like buying gas or snacks. Examples of these advertisements can be seen in Appendix C, Image 67 and at https://pro2-bar-s3-cdn-cf4.myportfolio.com/f2c3d1fd1347f0b6d20914f68366d629/5a897c8f-c445-4440-8782-9c7b2f902d76_rw_1200.jpg?h=58612d8696b3f4354dce484f486c99c4.

239.    By saturating public spaces with its advertisements, JUUL not only increased the buzz around its product, but it made it more difficult for those addicted to quit. In other words, by plastering public spaces with JUUL advertisements, JUUL ensured that those trying to quit would not be able to stop being reminded of the product, which in turn would trigger cravings, and increase the likelihood they would purchase the product again.

### vii.    JUUL Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth.

#### (1)    JUUL's Pricing Model Entices New Users, Including Youth and Non-Smokers

240.    Tobacco companies for years sold youth-brand cigarettes at lower prices that underage smokers could afford and used discounts and other promotions to ensnare underage smokers. JUUL is no different. It not only designed a marketing campaign to reach young people and entice new smokers, but it priced its products in such a way to ensure they would buy them.

241.    A pack of four JUULpods, which, according to JUUL, is the equivalent of four packs of cigarettes, costs approximately $13-$20. JUUL's website charges $15.99 for a pack of JUULpods, or about $4 per JUULpod.  By contrast, a single pack of cigarettes in California costs

approximately $8.

242.    Moreover, JUUL offers discounts to purchasers who refer others to purchase JUULpods or JUUL devices from JUUL.

243.    JUUL also offers discounts on JUULpods to individuals who sign up for JUUL's subscription service.[39]  Included among those discounts are both straight price discounts (e.g., 15% off), and bulk/loyalty discounts (buy 5, get 1 free).

244.    JUUL's subscription service favors the sale of higher strength, more addictive JUULpods.  For years, JUUL offered only a 5% strength version of its JUULpods.  After years of delay, it finally released a less potent, 3% strength version as well.  But while purchasers can buy any quantity of 5% strength JUULpods, JUUL places a limit on the number of 3% strength JUULpods that any single customer can purchase. But JUUL allows purchasers to buy as many 5% strength JUULpods as they want.

**(2)    JUUL Sought Out Retail Locations That Were Frequented by Its Target Audience And Displayed the Products in Arms' Reach.**

245.    For years, JUUL made it difficult for smoke shops, vape shops and other age-restricted stores to carry its products, instead directing all of its product to gas stations, which historically are the worst offenders with respect to underage sales. JUUL knows that teenagers, those new to smoking, and those trying to quit their nicotine addiction are likely to frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL would increase the chances that these people would purchase the product.

246.    To further drive curiosity and interest, and make it so its target audience, and especially teenagers, would purchase JUUL, JUUL instructed retailers to display the product in an unusual fashion. Whereas cigarettes and other tobacco products have long been kept behind the counter, JUUL designed display cases that would sit on store shelves. JUUL intentionally designed the clear display cases so that the bright white, sleek packaging and the flavors would catch consumers' eyes and make them interested in purchasing the product. Examples of these

---

[39] https://www.juul.com/auto-ship.

cases can be seen in Appendix C, images 77-78 and at https://inrejuul.myportfolio.com/point-of-sale.

247. JUUL knew that by asking retailers to display JUUL products separate from other tobacco products, and within arms' reach, it would also suggest to consumers that JUUL was more safe than traditional cigarettes and that it was not an addictive drug.

248. Moreover, on information and belief, not only are many of JUUL's retail locations are non-age restricted gas stations, but it appears that the retailers are frequently in close proximity to high schools and colleges. As one example, the following image of JUUL retailers in Berkeley, California shows that the majority of JUUL retailers in the region surround the University of California, Berkeley, and Berkeley High School. The blue circles in the image below mark the location JUUL sellers, and the orange dot represents the University of California Berkeley, which is nearly adjacent to the largest high school in the region, Berkeley High School.



249. On information and belief, JUUL's retail locations provide no signs warning or other indicators concerning the existence, danger, or amount of nicotine in JUUL products.

250. On information and belief, JUUL products are not sold in pharmacies, which have the lowest rates of underage tobacco sales.

### (3) JUUL Failed to Monitor Its Distributors, Fostering Unrestricted Sales to Minors

251. JUUL's distributors and wholesalers actively promote bulks sales of JUUL products online, including on social media platforms such as Instagram.

252. In November 2018, one Instagram post offered up large quantities of Mango pods

to wholesalers or stores, despite the fact that JUUL had just promised that it would stop selling Mango pods anywhere except its website. Notably, the poster is using a series of hashtags developed by or promoted by JUUL, including #juulnation. A hyperlink embedded in the post above directs the reader to a website where wholesale transactions of JUULpods are offered without any age verification or confirmation that the would-be purchaser has a business license: https://hotpodz.com/wholesale/, a page offering wholesale and bulk pricing on JUUL products without any age verification requirements. *See, e.g.*, Appendix C, Advertisement 55.

253.    A Google search for "JUUL wholesale" returns several vendors offering to sell vast quantities of JUUL Starter Kits, devices, and pods—including in flavors JUUL claims it only sells through its official website such as Mango--anywhere in the country with little due diligence. See, e.g., https://www.ionewholesale.com/juul-pod-systems, https://www.vapeinthebox.com/products/juul-pod-flavors?variant=13610126147659, https://infinitywholesalegroup.com/index.php?cPath=183&osCsid=df6e8406dcfeb045a9f916d44beb9dda.

254.    JUUL's lax monitoring has have also create a youth resale market, where teenagers purchase large amounts of JUUL e-cigarettes and/or JUULpods and then sell them to other students, often to support their own addiction.

**(4)     JUUL Sold Its Products Through Its Website and Offered Enticing Discount Subscription Services.**

255.    JUUL owns and operates www.juullabs.com and www.juulvapor.com (the "JUUL Websites"), where it markets, advertises and sells its e-cigarettes and JUULpods.

256.    The JUUL Websites are a leading online marketing and distribution channel for e-cigarettes. JUUL partners with other online and brick-and-mortar providers to market, advertise and sell, via the JUUL Websites, e-cigarettes.

257.    When a consumer purchases a JUUL e-cigarette and/or JUULpods utilizing any of the JUUL Websites, he or she first chooses his or her desired e-cigarette style and color and nicotine pod flavor and color. After the consumer has input that information into the JUUL Websites, the JUUL Websites advertise to the consumer different e-cigarette styles and colors

and/or a variety of nicotine pod flavors and colors. From Defendant's advertised e-cigarette and pod styles, consumers select a desired e-cigarette decorated in a style most appealing to the consumer, and/or one or more desired pod flavors, each of which has its own distinctive color.

258.    The JUUL Websites allow the purchaser to arrange automatic shipping of refill nicotine pods. Since 2015, JUUL has known that straw purchases of, e.g., 10 JUUL devices were being made for the purpose of resale to youth. JUUL also knew that its lax online age verification procedures allowed youth to purchase products directly from JUUL's website. By August 2017, when JUUL announced that it was increasing the age of purchase on its website to 21, JUUL had already entered agreements with numerous online vendors who would sell JUUL products with no such age requirement. Thus, JUUL was able to outwardly present an air of corporate responsibility, knowing full well that youth sales would continue unabated.

259.    JUUL represents that it uses state-of-the-art age verification for website purchases. But its verification has not been effective or properly implemented, as numerous underage purchasers have used JUUL's website to purchase products or obtain warranty service. This is reflected in the actual experiences of the Plaintiffs, as set forth in Appendix A.

**6.    JUUL's Actions Have Created a Youth Vaping Epidemic.**

260.    JUUL's marketing and product design efforts have been successful. Since its launch, JUUL is now the fastest growing e-cigarette in the country. Because the JUUL delivers more nicotine in a shorter amount of time than any other product, delivers that nicotine in a sweetened vapor that causes no irritation, and does so through a concealable device that can be consumed discretely in class, at home, and in the car, nicotine naïve users frequently spiral into patterns of addiction with no historical precedent. It is not uncommon for 15-year-old students who live at home with their parents to consume three to four JUULpods a day, the nicotine equivalent of at least as many packs of cigarettes.

261.    Because JUUL's marketing turned the JUUL into a status symbol for teens, the acute nicotine addiction a JUUL fosters is frequently reinforced by the idea—which JUUL spread—that JUUL use is what "cool" popular kids do in high school. As a result, the medical

community has found itself ill-equipped to develop a treatment for JUUL-addicted youth, as evidenced by a January 2019 FDA-sponsored meeting concerning the role of drug therapies in treating e-cigarette use.

262.    The vaping epidemic caused by JUUL has swept the entire nation in a short period of time.  On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent Electronic Nicotine Delivery System ("ENDS") vaping from 2017 to 2018 were the "*largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S.*"[40]

263.    The percentage of 12th grade students who reported vaping nicotine almost doubled between 2017 and 2018, rising from 11% to 21%. The ten-percentage-point increase in 12th grade students who reported vaping nicotine (an indicator of nicotine addiction) is "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade." *Id.*   "One in five 12th graders vaped nicotine in the last 30 days in 2018." *Id.*  And because JUUL controls over 50% of the e-cigarette market, and was released immediately prior to the jump in vaping prevalence from 11% of teens to 21%, **the entire increase in vaping prevalence since 2016 is attributable to JUUL.**



Source: "National Adolescent Drug Trends in 2018"

---

[40] http://monitoringthefuture.org/pressreleases/18drugpr.pdf (emphasis added).

264.     FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous – and dangerous – trend" that is responsible for an "epidemic" of nicotine use among teenagers. https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm. The rapid – indeed infectious- adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products." *Id.* The Commissioner identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products." *Id.*

265.     Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks." Https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf. The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."

266.     As detailed by Plaintiffs, the JUUL epidemic spreads uniformly across high schools in the United States. JUUL surges in popularity, largely through social media networks, and creates patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from Reddit in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given

because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make in their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.

https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Dec. 19, 2018).

267. In response to the post above, several others reported similar experiences:

a. "this is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is." *Id.*

b. "Same thing at my school. JUUL fiend is a term too." *Id.*

c. "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are." *Id.*

d. "same [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is." Id.

e. "the same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now." *Id.*

f. "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'" *Id.*

g. "It's the same at my school and just about every other school in Colorado." *Id.*

h. "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic'." *Id.* (citing https://imgur.com/a/BKepw).

i. "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one." *Id.*

j. "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping." *Id.*

268.    "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. *It's something that has swept through our age group and has truly taken over. And it happened almost overnight.*" *Id.* (emphasis added).

269.    A recent study of JUUL's sales and presence on social media platforms found that JUUL grew nearly 700% yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising. .[41] By comparison, VUSE, one of JUUL's competitors, spent $16 million on television advertisements alone. Despite JUUL's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.

270.    After the Vaporized campaign caught fire, retail stores began selling out of JUUL products and JUUL had a difficult time trying to meet demand coming in from its online ordering platform.

271.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.

---

[41] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, TOBACCO CONTROL (May 31, 2018), http://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382.

272.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across social media platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JUUL was paying for positive reviews and JUUL-related social media content.

273.    Some Twitter users have reported what appear to be JUUL bots.[42] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content. See, e.g., @HenrytheJUUL[43]

274.    The lead author of the study concluded that JUUL was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[44]

275.    A separate study of e-cigarette advertising on mobile devices found that 74% of total advertising impressions were for JUUL products, and that several of JUUL's advertisements highlighted JUUL's high-tech design, featured young people using JUUL products, or featured financial incentives for purchasing JUUL products. See Appendix B, Chart 8; https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes

276.    Chart 8 in Appendix B shows JUUL's viral expansion on Twitter between 2015 and 2017. JUUL-related posts on Twitter increased quadratically, exactly as one would expect from a blue-shaded area represents the number of JUUL-related Twitter posts, and the green line traces the quadratic growth curve that viral marketing creates. Its growth on Instagram was likely even more rapid.

277.    As a result of JUUL's aggressive advertising to teenagers, there is a new epidemic

---

[42] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd.
[43] https://twitter.com/hennrythejuul.
[44] Laura Kelley, THE WASHINGTON TIMES, *JUUL Sales Among Young People Fueled by Social Media, Says Study* (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/ (last visited June 4, 2018).

of teen addiction. Approximately 3.6 million middle and high school students are vaping regularly. *See* https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html (last accessed December 20, 2018). With JUUL holding approximately two thirds of the e-cigarette market, and is the company that has marketed itself most aggressively to youth, it's likely that millions of those teenagers are using JUUL.

278. Use of JUUL is rising exponentially, in line with the way in which its social media presence has grown. A recent study found that approximately 21 percent of high school seniors had engaged in nicotine vaping at least once in a 30 day period, an enormous rise over the survey's 2017 results, which found just 11 percent had. That spike was the largest spike for any substance recorded by the study in 44 years. *Id.*

279. In a statement issued by the FDA in November, 2018, the FDA noted that in 2016 and 2017, e-cigarette usage among high school students had been around 11 percent, but that in 2018, more than a quarter of high school students were regularly using e-cigarettes.[45]

280. Even more troubling are the challenges associated with getting kids to quit JUUL once they start. JUUL's aggressive social media campaign puts JUUL advertisements before them every day, all day. Those that want to stop thinking about it are faced with advertising when engaging in their regular activities. And even while JUUL has purportedly stopped advertising on social media in recent months, its hashtags, imagery, and impact live on, as there remain nearly 300,000 posts and counting on Instagram featuring the #juul hashtag as of December 20, 2018. Moreover, many medications for breaking nicotine addictions are approved only for adults.

281. As discussed in Appendix A, the Plaintiffs (or the minors they represent) have become addicted to nicotine as a result of using JUUL products. Plaintiffs' experiences were not isolated incidents. Rather, all of JUUL's other customers have been identically misled into purchasing JUUL's addictive nicotine products. Some of them have publicly complained about the undisclosed addictiveness of JUUL's nicotine products.

282. For example, one teen wrote:

---

[45] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/UCM625884.htm (lat accessed January 17, 2019).

1
2
"At [Lawrence Free State High School], underage use of vapes is quite typical. Out of 95 students surveyed, 50% of them said that the illegal use of vape products is very common. Students are able to get their hands on vape products with ease, as there are many effective methods of buying them unlawfully."

3
4
5
6
"In the past, users could purchase vaping products on the internet without being asked for any identification. That rule has since been altered and all consumers are now required to provide an I.D., but underage users can easily buy fake I.D.'s to avoid this. If minors are slick enough, they can go into vape stores, act of age and not be questioned when buying a device, an anonymous senior said."

. . .

7
8
"Another attractive characteristic of vaping is the buzz that the user gets after in-haling the substance. It can be described as a short-term head high."

9
10
"It's almost like being drunk—you feel it in your head and you just kind of wobble,' senior Isaiah Jacobs said. 'It's a dizzy feeling. It feels nice.'"

11
12
13
14
15
16
"The buzz is caused by nicotine which the vape juice contains. To a new user, vaping is an easy way to get a strong high. After continual use, users build up an immunity and must ingest more nicotine to reach their desired state. This is called a nicotine addiction and all consumers, especially minors, are susceptible to this craving according to the U.S. National Library of Medicine. Some students have become habitual users, causing them to spend time and money feeding their habit. Students who vape recognize that many of their peers have an addiction but still choose to partake in the activity, disregarding the risk."

17
18
"'Some [people who vape] will admit it,' senior Isaiah Jacobs said. 'You can tell they are addicted when they spend all their money and time on it, just like people who smoke cigarettes or drink alcohol.'"

19
20
21
"Once hooked, users inhale the many toxins that compose vape juice. Very little research has been conducted on the long-term effects that vaping has on a person's body according to pulmonologist Aman Kahn."

22
. . .

23
24
25
"With so little information available, students are unable to make an informed decision about whether or not to partake in vaping. Until further research has been conducted, underage users will continue to consume vape products without understanding the impacts that these substances can have on their health."

26
https://www.fsfreepressonline.com/features/2018/02/13/too-juul-for-school/ (last visited April 3,

27
2018).

28

Consolidated Amended Class Action Complaint

283.     A reporter at Kent State University wrote:

> "'Of course,' Freed said. 'Nothing should be going through your lungs but air. Being 21 years old, it's hard to watch 15-year-olds carry them around. I mostly use my JUUL for a quick buzz, but because that buzz is so short, I find myself using it too often.'"

> " Senior fashion merchandising major Avery Niernberger expressed concern for the new fad on Kent's campus."

> "'JUULs are just another 'trend' right now unfortunately,' Niernberger said.  'The scary thing is that since they're so new, no one truly knows the side effects they will bring to people. And right now my generation loves them, so I can only hope they won't affect my peers deeply.'"

> . . .

> " While traditional cigarette usage has dropped in recent years, newer electronic cigarettes exploded in popularity. A 2016 Surgeon General's report concerning electronic cigarette use among youth and adults indicated that e-cigarette use among American youth increased 900 percent between 2011 and 2015."

http://www.kentwired.com/latest_updates/article_637d8f2e-1f49-11e8-a245-87a74d0e50a2.html (last visited April 3, 2018).

284.     The uniformity of language, drug-like behaviors (e.g., inhaling multiple JUULs at once), and other uniform characteristics of JUUL use in each school are the result of viral marketing campaigns put in motion by JUUL and promoted by JUUL.

**i.     JUUL Was Able to Undo Decades of Progress Reducing Teen Smoking by Exploiting Regulatory Loopholes**

285.     The teen vaping epidemic was by design, not by accident.

286.     When JUUL was first developed, the FDA's regulations on tobacco products were vague as to whether they applied to vaping devices. Because the regulations did not explicitly identify electronic vaping devices that dispensed tobacco and nicotine as a regulated product, JUUL interpreted those regulations to mean that it could sell its dangerous products to anyone, regardless of their age, and that it did not have to comply with the advertising and labeling restrictions that restricted other tobacco companies.

287.     As other vaping companies began to enter the market, JUUL no doubt knew that this gray area was unlikely to stay gray for long. Knowing that the clock was ticking, JUUL went

1   on a wild spree to get as many young people addicted as possible while it still viewed itself as

2   "unregulated." The aggressive advertising described above was designed not just to sell the

3   products to teenagers, but to sell the product to as many teenagers as possible while it still had a

4   plausible defense to any assertion that it was violating FDA regulations. By hooking teens, JUUL

5   not only ensured it would have loyal consumers for decades, but those teens would influence their

    friends.

6       288.    Moreover, by pumping social media platforms full of images of cool, young

7   people having fun while JUULing, JUUL ensured that everyone from adults to young children,

8   would JUULing was a cool, fun, and safe activity. Just as RJR Reynolds learned with Joe Camel,

9   even very young children would in turn be more likely to form strong, positive associations with

10  the tobacco product and be more susceptible to trying it in the future.

11      289.    In 2017, the FDA announced that it would be taking steps to regulate vaping

12  devices such as JUUL and other ENDS. Regulations were proposed and ultimately went into

13  effect in late 2018. But the damage was done. Between 2017, use of vaping had shot up from 11%

14  of high school users to 27.7%,[46] no doubt due to the way in which JUUL's viral marketing

15  campaign had multiplied—exactly as JUUL had intended in 2015.

16      **D.    JUUL's Deal With Altria Reveals that JUUL's Goal Was Always About
                Increasing the Rates of Nicotine Addiction.**
17

18      290.    In December 2018, it was announced that tobacco giant Altria, which owns the

19  Philip Morris company, took a 35% share in JUUL, which was valued at $38 billion.

20      291.    Altria, which is a party to the Master Settlement Agreement, must abide by strict

21  rules to ensure that it is not directing its tobacco products to children. But JUUL is not a party to

22  that agreement. Thus, by providing Altria a controlling share, JUUL has single-handedly blown

23  up that agreement and put even more kids at risk.

24      292.    As a result of the acquisition, Altria now has access to JUUL's years of social

25  media metrics, youth survey responses, and a vast amount of other data, which Altria would not

26  ────────────────

27  [46] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/UCM625884.htm (last
    accessed January 17, 2019).

28

have been able to acquire on its own due to the Master Settlement Agreement. And Altria will almost certainly have JUUL's customer list, built up from years of selling its products on its website.

293.    Moreover, the deal ensures that even though JUUL is now subject to regulations, it will gain access to Altria's lobbying and marketing expertise, which it has honed through decades of mining regulatory loopholes to push its nicotine products.

294.    JUUL will also benefit from Altria's market dominance. For example, as part of the deal, Altria agreed to give JUUL top-shelf space so that Juulpods will be displayed next to Marlboro, the market leader.

**E.    Defendant Misled Class Members, Including Minors, Into Becoming Addicted to Nicotine Salts.**

295.    The individual Plaintiffs' circumstances are described in attached Appendix A. Because Plaintiffs did not, and do not, know the formula for Defendant's products and cannot test how addictive the products are before purchasing, Plaintiffs will be unable to rely on Defendant's labels when shopping for nicotine products in the future absent an injunction that requires Defendant to disclose the addictive effects and true health consequences of the product. Plaintiffs, and others similarly situated, are likely to be repeatedly presented with false or misleading information, making it difficult to make informed purchasing decisions.

## V.    CLASS ALLEGATIONS

296.    Plaintiffs bring this action against Defendant on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed **Class** is defined as follows:

> All persons who purchased, in the United States, a JUUL e-cigarette and/or JUULpods.

297.    Plaintiffs further propose the following **Youth Subclass**:

All class members who at the time of at least one purchase were under the age of 18.

298.    Plaintiffs also seek certification of the following **Consumer Deception Statute**

**Subclasses**:

299. **Consumer Deception Statute Subclass**: All class members who purchased the JUUL products in the following states, subject to the state's statute of limitations: Alabama, Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Georgia, Idaho, Illinois, Indiana, Kansas, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, West Virginia, Wyoming.

300. **Consumer Unfairness/Unlawfulness Subclass**: All Class members whose purchases were made in Alabama, Arizona, California, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Vermont, Washington, West Virginia, or Wyoming.

301. **Warranty Subclass**: All class members whose purchases were made in a state other than Louisiana.

302. **Express Warranty Reliance Class:** All members of the Warranty Subclass whose purchases were made in Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Mississippi, Montana, Nebraska, New York, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Utah, Washington, or Wyoming (together, the "Express Warranty Reliance Class

303. **Implied Warranty Privity Subclass**: All members of the Warranty Subclass whose purchases were made in Alabama, Arizona, California, Connecticut, Florida, Georgia, Idaho, Illinois, Kentucky, New York, North Carolina, Ohio, Tennessee, Washington, or Wisconsin.

304. **Licensure Subclass**: All members of the Class whose purchases were made in Alaska, Arkansas, California, Connecticut, the District of Columbia, Hawaii, Iowa, Kansas, Louisiana, Maine, Maryland, Missouri, Montana, Pennsylvania, Rhode Island, Texas, Utah,

Vermont, or Washington.

305.   **Negligent Marketing Youth Subclass**: All members of the Youth Subclass whose purchases were made in a state other than Michigan and Pennsylvania.

306.   Plaintiffs reserve the right to propose further subclasses of the above class and subclasses or to narrow the above class and subclass definitions, to be limited to persons who, prior to their purchases of JUUL products, were nonsmokers.

307.   Plaintiffs further reserve the right to propose further subclasses of the above classes and subclasses, or to narrow the above class and subclass definitions, to be limited to persons who reside in or made their purchases in one or more identified states (e.g., a single-state subclass of purchasers from California), including without limitation the states of residence of the plaintiffs named herein and states whose laws are materially the same.

308.   Plaintiffs also reserve the right to propose additional or further subclasses or narrowing of the above class and subclass definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

309.   Plaintiffs also reserve the right to propose additional or further youth subclasses or narrowing of the above class and subclasses to youth, based on the evidence adduced in discovery, or as necessary and appropriate.

310.   In each of the causes of action pled below, a statement that the count is alleged on behalf of a particular class or subclass includes all subclasses thereof, including subclasses that may later be proposed as described in the prior paragraphs.

311.   This action has been brought and may properly be maintained as a class action against the Defendant pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

312.   Numerosity: Plaintiffs do not know the exact size of the Classes and the Subclasses, but they are each composed of more than 500 persons.  The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

313. **Common Questions Predominate:** This action involves common questions of law and fact to the potential classes because each Class Member's claim derives from the false, deceptive, unlawful and/or unfair statements and omissions that led Class Members to believe that: (a) JUUL E-cigarettes and JUULpods were less addictive than traditional cigarettes; (b) JUUL products could be used without negative health consequences, and (c) they would be able to stop using and purchasing JUUL products "anytime." Class Member claims also derive from common questions of law and fact related to JUUL products falsely advertised as non-addictive. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each Class Member to recover. Among the questions of law and fact common to the class are:

a. Whether Defendant's advertising and marketing regarding the JUUL E-cigarette and JUULpods were likely to deceive Class Members or were unfair;

b. Whether Defendant intentionally omitted material information from its advertising and marketing materials;

c. Whether Defendant unfairly, unlawfully and/or deceptively induced Class Members to purchase JUUL E-cigarettes and/or JUULpods using the promise that they would be able to stop purchasing JUULpods "anytime";

d. Whether the JUUL e-cigarette is defective;

e. Whether Defendant knew or should have known about the JUUL's defect, and, if yes, how long Defendant has known of the defect;

f. Whether the defective nature of the JUUL e-cigarette constitutes a reasonable fact consumers would have considered in deciding whether to use or purchase JUUL products;

g. Whether JUUL had a duty to disclose the defective nature of JUUL e-cigarettes to Plaintiffs and Class Members;

h. Whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the JUUL e-cigarettes are defective and/or not merchantable;

i. Whether JUUL had a duty to warn of the risks its products pose;

j.   Whether Defendant breached its duty to warn of the risks its e-cigarettes pose;

k.   Whether the JUUL e-cigarette is unfit for the ordinary purpose for which they were used, in violation of the implied warranty of merchantability;

l.   Whether Defendant engaged in the alleged conduct knowingly, recklessly, or negligently;

m.   The amount of revenues and profits Defendant received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

n.   Whether Class Members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

o.   Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief

314.    Typicality: Plaintiffs' claims are typical of the class because each Plaintiff was misled into: (a) purchasing a highly addictive nicotine product due to Defendant's false advertising and unfair business practices; and/or (b) substituting addiction to vaporized nicotine salts in place of addiction to nicotine from cigarette smoking. Thus, Plaintiffs and Class Members sustained the same injuries and damages arising out of Defendant's conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of law as alleged.

315.    Adequacy: Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also has no interests that are in conflict with or antagonistic to the interests of Class Members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Classes. No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendant are common to Class Members and predominate over any individual issues that may exist, such that by prevailing on his/her own claim, Plaintiffs necessarily will establish Defendant's liability to all

Class Members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

316.   Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for the Defendant and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender. Furthermore, as the damages suffered by each individual Class Member may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

317.   Nexus to California:  The State of California has a special interest in regulating the affairs of corporations that do business here and persons who live here.  Defendant JUUL is based in San Francisco, California. Defendant designed and implemented the unlawful and deceptive conduct described in this Complaint from its headquarters in the San Francisco Bay Area. Additionally, Defendant has more JUUL e-cigarette consumers in California than in any other state. Accordingly, there is a substantial nexus between Defendant's unlawful behavior and California such that the California courts should take cognizance of this action on behalf of a class of individuals who reside in California and the United States.

318.   Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

VI.   **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**(False Advertising/Violation of the Deception Prong of Deceptive Trade Practices Statutes)**

*On behalf of the Class and the Consumer Deception Subclass*

319.     Plaintiffs reallege and incorporate the above paragraphs of this Class Action Complaint as if set forth herein.

320.     This cause of action is brought on behalf of the Consumer Deception Subclass (and further subclasses thereof).

321.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA and similar laws of other states, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

322.     Plaintiffs and class members who purchased JUUL e-cigarettes and JUULpod nicotine salt cartridges are "consumers" under these states' unfair and deceptive practices statutes, which are identified with specificity for this count in Appendix D.

323.     The provision of JUUL E-cigarettes and JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are "goods" within the meaning of these states' unfair and deceptive practices statutes.  Additionally, the provision of "Autoship" subscriptions for delivery of JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are covered "services" within the meaning of these states' unfair and deceptive practices statutes.  Defendant's actions, representations and conduct have violated, and continue to violate the deception prong of these statutes because they extend to transactions that are intended to result, or which have resulted, in the sale or distribution of goods or services to consumers.

324.     Plaintiffs, and those similarly situated, relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by not purchasing a JUUL E-cigarette and JUULpods.  Specifically, the plaintiffs viewed and relied upon the following advertisements and representations by JUUL:

325.     Plaintiffs relied on specific advertisements and representations by JUUL as set forth in Appendix A.

326.     In addition to the specific JUUL advertising described above, each of the plaintiffs was exposed to JUUL's deceptive advertising message as a result of JUUL's adaptation of the tobacco industry's long-standing and extensive deceptive advertising campaign to a pervasive viral marketing campaign delivered via social media and email.  From the introduction of the JUUL e-cigarette through at least 2018, JUUL used social media to inundate consumers with ads that—like those of the tobacco industry with respect to cigarettes—characterized JUUL e-cigarettes and JUULpods as a hip, stylish, fun activity that made one cool, rather than a means of delivering a highly addictive substance with long-term health effects.

327.     Each of the plaintiffs saw at least one advertisement in JUUL's long, pervasive advertising campaign, and each was exposed to the false messages conveyed by the campaign (i.e., that JUUL was less—or at least no more—addictive than traditional cigarettes; that JUUL e-cigarettes and JUULpods were a healthy, hip, fun activity, not a means of delivering extremely potent and addictive doses of nicotine).  JUUL's campaign lasted approximately three years and was pervasive on social media.  This was a "longstanding" campaign, particularly when compared with the lifespan of the target audience—teens—and as shown by the effectiveness of the Joe Camel advertising of similar length.  It was even more effective than a normal three-year advertising campaign because it co-opted the imagery and messaging of the tobacco industry's decades-long advertising of cigarettes as a stylish, cool activity.  Because of the length and pervasiveness of the campaign, it is not reasonable for each Plaintiff to identify in this Complaint every ad seen, but a representative sample of advertisements seen is shown above and in Appendix C.  A more complete gallery of marketing materials is available at https://inrejuul.myportfolio.com. Although the individual advertisements within JUUL's campaign vary in their details, groups of them share common elements such as their use of young, attractive models to convey the idea that JUUL would make one hip and attractive; use of active, healthy individuals to convey the idea that using JUUL was not unhealthy; and depiction of JUUL nicotine salt solutions as a flavorful "treat" rather than an addictive substance with long-term health effects. If known, further details of the timing and manner of each plaintiff's exposure to portions of JUUL's long, pervasive advertising campaign is identified in Appendix A.  Each

plaintiff was exposed to JUUL's campaign and its messaging prior to their purchase of JUUL e-cigarettes and JUULpods, and continued to be exposed to it even when they tried to quit vaping.

328. Plaintiffs have complied with all pre-suit requirements for bringing damages claims under the deception prong of the unfair and deceptive practices statutes by timely seeking informal resolution of the claims prior to filing suit. Defendant refused to resolve the claims.

329. Defendant's practices, acts, policies and course of conduct violated these states' prohibition on deceptive practices in that Defendant engaged in deceptive acts and practices in or affecting commerce, through their advertisements and labeling of JUUL e-cigarettes and JUULpod nicotine salt cartridges. JUUL engaged in a longstanding and extensive marketing campaign that deceived consumers.

330. Defendant specifically violated the deception prong of these statutes by:

    a. Omitting, concealing, and suppressing material facts in the labeling and advertising of its goods and services;

    b. Misrepresenting the sources, sponsorship, approval, endorsement or certification of goods or services;.

    c. Misrepresenting the affiliation, connection, or association with, or certification by, another for its goods or services;

    d. Misrepresenting that the goods or services that they sell have characteristics, ingredients, uses, benefits, or quantities, which they do not have;

    e. Misrepresenting that the goods or services that they sell are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not;

    f. Advertising goods or services with intent not to sell them as advertised;

    g. Misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

    h. Using innuendo or ambiguity as to material facts when such failure tends to mislead;

    i. Engaging in unconscionable conduct;

j.   Directing conduct at disabled persons, namely minors (traditionally recognized under these states' laws as having the "disability of nonage," "disability of infancy," or similar term) with diminished mental capacity to resist Defendant's advertising, product flavors and addictive nicotine products; caused the loss of assets essential to the health or welfare of the disabled persons (minors); and caused actual physical, emotional, or economic damage to disabled persons (minors), who are substantially more vulnerable than other members of the public to the Defendant's conduct because of their age, impaired understanding and diminished mental capacity;

k.   Using coercion in a transaction with respect to minors;

l.   Failing to honor a warranty;

m.   Soliciting to engage in a consumer transaction without the appropriate permits or licenses;

n.   Misleading about a substance or failing to identify the contents of the package or the nature of the substance contained inside the package;

o.   Misleading or causing misunderstanding as to the effects that a substance causes when ingested, injected, inhaled, or otherwise introduced into the human body;

p.   Making an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, even when, at the time the assertion is made, the person making lacks sufficient factually objective scientific, clinical or quantifiable evidence which substantiates the assertion; and

q.   Engaging in other conduct which similarly creates a likelihood of deception, confusion, or misunderstanding.

331.   Until the present, Defendant has knowingly accepted the benefits of its deceptive conduct in the form of profits from the sale of JUUL E-cigarettes and JUULpod nicotine salt cartridges.

332.     As a proximate result of the above-described deceptive acts, Plaintiffs and members of the Class and subclasses: (a) purchased and used JUUL nicotine products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchase of JUUL nicotine products; (c) suffered and/or will suffer additional economic losses in purchasing JUUL nicotine products to maintain their addiction; and (d) suffered and will suffer additional economic losses incidental to their addiction..

333.     As a direct and proximate result of these deceptive practices, Plaintiffs and the members of the Class and subclasses have been damaged and are entitled to recover actual damages, restitution, statutory damages and punitive damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Fraud)

*On behalf of the Class*

334.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

335.     On the dates set forth in this Complaint, and within the three years prior to the filing of this lawsuit, Defendant fraudulently and deceptively sold JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendant knew it to be untrue. On those same dates, Defendant fraudulently and deceptively failed to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUULpod refills. On the same dates, Defendant fraudulently and deceptively informed Plaintiffs that they would be able to cease purchasing JUULpods "anytime," when they knew it to be untrue.  On those same dates, Defendant fraudulently and deceptively failed to disclose to Plaintiff that the nicotine benzoate salts in JUULpods delivered nicotine to blood plasma at a rate four times higher than a smoked Pall Mall cigarette, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with cigarettes or other E-cigarette products. Defendant made each of these misrepresentations and omissions to those

similarly situated as Plaintiffs.

336.   Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs, and those similarly situated, as to whether to purchase a JUUL E-cigarette and JUULpod. Defendant had a fiduciary duty to accurately provide this information to Plaintiffs, and those similarly situated. In not so informing Plaintiffs, and those similarly situated, Defendant breached its duty to each of them.  Defendant also gained financially from, and as a result of, its breach.

337.   Plaintiffs, and those similarly situated, relied to their detriment on Defendant's fraudulent omissions. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation not purchasing a JUUL E-cigarette or JUULpod(s) and not subscribing to Defendant's "autoship" service.

338.   Plaintiffs  the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendant:

339.   *Who:* Defendant actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes from Plaintiffs and Class Members while simultaneously disclosing false or misleading evidence concerning nicotine content. Defendant also actively concealed the benzoic acid content of the JUUL e-cigarettes, while knowing that benzoic acid played a central role in determining the physiological effects of JUUL e-cigarettes. Defendant also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendant did so without notifying Plaintiffs. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at JUUL or PAX responsible for such decisions.

340.   *What:* Defendant knew, or was negligent or reckless in not knowing, that the JUUL e-cigarettes were likely to aggravate nicotine addiction in smokers and posed extreme risks of addiction to children and made misrepresentations about the risks, effects, operation, content, and other attributes of JUUL e-cigarettes.  These misrepresentations include both omissions of

nicotine warning, omission of facts regarding the increased potency and addictiveness of nicotine salts, misrepresentations about the amount of nicotine in JUULpods and the absorption thereof through use of JUUL, and misrepresentations of using JUUL as a fun, healthy activity for the young, without disclosing the long-term health effects and the actual feeling of being addicted to nicotine.

341.  *When*: Defendant concealed material information regarding the effect of JUUL e-cigarettes at all times and made representations from the time when the JUUL e-cigarette was announced to this day. Defendant still has not disclosed the truth about JUUL e-cigarettes. Defendant has amplified and cemented these misrepresentations in the minds of the public through its unprecedented social media efforts, the full scope of which is not yet fully known.

342.  *Where:* Defendant concealed material information and made misrepresentations regarding the true nature of JUUL e-cigarettes' nicotine formula on JUUL's websites, interviews with the media, promotional materials, and through social media. Plaintiff is aware of no document, communication, or other place or thing in which Defendant discloses consistent or truthful statements about JUUL e-cigarettes' potency or its actual nicotine content. Such information is not disclosed on JUUL's website or in any marketing materials or advertising materials.

343.  *How*: Defendant concealed critical information from Plaintiff and Class Members concerning the potency and effects of JUUL use, or made representations about the nicotine content and potency of the JUUL e-cigarettes that were false or misleading. Defendant actively concealed the truth about the real impact of JUUL e-cigarette use from Plaintiffs and Class Members at all times, even though it knew such information would be important to a reasonable consumer, and Defendant promised in JUUL's marketing materials that the JUUL e-cigarettes have qualities that they do not have.

344.  *Why:* Defendant actively concealed material information about the potency of JUUL e-cigarettes for the purpose of inducing Plaintiffs and Class Members to purchase and/or use JUUL e-cigarettes. Had Defendant disclosed the truth—that the JUUL e-cigarette was, by design, more physically addictive than cigarettes, for example in its advertisements or other

1  materials or communications, Plaintiffs and Class Members (all reasonable consumers) would

   have been aware of this fact, and would not have bought JUUL e-cigarettes or would have used

2  them in a way that posed fewer risks of creating or aggravating nicotine addiction.

3       345.    More information about each of these elements is provided in greater detail in the

4  body of this complaint, above.

5       346.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant

6  intended to induce Plaintiffs, and those similarly situated, to alter their positions to their

7  detriment.

8       347.    Plaintiffs, and those similarly situated, justifiably and reasonably relied on

9  Defendant's misrepresentations and/or omissions, and, accordingly, were damaged by the

10 Defendant.

11      348.    As a direct and proximate result of Defendant's misrepresentations and/or

12 omissions, Plaintiffs, and those similarly situated, have suffered damages in an amount equal to:

13 (a) the amount that Defendant charged them; and (b) the amount they paid in excess of what they

14 would have paid for a less addictive e-cigarette and refill cartridges containing nicotine in a non-

15 salt formulation.

16      349.    Defendant's conduct as described herein was willful and malicious and was

17 designed to maximize Defendant's profits even though Defendant knew that it would cause loss

18 and harm to Plaintiff, and those similarly situated.

19                           **THIRD CAUSE OF ACTION**

20                              **(Unjust Enrichment)**

21                            *On behalf of the Class*

22      350.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action

23 Complaint as if set forth herein.

24      351.    By means of Defendant's wrongful conduct alleged herein, Defendant knowingly

25 sold JUUL Products to Plaintiffs and members of the Class in a manner that was unfair,

26 unconscionable, and oppressive.

27      352.    Defendant knowingly received and retained wrongful benefits and funds from

28

Plaintiffs and members of the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Class.

353.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

354.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

355.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from selling JUUL Products to Plaintiffs and members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

356.     The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Class. Defendant should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by them.

357.     Plaintiffs and members of the Class have no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**(Strict Product Liability – Failure to Warn)**

***On Behalf of the Class and the Youth Subclass***

358.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

359.     Defendant designed, manufactured, distributed and sold JUUL devices and JUUL pods.

360.     Defendant was aware that the JUUL devices, when used in conjunction with JUUL pods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL pods.

361.     The use of JUUL devices and JUUL pods presented a substantial danger of nicotine exposure and addiction as described herein when a JUUL device was used with a JUUL

pod.  This danger was even greater with regard to youths and adolescents.

362.    Plaintiffs and members of the Class were not aware and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

363.    Plaintiffs and members of Youth Subclass also were not aware that the JUUL device and JUUL pods pose to youths and adolescents. Plaintiffs and members of the Youth Subclass were unable to appreciate the potential dangers, risks, and consequences of using a JUUL device with a JUUL pod because of their youth, inexperience and/or immaturity of judgment.

364.    In all forms of advertising as well as social media communications, Defendant failed to adequately warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendant failed to adequately warn in its advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendant marketed its products to minors and made them available in youth-friendly colors and flavors.  Defendant also designed its products to be more palatable to youth and nonsmokers by reducing "throat hit" and increased the level of nicotine that is absorbed by users, making them even more addictive.

365.    JUUL also failed to warn that its products were defective and did not conform to JUUL's representations about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence. JUUL products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette and the nicotine content of JUUL pods is closer to 24 cigarettes, or at least 20% more than one pack. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harm caused by increased exposure to nicotine as described herein.

366. The defects in JUUL Products, including the lack of warnings, existed at the time the JUUL pods and devices were sold and/or when the JUUL pods and devices left JUUL's possession or control.

367. The JUUL devices and pods were expected to be used by Plaintiffs and Members of the Class and Youth Subclass without substantial change in their condition from the time of their manufacture or sale.

368. By selling JUUL products to consumers like Plaintiffs and Class and Youth Subclass members when it already knew of the defects and dangerous qualities through internal testing and published reports, JUUL is strictly liable for the injuries that JUUL pods and devices have caused and will cause to Plaintiffs and Members of the Class and Youth Subclass.

369. Defendant's lack of sufficient instructions or warnings were a substantial factor in causing harm to Plaintiffs identified above.

370. Plaintiffs and the members of the Class and Youth Subclass were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the JUUL products as a result of Defendant's failure to warn and misrepresentations; (c) they purchased JUUL products that did not have the characteristics, qualities, or value affirmed and promised by Defendant; and (d) they have become addicted to nicotine and will need to undertake nicotine cessation treatments.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO WARN**
*On Behalf of the Class and Youth Subclass*

371. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

372. Defendant owed a duty to all persons, including youths and adolescents, who were reasonably foreseeable users of Defendant's products, to design, develop, formulate, test, and manufacture a product reasonably free of defect. JUUL had a duty to disclose to consumers, including youths and adolescents, the foreseeable risks associated with the use of JUUL devices

and pods, including that the JUUL devices and pods were particularly unsafe for youths and adolescents due to their increased vulnerability to nicotine addiction.

373.    At the time Defendant manufactured, distributed and sold JUUL devices and JUUL pods, Defendant was aware that the JUUL devices, when used in conjunction with JUUL pods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of the products, including that the JUUL devices and pods were particularly harmful to youths and adolescents.

374.    Defendant was negligent in that it knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious to nonsmokers, youths and adolescents, including the Plaintiffs and members of the Class and Youth Subclass, but failed to use reasonable care to warn Plaintiffs and members of the Youth Subclass of the potentially harmful and injurious effects in the manner that a reasonable person would under the same or similar circumstances.

375.    The use of JUUL devices and JUUL pods presented a substantial danger of causing persons, particularly youths and adolescents, the harms of nicotine exposure and addiction as described herein when a JUUL device was used or misused with a JUUL pod in an intended or reasonably foreseeable way by youths and adolescents.

376.    Plaintiffs and members of the Class and Youth Subclass were not aware and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction that the JUUL device and JUUL pods pose, particularly to youths and adolescents. Plaintiffs and members of the Class were unable due to Defendant's conduct to appreciate the potential dangers, risks, and consequences of using a JUUL device with a JUUL pod; the members of the Youth Subclass were particularly unable to so appreciate because of their youth, inexperience, and/or immaturity of judgment.

377.    JUUL failed to exercise reasonable care and give adequate warnings or instructions to consumers, particularly youths and adolescents, including Plaintiffs and Members

of the Class and Youth Subclass, about the reasonably foreseeable dangers that could result from using JUUL's devices and pods under reasonably foreseeable conditions. JUUL knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

378. In all forms of advertising as well as social media communications, Defendant failed to adequately warn or instruct foreseeable users, particularly youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendant failed to adequately warn in its advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendant marketed its products to minors and made them available in youth-friendly colors and flavors.

379. As described herein, JUUL products are also inherently defective and fail to conform to JUUL's affirmations of fact about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence. JUUL products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette, and the nicotine content of JUUL pods is closer to 24 cigarettes, or 20% more than one pack. These defects cause, maintain, or aggravate nicotine addiction and subject consumers, including Plaintiffs, to harms caused by increased exposure to nicotine.

380. By selling JUUL products containing defects to consumers like Plaintiffs and members of the Class and Youth Subclass when it already knew of the unreasonable dangers and defects through internal testing and published reports, JUUL failed to change the formulation of JUUL products and breached its duty to warn Plaintiffs that the JUUL products were inconsistent with its affirmations of fact.

381.     Plaintiffs relied on JUUL's representations and advertising during the class period.

382.     Plaintiffs identified above were harmed by Defendant's failure to warn. Defendant's lack of sufficient instructions or warnings were a substantial factor in causing harm to Plaintiffs and members of the Class and Youth Subclass.

383.     Plaintiffs and the members of the Class and Youth Subclass were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the JUUL products as a result of Defendant's failure to warn and misrepresentations; (c) they purchased JUUL products that did not have the characteristics, qualities, or value affirmed and promised by Defendant; and (d) they have become addicted to nicotine and will need to undertake nicotine cessation treatments.

## SIXTH CAUSE OF ACTION

### (Strict Liability – Design Defect)
*On Behalf of the Class and the Youth Subclass*

384.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

385.     This claim is brought by Plaintiffs on behalf of the Class and the Youth Subclass.

386.     Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL pods, which were intended by Defendant to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

387.     Defendant knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including the Plaintiffs and members of the Class and Youth Subclass.

388.     Nevertheless, as described herein, Defendant designed its products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product, such as by designing fruit- and candy-flavored JUUL pods, reducing throat hit, and by designing youthful and trendy packaging.

389. As a result, Defendant's products as designed were unreasonably dangerous, particularly to youths and adolescents, including Plaintiffs and members of the of the Class and Youth Subclass, and therefore defective. Defendant is strictly liable for the injuries that JUUL pods and devices have caused and will cause to Plaintiffs and Members of the Class and Youth Subclass.

390. Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products without fruit and candy flavors, not reducing throat hit, or by designing less youthful and trendy packaging.

391. As described herein, JUUL products are also inherently defective because they contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette, and the nicotine content of JUUL pods is closer to 24 cigarettes, or 20% more than one pack. These defects cause, maintain, or aggravate nicotine addiction and subject consumers, including Plaintiffs and members of the Class and the Youth Subclass, to harms caused by increased exposure to nicotine, which is particularly injurious to youths and adolescents.

392. As a result, Defendant's products as designed were unreasonably dangerous, particularly to youths and adolescents, including Plaintiffs and members of the Class and the Youth Subclass, and therefore defective. Defendant is strictly liable for the injuries that JUUL pods and devices have caused and will cause to Plaintiffs and Members of the Class and the Youth Subclass.

393. Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products that delivered less nicotine per puff, or used less potent and addictive forms of nicotine and without reduction of the "throat hit" that helps deter new users.

394. The risks inherent in the design of the JUUL device and JUUL pods outweigh significantly any benefits of such design

395. Plaintiffs were not aware of the aforementioned defects at any time prior to recent

1   revelations regarding problems with JUUL products and devices. Further, JUUL knew or had

2   reason to know that youths and adolescents would not fully realize the dangerous and addictive

3   nature of the JUUL products and the long-term complications nicotine addiction can present, or

4   that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard

    such risks..

5       396.    Plaintiffs and Class and Youth Subclass Members suffered harm as a result, in the

6   form of addiction to nicotine or aggravated addiction to nicotine.

7       397.    The defective design of Defendant's products was a substantial factor in causing

8   Plaintiffs' harm.

9       398.    As a legal and proximate result of the aforementioned defects of the subject

10  products, Plaintiffs sustained the injuries and damages set forth herein while using the subject

11  JUUL devices and JUUL pods in a reasonably foreseeable manner.

12      399.    Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time

13  of trial.

14                          **SEVENTH CAUSE OF ACTION**

15                      **(Strict Liability – Manufacturing Defect)**
                                *On Behalf of the Class*
16

17      400.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

18      401.    This claim is brought by Plaintiffs on behalf of the Class.

19      402.    In manufacturing the JUULpods, Defendant routinely added more nicotine salt to

20  the JUULpods than represented on the JUULpods labels or Defendant's advertising materials.

21      403.    In manufacturing the JUULpods, Defendant routinely added more benzoic acid

22  than the 4% solution specified in the '895 patent, which was the basis of the JUULpods

23  formulation.

24      404.    The variations in the nicotine salt content and/or benzoic acid in Defendant's

25  products caused harm to Plaintiffs and the Class by exacerbating the narcotic effects of

26  Defendant's JUUL e-cigarettes, increasing the risks of nicotine addiction or worsening existing

27  nicotine addictions, causing harm to Plaintiffs and the Class.

28

405.    The manufacturing defects in Defendant's products were a substantial cause of Plaintiffs' nicotine addiction or aggravation of their nicotine addiction.

406.

**EIGHTH CAUSE OF ACTION**

**(Product Liability - Negligent Design Defect)**
*On Behalf of the Youth Subclass*

407.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

408.    This claim is brought by Plaintiffs on behalf of the Youth Subclass.

409.    Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL pods, which were intended by Defendant to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

410.    Defendant owed a duty to youths and adolescents, who were reasonably foreseeable users of Defendant's products, to design, develop, formulate, test, and manufacture a product reasonably free of defect..

411.    At the time Defendant manufactured, distributed and sold JUUL devices and JUUL pods, Defendant was aware that the JUUL devices, when used in conjunction with JUUL pods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of the products, including that the JUUL devices and pods were particularly harmful to youths and adolescents. Defendant had a duty to refrain from designing its products in a way that would appeal to youths and adolescents due to their increased vulnerability to nicotine addiction.

412.    Defendant was negligent in that it knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious to youths and adolescents, including the Plaintiffs and members of the Youth Subclass, but failed to use reasonable care to design its products in a way to prevent youths and adolescents from buying and

using them.

413.     Instead, as described herein, Defendant negligently designed its products in ways that appeal to youths and adolescents and encourage them to buy and use the product, such as by designing fruit- and candy-flavored JUUL pods, reducing throat hit, and by designing youthful and trendy packaging.

414.     Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products without fruit and candy flavors, without reduction of the "throat hit," and by designing less youthful and trendy packaging.

415.     As described herein, Defendant was also negligent in that it knew or, by the exercise of reasonable care, should have known that its products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette, and the nicotine content of JUUL pods is closer to 24 cigarettes, or 20% more than one pack.  These defects cause, maintain, or aggravate nicotine addiction and subject consumers, including Plaintiffs and members of the Youth Subclass to harms caused by increased exposure to nicotine, which is particularly injurious to youths and adolescents.

416.     Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products that delivered less nicotine per puff, or used less potent and addictive forms of nicotine.

417.     The risks inherent in the design of the JUUL device and JUUL pods outweigh significantly any benefits of such design.

418.     Plaintiffs were not aware of the aforementioned defects at any time prior to recent revelations regarding problems with JUUL products and devices. Further, JUUL knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

419.     Plaintiffs and members of the Youth Subclass suffered harm as a result, in the

form of addiction to nicotine or aggravated addiction to nicotine.

420.     The defective design of Defendant's products was a substantial factor in causing Plaintiffs' harm.

421.     As a legal and proximate result of the aforementioned defects of the subject products, Plaintiffs sustained the injuries and damages set forth herein while using the subject JUUL devices and JUUL pods in a reasonably foreseeable manner.

422.     Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time of trial.

## NINTH CAUSE OF ACTION

### (Negligent Marketing)

*On behalf of the Negligent Marketing Youth Subclass*

423.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as though fully set forth herein..

424.     JUUL owes numerous duties to Plaintiffs and the other members of the Class. These duties include:

    a.   to exercise reasonable care in ensuring that its marketing does not target minors;

    b.   to exercise reasonable care in ensuring that its electronic cigarette devices and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors;

    c.   to use reasonable and adequate procedures that are compliant with industry-standard practices in ensuring that distributors and retailers of its electronic cigarette devices and JUULpods do not sell and/or distribute them to minors; and

    d.   to implement processes to quickly detect whether its electronic cigarette devices and JUULpods are sold and/or distributed to minors and to timely act on this information to eliminate the sale and/or distribution of electronic cigarette devices and JUULpods to minors.

425.     Under several states' laws, JUUL owes a statutory duty to Plaintiffs and Negligent Marketing Subclass members to not sell and/or distribute its electronic cigarette devices and JUULpods to minors and to undertake appropriate measures to comply with this mandate, including the following laws: ALA. CODE § 28-11-13(a); ALASKA STAT. § 11.76.109; ARIZ. REV. STAT. § 13-3622(A); ARK. CODE ANN. § 5-27-227(a)(1); CAL. BUS. & PROF. CODE §§ 22958(a) and 22963(a); CAL. PENAL CODE § 308(a)(1)(A); CAL. BUS. & PROF. CODE §§ 22963 (a), (b); COLO. REV. STAT. §§ 18-13121(1)(a) and 44-7-103; CONN. GEN. STAT. § 53-344b(b); DEL. CODE ANN. tit. 11, §§ 1116(a) and 1118(a); D.C. Code § 7-1721.02; FLA. STAT. § 877.112(2)–(3); GA. CODE ANN. § 16-12-171(a)(1)(A); HAW. REV. STAT. § 7121258(1) and § 245-(a); IDAHO CODE ANN. §§ 39-5705(1) and39-5714(1); 720 ILL. COMP. STAT. 675/1.5(b) and 720 ILL. COMP. STAT. 675/1.5(c)(2); IND. CODE §§ 35-46-1-10(a), 35-46-1-10.2(a); §§ 7.1-7-5.5-1; 7.1-7-5.5- 5; 7.1-7-5.5- 3; 7.1-7-5.5-2; IND. CODE § 7.1-7-4-6(b); IOWA CODE ANN. § 453A.2(1); KAN. STAT. ANN. § 79-3321(l); KY. REV. STAT. ANN. §§ 438.310(1); 438.313(1) 438.315(1); LA. REV. STAT. ANN. §§ 14:91.8(C); 26:911(A)(1); and 14:91.6(A); ME. REV. STAT. ANN. tit. 22 § 1555-B (2); MD. CODE ANN., HEALTH GEN. § 24- 305(b); MD. CODE ANN., CRIM LAW §§ 10- 107(b)(2), (c)(1); MASS. GEN. LAW ch. 270 § 6 (b), 940 MASS. CODE REGS. 21.04(3), and 940 MASS. CODE REGS. 21.04(1)(c), (4)(a); MINN. STAT. §§ 609.685(1)(a), (2)(a); MISS. CODE ANN. § 97-32-51(2); MO. REV. STAT. §§ 407.926.1 and 407.931.1; NEB. REV. STAT. §§ 28-1419;  28-1425; NEV. REV. STAT. ANN. § 202.2493.2; N.H. REV. STAT. ANN. §§ 126-K:4(I); 126K:8(I); N.J. STAT. §§ 2A:170-51.4(a)(2) and 2C:33-13.1(a); N.M. STAT. ANN. §§ 30-493(A),(E); 30-49-8(A); N.Y. PUB. HEALTH LAW §§ 1399-cc(2), 1399-bb(4), and 1399-bb(5); N.C. GEN. STAT. § 14-313(b) and N.C. GEN. STAT. § 14-313(b2); N.D. CENT. CODE § 12.1-3103(1)(a); OHIO REV. CODE ANN. § 2927.02(B)(1); OKLA. STAT. tit. 37 §§ 600.3(A) and 600.13(A); OR. REV. STAT. ANN. §§ 167.755(1); R.I. GEN. LAWS ANN. §§ 11-9-13, 11-9-13.10 and 11-9-13.8(1); S.C. CODE ANN. §§ 16-17-500(A); 16-17- 502(A); S.D. CODIFIED LAWS § 34-46-2(1); TENN. CODE ANN. § 39-17-1504(a) and § 39-17-1504(d); TEX. HEALTH & SAFETY CODE ANN. §§ 161.082, 161.087 and 161.452(c); UTAH CODE ANN. § 76-10-104(1); 7 VT. STAT.

ANN § 1003(a); VA. CODE ANN. § 18.2-371.2(A), VA. CODE ANN. § 18.2- 371.2(C);

WASH. REV. CODE ANN. § 26.28.080(1) and § 70.345.090(1)-(7); W. VA. CODE ANN. § 16-

9A-2(b)(3); WIS. STAT. ANN. § 134.66(2)(a); and WYO. STAT. ANN §§ 14-3-302(a),(c).

426.    JUUL knew the risks that minors would be attracted to its electronic cigarette devices and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors.

427.    JUUL knew or should have known that its marketing, distribution, and sales practices did not adequately safeguard Plaintiffs and the other Class members from the sale and/or distribution of electronic cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

428.    JUUL breached the duties it owes to Plaintiff and Class members in several ways, including by:

       a.  designing and manufacturing a product that, due to its ease of inhalation, deceptive flavoring and nicotine potency, is hazardous to foreseeable users, namely minors;

       b.  permitting the implementation of inadequate systems, protocols and practices by itself and by its distributors and retailers that allowed minors to purchase and/or receive its electronic cigarette devices and JUULpods, creating a foreseeable risk of harm;

       c.  inducing the purchase of JUUL e-cigarettes and JUULpods by minors through marketing its products to youth and adolescents, such as through the use of "viral" social media campaigns, and by fostering a "cool," youthful image;

       d.  failing to comply with the minimum industry standards with respect to its distributors and retailers; and

       e.  failing to take timely, affirmative steps to eliminate the sale and/or distribution of e-cigarettes to minors when it knew that minors were purchasing and receiving its e-cigarettes.

429.    But for JUUL's wrongful and negligent breach of the duties it owed to Plaintiffs

and the other Class members, they would not have been induced to purchase JUUL products and unable to acquire them.

430. The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of JUUL's negligent conduct.

## **TENTH CAUSE OF ACTION**

### **(Negligent Misrepresentation)**

*On behalf of the Class*

431. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

432. This claim is brought by Plaintiffs on behalf of the Class.

433. As alleged above, Defendant has misrepresented the nicotine content of JUULpods on its label. And as alleged above, Defendant has also misrepresented the potency and addictiveness of its nicotine salt formulation, the suitability of JUULpods as a "treat" to be enjoyed with meals, the nicotine content of JUULpods, and the use of JUULpods as a cool, fun, healthy activity rather than a means of delivering a highly addictive dose of nicotine.

434. When making these statements, Defendant was aware that these representations were false or made them without knowledge of their truth or veracity.

435. The negligent misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and all Class members to purchase the products at issue.

436. Plaintiffs would not have purchased JULL e-cigarettes, or would not have purchased the products on the same terms, if Plaintiffs had known the truth of the facts misrepresented by Defendant.

437. Plaintiffs and Class members are entitled to damages and other legal and equitable relief as a result.

## **TWELFTH CAUSE OF ACTION**

### **(Negligent Per Se – Lack of Licensure)**
*on behalf of the Licensure Subclass*

438. Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs

as though fully set forth herein.

439.    JUUL owes statutory duties to Plaintiffs and the other members of their Subclasses to exercise reasonable care in ensuring that its electronic cigarette devices and JUULpods are not sold in these states because JUUL lacks the adequate licensing.  The following state laws required JUUL to have a license for retail sale of electronic cigarettes:  ALASKA STAT. § 43.70.075(a); ARK. CODE ANN. §§ 26- 57-214 and 26-57- 215(b); CAL. BUS. & PROF. CODE §§ 22972; CONN. GEN. STAT. § 21a415(a); D.C. CODE § 47- 2404(a); HAW. REV. STAT. § 28-164; IND. CODE §§ 7.1-3- 18.5-1 and 7.1-7-5- 1.1(a); IOWA CODE ANN. §§ 453A.47A(1 ); 453A.13(1); and 453A.36 (7)(a); KAN. STAT. ANN. § 793303(a); LA. REV. STAT. ANN. § 26:902(1); ME. REV. STAT. ANN. tit. 22 § 1551-A(1); MD. CODE ANN., BUS. REG.§§ 16.7-201, 16.7-211(a), 16.7-213(a); MO. REV. STAT. § 407.934.1; MONT. CODE ANN. § 16-11303(1); 72 PA. CONS. STAT. § 8220-A(a); R.I. GEN. LAWS ANN. § 23-1-56(a); TEX. HEALTH & SAFETY CODE ANN. § 161.456 and 34 TEX. ADMIN. CODE 3.1206(b); TEX. HEALTH & SAFETY CODE ANN. § 161.452(c); UTAH CODE ANN. § 5914-803(1) UTAH CODE ANN. § 2662-201; 7 VT. STAT. ANN. § 1002(a); WASH. REV. CODE ANN. § 70.345.030(1)(a)

440.    JUUL knew or should have known that it lacked adequate licensing to sell and distribute its electronic cigarette devices and JUULpods in these states.

441.    The licensing laws are intended to protect Plaintiffs and Class Members from the unlawful sale of electronic cigarette devices and nicotine pods.

442.    JUUL breached the duties it owed to Plaintiffs and Subclass members by selling and distributing electronic cigarette devices and JUULpods in these states without, on information and belief, adequate licensure.

443.    But for JUUL's wrongful and negligent breach of the duties it owed to Plaintiffs and the other Subclass members, they would not have been able to acquire the electronic cigarette devices and JUULpods.

444.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of JUUL's negligent conduct.

445.

1

### TWELFTH CAUSE OF ACTION
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. §§ 2301, *et seq.*)

2

3

*On behalf of the Class*

4    446.    Plaintiffs incorporate by reference all preceding allegations as though fully set

5    forth herein.

6    447.    Plaintiffs bring this action on behalf of themselves and the Class against Defendant

7    JUUL Labs, Inc.

8    448.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by

9    virtue of 28 U.S.C. § 1332 (a)-(d).

10    449.    Plaintiffs and members of the Class are "consumers" within the meaning of 15

11    U.S.C. § 2301(3).

12    450.    Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C.

13    § 2301(4) and (5), respectively.

14    451.    The Products are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

15    452.    Plaintiffs have met all requirements for pre-suit notice.

16    453.    Plaintiffs have met all requirements for pre-suit notice.15 U.S.C. § 2310(d)(1)

17    provides a cause of action for any consumer who is damaged by the failure of a warrantor to

18    comply with a written or implied warranty.

19    454.    The amount in controversy of Plaintiffs' individual claims meets or exceeds

20    $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value

21    (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

22    455.    Defendant provided Plaintiffs and each member of the Class with "written

23    warranties" and "implied warranties," as identified herein, which are covered under 15 U.S.C. §

24    2301(6) and (7), respectively.

25    456.    Defendant's written warranty includes written affirmations of fact made in

26    connection with the sale of JUUL products on its website, print advertising, marketing materials,

27    and on its packaging materials that state "1 JUULpod contains ~.7ml with 5% nicotine by

28

Consolidated Amended Class Action Complaint

weight" and is "approximately equivalent to about 1 pack of cigarettes," and that each JUULpod is "5% Strength." As described herein, these statements are false and significantly misrepresent the amount of nicotine in JUUL's products.

457. Defendant's implied warranties include affirmations that the percentage of nicotine in JUULpods match the represented amount of nicotine on JUUL's containers, and that JUUL e-cigarettes are fit for their intended purposes of offering an alternative to cigarettes, despite the fact that JUUL products, when used as intended or as reasonably foreseeable, merely continue, worsen or aggravate users' underlying nicotine addiction while exposing the consumer to new and increased harm posed by JUUL products, as set forth herein..

458. The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the Class purchased their Products.

459. Defendant breached these written and implied warranties as described in detail herein. Without limitation, the Products share common defects in that they contain and deliver significantly more nicotine than: (a) was expressly and impliedly represented, and (b) was revealed to approving regulators, consumers, and the public.

460. Plaintiffs and each member of the Class have had sufficient direct dealings with either Defendant or its agents (including directly online and through retailers) to establish privity of contract between Defendant, on the one hand, and Plaintiffs and each member of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Defendant and its retailers, and specifically, of Defendant's implied warranties. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranties provided with the Products; the warranty agreements were designed for and intended to benefit consumers only.

461. Affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or each Product, Defendant knew, or should have known, of its misrepresentations and/or material omissions concerning the Products' inability to function as warranted, but nonetheless failed to rectify the situation and/or disclose the defects. Under the circumstances, the remedies available under any informal

settlement procedure would be inadequate and any requirement that Plaintiffs or members of the Class resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

462.    In addition, given the conduct described herein, any attempts by Defendant, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage of the defects in JUUL products is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defects is null and void.

463.    As a direct and proximate result of Defendant's breach of the written and implied warranties, Plaintiffs and each member of the Class have suffered damages.

464.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by law, including compensation for the cost of purchasing the Products, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

**THIRTEENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**U.C.C. § 2-313**
**(On behalf of the Warranty Subclass)**

465.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

466.    For the court's convenience, attached to this complaint as Appendix F is a table identifying each state statute adopting the U.C.C.'s provision, U.C.C. § 2 313, on express warranties. Plaintiffs have met all requirements for pre-suit notice.

467.    JUUL has expressly warranted to Plaintiffs and Class members through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, and its packaging materials that "1 JUULpod contains ~.7ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes."

468.    JUUL also expressly warranted that JUULpods are "5% Strength" as stated on the front of JUUL's product packaging.

469.    JUUL also expressly warranted that one JUULpod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials.

470.     JUUL also expressly warranted that JUUL use causes less, or at least no more, nicotine to enter the bloodstream than a cigarette and that one JUULpod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials.

471.     These affirmations of fact became the basis of the bargain between JUUL and Plaintiffs and all Class members, thereby creating express warranties that JUUL products would conform to JUUL's affirmations of fact, representations, promises, and descriptions.

472.     As described herein, JUULpods actually contain 6.2% nicotine salt rather than 5% nicotine as advertised, and JUUL delivers more nicotine per puff than a traditional cigarette. JUULpods contain significantly more nicotine than one pack of cigarettes.

473.     JUUL products are defective and fail to conform to JUUL's affirmations of fact about JUULpods' nicotine content, the pharmacokinetics of JUUL use, and JUULpods' cigarette equivalence in violation of JUUL's express warranties. JUUL products contain and deliver significantly more nicotine than JUUL represents. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harm caused by increased exposure to nicotine as described herein.

474.     By selling JUUL containing these defects to consumers like Plaintiffs and Class members when it already knew of the defects through internal testing and published reports, JUUL failed to adjust the nicotine content in JUUL products and breached its express warranty to provide JUUL products that were consistent with its affirmations of fact.

475.     Plaintiffs and the members of the Class were injured as a direct and proximate result of Defendant's breach of its express warranty because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the Product as a result of Defendant's misrepresentations and breach of its express warranties; and (c) they purchased Products that did not have the characteristics, qualities, or value affirmed and promised by Defendant.

476.     JUUL's breach of its expressed warranties damaged Plaintiffs and the Class Members in an amount to be proven at trial.

477.     ***Plaintiffs also allege the following*** on behalf of the Express Warranty Reliance *Subclass:*

478.     Plaintiffs and the proposed Class members relied upon JUUL's affirmations of fact regarding the nature of nicotine content and delivery provided by JUUL devices and JUUL pods in deciding to purchase the JUUL products.

<div align="center">

**FOURTEENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**U.C.C. §2-314**
**(On behalf of the Warranty Subclass)**

</div>

479.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

480.     This claim is brought by Plaintiffs on behalf of the Warranty Subclass.

481.     For the court's convenience, attached to this complaint as Appendix G is a table identifying each state statute adopting the U.C.C.'s provision, U.C.C. § 2 314, on express warranties. Plaintiffs have met all requirements for pre-suit notice.

482.     Defendant, through the acts and omissions alleged herein, in the sale, marketing, and promotion of JUUL products impliedly warranted that JUUL e-cigarettes and cigarettes were equivalent in terms of nicotine content, pharmacokinetics, and puff-count.

483.     Defendant is a merchant with respect to the good which were sold to Plaintiff and the Class.

484.     A warranty that the JUUL products were in merchantable condition and fit for the ordinary purpose for which a smoking alternative or smoking cessation device would be used is implied by law pursuant to U.C.C. § 2 314.

485.     Defendant, through the acts and omissions alleged herein, in the sale, marketing, and promotion of JUUL products, impliedly warranted that JUUL e-cigarettes were safe, safer than cigarettes, and that they were equivalent to cigarettes in terms of nicotine content, pharmacokinetics, and puff-count.

486.     JUUL e-cigarettes are not fit for their intended purposes of offering an alternative to cigarettes because JUUL e-cigarettes, when used as intended or reasonably foreseeable, worsen or aggravate users' underlying nicotine addiction. Furthermore, by worsening users' addiction,

<div align="center">Consolidated Amended Class Action Complaint</div>

JUUL products have served as a gateway to increased cigarette use.

487.    JUUL also warranted to Plaintiffs and Class members through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, and its packaging materials that "1 JUULpod contains ~.7ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes." JUUL also warranted that JUULpods are "5% Strength" as stated on the front of JUUL's product packaging.

488.    JUUL products are in fact defective and fail to conform to JUUL's implied and express representations about JUULpods' safety, nicotine content, the pharmacokinetics of JUUL use, and JUULpods' cigarette equivalence.

489.    JUUL products are dangerously addictive and contain and deliver significantly more nicotine than JUUL represents. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harms caused by increased exposure to nicotine as described herein.

490.    By selling JUUL containing these defects to consumers like Plaintiffs and Class members when it already knew of the defects through internal testing and published reports, JUUL breached its implied warranties.  Despite having received notice of these defects, JUUL continues to misrepresent the nature of its products and breach its implied warranties.

491.    Plaintiffs and the members of the Class were injured as a direct and proximate result of Defendant's breach of its implied warranties, which was a substantial factor in the harm they endured because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the Product as a result of Defendant's misrepresentations and breach of its implied warranties; (c) they purchased Products that did not have the characteristics, qualities, or value affirmed and promised by Defendant,  and (d) they were harmed by the defects and increased exposure to nicotine.

492.    ***Plaintiffs allege the following additional allegation*** *for the Implied Warranty Privity Subclass:*

493.    Plaintiffs and each member of the Class have had sufficient direct dealings with

either JUUL via its website or its agents (including distributors and dealers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the Class, on the other hand.

## FIFTEENTH CAUSE OF ACTION

## (Violation of the Unfair and Unlawful Prongs of Unfair and Deceptive Trade Practices Statutes)

*On behalf of the Consumer Unfairness/Unlawfulness Subclass*

494. Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

495. Plaintiffs bring this claim individually and on behalf of the Consumer Unfairness/Unlawfulness Subclass.

496. Plaintiffs and class members who purchased JUUL e-cigarettes and JUULpod nicotine salt cartridges are "consumers" under their states' unfair and deceptive practices statutes, which are identified with specificity for this count in Appendix E.

497. The provision of JUUL E-cigarettes and JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are "goods" within the meaning of these states' unfair and deceptive practices statutes. Additionally, the provision of "Autoship" subscriptions for delivery of JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are covered "services" within the meaning of these states' unfair and deceptive practices statutes

498. Defendant has engaged, and continues to engage, in unfair, unlawful and deceptive trade practices in California and other states by engaging in the unfair, unlawful, and deceptive business practices outlined in this Class Action Complaint. JUUL participated in a long-standing and extensive marketing campaign that deceived consumers. In particular, Defendant has knowingly and willfully engaged, and continues to engage in, unfair, unlawful and deceptive trade practices by, without limitation:

        a. developing and marketing a product that contained nicotine levels far in excess of what smokers need to comfortably switch from cigarettes, with the intention

of creating and fostering long-term addiction to JUUL products;

b.   falsely and deceptively marketing, advertising, and selling JUUL e-cigarettes and JUULpods by misrepresenting their nicotine content, nicotine pharmacokinetics, and suitability as an "alternative" to cigarettes, and falsely implying that they were useful as a smoking or nicotine-use cessation device, when in fact, JUUL is likely to aggravate cigarette and nicotine addiction;

c.   falsely and deceptively marketing, advertising and selling JUUL's "autoship" service for use in California as something consumers could cancel "anytime" without disclosing to consumers how addiction associated with use of JUUL e-cigarettes would interfere with their ability to cancel the JUULpod subscription;

d.   falsely and deceptively marketing, advertising and selling JUULpods and JUUL e-cigarettes using affiliate and native advertising that deliberately deceived Plaintiffs and members of the Class into believing that objective, neutral sources were endorsing JUUL nicotine products when, in reality, those sources were merely delivering a paid advertisement on behalf of JUUL;

e.   creating and disseminating advertising (and allowing third parties to create and disseminate advertising) that lured underage smokers and non-smokers into using JUUL e-cigarettes, and disseminating (and allowing third parties to disseminate) that advertising through unregulated social media platforms that primarily targeted underage persons;

f.   setting the price of JUULpods at an artificially low price that is intended to and does attract underage users to purchase JUUL products, and using discounts, product giveaways, and sponsored social events to induce purchase of nicotine in violation of public policy; and

g.   violating other legal standards set forth above.

499.   Defendant's unfair acts and practices led consumers to falsely believe that: (a) JUUL e-cigarettes and JUULpods delivered less nicotine, or the same amount of nicotine, as

traditional cigarettes; (b) JUUL were less addictive than combustible cigarettes; and (c) with the autoship services, that Plaintiffs and Class Members would be able to stop using and purchasing JUUL products "anytime" even though JUUL knew that addiction associated with use of JUUL e-cigarettes would interfere with their ability to cancel the JUULpod subscription. Defendant knew it was leaving these impressions and knew that they were false. Defendant developed and marketed a product that delivered nicotine levels far in excess of what smokers need to comfortably switch from cigarettes, with the intention of creating and fostering long-term addiction to JUUL products.

500.    Defendant's acts and omissions are unfair in that they (1) offend public policy[47]; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.

501.    Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that they could not have been reasonably avoided by consumers.

502.    Defendant's acts and omissions are unlawful because they violate various local, state, and federal laws and regulations;[48] Plaintiffs and class members are the intended beneficiaries of these laws and regulations; and Defendant's unlawful acts caused injury to Plaintiffs and class members.

503.    Until the present, Defendant has knowingly accepted the benefits of its unfair and unlawful conduct in the form of profits from the sale of JUUL e-cigarettes and JUULpod nicotine salt cartridges.

504.    As a proximate result of the above-described unfair and unlawful acts, Plaintiffs and members of the Consumer Unfairness/Unlawfulness Subclass: (a) purchased and used JUUL nicotine products when they would not otherwise have done so; (b) suffered economic losses

---

[47] Defendant's conduct violates public policy pursuant to, among other sources of law, the statutes set forth in the negligence per se sections of this Complaint, statutes identified in Appendices F-G, and pursuant to Federal Trade Commission regulations, including the prohibition on misleading affiliate and native advertising.
[48] *See* prior footnote.

consisting of the cost of purchase of JUUL nicotine products; (c) suffered and/or will suffer additional economic losses in purchasing JUUL nicotine products to maintain their addiction; and (d) suffered and will suffer additional economic losses incidental to their addiction.

505.    Plaintiffs, and those similarly situated, relied to their detriment on Defendant's unfair, unlawful, and deceptive business practices.  Had Plaintiff, and those similarly situated, been adequately informed rather than intentionally deceived by Defendant, each would have acted differently by, without limitation: not purchasing a JUUL E-cigarette or JUULpod and not subscribing to Defendant's "autoship" service.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment as follows:

1.  For the greater of actual or compensatory damages according to proof;

2.  For restitution;

3.  For injunctive relief;

4.  An award of statutory damages, including as appropriate double or treble damages authorized by statute;

5.  An award of compensatory damages, the amount of which is to be determined at trial;

6.  An award of punitive damages, the amount of which is to be determined at trial;

7.  For reasonable attorneys' fees according to proof;

8.  For costs of suit incurred; and

9.  For such further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

*Plaintiffs hereby demand a trial by jury*

Dated:  January 25, 2019        **GUTRIDE SAFIER LLP**

_____
Adam J. Gutride, Esq.
Seth A. Safier, Esq.

Todd Kennedy
Anthony J. Patek
Kristen Simplicio
100 Pine Street, Suite 1250
San Francisco, California 94111

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio, admitted pro hac vice
Jason Rathod, admitted pro hac vice
Esfand Nafisi (State Bar No. 320119)
412 H Street NE, Suite 302
Washington, D.C. 20002

**BERGER MONTAGUE, P.C.**
Sherrie R. Savett, pro hac vice forthcoming
Russell D. Paul, admitted pro hac vice
Neil Makhija, admitted pro hac vice
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604
Email: ssavett@bm.net
Email: rpaul@bm.net
Email: nmakhija@bm.net

Attorneys for Plaintiffs

EXHIBIT A

# JUUL Advertising Over its First Three Years on the Market

Robert K. Jackler, Cindy Chau, Brook D. Getachew, Mackenzie M. Whitcomb, Jeffrey Lee-Heidenreich,

Alexander M. Bhatt Sophia H.S. Kim-O'Sullivan, Zachary A. Hoffman, Laurie M. Jackler, Divya Ramamurthi

Stanford Research into the Impact of Tobacco Advertising

Stanford University School of Medicine

**Correspondence:**
Robert K. Jackler, MD
Stanford Research into the Impact of Tobacco Advertising
801 Welch Road
Stanford, CA, 94305
jackler@stanford.edu
650-725-6500; Fax: 650-725-8502.

**Published:** January 21, 2019

_____

**ABSTRACT:**

**Background:** JUUL e-cigarette now dominates the American vapor market and has achieved a cult level of popularity among school aged adolescents

**Objectives:** JUUL's promotional efforts have yet to be systematically studied.

**Methods:** JUUL's advertising (June 2015 - November 2018) derived from its website, social media (Instagram, Facebook, and Twitter), hashtags, and customer directed emails were analyzed.

**Results:** As of November 2018, 2691 Twitter, 248 Facebook and 187 Instagram posts, and 171 customer directed marketing emails from JUUL controlled accounts were available for study. JUUL's Instagram account had 77,600 followers and #juul had 260,866 postings. JUUL's Vaporized launch campaign featured models in their 20s appearing in trendy clothes engaged in poses and movements more evocative of underage teens than mature adults. Subsequently, JUUL's principal advertising themes have been closely aligned with that of traditional tobacco advertising

(pleasure/relaxation, socialization/romance, flavors, cost savings and discounts, holidays/ seasons, style/identity, and satisfaction). Advertising prominently featured sweet and fruity flavors, especially mango. The company employed social media influencers as brand ambassadors. They also sought individuals who were popular on the internet, enrolled them in JUUL's affiliate program, and compensated them for posting positive reviews while insisting that they not reveal this relationship.

**Conclusions:** JUUL's advertising imagery in its first 6 months on the market was patently youth oriented. For the next 2 ½ years it was more muted, but the company's advertising was widely distributed on social media channels frequented by youth, was amplified by hashtag extensions, and catalyzed by compensated influencers and affiliates. JUUL's mission statement to "*Improve the lives of the world's one billion adult smokers*" and their repeated assertion that their product is meant for "*adult smokers only*" has not been congruent with its marketing practices over its first 3 years.

Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

## INTRODUCTION

JUUL is an electronic vaping device which resembles a USB memory stick. The company explained the name as connoting a "*jewel*" (something precious) and "*joule*" (a unit of energy). Many media articles refer to JUUL as the "*iPhone of e-cigarettes*" and the package of both products bear a close resemblance.[1] Both co-founders James Monsees and Adam Bowen are graduates of Stanford's Design School, the alma mater of many Apple designers. JUUL's vapor delivers an exceptionally high nicotine concentration (59mg/ml) making it highly addictive for nicotine naïve individuals.

Since its introduction in June 2015, JUUL has had a meteoric rise in sales and in November 2018 represented 76.1% of the US e-cigarette market according to Nielsen data.[2] JUUL's dollar sales increased by 783% in the 52 week for the period ending June 2018.[3] Largely driven by the immense rise in JUUL sales, the entire e-cigarette marketplace grew by 97%, to nearly $2 billion, over the same period.[3] A mere 3 years since its product launch the company has achieved a valuation of $15 billion.[4] JUUL is now recognized to be the fastest startup to reach $10 billion valuation, achieving this measure 4 times faster than Facebook.[5] Over the 12 month period ending August 2018, JUUL has sold $1.29 billion in devices and e-juice containing pods.[6] The JUUL founders have portrayed their company as wholly focused upon rescuing millions of adult smokers. The company's 2018 mission statement specifies its goal is to: "*Improve the lives of the world's one billion adult smokers*" and "*dedicated to eliminating cigarettes by offering existing adult smokers with a better alternative to combustible cigarettes.*"[7] Despite this stated intention, a principal driver of JUUL's explosive growth in sales has been its adoption by youth. In November 2018, the Center for Disease Control and Prevention reported current e-cigarette use among American high school students reached 20.8% (3.05 million users) representing a 78% increase from the prior year.[8] A 2018 survey of 14,379 teens and young adults between the ages of 15 and 34 years, showed that teens ages 15-17 years were 16 times more likely to be current JUUL users than the 25-34 year old group.[9] Ever use of JUUL was 9.5% for ages 15-17, 11.2% for 18-21, and 3.2% for 25-34. While not evaluated in this study, the remaining group of adult smokers, age ≥35 may well be infrequent JUUL users. The appeal of JUUL to teenagers includes its stealthiness (that parents and teachers may not recognize it for what it is), its youth appealing flavors (e.g., mango, crème brûlée, mint, fruit medley), and its positioning as the latest technology.[10]

Concern over JUUL's rapid rise among American youth led the US Food and Drug Administration (FDA) in April 2018 to announce that it was considering enforcement actions to counter underage sales and requested documents from the company to evaluate the drivers of underage use.[11] In October 2018, as part of its ongoing investigation, the FDA seized thousands of documents from JUUL headquarters.[12] In November 2018, the FDA announced a series of measures intended to constrain youth access to JUUL and other e-cigarettes.[13] The attorneys general of Iowa, Massachusetts, and North Carolina have launched investigation into underage use of JUUL.[14-16] Lawsuits have begun to appear, both by individual litigants and class actions, based upon JUUL leading to nicotine addiction among youth.[17]

JUUL's marketing efforts over its period of phenomenal growth have yet to be comprehensively analyzed in the academic literature. It is important to study the way the advertising evolved, both its messaging and channel use, to evaluate its intended targets and what it reveals about the company's awareness that its product was increasingly becoming popular among adolescents. The goal of this study is to analyze JUUL's promotional efforts over its first 3 years on the market including its hosted events as well as its advertising in print, web, e-mail, and social media channels (Instagram, Facebook, Twitter).

## METHODS:

### Assembling a Collection of JUUL Advertising:

A multifaceted approach was employed to gather and analyze JUUL advertisements from the time of their market launch in June 2015 through November 2018. Using the Internet Archive Wayback Machine the JUUL company website (juul.com,

juulvapor.com) was obtained in its iterations including versions pre-dating the product launch.[18] Brand postings on Instagram, Facebook, and Twitter were collected as were customer directed emails. It is important to note that JUUL removed much of its early advertising from 2015 to 2017 from its social media channels. Many early JUUL advertisements were collected during 2015 and 2016 by our team at Stanford Research Into The Impact of Tobacco Advertising (SRITA).[19] These were supplemented by the JUUL e-mail collection from Rutgers University's Trinkets and Trash collection.[20]

Much of the early "Vaporized" campaign was reconstructed from alternative sources including the campaign's creative agencies. Quotes relevant to the company's advertising strategy by JUUL's founders and senior leadership were gleaned from their web and social media sites as well as news media reports. Additional sources included reports concerning JUUL from a wide variety of media outlets including the Wall Street Journal, Wired, New Yorker, CNBC, Bloomberg, Axios, AdAge, and others. The investigators also interviewed JUUL leadership, including one of the co-founders (James Monsees), in August 2018 during which the evolution of JUUL marketing was discussed.

A collection of over 1500 JUUL advertise-ments have been made available on the SRITA website (tobacco.stanford.edu/juul) along with 30 JUUL pro-motional videos (tobacco.stanford.edu /videos/juul) and 82 comparisons between JUUL and traditional tobacco advertising (tobacco.stanford.edu /juultobaccocomparison).

**Hashtag Marketing:**

JUUL employed a hashtag marketing strategy on Instagram, effectively mingling its advertisements with postings from a wide variety of users. User generated JUUL-related images along with their captions were downloaded from Instagram using a third party open source module Instaloader.[21] The study specifically focused on #juul because of its repeated use by Juul's official Instagram account (@juulvapor) and also its popularity among Instagram users.

Because of the enormous number of posts appearing on JUUL's primary hashtags, a sampling mechanism was necessary. Inclusion criteria were: 1. posts needed to be related to JUUL; 2. were from the community rather than the company, and 3. included the image of a person or a meme. Tagged images on JUUL's official Instagram page (@juulvapor) were also included if they met these criteria. All images on #juul and tagged at @ juulvapor were collected over two one week intervals in mid-2018 (6/28 - 7/4, 7/18-7/24). A total of 9246 posts for the hashtag #juul and 239 tagged @juulvapor posts were downloaded. A majority of the #juul posts (8720) and tagged @juulvapor (123) and were excluded from analysis as they were either not related to JUUL or did not involve the image of a person or meme. The method described above yielded a set of 526 #juul posts and 116 tagged @juulvapor for analysis.

**Content Analysis:**

Our goal was to evaluate for possible youth orientation in community posts appearing in the same stream as JUUL marketing. A codebook measured the following themes: youth appeal, humor, pop culture, use of memes, cartoon imagery, covert use of the product, JUUL tricks, and JUUL as an alternative to smoking. (**Supplemental Table 1**) Information on post origin (consumer, vendor/store, meme account) as well as the number of likes and comments for each post was also recorded. Three independent coders all aged 19 (2 males, 1 female) coded the posts. Inter-coder reliability was established on a sample of images of similar hashtag sites (#juulnation, #juullife, #di4j). Inter-coder reliability was high with Krippendorf alpha values ranging from 0.781 to 1.0.

**RESULTS:**

**I. JUUL SAMPLING EVENTS**

Around the product launch and over JUUL's first year on the market, the company sponsored a number of promotional events which were featured on the company's social media sites and via e-mail invitation. **(Figure 1,2)** We were able to identify 25 JUUL sampling events the company sponsored between June 4 and December 8, 2015. These we held in metro New York (8), metro Los Angeles (9), Las Vegas (5), Miami (1) and one each in Southampton, New York and Ventura, California. **(Supplemental Online Table 1)**

**Figure 1.** Invitations to JUUL Launch Party June 2015



**Figure 2.** Photos from one of many JUUL Sampling events. This event was held September 4-6, 2015, in the San Bernardino, California at the Nocturnal Wonderland music festival. Note the numerous hashtags which distribute JUUL's promotion to a wide community including non-tobacco hashtags such as #style, #design, #electronics, #technology, #smart, and #gadget.



Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

These were youth-oriented entertainment events, usually either music or cinema themed, whose primary purpose was to distribute free samples of JUUL devices and their flavor pods to a youthful audience in order to help establish JUUL in the vapor marketplace. Photos from these events show sophisticated stagecraft stylized on the #vaporized theme with a definite youthful and rock music theme. We know a fair amount about events, not only from the company's social media postings, but also from online descriptions by its event planners and designers as well as photographers who commemorated the activities.

For the JUUL Vapor Lounge, Boxman Studios (Charlotte, NC) modified a shipping container (a 20' x 8' steel box) into a: *"modern, inviting, and unique sampling experience for consumers."* [22] The tableau designed by NKdsgn was dominated by vibrant bright colors which mimicked the brand's promotional imagery with banners and videos adorned with the JUUL brand name.[23] The product was displayed in a jewel case, an evident play on its name. According to Boxman Studios: *"As people entered the space they were greeted by JUUL team members where they got the chance to experience vapor with JUUL products. With four distinct flavors to try out, guests could relax in the lounge area, check out JUUL products in the illuminated display, or snap pictures in the Bosco Animated Gif Booth."*[22] Images from the events show a youthful audience, with most attendees appearing to be in their twenties. Some attendees were photographed in poses reminiscent of teen behavior, such as wearing a hat on backwards, while holding a skateboard, or a girl with purple hair holding a JUUL. Photos show attractive young girls in colorful JUUL tee shirts serving as hosts and distributors of free samples. (**Figure 3**)

Figure 3. JUUL hired attractive young women to distribute its free products at sampling events such as this one in the Betsy Hotel, South Beach in Miami.



BeCore is a Los Angeles firm which manages *"sampling tours, experimental marketing, brand activation."*[24] The company explained that it *"designed, fabricated and managed a custom container to function as a mobile sampling lounge."* These JUUL events were geographically dispersed: *"touring various events in multiple markets across the East Coast . . . the tour has been extended to include cities along the West Coast and other major cities."* According to BeCore, the results from these events were impressive: *"On average, BeCore exceeded the sampling goals set by JUUL for each location (average number of*

*samples/event distributed equals 5,000+).”* (**Figure 4**) In July 2015, JUUL tweeted an invitation to an event at which all attendees:  *"get a free #juul kit."*[25] JUUL's Twitter account posts numerous invitations for free sample events. Repeatedly after October 24, 2017 JUUL tweeted the following: *"FDA regulations prohibit manufacturers from providing free samples of nicotine*

*and nicotine related products."*[25] On December 7, 2017 JUUL tweeted an invitation for a *"demo event"* for $1 in Miami. As late as April 18, 2018 JUUL tweeted invitation to "*Learn how to use your device and sample #juulpod flavors to find your favorite."*[25]

**Figure 4**. Distributing free samples at a JUUL event. The note at the bottom indicated that such events *"exceeded the sampling goal of distributing 5000+ samples for each location."*



**THE RESULTS:**

On average, BeCore exceeded the sampling goals set by JUUL for each location (average number of samples/event distributed equals 5,000+).

    The principal focus of these activities was to get a group of youthful influencers to accept gifts of JUUL products, to try out their various flavors, and then to popularize their products among their peers. The events were always free and featured popular bands such as CHAPMAN, illumanti AMS, Mary Kwok and others. Other events were movie nights held on rooftops. One Los Angeles event, managed by Cinespia, was an all night "slumber party" held in Hollywood's Forever Cemetery featuring movies such as: Can't Hardly Wait,  SCREAM, and Cruel Intentions.

    JUUL events continued well beyond its first year on the market. In 2016 and 2017, the company

held sampling events in large metropolitan cities including Miami and New York City. between (**Figure 5**) In January 2018, JUUL sponsored a "*Music in Film Summit*" at the Sundance Film Festival in Utah. Celebrities such as Nicholas Cage, Elijah Wood and Dan Reynolds and Tyler Glen of rock band Imagine Dragons were photographed at the JUUL lounge.[26] The design had evolved from the earlier events: *"The brand name was displayed with life-sized backlit letters in this sophisticated lounge. Brand ambassadors were on hand to provide guests with more information."* Celebrities were given special treatment: *"For VIPs and talent, Juul had an upstairs*

Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

*lounge that provided a more exclusive experience and gifting suite. VIPs could even choose to have their samples custom-engraved on site.*" A social media post indicated that free samples of JUUL were provided.[27]

The SRITA website contains 345 images from JUUL event (tobacco.stanford.edu/pods/juul/juul events)

**Figure 5** October 2017 JUUL sampling event offering $1 flavor tasting.



## JUUL ADVERTISING:

### JUUL's Launch Advertising Theme (2015 to early 2016): "Vaporized"

The initial JUUL marketing campaign, designated "*Vaporized,*" was designed by Creative Director Steven Baillie along with Grit (*"Grit delivers strategic yet creative solutions, up-to-the-minute intel and intuition, unearthing what is and will be buzzing in culture"*) and Cult Collective (*"Cult Collective is devoted to giving brands a cult-like following")*[28-30] The targeting of youthful consumers was evident in the design and implementation of the vaporized campaign. "*Vaporized*" featured models in their 20s, appearing trendy in casual dress. **(Figure 6)** Their poses were often evocative of behaviors more characteristic of underage teens than mature adults. In their case study for JUUL, Cult creative described their intention: *"We created ridiculous enthusiasm for the hashtag "Vaporized," and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be our best customers."*[31] Based upon subsequent sales trends it is clear that this imagery resonated with underage teens who aspire to emulate these trendsetting young adults. The central message seems to be that if you try JUUL you will be blown away (i.e.vaporized) by the wonderful new vapor product. Richard Mumby, chief marketing officer over the founding JUUL campaign, described the vaporized theme as possessing *"dynamic energy."*[32] The vivid color scheme of Vaporized advertisements closely resembles that of Natural American Spirit Cigarettes, a leading youth brand. (**Figure 7**) Embedded in the Vaporized campaign was the slogan "*smoking evolved*" which serves to associate the brand with themes of high tech and latest generation (e.g., must have newest iPhone model). The net effect of the initial campaign was to establish a notably youth-oriented brand identity for JUUL.

The SRITA website has 50 images from the Vaporized campaign (tobacco.stanford.edu/pods /juul/vaporized) and 24 videos (tobacco.stanford.edu /videos/juul).

**Figure 6.** JUUL's "Vaporized" launch campaign of 2015 displayed happy twenty something models in trendy dress often playfully posed. The JUUL device was often surrounded by brightly colored triangles which, in digital version, flashed through a vivid color rainbow.



**Figure 7.** JUUL 's color schema appears to emulate that of American Spirit cigarettes, a popular brand among American Youth.



B.  **JUUL's Advertising Themes (2016 – mid-2018):**

In early 2016, JUUL's advertising gradually transitioned in both its style and message content to align with 6 main themes: pleasure/relaxation, socialization/romance, flavors, economics, holiday/ seasons, style/identity, and switching/satisfaction. Our entire library of JUUL advertisements can be accessed on the SRITA website.[19]

**Pleasure/Relaxation**

A central message of JUUL advertising, as with all tobacco promotion, is that using the product adds comfort and joy to your life. **(Figure 8)** Slogans such as *"Enjoy a JUUL moment"* and *"Cozy up with JUUL"* implants the notion that every period of relaxation should be accompanied by JUUL. Reinforcing this theme, JUUL frequently posts to the #juulmoment. Weekends have a special marketing appeal: *"Ease into the weekend with JUUL"* and *"Don't go into the long weekend unprepared."* Conversely, if you only take your JUUL to work, *"Monday's don't need to be hard."* The message, *"Enjoy yourself, you earned it"* portrays the device as a reward, a special treat you deserve.

Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

**Figure 8.** This 2018 advertisement is typical of the pleasure/relaxation theme. Note how the model puffs a vapor plume while he admires his JUUL.



**Socialization/Romance:**

JUUL is frequently portrayed as a social activity to be shared among friends**. (Figure 9)**   Depictions of friends JUULing together are reinforced by slogans such as *"Share JUUL"* and *"Give JUUL."* Inevitably, JUUL is associated with romance such a couple, face to face, mingling their exhaled vapor – yet another motif traditional in tobacco marketing. JUUL encourages consumers to show their affection via JUUL: *"Surprise your love with JUUL for Valentine's Day"* and *"Forget diamonds. Surprise that special someone . . . with JUUL."* JUUL also exploits the fear of smokers being socially ostracized: *"Say goodbye to smelling like an ashtray."*

**Figure 9** Example of the Socialization/Romance theme.



Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

**Flavors**

In the US JUUL offer 8 flavors: Virginia tobacco, classic tobacco, mint, menthol, cucumber, mango, creme, and fruit. In late summer 2018 JUUL toned down the names of three of its flavors which were originally cool cucumber, crème brûlée, fruit medley. As of November 13, 2018 all but Virginia tobacco, mint, and menthol are available in the US only via the company website.[33] JUUL has offered limited edition flavors for a fixed length of time including coco mint.[34] JUUL has registered many other flavors with the FDA including peanut and jam, apple crumble, apple cran, peach ginger tea, chestnut croissant, mimosa, strawberry limoncello, cinnamon snap, lemon poppyseed and spicy watermelon which have not appeared on the market to date.[35] A June 2017 JUUL customer survey included Berry crumble, peanut jam, and classic dessert.[36] In the UK, JUUL offers Mango Nectar, Royal Creme, Golden Tobacco, Glacier Mint, Apple Orchard - all in 1.7% (20mg/ml) nicotine.

Since the product's inception, flavors have played a central role in JUUL marketing. **(Figure 10)** Special emphasis has been placed upon sweet and fruity flavors such as mango. The frequency of JUUL advertisements by flavor from social media channels and via email in the period June 2015-October 2018: mango 40, cool mint/classic menthol 25, cucumber 18, classic tobacco/Virginia tobacco 18, crème brûlée 12, fruit medley 6, and multiple flavors 34. (**Table 1**) The emphasis upon dessert flavors is clear: *"Have a sweet tooth, try bruule."* JUUL's slogan, *"Save room for JUUL"* of early 2016 is clearly meant to be evocative of the common phrase *"Save room for dessert."* On April 2017 JUUL posted *"Turns out a whole lot of you love mango."* Subsequently it became the most prominently featured flavor with laudatory comments such as: *"Get into the tropical mood of summer with mango JUUL Pods"* (July 2018) and *"Love, love, love the mango pods"* (August 2018).

**Figure 10.** This 2018 advertisement is a JUUL promotion for mango pods, its most popular flavor. ("*Love, Love, Love the Mango pods!!*")



Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

**Table 1:** JUUL advertisements (**176**) with flavor as a principal theme on social media channels and via email June 2015-October 2018 (a partial list due to company deletions).

| Channel | Mango | Cool Mint or Classic Menthol | Cool Cucumber | Classic Tobacco or Virginia Tobacco | Crème brûlée | Fruit Medley | Classic Menthol & Classic Tobacco | Multiple Flavor Variety |
|---|---|---|---|---|---|---|---|---|
| Twitter | 16 | 10 | 10 | 7 | 5 | 2 | 14 | 6 |
| Facebook | 6 | 4 | 3 | 3 | 3 | 1 | 3 | 4 |
| Instagram | 5 | 4 | 3 | 2 | 2 | 1 | 0 | 2 |
| Email | 13 | 7 | 2 | 6 | 2 | 2 | 6 | 22 |
| **Total** | **40** | **25** | **18** | **18** | **12** | **6** | **23** | **34** |
| **2018 only** | **18** | **14** | **8** | **10** | **3** | **0** | **12** | **20** |

**Cost Savings/Discounts**

JUUL's business model is to get their devices into as many customer's hands as possible and then sell them nicotine containing flavor pods on a recurring basis. **(Figures 11,12)** This explains why JUUL regularly advertises discounts for its starter kits. (e.g. 15%, 25%, 40% off). Aligned with this strategy, JUUL heavily promotes its auto-ship subscription purchase plan for its pods. Soliciting its customers as marketing partners, it offers a *"JUUL referral program – give $15 get $15."* For those price sensitive buyers, JUUL promotes its *"JUUL savings calculator"* so that its customers realize that using JUUL is a cheaper way of satisfying their nicotine addiction than cigarettes. (**Table 2**)

The SRITA website has 45 images of JUUL's discount advertising (tobacco.stanford.edu/pods/juul/discounts).

**Figure 11.** Discount on a JUUL starter set.



**Figure 12**. JUUL's reward program encourages it customers to serve as brand ambassadors.



**Holidays/Seasons**

On a regular basis, JUUL posts advertisements referencing changing seasons and major holidays such as Mother's Day, Father's Day, St Patrick's Day, Valentine's Day, New Years, Labor Day, and Thanksgiving, July 4. **(Figure 13)** Examples of slogans include: *"Celebrate fall with JUUL," "The perfect holiday companion," "Enjoy the holidays with JUUL," and "This season give JUUL."*

**Figure 13.** Example of the Holidays/ Seasons theme which also emphasizes that using JUUL is a social activity among friends.



**Table 2:** JUUL advertisements (June 2015-October 2018) featuring discounts and cost savings.
(a partial list due to company deletions).

|  | Percentage Discount* | Dollars off * | "Pods on us" (free with auto-ship) | Savings Calculator# | Give $15 Get $15 | Buy 1 Pod Pack Get 1 Free |
|---|---|---|---|---|---|---|
| Twitter | 38 | 8 | 0 | 5 | 5 | 0 |
| Facebook | 8 | 3 | 0 | 0 | 0 | 1 |
| Instagram | 2 | 1 | 0 | 0 | 0 | 0 |
| Email | 11 | 8 | 10 | 4 | 2 | 5 |
| **Total** | **59** | **20** | **10** | **9** | **7** | **6** |

*Percentage Discounts ranges from 15 to 40% off starter kits

+Dollars discounts range from $15 to $20 off starter kits

#Purported savings switching to JUUL from cigarettes

**Style/Identity**

In its early advertising, JUUL depicted stylish and attractive models of a type youthful consumers would like to emulate. Attractive girls in pants torn at the knee dressed in crop tops with their navel showing. Men wearing jeans or khaki pants. Many smiling broadly and in whimsical poses, always with a JUUL in hand. Celebrities are important cultural symbols sought after by advertisers. In January 2016, JUUL posted images on both its Facebook and Instagram accounts of Katy Perry holding a JUUL at the Golden Globes. **(Figure 14)** One of its models in the Vaporized campaign resembles Ariana Grande in pose and coiffure. **(Figure 15)** The style of the product itself is emphasized with limited edition colors such as blush gold, silver, navy blue, and turquoise.

**Figure 14.** JUUL posted Katy Perry holding a JUUL at the Golden Globes in January 2016. Use of the image of a celebrity using the company's product is an example of the style/identity theme.



**Figure 15.** The pose and hairstyle of this 2015 Vaporized campaign advertisement are reminiscent of popular singer Ariana Grande. This is an example of the style/identity theme.




**Company Messages**

Across its social media platforms, JUUL often posts messages expressing the company's position on regulation and public policy. JUUL also conducts customer surveys and criticizes research with findings contrary to its business interest (e.g., Truth Initiative). Frequently, the postings portray the company's marketing practices in a positive light: "*We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences.*" (March 14, 2018)

The SRITA website has 45 images of JUUL company messaging (tobacco.stanford.edu/pods /juul/companymessage).

**Switching/Satisfaction**

Despite FDA rules which prohibit scientifically unsupported advertising claims promoting e-cigarette as a means of quitting combustible cigarette smoking, the practice is widespread among electronic nicotine delivery systems.[37] Many JUUL advertisements promote its use in "switching" from traditional cigarettes. (**Figure 16**) Examples of this genre of slogan include: "*make the switch," "help a smoker switch to JUUL," "help mom switch to JUUL," "the right tool to switch, alternative to cigarettes,*" etc. This theme has

dominated since mid-2018, in response to intense negative media attention and threatened FDA action in response to widespread use among non-smoking youth. Since May 2018 a string of advertisements have appeared with a JUUL device portrayed as the "I" in the word switch. Simultaneously, a series of video testimonials of former smokers crediting JUUL for helping them transition appeared on their website and in social media channels.

The term satisfaction has a long history in tobacco advertising as a code word for overcoming the urges of nicotine addiction. JUUL advertising copy has numerous variants on the satisfaction theme: *satisfying, intensely satisfying, simply satisfying, most satisfying, satisfaction with no stink attached, share the satisfaction*, etc. A series of Instagram posts from the JUULVapor account depict JUUL devices next to coffee cups accompanied by phrases such as "*Good morning! Have you had a #juulmoment today?*" The urge to reach for a cigarette immediately upon arising is a well known behavioral marker of nicotine addiction. Continuity of nicotine dosing throughout daily activities is imbedded in JUUL advertising: upon arising and subsequently when eating, socializing with friends, partying at night, etc. Making JUUL an integral part of ordinary life is the goal: "*Before you head out remember wallet, keys, phone, #juul.*" Images such as

those with suitcases accompanied by the slogan:*"Pack the essentials"* reinforce the central role of JUUL (ie. nicotine) in daily life.

The company touts internal "research," without providing methodology or data for scrutiny. In 2018, it made the bold assertion that: *"The company's research shows more than one million smokers have already switched to JUUL."*[38] It is interesting to note that JUUL's researchers do not make publicly available

any effort to quantify its product use among underage non-smoker. Seeking to deflect regulatory attention from its messaging, JUUL's website maintains that: *"Consistent with FDA regulations, JUUL Labs can not and does not promote its products as less harmful or safer than cigarettes."*[39]

The SRITA website has 112 images of JUUL's switch themed advertising (tobacco.stanford.edu/pods/juul/switch).

**Figure 16**. In 2018, JUUL social media promotion focused on the switching/satisfaction theme. The appearance of an elderly model is extremely rare in tobacco advertising.



#### C. JUUL's Advertising Themes (late 2018):

As regulatory pressures intensified, over the summer of 2018 JUUL re-focused its advertising to focus upon its 'switch' theme. **(Figure 17,18)** This included older models, primarily middle aged or older, and included numerous testimonial videos on Instagram, Facebook, and Twitter. Meanwhile, marketing emails continued to promote flavors such as mango, offer discounts, and to encourage signing up for auto-ship subscription. A series of defensive press statements from JUUL leadership also appeared in response to FDA and other regulatory attention.[19]

## II. JUUL ADVERTISING CHANNELS:

### JUUL Traditional Media:

**Print:**

JUUL has minimally used traditional channels used by tobacco advertisers such a magazines, newspapers, billboards, radio, and television. In 2015, JUUL chose a single magazine to launch their advertising campaign. It was VICE magazine, a glossy pop culture focused publication which markets itself to advertisers as *"#1 youth media company."*[40] Contrary to their stated purpose, JUUL chose VICE to

launch its initial campaign to fulfill its mission of reaching *"adult smokers."* The full page advertisements on the inside of the cover page were colorful and showed 20-something models in playful poses. Beginning in late summer of 2018 JUUL began to run full page newspaper advertisements on the switch theme.

The SRITA website has 12 images from Vice Magazine (2015) and the San Francisco Chronicle (2018) (tobacco.stanford.edu/pods/juul/print).

**Figure 17** December 2018 newspaper switch themed advertisement



**Figure 18.** December 2018 newspaper switch themed advertisement



**Billboards:  JUUL Times Square**

As part of JUUL's launch in 2015, brightly colored 12-unit billboard display flashed images of attractive and fashionably casual young models smiling, joyously jumping, and kissing while enthusiastically vaping.[28] **(Figure 19)** The display, which was up for a month, was designed by Georgia, a creative production center based in Soho, New York City.[41] While striking in still pictures, their youthful emphasis is most vividly depicted in animated gifs.[19,28] Animated tobacco billboards in Times Square have a long history. A block long Camel Cigarette billboards (1941-1966) puffed impressive "smoke rings" made of steam followed by an illuminated Joe Camel (1989-1994), Marlboro, Winston, Kool and others. In 1999, major American tobacco companies agreed to halt outdoor billboards.[42] (**Figure 20**)

The SRITA website has 14 images and 3 videos of JUUL's Time Square Billboard Promotion (tobacco.stanford.edu/pods/juul/timessquare)

**Figure 19.** A collage of images from JUUL's 2015 Times square animated billboard which were vividly colorful and featured twenty something models in playful activities while vaping a JUUL.



**Figure 20.** Times Square advertisements for JUUL (2015) and Camel (1940s).



**Point of Sale:**

Vaporized imagery predominated in early JUUL point of sale promotions. (Ref Georgia In Store) According to the creative team (Georgia) campaign appeared in over 20,000 retailers.[41] Discounts predominate in store window posters. In product displays JUUL kits and pods are often elegantly arranged in clear plastic "jewel" cases.

The SRITA website has 49 store window posters and displays. (tobacco.stanford.edu/pods/juul/stores)

**Mobile Phone Advertising**

Over the calendar year of 2015, even though it was not introduced until mid-year, JUUL did by far the most paid mobile advertising of any e-cigarette company.[43] JUUL's 5 different advertising impression appeared in 468 mobile advertising observations which comprised 74% of all e-cigarette advertising for the entire year. The advertisements were to be part of the youth-oriented "Vaporized" campaign.

**Radio:**

In mid-2018, JUUL launched radio advertise-ments.[44] The messages are focused upon the "switch" theme. Unlike other major e-cigarette companies, we are not aware of television advertising by JUUL.

**JUUL Social Media**

**Instagram, Facebook, Twitter**

We collected advertisements from JUUL's Twitter, Facebook, and Instagram accounts.[19] Our assembled collection included a total of 2691 tweets collected from JUUL's official twitter handle for the years 2015 to November 2018 [2015 (172), 2016 (216), 2017 (927) and 2018 (1376)]. We also collected 248 Facebook posts from the same time period [2015 (12), 2016 (25), 2017 (62) and 2018 (149)]. On Instagram, our collection included 187 Instagram posts. As of November 2018, followers of JUUL's Instagram was 77,600, Twitter 19,700, and Facebook 10,280.

It is important to acknowledge that JUUL has deleted a large portion of its social media history. In July 2018, a JUUL spokesperson indicated that the company has worked with social media companies to remove youth-oriented content with some 4000 such posts removed from Instagram and Facebook.[45] For example, the entire inventory of JUUL communications from its initial marketing campaign "Vaporized" have been expunged by the company. "Vaporized" would have remained vaporized had we not been able to resurrect this campaign from other sources. Instagram postings prior to June 17, 2017 were entirely deleted prior to mid-2018 and then a second deletion occurred in August 2018 leaving only new postings on the switch theme. As of October 2018, JUUL's Instagram had reduced to 46 posts. On November 14, 2018 JUUL ceased using Instagram and Facebook in the United States.[38]

While non-company posting were not a primary subject of this study, even a cursory evaluation shows them to be voluminous. Over a quarter of a million followers of #juul on Instagram is dwarfed by the multitudes of YouTube videos returned by a search on JUUL which includes 11 with >1,000,000 views and 109 with >100,000 (October 2018). Scanning through voluminous social media show it to be permeated with postings by teenagers.

The SRITA website has 223 Twitter, 175 Facebook, and 216 Instagram samples of JUUL promotion (tobacco.stanford.edu/juul).

**Social Media Influencers:**

JUUL has employed influencers - social media users with sizable followings recruited to increase brand awareness and to inspire sales. **(Figure 21,22,23)** Confirming that JUUL used influencers since its inception was a June 2015 listing for an Influencer Marketing Intern. The job description makes the strategy clear: "*The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements. . . to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc.*"[46]

Influencers are a form of paid promotion. For example, an influencer may earn $1000 for each 100,000 followers.[47] A particularly well documented example is that of DonnySmokes (Donny Karle, age 21), whose JUUL "unboxing" YouTube video garnered

some 52,000 views.[48] With 120,000 subscribers on his YouTube channel, Mr. Karle was able to earn a good income stream from vapor companies before YouTube interrupted his channel. In October 2018, JUUL's website still requests applications to "*Join the JUUL*

*Influencers.*" [49]  The application requires candidates to disclose their profiles for Instagram, Twitter, Facebook, blogs, and vlogs along with their number of followers for each.

**Figure 21.**  2015 JUUL summer influencer marketing internship solicitation from Internships.com. (https://www.internships.com/marketing/influencer-marketing-intern-i7391759)



**Influencer Marketing Intern**

PAX Labs
660 Alabama Street
San Francisco, CA
Posted: May 15 2015

**Application Deadline:** Closed
**Position:** Full-time, Paid
**Timeframe:** 06/01/15 — 09/01/15

Closed    This position is closed

This role will focus on the research, development and tracking of PAX and JUUL growth and expansion through influencerbased marketing opportunities. The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements. This includes research, design, implementation and execution of all components of the programming, communication, and tracking. This role requires a broad understanding of the full breadth of PAX Labs, Inc. products and target customers. This knowledge will be used to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through wordofmouth and social media channels, etc. You will also work with supporting our assistant brand manager, ecommerce manager, and social media manager to ensure influencer experience is running smoothly and is being tracked and measured. This role reports to the Experiential Marketing Manager.

**Figure 22**. Invitation on JUUL's website (October 2018) to recruit social media Influencers.



**Figure 23**: From JUUL website in November, 2018, JUUL "marketing spend" may refer only to spending external to the company. It may, or may not, include hired social media managers and influencers. Superimposing the number of social media postings on this curve would likely show a vast frequency during the time of little reported market spending. Because the company has deleted much of its social media history over its period of rapid growth, such a quantitative depiction is not possible.



**JUUL Affiliate Program:**

JUUL has used an affiliate program which makes payouts to online sites which refer business to them. In the vaping industry, this most often takes the form of sites which review the product favorably and include a link to the product's website, especially to their "*buy now*" section. JUUL partnered with the company Impact Radius (https://impact.com/) whose goal is to: "*optimize partner marketing investments.*"[50] In their affiliation application, JUUL explained: *How it works: You get paid by advertising performance campaigns to your audience on your blog, website, newsletter, search landing page. Depending on the specific terms of our agreement you can get paid as frequently as daily using direct deposit into your bank account.*[50] It goes on to specify: "*The purpose of this Agreement is to allow HTML linking*

*between your web site and the juulvapor.com web site*" and "*At all times, you must clearly represent yourself and your web sites as independent from juulvapor.com.*" (**Figure 20**)

JUUL offers payment of 25% of net sales for new customer and 10% of net sales for existing customers. On October 31, 2018 JUUL halted its affiliate program.[51] JUUL did not wait for an internet admirer to apply to its affiliates program. In response to a complimentary tweet on JUUL's Twitter feed, the company replied with an invitation for the individual to join the affiliates program 18 times (15 in 2017 and 3 in 2018).

**Figure 24.** Application to Join JUUL Affiliates program (Novemeber 2018)



**JUUL e-Mails to Customers**

JUUL has sent out marketing e-mails to customers and those who have signed up to their newsletter on a regular basis since the company launched its product and continues to do so as of November 2018. We examined 189 JUUL emails to its

customers spanning 2015-2018. In 2018, JUUL's claims that it employs a strict system to prohibit purchasing of their products via their website by those under age 21 sales. To test its efficiency, in July 2018 we have had 5 underage student summer interns (ages 15-19) attempt to purchase JUUL products from the company

website. All were appropriately rejected after uploading their demographic data. However, within a day each received a follow up e-mail notice that read "*Welcome to JUUL*." Shortly thereafter they received a series of advertising emails from JUUL including a discount coupon to buy a starter kit. After notifying senior leaders of JUUL of this practice, they promptly discontinued it.

The SRITA website has 189 JUUL emails to its customers (tobacco.stanford.edu/pods/juul/email)

**JUUL Brand Website:**

Numerous versions of the JUUL website were captured by the internet archive Wayback Machine.[18] At the time of JUUL's launch (June 19, 2015) JUUL's website prominently featured the Vaporized campaign imagery including an animated gif. A link to its Instagram, Facebook, Twitter, and YouTube sites were included. Six months later (Jan 19, 2016) the website showed popular singer Katy Perry at the Golden Globes holding a JUUL, the image was reposted on JUUL's social media channels.

**JUUL HASHTAGs**

**JUUL Hashtag Marketing:**

Hashtags are of special interest as they have been extensively used by JUUL and greatly expand the reach of the company's social media postings. **(Figure 25)** Hashtags connections used in their Instagram postings can be considered in several categories: Those created by JUUL (eg. #juul, #juulvapor, #switchtojuul, #vaporized); JUUL focused but created by customers or vendors (eg. #juulnation,#juullife); and trending topics unrelated to JUUL (eg. #mothersday, #goldenglobes, #nyc). Comparing JUUL's first year on the market with its third, JUUL actually ramped up its hashtag use substantially. **(Tables 3,4)** As of 1/21/2019 the company's premier hashtag (#juul) has 336,308 posts. The growth in hashtag posting remains robust. In the 27 days between October 17, and November 12, 2018 #juul alone added 23,676 or an average of 877 posts per day.

The SRITA website has 212 examples of youth oriented community posts to #juul from the last week

of November 2018 (tobacco.stanford.edu/pods /juul/hashtagjuul). Of note, these #juul community posts were gathered after JUUL had halted use of Instagram and deleted all of its earlier posts.

**Table 3.** JUUL Hashtags cited on company Twitter account during JUUL's first year on the market (June 2015 – May 2016)

| JUUL Specific | Vapor related |
|---|---|
| #juul | #vape |
| #jullvapor | #vapelife |
| #juulpods | |
| #juultip | **Other Hashtags** |
| #juulallnight | #nyc |
| #vaporized | #DomenicoSpano |
| #cocomiint | #NYFWM |
| #tabaac | #LifeIsBeautiful2015 |
| #LightsCameraVapor | #CyberMonday |
| | #recipe |
| | #foody |

**JUUL Hashtag Content Analysis:**

The three 19 year old content reviewers evaluating JUUL related community posts, which contained either the image of a person or a meme, identified 68.8% (362/526) on #juul and 48.3% of images tagged @juulvapor (56/116) to be "youthful." (**Table 5**). Among #juul community posts humor (40.7%), memes (31.2%), and pop culture references (29.1%) were most commonly identified. The average number of likes for #juul was 80 (range 0-1879) and @juulvapor 395 (range 12-13,733). Intercoder reliability via Krippendorf's alpha values ranging from 0.781 to 1.0. In order to provide others the opportunity to independently examine the images coded, the entire set coded will be made available to any researcher who requests it.

**Figure 25.**  A sampling of community images from #juul.  While JUUL halted its own Instagram posts in November 2018, a vast community, predominantly young people continue to post to #juul it created. As of January 21, 2019, #juul has 336,308 posts.



**WARNINGS**

While JUUL advertisements and social media posts routinely carry warnings against underage use and disclose nicotine content in 2018, these notifications were not always included and have evolved over time. A review of the earliest among 171 JUUL promotional e-mails found that between product launch in June 2015 to April 7, 2016 no mention was made of JUUL nicotine content. After that, JUUL emails carried the message about the addictiveness of nicotine discreetly positioned in fine print at the bottom of the e-mail. JUUL's Twitter feed containing 2691 tweets did not add a nicotine warning until October 6, 2017. In 2017-2018, JUUL's Instagram posts carried the admonition: *"Warning: This product contains nicotine." Nicotine is an addictive chemical."* In late June 2018, the Instagram warning text changed to: *"WARNING: Contains nicotine, which can be poisonous. Avoid contact with skin and eyes. Do not drink. Keep out of reach of children and pet. In case of accidental contact, seek medical help."* Beginning on July 30, 2018, advertising imagery on JUUL's Twitter feed placed a black box nicotine warning above the image. Since August 9, 2018, JUUL's video testimonials on Instagram commence with a prominent black box

warning. In November 2018, the FDA published detailed guidance labelling requirements for tobacco products regarding nicotine addiction.[52]

Warnings against use of JUUL by underage youth have also evolved over the years. JUUL's e-mails and tweets were each studied. A search of JUUL company tweets from 2015 to 2018 in the SRITA collection, the terms *"adult"* or *"adult smoker"* first appeared on July 5, 2017, where it stated that: *"Here at JUUL we are focused on driving innovation to eliminate cigarettes, with the corporate goal of improving the lives of the world's one billion adult smokers."* A December 12, 2017, tweet references a section in JUUL's website titled *"How JUUL Labs is Combating Underage Use of our Product."*

Review of JUUL emails to customers showed *"Intended for adult smokers only"* first appeared on Nov 26, 2015 and appeared sporadically after. Beginning with an April 7, 2016 email, this changes to: *"Intended for adult smokers only – not for sale to minors."* In August 2017 the wording changed again to: *"Age restricted product. Not for sale to minors"* and later to:*"For adults 21+ years old only. Not for sale to minors."* A black box was added to the underage use warning in October 2018 to JUUL advertisements which include a visual.

**Table 4.** Hashtags used by JUUL on the advertisements they posted to their Instagram account over the brand's third year on the market with number of postings to each hashtag (as of October 17, 2018). Note that many other JUUL related hashtags exist (eg #juultricks, #juulgod, #juuling, #doitforjuul, #juul memes, #juulinschool) but were not used in JUUL advertising postings. (*still in use by JUUL as of October, 2018)

**JUUL Specific**

| | | | |
|---|---|---|---|
| #juul* | 260,866 | #thesmokingalternative | 21 |
| #juulvapor* | 33,945 | #juulmiami | 15 |
| #juulnation | 23,273 | #juulinhand | 17 |
| #juulpods | 28,741 | #juulfacts | 6 |
| #coolmint | 11,940 | #sharejuul | 1 |
| #juullife | 10,299 | #juulhandcheck | 2 |
| #fruitmedley | 5,163 | | |
| #fruitfriday | 3,694 | | |
| #coolcucumber | 3,558 | **Non-JUUL Specific** | |
| #mangomonday | 3,488 | #TBT | 454,246,460 |
| #juulpod | 3,189 | #nyc | 105,612,598 |
| #virginiatobacco | 2,418 | #miami | 55,280,014 |
| #switchtojuul* | 997 | #tgif | 32,260,047 |
| #tobaccotuesday | 914 | #mothersday | 16,047,324 |
| #juulmoment | 797 | #mango | 12,207,495 |
| #classictobacco | 389 | #fathersday | 8,512,901 |
| #classicmenthol | 319 | #laborday | 2,6262,705 |
| #juulnyc | 81 | #cremebrulee | 659,193 |
| #mintpod | 33 | #taxseason | 493,694 |

**Table 5:** Content analysis of youthful attributes of community posts to #juul and tagged @juulvapor (6/28 - 7/4, 7/18-7/24). Krippendorf's alpha is a measure of inter-coder reliability.

| Themes* | #juul | Tagged @juulvapor | Krippendorf's Alpha |
|---|---|---|---|
| Youthful | 362 (69%) | 56 (48%) | 0.891 |
| Humorous | 214 (41%) | 8 (7%) | 0.831 |
| Meme | 164 (31%) | 3 (3%) | 1.0 |
| Pop Culture | 153 (29%) | 15 (13%) | 0.781 |
| Animated Character | 75 (14%) | 4 (3%) | 1.0 |
| JUUL tricks | 55 (10%) | 5 (4%) | 1.0 |
| Covert Use | 29 (6%) | 2 (2%) | 1.0 |
| Alternative to Smoking | 24 (5%) | 5 (4%) | 1.0 |
| **Total** | **526*** | **116** | |

*  Count exceeds total as some posting had multiple themes

**DISCUSSION:**

**Evolution of JUUL advertising:**

JUUL's advertising has evolved over the three plus years since its introduction to the market in three recognizable phases. Between its launch in June 2015 and early 2016 JUUL's Vaporized campaign featured patently youth-oriented imagery and messaging. Vaporized advertisements were distributed via the brand website, emails, multiple social media channels, and in an enormous animated billboard in New York City's Times Square. Vaporized had neither nicotine nor underage use warning messages. The campaign included distribution of thousands of free samples at parties hosted in a number of major America cities. Ultimately, JUUL's Vaporized campaign initiated a surge in demand for their product among American youth. In a recent interview, co-founder James Monsees admitted the early Vaporized campaign as "flawed."[53]

Few products have disrupted a market as quickly and thoroughly as JUUL has to e-cigarettes. Aside from becoming its dominant player, JUUL's rise also expanded the size of the overall e-cigarette market. Over its first few years, the Vaporized campaigns and its successors fulfilled the aspirations of its creative agency (Cult Collective) to give the brand *"a cult-like following."* In so doing it, it pursued the path advocated by its creative Director Steven Baillie by aligning to: *"what is and will be buzzing in culture."*[28]

**The Roots of JUUL Promotion in Traditional Tobacco Advertising:**

JUUL's principal advertising themes (pleasure/relaxation, socialization/romance, flavors, cost savings and discounts, holidays/ seasons, style/identity, and satisfaction) are closely aligned with that of traditional tobacco advertising. In an interview with the authors, JUUL co-founder James Monsees indicated that design of JUUL's advertising had been informed by traditional tobacco advertisements and that our SRITA online tobacco advertising collection had been quite useful to them. The SRITA website includes 82 comparisons between JUUL and historical cigarette advertisements (tobacco.stanford.edu/juultobaccocomparison).

(**Figures 26-36**) Clear references exist to both historical and contemporary tobacco advertising themes. Contemporary examples include the coloration of American Spirit, the playful twenty somethings of Newport (Alive with Pleasure), the relaxed poses of Camel (Pleasure to Burn), the stylish smoking of Virginia Slims ("You've Come a Long Way Baby), among many others.The one theme not characteristic of traditional tobacco marketing is the "switch" theme which predominates in 2018. To avoid possible action by the FDA regarding therapeutic claims, JUUL has avoided explicit messaging that its customers use its product to quit smoking.[37] Transitioning from conventional cigarettes to JUUL as a means of satisfying nicotine addiction is also a better business model for JUUL, whose profit is based upon long term use of their consumables (nicotine e-liquid pods). The term satisfaction, used by JUUL in some advertisements, has long been used by tobacco advertisers as a proxy for satisfying one's craving driven by nicotine addiction.

**Figure 26.** Tobacco advertisements have long featured attractive young women in suggestive poses.

 

**Figure 27**. Similarities between a JUUL advertisement and the 2000 Camel "Pleasure to Burn" campaign. Tobacco products are promoted both as a way of relaxing and perking up, an example of elasticity of meaning.

 

**Figure 28.** Similarities between a JUUL advertisement and a 2002 advertisement typical of the "Newport Pleasure" campaign of 1973 – 2016.  Playfully arranged groups of young people.

 

**Figure 29**. Similarities between a JUUL advertisement and a 1987 advertisement typical of the Virginia Slims "You've Come a Long Way Baby" campaign of 1968 – 1990.



**Figure 30**. Similarities between a JUUL "Smart" advertisement and a 1950s advertisement from a 1955 Parliament "Smart" advertisement.  In both the term 'smart"conveys a message of health reassurance.




**Figure 31**.  JUUL's "smoking evolved" conveys a similar message of health reassurance to L&M's "miracle tip."




**Figure 32.** Tobacco advertisements often showed romantic couples mingling smoke.  In this 1932 Lucky Strike advertisement the future groom exhales a set of wedding rings.



**Figure 33.** Tobacco marketers use myriad themes suggesting that their products foster success in romance.




Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

**Figure 34**. Both the JUUL and Lark advertisement suggest giving the gift of a safer product to enhance a loved one's health.




**Figure 35**. Similarities between a JUUL "Mother's Day" advertisement and a 1950s advertisement from Chesterfield.




**Figure 36.** The slogan "Save room for JUUL" emulates the phrase of "Save room for dessert" reinforcing the notion that JUUL is a sweet treat (eg.Creme brulee)




**JUUL's Advertising Appeal to Youth:**

Advertisers tailor their advertising to the channels of the age ranges they intend to target (eg. baby boomers, Gen X-Y-Z). Use of media channels frequented by underage youth, such as teen magazines, has long been prohibited in the US for tobacco products. Gen Y, commonly referred to as millennials (born 1980-1994), are known to be tech savvy and were the first consumer age group to heavily use social media. Their attention to product promotion could be grabbed by graphic content (eg. videos, animations) and they have less interest in television than earlier generations.[54] Present day middle and high school students fall into Gen Z (born 1995 to 2012). Gen Z youth have never experienced the world without the internet and live immersed in social media, most often viewed on mobile phones.[55] They are especially technology driven, are drawn to entertaining interactions, and are easily swayed by messages that the company is committed to doing good for humanity.[56] Gen Z's social media engagement is even more intensive than their older Gen Y brethren. As of April 2018 Instagram, an image and video sharing platform which is the favorite social media site among US teens, was used by 63% of teens

age 13-14 and 78% ages 15-17.[57] The time spent online is high.[58] In 2018, 89% of teens were online either *"almost constantly"* (45%) or *"several times a day"* (44%).[58] Minimally used in JUUL's advertising are the traditional media channels (eg. magazines, newspaper, radio, television) principally used in targeting baby boomers and Gen X.[59] While under intense regulatory scrutiny, in mid 2018 JUUL began newspaper and radio advertising on the adult oriented switch theme.

The generational focus of JUUL's advertising has clearly been upon Gen Y young adults and Gen Z school age youth. JUUL's channels are clearly not aligned to the media preferences typical of the baby boom generation (1946-1964) and Gen X (1965-1980) generations. JUUL's advertising regularly carries the phrase *"for adult smokers only."* Among Adults, in 2016 the CDC estimated there were some 37.8 million cigarette smokers in the US of whom 18-24 (3.9 million), 25-44 (14.7 million), 45-64 (15.0 million), and ≥65 (4.5 million).[60] Among adolescents, in 2017 CDC reported there were approximately 1.35 million cigarette smokers in the US (high school 1.1 million, middle school 0.25 million).[61] This implies that only about 10% of American cigarette smokers are among

the age group of those most heavily frequenting JUUL's social media advertising channels, highlighting that JUUL's promotional efforts are notably misaligned with its professed purpose.

**Efforts to Achieve Maximal Reach for JUUL's Social Media Channels:**

JUUL funds its advertising differently from most of its competitors. After its initial 6 months, it did not use paid advertisement until newspaper and radio promotion appeared in mid-2018. This does not mean that it did not have a budget for promotion, quite the contrary. Searches on LinkedIn, Glassdoor, and other job listing sites reveal that JUUL maintains a sizable in house social media team including managers and staff overseeing content, community, and analytics.[62] Social media, which was originally used for conversation and content, has become a well established channel for customer acquisition. Unlike many competing e-cigarette brands, JUUL has avoided paid social media advertisement. It may be relevant that, in 2018, 46% of those ages 15-25 use ad blocking software, substantially the highest of any consumer age group.[63]

The goal of unpaid, often referred to as organic, social media marketing is to stimulate conversation about their product to encourage creation of a community who will contribute favorable user generated comments. JUUL's organic social media marketing helped to create a community who came to call themselves "JUULers." Enthusiasm among this group was ginned up by JUUL's "influencers" - individuals with large inventories of followers on social media who are compensated to serve as brand ambassadors. JUUL has used influencers to create and nurture conversations about their brand. Influencers contribute what appears to be independent user generated content which is influential, in part, due to its perceived independence from marketers' influences. JUUL has used celebrities in its promotion such as Katy Perry at the Golden Globes holding a JUUL and an Ariana Grande look-a-like. A study of e-cigarettes advertisements on Instagram showed that celebrities increased positive attitudes towards the product and intentions to use it compared with non-celebrity advertisements.[64]

Sophisticated social media marketers use various methods to achieve diffusion of their message beyond their brand account. Creating a hashtag (eg. #juul) is free and powerful method of mingling brand advertising messages with large audiences. These include both interested parties and those for example, who know #juul to be popular among their peer group and use it to post their unrelated material to enhance its visibility. Similarly, JUUL uses unrelated hashtags (eg. #goldenglobes, #nyc, #mothersday) to display its advertisements to a potentially vast audience who have not yet indicated any interest in their products. Tagging of images enabled on JUUL's Instagram page was another means of linking youthful imagery to their brand advertising. The scope and scale of JUUL's hashtag distribution is noteworthy with over a quarter of a million community posts to #juul. Even after JUUL ceased posting to its Instagram account in November 2018, the vibrant community of #juul lives on, including an abundant representation of youthful postings.

JUUL's affiliates program was a means of incentivizing positive reviews by what consumers believed to be independent evaluators who were actually compensated for their favorable commentary by as much as 25% of net sales using a customized link crediting them as the source. That JUUL shut down its affiliate program when under focused regulatory attention (October 31, 2018) was a tacit admission that the company feared that scrutiny of this program would not reflect well on its marketing practices.

**JUUL Flavors**

As part of their action plan in advance of anticipated FDA regulation JUUL issued a press release (November 13, 2018 – 2 days before the FDA announcement) with the following statement: *We launched flavors like Mango, Fruit, Creme, and Cucumber as effective tools to help adult smokers switch from combustible cigarettes, and we do not sell flavors like Gummy Bear or Cotton Candy, which are clearly targeted to kids.*[33] In their statement, JUUL makes a distinction for which the demarcation line is unsupportable. JUUL flavors currently on the market such as mango and crème (recently crème brûlée) may

be preferred by some adult smokers, but they have differential appeal to youth. In addition, the limited edition flavor coco mint (a mix of chocolate and mint) as well as many of their developmental flavors (eg. peanut and jam, classic dessert, cinnamon snap) would similarly have youthful orientation.

**Literature on the Impact of E-cigarette Advertising:**

A number of academic studies have appeared over the last few years evaluating the impact of e-cigarette advertising. A recent study analyzed the volume of JUUL related postings on Twitter, Instagram, and YouTube.[65] The vast majority of the postings counted were community generated, while the present study focuses upon postings originating from the company as part of their marketing campaigns. Multiple studies have shown that exposure to e-cigarette advertising on social networking sites among youth who had never used e-cigarettes increases the likelihood of subsequent e-cigarette use.[66-68] In addition, the number of channels of e-cigarette advertising exposure increased the probability of use among youth.[69] The ability of teens to recall e-cigarette advertising is associated with both susceptibility and actual use.[70] Exposure to digital e-cigarette advertising was associated with lower perceived harm.[71] The regulatory environment also has an effect. Adults smokers in countries with few e-cigarette advertising restrictions and less restrictive e-cigarette regulations, such as the United States, were more likely to notice advertisements.[72]

The message content of e-cigarette advertisements appears similar to the findings of this study. An analysis of e-liquid Instagram postings found that messages emphasized positive experiences, personalization, aspirational identities, taste, pleasurable physical and emotional effects, edgy/cool themes, and tended not to emphasize health and cessation claims.[73] Socially themed advertisements (eg. as fashionable, socially approved, socially enhancing) more effectively communicated reduced harm message among young adults than health themed advertisements.[74] Despite JUUL's claims that it is meant as an alternative to smoking, less than one-third of 1% of tweets mentioned using JUUL to quit smoking.[75] The frequency of postings in October 2018 on #juul (237,190) and #juulvapor (32,560) compared with #switchtojuul (901) suggests that its customer base are not especially engaged in the switching message.

Social media conversations relating to e-cigarettes have been studied. Between April and December 2017 over 80,000 tweets discussed JUUL. Most common were direct communication from one person to another, usually in the form of recommending JUUL to a friend. The topic of school, most often as a place for JUULing, was found in 3.66% of posts. [75] A study of JUUL's official Twitter account found that 25% were youth ≤18 and that they often shared the tweet with other adolescents.[76] On Instagram, images showing the e-cigarettes in use (e.g., blowing vapor) or the vaping device received the most likes.[77] Also on Instagram, 38% of images related to customization of the device, 18% juices/flavors, and 13% performing vape tricks.[78] Among JUUL related twitter posts most notify friends about buying or using JUUL.[75] A study of a vaping related hashtag on Instagram (#vapelife) suggested that user generated posts establish a social identity among e-cigarette users and that communication within a peer network escalated usage.[79]

Youth perceived that flavored e-liquids advertisements are meant for them.[80] An fMRI study among college age youth showed greater nucleus accumbens activity (function is reward and reinforcement) for sweet/fruit versus tobacco flavor e-cigarette advertisement.[81] Exposure to e-cigarette advertisement is associated with use of multiple tobacco products including cigarettes, hookah, and cigars.[82] In general, Pod based e-cigarette are associated with a high rate of polytobacco use, especially cigarettes, among adolescents.[83] While use of traditional cigarettes is higher among lower socioeconomic groups, the demographics are different for e-cigarettes. Higher socioeconomic status was associated with greater recent exposure to e-cigarette advertising.[84]

**JUUL as a Fad:**

The ultimate metric of success of efforts to spur viral marketing is creations of a fad - an intense and widely shared enthusiasm for the company's product. Attaining such a level of feverish purchasing is rare. Beanie Babies of the 1990s and fidget spinners in 2017 are well known examples.[85] Fads are triggered by an informational cascade among potential customers.[86] Information transmission, which earlier might have been driven by phone conversation, is greatly facilitated by the speed and ubiquity of social media. One of the best examples of viral social media driven marketing is the 2014 Ice Bucket Challenge which stimulated donations to the charity supporting research into amyotrophic lateral sclerosis. Teens, who demonstrate their individuality by conforming to the behaviors of their peers, are especially vulnerable to fads. There is little controversy that JUUL has greatly benefited from the craze for its products among the Gen Z cohort. While fads are idiosyncratic, they are also typically fragile and short lived. Companies benefiting from such frenzy of purchasing have roles in both the initiation and propagation of the craze. While JUUL's creators certainly could not have predicted the extraordinary rate of adoption of their product, the company's initial Vaporized campaign certainly triggered the interest among US teens and its prolific presence on youth consumed social media channels, enhanced by company paid influencers, undoubtedly sustained the craze and furthered its attaining a fevered pitch.

Once the initial youth-oriented Vaporized campaign introduced JUUL to youthful trendsetters, the growth of JUUL in 2017 and 2018 may have been driven predominantly by viral peer to peer spread among teens both in person and via social media. Advertisers dream that their product will ride the wave of such a consumer craze, but advertising alone cannot achieve this level of growth realized by JUUL. The growth of JUUL may be attributed to its perception as the latest high tech gadget, its stealthfulness making it easily hidden from parents and teachers, and its offering of youth appealing sweet and fruity flavors (eg. mango, crème brûlée).

**Measures Taken by JUUL in Response to Regulatory Criticism of its Marketing Practices:**

The JUUL founders have portrayed their company as wholly focused upon rescuing billions of adult smokers.[7] **(figure 37) S**uggesting an awareness of underage uptake, on August 23, 2017 JUUL raised purchase via JUUL's website from 18 to 21 years. Beginning in the last quarter of 2017, a flurry of media reports appeared expressing concern over the rapid adoption of JUUL by American high school students. On October 15, 2017, New York Senator Charles Schumer pushed for regulation of JUUL.[87] The company publicly admitted their problem with teen sales on their website in November 2017.[88]

On April 18, 2018, eleven senators signed a letter to JUUL with a series of pointed interrogatories concerning youth uptake of their product.[89] Shortly thereafter, on April 25, 2018, FDA requested documents from JUUL on the drivers of youth sales (marketing, design, flavors) and the issued citations and warning to 40 retailers for underage sales of JUUL.[11] On April 25, 2018 the day after the FDA announced that it was focusing regulatory attention on its products, JUUL issued a press release announcing their *"comprehensive strategy to combat underage use"* stating: *"Company Will Support State and Federal Initiatives to Raise Minimum Purchase Age to 21+ and Work with a Group of Public and Tobacco Control Officials as Part of $30 Million Initiative."* The company's $30 million commitment over the next three years was designated for *"youth prevention and community engagement."*[90] This proposal rapidly drew criticism from the public health community based upon the long history of tobacco industry youth education being either ineffective or disguised tobacco promotion.[91] The proposed JUUL youth education curriculum has been criticized as having little mention of either JUUL itself or the role of flavors in attracting youth.[92] In response to the upwelling of criticism, JUUL halted this program.[93]

**Figure 37.** October 2018 public relations newspaper advertisement



On June 12, 2018, JUUL announced that only adult models would be used on their Instagram, Twitter or Facebook who are former smokers who switched to JUUL.[94] JUUL Also announced a new Marketing and Social Media Policy and indicated that it was taking down some social media posts.[95] In mid-August 2018, JUUL removed all posts from its Instagram account except those relating to the "switch" theme.

During this period of JUUL's efforts to assuage regulators concerns, it also engaged in political appeals which many would consider contrary to the goal of youth protection. On June 6, San Francisco voters overwhelming rejected a tobacco industry supported referendum to reverse their ban on flavored tobacco products.[96] On June 7, 2018 JUUL appealed to its customers via email to oppose flavor bans by posting comments to the FDA in support of flavored nicotine products with the plea: *"If flavors have been important to your switching journey, please let the FDA know. Furthermore, please tell your friends and family that their voices should also be heard, and encourage them to speak out against flavor bans."[97]* (**Figure 38).** A second such appeal was sent on December 8, 2018, targeted to citizens of California, making the plea that they contact their legislators to voice opposition to proposed flavor limiting legislation.

In November, 2018, one day before the FDA announced its proposed steps to prevent youth access, JUUL announced its own "*action plan*" to counter youth use. This included halting social media advertising in the United States and limiting sale of flavors other than tobacco and mint/menthol to the company's age-gated website.[33] JUUL's decision to halt its social media only in the US (but not Canada, United Kingdom, or Russia where JUUL is also on the market) suggests that their action is more a defensive tactic in response to threatened regulation than a genuine commitment to stemming underage use. It is hard to escape the impression that JUUL seems willing to give up social media marketing in the US, where it has a dominant market share, and keep using it in a global markets.

**Figure 38.** JUUL e-mail to customer soliciting them to support their flavor offerings by submitting comments to the FDA. (June 7, 2018)



**Study Limitations:**

The primary limitation of this study was the sizable fraction of JUUL's social media history which had been deleted by the company. Drawing upon a disparate number of sources we have been able to reconstruct a comprehensive picture of the company's promotion, but we cannot exclude the possibility that relevant material was out of our purview. Another limitation stemmed from our primary focus upon online marketing. The retail environment, both point-of-sale advertising and product displays, has an important influence over purchase decisions. A 2016 survey showed that 68% of middle and high school students were exposed to e-cigarette advertisements in the retail environment.[98]As our focus was on brand advertising, company generated social media postings were emphasized. While advertising likely played a major role in the rapid growth of JUUL, the role of peer to peer social media traffic in popularizing JUUL was likely substantial. While a fraction of these communications may have been independent of company influence, an indeterminate component of this activity was influenced by compensated brand ambassadors.

The content analysis was limited in that it only involved community posts accompanying JUUL advertising in #juul, not JUUL's advertising itself. Content analysis, by its nature, raises the possibility of bias. While we have tried to minimize this potential by using a carefully configured code book and validating intercoder reliability, our three 19 year old coders all came from a single age group and were all highly accomplished students. In order to provide others the opportunity to independently examine the images coded, the entire set coded will be available to researchers who requests it.

Exhibit A to First Amended Consolidated Complaint, In re JUUL Prods. Lit., No. 3:18-cv-02499-WHO

**Perspective:**

In a Twitter posting (March 14, 2018) JUUL stated: *"We market our products responsibly, following strict guidelines to have material directed exclusively toward adult smokers & never to youth audiences."*[25] JUUL leadership has repeatedly denied that the company targets youth in its marketing. In August 2018, co-founder James Monsees described selling JUUL to youth was *"antithetical to our mission."*[99] JUUL describes their Marketing and Social Media Code as *"our responsibility"* and *"we adhere to strict guidelines"* including:

*"We do not feature images or situations intended for a youth audience."*

*"We only share user generated social media content that does not feature underage users"*

*"We ensure responsible placement of our product designed to limit exposure to an underage demographic."*

*"We only post social media content targeting adult smokers, and always demonstrate the product in a mature context."*[95]

This study shows that during the phenomenal upswing in demand over 2015 to 2018 JUUL continued to engage in advertising either targeted to youth (initial year) or by placing its promotional material preferentially in youth consumed media channels (later 2 years). During its meteoric growth, JUUL posted a prodigious volume of advertisements via social media, promoted them via paid influencers, and distributed its messages to a wide community via hashtags. The credibility of JUUL leadership denials of youth targeting is undermined by their diligent efforts to expunge their social media history. It seems improbable that a company which describes itself as the *"most educated company, the most diligent, the most well-researched,"* would not have early on recognized that underage youth were an important driver of their phenomenal revenue growth.[100] Evidence in support of this inference comes from a New York Times article which quoted a former JUUL manager that the company was aware as early as 2015 that its product was finding its way to teenagers.[99]

Positioning itself as a high tech alternative to traditional combustible smoking has been central to JUUL's brand identity since its inception. In 2018, JUUL differentiated itself from the tobacco industry by asserting: *"JUUL Labs is not big tobacco."*[101] Positioning itself as the rebel outsider seeking to disrupt the tobacco industry while saving billions of lives is likely a core element of the brand's appeal to youth. Marketers know that promoting their brand as "doing good for humanity" resonates with idealistic youth. Internal tobacco industry documents have shown that traditional tobacco companies claim that their advertising targets only adult smokers, while in reality they systematically target youthful "starter smokers."[102] In many senses, in its promotional practices JUUL has faithfully recapitulated the playbook of traditional cigarette marketers. JUUL's transition from disruptive upstart into a mainstream tobacco company is increasingly evident.

In December 2018, the maker of Marlboro cigarettes (Altria Group, Inc., Richmond, Virginia) announced a $12.8 billion investment to acquire a 35% equity interest in JUUL giving the 3+ year old company a valuation of $38 billion.[103] The combining of Altria's flagship brand Marlboro with JUUL brings together the leading cigarette and e-cigarette starter brands among American high school students. Concern that the two brands have a strong potential for marketing synergies led FDA Commissioner Scott Gottlieb to express concern that the alignment of the brands will undermine efforts to reduce youth initiation to nicotine addiction.[104] That Marlboro and JUUL promotional tactics each separately led to dominance among youth, their joining forces highlights the pressing need for regulatory intervention.

*The authors have no financial relationships relevant to this article to disclose*

**References.**

1. Pierce D. This might be the first great e-cig. Wired. April 21, 2015. https://www.wired.com/2015/04/pax-juul-ecig (accessed December 5, 2018).

2. Carver R. Juul expands top US e-cig market share; traditional cigarettes volume continues to slip. Winston – Salem Journal. November 27, 2018. https://www.journalnow.com/business/juul-expands-top-u-s-e-cig-market-share-traditional/article_9bdfd55c-68b5-5c08-aeb8-edb4a616ca9e.html (accessed December 5, 2018).

3. LaVito A. Popular e-cigarette Juul's sales have surged almost 800 percent over the past year. CNBC. July 2, 2018. https://www.cnbc.com/2018/07/02/juul-e-cigarette-sales-have-surged-over-the-past-year.html (accessed December 5, 2018).

4. Primack D. Scoop: The numbers behind Juul's investor appeal. Axios. July 2, 2018. https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html (accessed December 5, 2018).

5. Yahoo Finance. Juul surpasses Facebook as fastest startup to reach decacorn status. October 9, 2018. https://finance.yahoo.com/video/juul-surpasses-facebook-fastest-startup-210149619.html (accessed December 5, 2018).

6. LaVito A. E-cigarette sales are booming thanks to Juul. CNBC. August 21, 2018. https://www.cnbc.com/2018/08/21/e-cigarette-sales-are-booming-thanks-to-juul.html (accessed December 5, 2018).

7. JUUL mission statement. https://www.juul.com/mission-values (accessed December 5, 2018).

8. Cullen KA, Ambrose BK, Gentzke AS, Apelberg BJ, Jamal A, King BA. Notes from the Field: Use of Electronic Cigarettes and Any Tobacco Product Among Middle and High School Students — United States, 2011–2018. MMWR Morb Mortal Wkly Rep 2018; 67:1276–1277.

9. Vallone DM, Bennett M, Xiao H, Pitzer L, Hair EC. Prevalence and correlates of JUUL use among a national sample of youth and young adults. Tob Control. 2018; doi:10.1136/tobaccocontrol-2018-054693. [Epub ahead of print] PubMed PMID: 30377241.

10. Ramamurthi D, Chau C, Jackler RK. JUUL and other stealth vaporisers: hidingthe habit from parents and teachers. Tob Control. 2018; pii: tobaccocontrol-2018-054455. doi: 10.1136/tobaccocontrol-2018-054455. [Epub ahead of print] PubMed PMID: 30219794.

11. U.S.Food and Drug Administration. Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes. April 24, 2018.https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm605432.htm (accessed December 5, 2018).

12. Hoffman J. F.D.A. Seizes Documents from Juul Headquarters. New York Times. October 2, 2018. https://www.nytimes.com/2018/10/02/health/juul-ecigarettes-fda-raid.html (accessed December 5, 2018).

13. Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarette. https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm625884.htm?utm_source=Eloqua&utm_medium=email&utm_term=stratcomms&utm_content=pressrelease&utm_campaign=CTP%20News%26Connect%26SOS%3A%20November%2015%20Policy%20and%20NYTS%20-%20111518 (accessed December 5, 2018).

14. Iowa Attorney General Attorney General Miller announces initiative with JUUL Labs to fight underage use. April 25, 2018. https://www.iowaattorneygeneral.gov/newsroom/attorney-general-miller-juul-labs-ecigarette/ (accessed December 5, 2018).

15. Massachusetts Attorney General. AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors. July 24, 2018. https://www.mass.gov/news/ag-healey-announces-investigation-into-juul-other-online-e-cigarette-retailers-over-marketing (accessed December 5, 2018).

16. North Carolina Attorney General Josh Stein announces investigation into e-cigarette maker JUUL. Press release. October 15, 2018. https://www.ncdoj.gov/News-and-Alerts/News-Releases-and-Advisories/Attorney-General-Josh-Stein-Announces-Investigatio.aspx (accessed December 5, 2018).

17. JUUL Lawsuits Could Change e-Cigarette Marketing. Consumer Safety. July 27, 2018. https://www.consumersafety.org/news/safety/juul-lawsuit-e-cigarette-marketing/ (accessed December 5, 2018).

18. Internet Archive Wayback Machine. JUUL's websites 2015- 2018. https://web.archive.org/web/*/juulvapor.com (accessed December 5, 2018).

19. Stanford Research into the Impact of Tobacco Advertising. JUUL. tobacco.stanford.edu/juul (accessed December 5, 2018).

20. Trinkets & Trash. JUUL. www.trinketsandtrash.org (accessed December 5, 2018).

21. GitHub. Instaloader. https://github.com/instaloader/instaloader (accessed December 5, 2018).

22. Boxman Studios (Charlotte N.C). Juul & Becore. http://boxmanstudios.com/portfolio/juul-vapor-lounge/(accessed December 5, 2018).

23. NKdsgn LLC. JUUL container. https://www.nkdsgn.com/juul/ (accessed December 5, 2018).

24. Becore (Los Angeles)  Sampling tours, Experimental marketing, brand activation. https://becore.com/portfolio/juul-sampling-tour/ (accessed December 5, 2018).

25. Stanford Research into the Impact of Tobacco Advertising. JUUL twitter http://tobacco.stanford.edu/pods/juul/twitter (accessed December 5, 2018).

26. Mirrored Media. Sundance Film Festival 2018- Park City Live Attractions. February 2, 2018. http://www.mirroredmedia.com/2018/02/02/sundance-film-festival-2018-  park-city-live-activations/ (accessed December 5, 2018).

27. Reddit. Got the slate blue juul for free at a party in Sundance, I love it. January 26,2018.https://www.reddit.com/r/juul/comments/7t0uad/got_the_slate_blue_juul_for_free_at_a_party_in/ (accessed December 5, 2018).

28. Creative Director Steven Baille. JUUL advertisements. Vimeo. https://vimeo.com/user32215494 (accessed December 5, 2018).

29. Grit: About Grit. http://www.gritcreativegroup.com/#/about (accessed December 5, 2018).

30. Newlands M. Join The Engagement Advertising Cult: An Interview With Cult Collective's Ryan Gill. Forbes September 16, 2016. https://www.forbes.com/sites/mnewlands/2016/09/26/join-the-engagement-advertising-cult-an-interview-with-cult-collectives-ryan-gill/#1d1ab7291016 accessed December 5, 2018).

31. Cult Creative JUUL case study. http://cultideas.com/case-study/juul (accessed September 21, 2018).

32. Harty H. JUUL hopes to reinvent e-cigarette ads with 'vaporized' campaign. AdAge June 23, 2015. https://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-      cigarette-ads-campaign/299142/ (accessed December 5, 2018).

33. JUUL. JUUL Labs Action Plan. November 13, 2018. https://newsroom.juul.com/2018/11/13/juul-labs-action-plan/ (accessed December 5, 2018).

34. Tinnerz. Coco mint juulpod . YouTube. November 24, 2015. https://www.youtube.com/watch?v=7dJxzHxV4uY (accessed December 5, 2018).

35. Reddit. Complete JUUL registered FDA product list. August 22, 2018. https://www.reddit.com/r/juul/comments/99abd4/ive_mentioned_this_many _times_on_this_sub_here_is/ (accessed December 5, 2018).

36. JUUL SurveyMonkey Survey: June 2017. https://www.surveymonkey.com/r/Juuljune (accessed December 5, 2018).

37. Ramamurthi D, Gall PA, Ayoub N, Jackler RK. Leading-brand advertisement of quitting smoking benefits for e-cigarettes. Am J Public Health. 2016;106: 2057-2063.

38. JUUL Labs implements new social media policy. June 14, 2018. https://support.juul.com/learn/read/juul-labs-implements-new-social-media-policy     (accessed December 5, 2018).

39. JUUL . The smoking alternative unlike any other e-cigarette or vape. www.juul.com (accessed September 15, 2018).

40. VICE. Digital Media Kit. https://kit.vice.com/ (accessed December 5, 2018).

41. Georgia Creative Production Studio. JUUL in store visuals. http://www.ggeeoorrggiiaa.com/new-page-37/ (accessed December 5, 2018).

42. Meier B. Lost Horizons: The Billboard Prepares to Give up Smoking. New York Times. April 19, 1999. https://www.nytimes.com/1999/04/19/us/lost-horizons-the-billboard-prepares-to-give-up-smoking.html (accessed December 5, 2018).

43. Cantrell J, Ganz O, Emelle B, Moore R, Rath J, Hair EC, Vallone D. Mobile marketing: an emerging strategy to promote electronic nicotine delivery systems. Tob Control. 2017; e2:e1-e3.

44. Friedman R. Vaping Cigarette Company Juul is Going Hard with Radio Ads Despite 48 Year Old Cigarette Ad Ban. ShowBiz411. October 4, 2018. http://www.showbiz411.com/2018/10/04/vaping-cigarette-company-juul-is-going-hard-with-radio-ads-despite-48-year-old-cigarette-ad-ban (accessed December 5, 2018).

45. Brodwin E. The wildly popular e-cig startup Juul is valued at $15 billion, but it faces a growing backlash of lawsuits and investigations. Business Insider . July 28, 2018. https://www.businessinsider.com/juul-e-cig-booms-amid-backlash-lawsuits-investigations-2018-7 (accessed December 5, 2018).

46. JUUL Influencer Marketing Intern. https://www.internships.com/marketing/influencer-marketing-intern-i7391759 (accessed Nov 14, 2018).

47. Chen Y. What influencer marketing really costs. Digiday June 5, 2017. https://digiday.com/marketing/what-influencer-marketing-costs/ (accessed December 5, 2018).

48. Conti A. This 21-Year-Old Is Making Thousands a Month Vaping on YouTube. Vice. February 5, 2018. https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month-vaping-on-youtube (accessed December 5, 2018).

49. JUUL. Join the JUUL Influencers. https://www.juul.com/influencers (accessed December 5, 2018).

50. JUUL. Affiliate program application. https://app.impact.com/campaign-promo-signup/JUUL-Vapor.brand?execution=e1s1 (accessed December 5, 2018).

51. Reynoldson JR. JUUL Labs cancels payments to vaper reviewers: Here's the email they sent us. Vapor Vanity. October 30, 2018. https://www.vaporvanity.com/juul-labs- cancels-payments-vape-reviewers-email-they-sent/ (accessed December 5, 2018).

52. Food and Drug Administration. FDA deems certain tobacco products subject to FDA authority, sales, and distribution restrictions, and health warning requirements for packages and advertisements. November 2018. https://www.fda.gov/downloads/TobaccoProducts/Labeling/RulesRegulations Guidance/UCM499354.pdf. (accessed December 4, 2018).

53. Yankowicz W. Inside Juul: The Most Promising, and Controversial, Vape Company in America. Inc. September 24, 2018. https://www.inc.com/will-yakowicz/2018-private-titans-juul-labs-vaporizer-nicotine-electronic-cigarettes.html (accessed December 4, 2018).

54. Naumovska L. Marketing communication strategies for generation Y–millennials. Business Management and Strategy. 2017; 8:123-133.

55. Forbes Expert Panel: 13 Strategies For Marketing To Generation Z. February 22, 2018. https://www.forbes.com/sites/forbesbusinessdevelopmentcouncil/2018/02/2 2/13-strategies-for-marketing-to-generation-z/#1f442d8c31c3 (accessed December 4, 2018).

56. Southgate D, Brown KW. The Emergence of Generation Z and Its Impact in Advertising. J Advertising Research 2017; 57:227-234.

57. Pew Research Center. Percentage of teenagers in the United States who use Instagram as of April 2018, by age group. In Statista - The Statistics Portal.

Retrieved November 2, 2018, from
https://www.statista.com/statistics/419372/us-teen-instagram-users-age-
reach/. (accessed December 4, 2018).

58.  Anderson M, Jaing J. Teens, Social Media & Technology. Pew Research Center.
May 31, 2018. http://www.pewinternet.org/2018/05/31/teens-social-media-
technology-2018/ (accessed December 4, 2018).

59.  Morrissey J. Baby Boomers to Advertisers: Don't Forget About Us. New York
Times. October 15, 2017.
https://www.nytimes.com/2017/10/15/business/media/baby-boomers-
marketing.html (accessed December 4, 2018).

60.  Jamal A, Phillips E, Gentzke AS, et al. Current Cigarette Smoking Among Adults
— United States, 2016. MMWR Morb Mortal Wkly Rep. 2018; 67:53–59.

61.  Wang TW, Gentzke A, Sharapova S, Cullen KA, Ambrose BK, Jamal A. Tobacco
Product Use Among Middle and High School Students - United States, 2011-
2017. MMWR Morb Mortal Wkly Rep. 2018; 67:629-633.

62.  Community Manager - Social Media at JUUL Labs https://angel.co/juul-
labs/jobs/396733-community-manager-social-media. (accessed December 4,
2018).

63.  AudienceProject. Share of internet users who used an adblocker in the United
States as of 2nd quarter 2018, by age group. In Statista - The Statistics Portal
https://www.statista.com/statistics/352030/adblockign-usage-usa-age/
(accessed December 4, 2018).

64.  Phua J, Jin SV, Hahm JM. Celebrity-endorsed e-cigarette brand Instagram
advertisements: Effects on young adults' attitudes towards e-cigarettes and
smoking intentions. J Health Psychol. 2018; 23:550-560.

65.  Huang J, Duan Z, Kwok J, Binns S, Vera LE, Kim Y, Szczypka G, Emery SL. Vaping
versus JUULing: how the extraordinary growth and marketing of JUUL
transformed the US retail e-cigarette market. Tob Control. 2018; doi:
10.1136/tobaccocontrol-2018-054382. [Epub ahead of print] PubMed PMID:
29853561.

66.  Camenga D, Gutierrez KM, Kong G, Cavallo D, Simon P, Krishnan-Sarin S. E-
cigarette advertising exposure in e-cigarette naïve adolescents and
subsequent  e-cigarette use: A longitudinal cohort study. Addict Behav.
2018;81:78-83.

67.  Pokhrel P, Fagan P, Herzog TA, Laestadius L, Buente W, Kawamoto CT, Lee HR,
Unger JB. Social media e-cigarette exposure and e-cigarette expectancies and
use among young  adults. Addict Behav. 2018;78:51-58.

68.  Dai H, Hao J. Exposure to Advertisements and Susceptibility to Electronic
Cigarette Use Among Youth. J Adolesc Health. 2016; 59: 620-626.

69.  Mantey DS, Cooper MR, Clendennen SL, Pasch KE, Perry CL. E-Cigarette
Marketing Exposure is Associated with E-Cigarette Use Among US Youth. J
Adolesc Health. 2016;58:686-90.

70.  Nicksic NE, Harrell MB, Pérez A, Pasch KE, Perry CL. Recall of E-cigarette
Advertisements and Adolescent E-cigarette Use. Tob Regul Sci. 2017; 3:210-
221.

71.  Reinhold B, Fischbein R, Bhamidipalli SS, Bryant J, Kenne DR. Associations of
Attitudes towards electronic cigarettes with advertisement exposure and
social   determinants: a cross sectional study. Tob Induc Dis. 2017. 3;15:13.

72.  Wadsworth E, McNeill A, Li L, Hammond D, Thrasher JF, Yong HH, Cummings
KM, Fong GT, Hitchman SC. Reported exposure to E-cigarette advertising and
promotion  in different regulatory environments: Findings from the
International Tobacco Control Four Country (ITC-4C) Survey. Prev Med.
2018;112:130-137.

73.  Laestadius LI, Wahl MM, Pokhrel P, Cho YI. From Apple to Werewolf: A content
analysis of marketing for e-liquids on Instagram. Addict Behav. 2018; pii:
S0306-460: 31012-18.

74.  Pokhrel P, Herzog TA, Fagan P, Unger JB, Stacy AW. E-cigarette Advertising
Exposure, Explicit and Implicit Harm Perceptions, and E-Cigarette use
Susceptibility Among Non-Smoking Young Adults. Nicotine Tob Res. 2018; doi:
10.1093/ntr/nty030. [Epub ahead of print] PubMed PMID: 29444275.

75.  Allem JP, Dharmapuri L, Unger JB, Cruz TB. Characterizing JUUL-related posts
on Twitter. Drug Alcohol Depend. 2018;190:1-5.

76.  Chu KH, Colditz JB, Primack BA, Shensa A, Allem JP, Miller E, Unger JB, Cruz TB.
JUUL: Spreading Online and Offline. J Adolesc Health. 2018; 63:582-586.

77.  Chu KH, Allem JP, Cruz TB, Unger JB. Vaping on Instagram: cloud chasing, hand
checks and product placement. Tob Control. 2018; 26:575-578.

78.  Lee AS, Hart JL, Sears CG, Walker KL, Siu A, Smith C. A picture is worth a
thousand words: Electronic cigarette content on Instagram and Pinterest. Tob
Prev Cessat. 2017; 3: pii: 119.

79.  Laestadius LI, Wahl MM, Cho YI. #Vapelife: An Exploratory Study of Electronic
Cigarette Use and Promotion on Instagram. Subst Use Misuse. 2016; 51:1669-
1673.

80.  McKelvey K, Baiocchi M, Ramamurthi D, McLaughlin S, Halpern-Felsher B.
Youth say ads for flavored e-liquids are for them. Addict Behav. 2018;
pii:S0306-4603: 30957-62.

81.  Garrison KA, O'Malley SS, Gueorguieva R, Krishnan-Sarin S. A fMRI study on
the impact of advertising for flavored e-cigarettes on susceptible young adults.
Drug Alcohol Depend. 2018;186: 233-241.

82.  Auf R, Trepka MJ, Selim M, Ben Taleb Z, De La Rosa M, Cano MÁ. E-cigarette
marketing  exposure and combustible tobacco use among adolescents in the
United States. Addict Behav. 2018;78:74-79.

83.  McKelvey K, Baiocchi M, Halpern-Felsher, B. Adolescents' and young adults'
use and perceptions of pod-based electronic cigarettes. JAMA Network Open.
2018; e183535-e183535.

84.  Simon P, Camenga DR, Morean ME, Kong G, Bold KW, Cavallo DA, Krishnan-
Sarin S. Socioeconomic status and adolescent e-cigarette use: The mediating
role of e-cigarette advertisement exposure. Prev Med. 2018;112:193-198.

85.  Duhigg C. From Beanie Babies to fidget spinners, the evolution of toy fads
shows how technology has thrown the consumer economy into chaos. New
York Times Magazine. August 20, 2017.
https://www.nytimes.com/2017/08/15/magazine/the-rise-of-the-fidget-

spinner-and-the-fall-of-the-well-managed-fad.html (accessed December 5, 2018).

86. Bikhchandani A, Hirshleifer D, Welch I.A theory of fads, fashions, and cultural change as informational cascades. J Political Economy.1992;100: 992-1026.

87. Logan S, Campanile E. -  Schumer pushes for regulations on e-cigs as more kids vape. New York Post. October 15, 2017.
https://nypost.com/2017/10/15/schumer-pushes-for-regulations-on-e-cigs-as-more-kids-vape/ (accessed December 5, 2018).

88. JUUL Labs is Combating Underage Use of our Product (Nov 22, 2017) https://web.archive.org/web/20171122022800/https://www.juullabs.com/ (accessed December 5, 2018).

89. Durbin & Senators Press JUUL Labs, Inc. For Answers On Marketing Addictive E-Cigarette Vaping Product To Teens, Urge FDA To Take Swift Action. April 18, 2018 durbin.senate.gov/newsroom/press-releases/durbin-and-senators-press-juul-labs-inc-for-answers-on-marketing-addictive-e-cigarette-vaping-product-to-teens-urge-fda-to-take-swift-action- (accessed December 5, 2018).

90. JUUL Labs Announces comprehensive strategy to combat underage use. https://support.juul.com/learn/read/juul-labs-announces-comprehensive-strategy-to-combat-underage-use (accessed December 5, 2018).

91. Landman A, Ling PM, Glantz SA. Tobacco industry youth smoking prevention programs: protecting the industry and hurting tobacco control. Am J Public Health. 2002; 92:917-30.

92. Liu J, Halpern-Felsher B. The Juul Curriculum Is Not the Jewel of Tobacco Prevention Education. J Adolesc Health. 2018; 63:527-528.

93. Boyles S. Juul Drops E-Cig Education Program for Schools. MedPage Today. October 25, 2018. https://www.medpagetoday.com/pulmonology/smoking/75918(accessed December 5, 2018).

94. Woolf J. E-Cig Maker Juul Won't Tempt Instagrammers With Models Anymore. Bloomberg. June 14, 2018. https://www.bloomberg.com/news/articles/2018-06-14/e-cig-maker-juul-won-t-tempt-instagrammers-with-models-anymore (accessed December 5, 2018).

95. JUUL marketing and social media code. https://www.juul.com/our-responsibility (accessed December 5, 2018).

96. McClurg L. San Francisco Passes First-in-the-Nation Flavored Tobacco, Vaping Ban. KQED June 6, 2018. https://www.kqed.org/futureofyou/441395/sf-voters-may-ban-vape-flavors-menthol-cigarettes (accessed December 5, 2018).

97. JUUL flavor appeal (email of June 7, 2018) http://tobacco.stanford.edu/tobacco_web/images/pod/juul/email/large/email_132.j  pg. (accessed December 5, 2018).

98. Marynak K, Gentzke A, Wang TW, Neff L, King BA. Exposure to Electronic Cigarette Advertising Among Middle and High School Students - United States, 2014-2016. MMWR Morb Mortal Wkly Rep. 2018; 67:294-299.

99. Richtel M, Kaplan S. Did Juul Lure Teenagers and Get 'Customers for Life'? New York Times. August 27, 2018.

https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html     (accessed December 5, 2018).

100. .Haar MV. Pax stays ahead of the curve. Convenience Store News. October 14,2015. https://www.cspdailynews.com/category-news/tobacco/articles/pax-stays-ahead-curve (accessed December 5, 2018).

101.Fact: JUUL labs in not big tobacco. (June 22, 2018) http://tobacco.stanford.edu/tobacco_web/images/pod/juul/instagram/large/img_143.  jpg (accessed December 5, 2018).

102. U.S. Department of Health and Human Services. Preventing tobacco use among youth and young adults. A report of the Surgeon General. 2012. https://www.surgeongeneral.gov/library/reports/preventing-youth-tobacco-use/full-report.pdf. (accessed December 5, 2018).

103. Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth.  Altria Press release (December 20, 2018) (http://investor.altria.com/file/Index?KeyFile=396169695). (Accessed January 9, 2019)

104.  Kaplan S.  FDA accuses JUUL and Altria of backing of plan to stop youth vaping.  New York Times. January 4, 2019.

Case 3:18-cv-02499-WHO Document 1082 Filed 07/29/19 Page 218 of 439

**Supplemental Table 1:  Content Analysis Coding Tool:**

**Coders are to analyze the post using the image/video in the post, the caption of the post (excluding hashtags), and the username associated with the post. Coders are permitted to search through a post's username to discern post origin and intent.**

1. **Coder Name**
    a. Clearly write in the name of the coder in the space provided.
2. **Post Number**
    a. Clearly write in image number.
3. **Post Origin**
    a. Consumer: *User name of individual or group of people, no mention of store/vendor in content. Can be an account that consumers send posts to.*
    b. Vendor/Store: *A company or person selling a product*
    c. Meme Account: *An account that primarily posts memes*

*Notes: If you are uncertain of the origins of an account you may look up their page on Instagram. A meme account is an account where the <u>majority</u> of posts are memes. Consumer pages <u>can be</u> accounts where individuals send in posts to a single page (i.e. multiple consumers present).*

4. **Meme:** *A humorous image, video, piece of text, etc., that is copied (often with slight variations) and spread rapidly by Internet users. If it is a cartoon with text, consider it a meme. Screenshotted snapchats, Twitter pages, altered texts, cartoons etc. count as memes.*

5. **Reference pop culture:** *The accumulation of cultural products such as movies, TV shows, video games, sports, fads, literature, music, art, celebrities, etc. that are aimed at and/or appealing to younger people. Please be sure to consider captions in your answer.*

*Note: Fads can include dance moves such as flossing, fidget spinners, In My Feelings challenge, Fortnight, eating TidePods etc. Do not consider fashion style to be 'pop-culture'.* **<u>Do not consider 'Juuling' and/or vaping in itself as pop-culture.</u>**

6. **Is the post youthful?** *Youthful people, typical high school/college behavior, peer pressure, youthful paraphernalia or accessories (i.e. friendship bracelets), partying, immature behavior, etc.*

    *Note: Please do not consider fashion trends as youthful*

7. **Quit Smoking, Switch, Alternative:** *i.e. promotes product as safer than cigarettes, alternative to cigarettes, no second hand smoke, less toxins than cigarettes, etc. \*\*Adapted from Curry Codebook*

8. *Are there animated characters/cartoons/illustrations/animal?*
    a. *No*
    b. *Yes*

9. **Social:** *Only count real people whose <u>faces</u> you can see.*

    a. No People (*only inanimate objects featured*)
    b. 1 Person
    c. More than 1 person
    d. **ONLY** body parts are discernable in post

10. **Age of people:** *Estimate age <u>only if face</u> is visible. If a group of people, estimate age of youngest person ONLY ANSWER FOR REAL PEOPLE*

11. **Themes** * Adapted from Brianna A Lienemann et al (Methods for Coding Tobacco-Related Twitter Data: A Systematic Review)
    a. Party Scene (*at a bar, club, party, concert, etc.*)
    b. Joke or Humorous (*contains a pun, an understatement, joke, something ludicrous, satire, exaggeration, irony, or humorous intent*) *** The Impact of Humor in Advertising, Weinberger.
    c. Action, Adventure *(Person is <u>actively engaged</u> in activity)*
    d. Romance *(people are holding hands, showing affection, kissing, etc.)*
    e. Other

*Note: If there are multiple themes present, please select the <u>primary</u> theme in the image.*
*Consider the INTENT of the post and read captions carefully when making your decision.*

12. **Sexual Appeal:** *Libido; horny. Sexual attractiveness beyond beauty or glamour because the image or texts convey a feeling of sexiness or sexuality. Revealing outfits, regardless of gender. Sexually suggestive poses. Images with exaggerated, enhanced, or exposed sex organs (e.g., breasts, cleavage, crotch, backside) in focus. Sexual entendres. Hooking up.*

13. **Is any person in the post using a Juul covertly or stealthily <u>and/or</u> referring to covert Juul use?** *Ie. in covert locations, in a public location hiding use, using in bathroom, classroom, under clothing, etc.*

*Note: Locations listed are considered inherently covert (i.e. if using a Juul in a bathroom this is a covert behavior).*

14. **Place/Location** *Indicate the setting of the ad. Look at the surroundings, what the model is wearing, props, etc. Also select a location if the image is <u>referencing</u> a specific location (i.e. high school bathroom)* ***definition from Divya's codebook
    a. Bar, Nightclub, day or night time party, Concert, or Restaurant Scene- *Bar, nightclub, party, or restaurant scene is primarily an indoor scene, unless it is a bar, nightclub, or restaurant in the open air (sometimes found on beach resorts).*
    b. School Property - *Post takes place on school property including classrooms, bathrooms, sporting events, school assemblies, etc.*
    c. Other/Not Applicable - *Cannot discern background, none of the above categories fit but you can still discern a background (i.e. you cannot make sense of the location, it is unclear where the subject is, shot is zoomed in on face, text only, etc.)*

**Supplemental Table 2  JUUL Events at which samples were distributed:**

June 4, 2015.  **JUUL Launch Party**.  Jack Studios, Chelsea, NY
Event Photos:
(https://www.shutterstock.com/editorial/search/vapor?search_source=base_search_form&sort=date&cat=&page=eyJ2IjoxLCJzIjo2MzJ9&date_range=)

June 6, 2015.  **The JUUL Vapor Lounge.**  Marquee, New York City, NY
Partner: BeCore, Boxman Studios
Becore.  https://becore.com/portfolio/juul-sampling-tour/
Boxman Studios.  http://boxmanstudios.com/portfolio/juul-vapor-lounge/
Event Photos:
(https://www.flickr.com/photos/boxmanstudios/albums/72157654940327559/with/19167315070/)

June 16, 2015.  **Yacht Party.**  New York City, NY
Partner: Insidehook
Event Photo: Instagram post (community user)

June 18, 2015.  **The Chinese Major!**  Old American Can Factory, Brooklyn, NY
*"After Party Sponsored by New Amsterdam Vodka, featuring a Vapor Lounge by JUUL."*
Partner: Rooftop Films
Via: (https://docs.google.com/forms/d/e/1FAIpQLSfPUfJtUPnMvfjUcxa-_TJ0iFggG7lEgk-hEoIBV79CsjV8NQ/viewform)
(https://www.facebook.com/search/top/?q=Rooftop%20Films%2C%20juul)

June 19, 2015.  **New York Non-Fiction.**  Industry City, NY
Partner: SPIN, Rooftop Films
Event Photos: (https://www.spin.com/2015/06/dj-parler-spin-juul/)

July 11, 2015.  **Party @ 1OAK.**  Southampton, NY
Partner: TURBZ
Invitation via: Twitter (JUUL) and JUUL E-mail

July 18, 2015.  **The Chinese Mayor!**  New York City, NY
Partner: Rooftop Films
Invitation via: Twitter & Facebook post (both JUUL)

July 23, 2015.  **NY VICE Photo Show.**  New York City, NY
Partner: PioneerWorks, VICE
Invitation via: JUUL E-mail

August 6, 2015.  **LA VICE Photo Show.**  Los Angeles, CA
Partner: VICE
Invitation via: JUUL E-mail

August 8, 2015.  **Saturdays at Create.**  Los Angeles, CA
Partner: SBE Group
Invitation via: JUUL E-mail

August 13, 2015.  **Art Walk.**  (Downtown) Los Angeles, CA.

Partner: unknown
Invitation via: JUUL E-mail

August 15, 2015. **Movies All Night Slumber Party.** Los Angeles, CA
Partner: Cinespia
Invitation via: Instagram Post (JUUL Scrubbed)

August 23, 2015. **Sundays at VIX.** Los Angeles, CA
Partner: SBE Group
Invitation via: JUUL E-mail

August 27-30, 2015. **LA Food & Wine Festival.** Los Angeles, CA
Partner: LA Food and Wine Festival
Invitation via: JUUL E-mail

September 4-6, 2015. **JUUL Vapor Lounge.** San Manuel Amphitheater, San Bernardino, CA
Partner: Nocturnal Wonderland (music festival)
Invitation via: Instagram (scrubbed) and Twitter post (both on @juulvapor)

September 12-13, 2015. **Bite of Las Vegas.** Desert Breeze Park, Las Vegas, NV
Partner: Bite of Las Vegas
Invitation via: JUUL E-Mail and Twitter Post (JUUL)

September 18-20, 2015. **California Beer Festival.** Plaza Park, Ventura, CA
Partner: California Beer Festival
Invitation via: JUUL E-mail and Twitter Post (JUUL)

September 18, 2015. **JUUL @Cinespia.** Hollywood Forever Cemetery, Los Angeles, CA
Partner: Cinespia, BeCore
Invitation via: Facebook Post (BeCore)

September 27, 2015. **JUUL Vapor Lounge.** Downtown Las Vegas, Las Vegas, NV
Partner: Life is Beautiful (music festival)
Event Photo: Twitter (Life is Beautiful & JUUL's account) and Yelp images from community
(https://www.yelp.com/biz_photos/life-is-beautiful-festival-las-vegas-2?select=KuVlBmtGIFA9a7pe5ljnOQ)

October 2, 2015. **NASCAR Truck Series.** Las Vegas, NV
Partner: NASCAR
Invitation via: JUUL E-mail

October 9-10, 2015. **Wine Amplified.** Las Vegas, NV
Partner: Wine Amplified
Invitation via: JUUL E-Mail, Twitter (JUUL), and Instagram (community user)

October 14, 2015. **The Players Club.** Die Fabrik Nightclub, New York City, NY
Partner: American Two Shot
Event Photos: (https://www.wmagazine.com/story/american-two-shot-justine-skye-players-club)
(https://bfa.com/home/photo/1710575?collection-fk=13840)

October 17-18, 2015. **Las Vegas Red Bull Air Races.** Las Vegas, NV

Partner: Red Bull
Invitation via: JUUL E-Mail

October 31-November 1, 2015.  **Hard: Day of the Dead.**  Pomona, CA
Partner: HARD
Invitation via: JUUL E-Mail

December 8-9, 2015.  **Wynwood Smoke & Lounge.**  Miami, FL
Partner: Wynwood Smoke & Lounge
Invitation via: Twitter post

April 7-8, 20?? (assuming 2016/2017).  **JUUL Vapor Lounge.**  Miami Beach, Miami, FL
Event Photos: (https://www.ohellomedia.com/all-projects/juul)

October 13-14, 2017.  **JUUL in NYC.**  New York City, NY
Partner: Iconic Magazines
Invitation via: Facebook Post (JUUL)

February 8, 2018.  **Partner: Sundance Film Festival.**  Park City, UT
Event Photos: (http://www.mirroredmedia.com/2018/02/02/sundance-film-festival-2018-park-city-live-activations/)

## APPENDIX A – INDIVIDUAL PLAINTIFF ALLEGATIONS

A.    Hasnat Ahmad............................................................................................... 3

B.    Liliana Andrade ............................................................................................ 6

C.    Jose Angullo .................................................................................................. 9

D.    B.C., a minor, through his Parent and Natural Guardian Mary Baker ....12

E.    Adam Banner ............................................................................................... 13

F.    Tommy Benham ........................................................................................... 16

G.    D.C. through his parent and natural guardian Kisha Chandler............... 19

H.    Bradley Colgate ........................................................................................... 20

I.    Kaytlin McKnight ........................................................................................ 22

J.    Q.C. through his parent and natural guardian Anjie Comer..................... 23

K.    A.U., and her mother and natural guardian, Lisa Commitante................ 24

L.    D.C. and his mother and Natural Guardian Renee Deeter......................... 24

M.    D.D. and C.D., minors, through their Parent and Natural Guardian
      Joseph DiGiacinto ....................................................................................... 25

N.    K.S. though his parent and Natural Guardian Rachelle Dollinger........... 28

O.    J.D. through his parent and natural guardian Nicole Dramis .................. 30

P.    Jillian Furey ................................................................................................. 32

Q.    M.H., and her mother and natural guardian, Jennifer Hellman .............. 33

R.    Austin Hester .............................................................................................. 35

S.    Edgar Kalenkevich ...................................................................................... 37

T.    David Kugler................................................................................................ 42

U.    Tracie Kugler, on behalf of her son, Z.K, a minor .................................... 44

V.    Kacie Ann Lagun (née Durham)................................................................. 46

W.    David Langan................................................................................................ 49

X.    Jonathan Mardis.......................................................................................... 51

Y.    M.C. through his Parent and Natural Guardian Jeannine Manning......... 52

Z.    David Masessa.............................................................................................. 54

AA.    Ron Minas .................................................................................................... 59

BB.    L.B., and her mother and natural guardian Jill Nelson ............................ 60

CC.    **S.G., a Minor, through her Parent and Natural Guardian Ashley Noble. 62**

DD.    **D.O. through her mother and natural guardian Atoyia Orders ............... 64**

EE.    **Jack Roberts ............................................................................................................ 66**

FF.    **W.T. and A.R.T., both minors, through their parent and Natural Guardian Tonya Rowan ........................................................................................ 70**

GG.    **Amber Royce ........................................................................................................... 72**

HH.    **D.S., a minor, through his Parent and Natural Guardian Amber Selfridge ................................................................................................................................. 73**

II.    **Laura Staller .......................................................................................................... 75**

JJ.    **Anthony Smith ...................................................................................................... 77**

KK.    **Corey Smith ............................................................................................................ 79**

LL.    **T.B.T. through his parent and Natural Guardian Marlene Thomseth-Belcher ..................................................................................................................... 79**

MM.    **Michael Viscomi ................................................................................................... 81**

NN.    **O.V. through her parent and natural guardian Tanya Viti ....................... 84**

OO.    **S.W. through his parent and natural guardian Joe Weibel ...................... 86**

PP.    **J.Y., a Minor, through his Parent and Natural Guardian Barbara Yanucci ................................................................................................................................................................. 87**

**A. Hasnat Ahmad**

    1.    Plaintiff Hasnat Ahmad ("Ahmad") attends university in Chicago, Illinois but resided in Euless, Texas when the transactions described below occurred.

    2.    Before using a JUUL for the first time in October 2017, at the age of 17, Ahmad had seen JUUL advertisements and promotions on Instagram and Twitter. These advertisements promoted JUUL's flavors, discounted Starter Kits and Auto-ship service. In stores, Ahmad also saw JUUL point of sale materials promoting JUUL's discounted Starter Kits, flavors, and high-tech design. Prior to using a JUUL, none of the advertisements or in-store promotions Plaintiff saw disclosed the nature or addiction risks of JUUL's products, the existence or amount of nicotine in JUUL's products, or that the JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette. Nor did they indicate that the JUUL was an age-restricted product. Instead, these advertisements portrayed JUUL as a stylish, high-tech way to "beat the August heat" or "enjoy dessert without the spoon."



    3.    When Ahmad was offered a mango-flavored JUUL by one of his many high school friends who had taken up JUUL use, he had never smoked a cigarette or

used any other tobacco product. Ahmad decided to try the JUUL because everything he had seen had led him to believe that JUUL use was fun and harmless. Though Ahmad would have known to avoid a Tobacco or Menthol flavored e-cigarette offered to him, he did not think a mango-flavored JUUL could be dangerous or addictive. Had Ahmad known the risks, he would not have used a JUUL.

4.      Ahmad enjoyed the feeling and social acceptance of JUULing. He soon started purchasing JUUL products from friends at school and, on rare occasions, from sellers on eBay using his parents' credit card, explaining to his parents that the resulting charges were school-related. This deception caused him a great deal of guilt, but he was so desperate to obtain nicotine that he could not restrain himself.

5.      After Ahmad visited JUUL's website for the first time in 2017, JUUL began sending him promotional e-mails offering discounts and promoting JUUL flavors, including what would become his preferred flavor, Cool Mint. None of those promotions disclosed the nicotine content of Mint pods or that Mint pods could contain up to 94 mg/mL nicotine. If they had, Ahmad would not have used Mint pods.

6.      On February 27, 2018, when Ahmad was still 17, he purchased a "Basic Kit" directly from JUUL's website using his parent's credit card and identification.

7.      On social media, Ahmad saw a significant amount of JUUL promotional content from third parties, including the Instagram accounts @Doit4JUUL and @JUULTricks. On YouTube, Ahmad saw numerous videos from Donny Smokes, including the JUUL Challenge. On Snapchat, Ahmad saw similar JUUL content created by his own friends and classmates. The social media content Ahmad saw and which drove the surge in popularity among his friends was overtly youth-oriented and promoted nicotine abuse, downplayed or normalized addiction

risks, encouraged JUUL use in school, provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also encouraged viral content creation by encouraging viewers to post their own JUUL-related content, including selfies, nicotine abuse "tricks" like inhaling ten JUULs at once, memes normalizing addiction and adolescent use of JUUL products, and imagery suggesting that JUUL use might improve a person's dating prospects.  Ahmad did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors whose aim was to promote JUUL use to adolescents and profit from their addiction. Had Ahmad known that he was being bombarded by marketing as part of a scheme to addict him to nicotine, he would have rejected offers to use a JUUL or would have attempted to stop using a JUUL far sooner than he did.

8.       Copying the behavior that had been modeled for him by cool, attractive social media influencers and accounts, Ahmad mimicked many of the behaviors he saw on social media and posted his own JUUL-related content to Snapchat.  For example, Ahmad posted pictures of a JUUL on March 23 and 26, 2018.

9.       Soon after he started using a JUUL, Ahmad was consuming one to two JUUL pods per day, which cost him about $35 each week.

10.       A little over a year after his first JUUL use, Ahmad began smoking combustible cigarettes on a trip abroad. He now smokes Marlboro cigarettes and uses a JUUL.

11.       Currently a freshman in college, Ahmad is badly addicted to nicotine but has been unable to quit either JUUL or cigarettes. When he goes more than a day without nicotine, he suffers from severe headaches, dizziness and blurred vision.

12.       Ahmad still consumes one to two JUUL pods per day along with up to half a pack of cigarettes.  He starts using JUUL within 5 minutes of waking up, and he

JUULs and smokes throughout the day. He considers the decision to start JUULing as one of the worst mistakes of his life.

**B. Liliana Andrade**

13.     Plaintiff Liliana Andrade ("Andrade") is a resident of Sanford, Florida.

14.     Andrade started using JUUL in 2015 when she was 15 years old. Prior to her first JUUL experience, she had tried cigarettes a few times but had never been a regular smoker.

15.     Before Andrade used a JUUL for the first time, she had seen JUUL advertisements in local gas stations and JUUL posts on Twitter. The in-store advertisements promoted JUUL's flavors and offered discounts on the JUUL device and "Starter Kit." The Twitter posts portrayed fashionable young people using JUUL while engaging in playful poses. None of the JUUL content Andrade saw disclosed that JUUL was an age-restricted product, that it contains nicotine, and delivers nicotine to the bloodstream at least as efficiently as cigarettes and presents a risk of nicotine addiction.



16.     Andrade also visited JUUL's website before using a JUUL. She remembers that the website presented the JUUL as a lifestyle product instead of a highly addictive nicotine delivery system. She does not remember seeing any warnings about nicotine or addiction on JUUL's homepage.

17.     She does remember seeing the JUUL chart in 138 below, comparing a cigarette to a JUUL and showing the JUUL to be less harmful than a cigarette.

18.     During one visit to JUUL's website, Andrade signed up to receive e-mail updates.  Since then, JUUL has sent her numerous e-mail promotions and surveys.

19.     Although Andrade was not a smoker looking to switch from cigarettes, when her friend offered her a Fruit Medley JUUL, she decided to try it because she thought the "fruit medley" flavor sounded appealing and she did not understand the risks JUUL posed. She would not have tried a JUUL if it was not fruit flavored.

20.     Andrade found that she liked the fruit flavor, the vapor's lack of harshness, and the "buzz," or nicotine impact, of the Fruit Medley pods.  After her first JUUL experience, she would use her friends' JUULs every time she could.  Within a few weeks, she purchased her own JUUL device from a friend and began purchasing JUULpods from classmates.

21.     Once she had a JUUL device of her own, Andrade's JUUL consumption quickly escalated.  Within a short time, she was consuming one JUULpod every day.

22.     Like many of her friends in high school, Andrade was very active on social media platforms including Facebook, Twitter, and Instagram.  On these platforms, Andrade saw posts from JUUL suggesting that she "beat the August heat with Cool Mint" and that she take the time to "enjoy a JUUL moment."  Other posts presented JUUL as an "essential" device to have on hand when traveling or simply leaving the house for the day.  This messaging convinced Andrade that JUUL was an indulgence that she should make a part of her daily routine. Andrade followed or otherwise closely observed JUUL's social media accounts starting in late 2015 and was exposed to the themes, images and hashtag marketing campaigns described in the complaint.

23.     On Facebook, Andrade saw JUUL's promotion of images of Katy Perry and Orlando Bloom sharing a JUUL, multiple flavor promotions for JUUL's "Make it a

Mango Monday" campaign, Cool Mint JUULpods, and several other flavor promotions.

24.    Andrade saw JUUL's Vaporized promotions on Twitter, which included several advertisements featuring stylish young women holding JUUL products as well as images of from JUUL's launch parties.



25.    On the social media platform Snapchat, Andrade has been exposed to JUUL-related posts that normalize nicotine abuse among teenagers, promote websites that sell JUUL products and JUUL-compatible products and encourage other adolescents to create similar content.  These JUUL promotions often include hashtags from social media campaigns started or promoted by JUUL including #juulnation, #juul, and #juulvapor.

26.    On Instagram, Andrade saw JUUL's promotions of influencer Zayas. Andrade did not know that Zayas was being paid to use a JUUL and promote JUUL on Instagram.

27.    Andrade's favorite flavors are Cool Cucumber, Mango and Fruit Medley. Although she has tried every pod flavor, she has never purchased tobacco or menthol-flavored pods.

28.     Though Andrade is now over 18 and buys JUULpods legally, she is aware of multiple stores and gas stations in her area that sell JUULpods—often at significant markups—to minors without age verification. The nearest is a less than five-minute walk from her high school.

## C. Jose Angullo

29.     Jose Angullo is a 23 year old resident of Virginia.

30.     Plaintiff Angullo started using JUUL products in 2018 after hearing a radio commercial on station DC101, seeing advertisements in gas stations, and he also saw JUUL content on social media including Facebook, and received promotional emails from JUUL.

31.     Plaintiff bought JUUL to see what it was because the marketing made it seem like a safer alternative to smoking and did not contain any warnings. He specifically saw this ad (available at https://bit.ly/2UbgJRo)



32.     Prior to using JUUL, Plaintiff Angullo used to smoke between 10-20 cigarettes per day.

33.     He now purchases JUUL at $17/per pack at the 7-11 convenience stores and smokes one JUUL pod per day, and sometimes more.

34.     Angullo noticed the 5% strength label on the JUUL pod and thought it meant it was 5% of the nicotine of a regular cigarette.

35.     JUUL's in-store displayed belied the true nature of the nicotine content



and delivery from JUUL. Plaintiff saw these displays before using the product:

36.     Plaintiff prefers to use the mango flavor, which is more palatable. He saw specific ads related to mango that downplayed the or omitted the harms of exposure to nicotine or warned of the content of nicotine in JUUL, including the following online and on Twitter and Instagram:







37. Plaintiff has received promotional emails and online content from JUUL, none of which contained warnings explaining that JUUL pods contain and delivered more nicotine than a pack of cigarettes.

38.     He smokes JUUL within 5 minutes of waking up. JUUL is stuck on his mind more than cigarettes ever were and he feels completely addicted.

39.     Plaintiff coughs every day and has a persistent cough that never goes away.

40.     Plaintiff would never not have purchased JUUL products if he knew the true nature of nicotine content and delivery, including that content in relation to a pack of cigarettes.

**D. B.C., a minor, through his Parent and Natural Guardian Mary Baker**

41.     Plaintiff B.C. and his Parent and Natural Guardian Mary Baker ("Baker") are residents of Huntington, West Virginia.

42.     B. C. used a JUUL for the first time in 2016 at the age of 14.

43.     Prior to his first JUUL use, B.C. had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit."  B.C. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed.  The representations and omissions in JUUL's in-store promotions materially impacted B.C.'s assessment of, and eventual decision to use, JUUL products.

44.     JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached B.C. and B.C.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, B.C.

would not have been exposed to, and would not have used, JUUL products.

45.     When one of B.C.'s friends offered him his first puff of a JUUL, B.C. accepted.  Shortly thereafter, he started buying JUUL products of his own.  At this time, B.C. did not know that JUULpods contain nicotine and can cause nicotine addiction.  Had B.C. known that JUULpods have been formulated to deliver nicotine more effectively than a cigarette, he would not have started using JUUL products.

46.     Although well below the minimum legal age to purchase JUUL products, B.C. was nevertheless able to purchase JUUL products from local stores and classmates.

47.     B.C. was still below the legal age to purchase JUUL products when he obtained warranty service for his JUUL device from the JUUL website in 2018.

48.     Like many other students, B.C. has used his JUUL at school.  Due to this in-school JUUL use, B.C. was suspended from school three times in 2017 and two more times in 2018.

49.     Baker has sought assistance for B.C.'s nicotine addiction but, to date, B.C. is still hooked.

50.     B.C.'s currently consumes one JUULpod a day.  He takes his first puff of JUUL within 5 minutes of waking up.

**E.  Adam Banner**

51.     . Plaintiff Adam Clayton Banner ("Banner") is a resident of Asheville, North Carolina. When he used a JUUL for the first time in 2017, at the age of 33, Banner was a social smoker who smoked less than one pack of cigarettes a month, if that.

52.     Prior to using a JUUL, Banner saw JUUL advertising in stores that promoted JUUL's devices, JUULpods, flavors, and discounted Starter Kits. Those promotions did not disclose that the JUUL contained nicotine, warn of nicotine's

risks, or disclose that the JUUL could deliver more nicotine per puff than a cigarette and delivered that nicotine to the bloodstream faster than a cigarette. Had JUUL disclosed this information, Banner would not have used a JUUL.

53.     Prior to using a JUUL, Banner saw a significant amount of JUUL-related promotions and content on Instagram, Facebook and Twitter. These promotions presented JUUL as a high-tech lifestyle product for young adults like him, promoted JUUL's flavors, discounts on Starter Kits, and did not provide any meaningful information for smokers looking to switch about the nicotine content, delivery, or pharmacokinetics that JUUL had carefully engineered. Nor did the postings indicate that the JUUL's central function was to deliver doses of nicotine that could exceed that of a cigarette, that the JUUL contains at least 59 mg/mL nicotine, or that the JUUL's nicotine had been chemically altered to create nicotine impact that equals or exceeds a cigarette.

54.     Banner also saw JUUL content on social media including on Facebook, Twitter, and Instagram. This focus-flavored content encouraged Banner to try Mango JUULpods and "start [his] week with Cool Mint JUULpods." The "Cool" Mint advertisements did not disclose that the Mint pods contained up to 94 mg/mL nicotine – more than twice the "5% strength" labeling statement indicated.

55.     Many of JUUL's posts included what appeared to be user-generated posts from young adults sharing a "#JUULmoment." Banner does not recall seeing disclosures about nicotine or warnings about nicotine or nicotine addiction in any of JUUL's social media content.

56.     When Banner's brother, Zachary Shane Goforth, returned from college in the summer of 2017, he brought the JUUL he had begun using at the start of the year. Banner decided to try his brother's JUUL because the fruit flavors were appealing to him and his brother insisted he try JUULing instead of smoking

cigarettes.

57.     About two months later, Banner bought a discounted Starter Kit of his own similar to his brother's.

58.     Banner visited JUUL's website and soon thereafter began receiving emails from JUUL.  Banner did not see any disclosures on JUUL's website that JUUL's Mint pods contain at least 59 mg/mL nicotine and can exceed 90 mg/mL. The emails Banner received promoted JUUL's flavored pods and the lifestyle appeal of JUUL use. Nothing he saw on JUUL's website or in JUUL's emails indicated that the JUUL contained at least 59 mg/mL of nicotine, that the JUUL delivered at least as much nicotine per puff as a cigarette, or that the nicotine from a JUUL entered the bloodstream faster, or caused a higher peak blood-nicotine concentration than a cigarette. Instead, his impression was that the JUUL was a device for quitting smoking and therefore posed less risks of addiction than cigarettes.

59.     Banner saw and relied on the representation that a JUUL is equivalent to a pack of cigarettes, which is imprinted on JUULpod packaging, posted on JUUL's website, and posted by third parties in reviews and on social media. He assumed that a JUUL was delivering the same kind and amounts of nicotine as a cigarette. Had he known that the JUUL was chemically designed to deliver stronger nicotine impact than a cigarette or that the JUUL delivered more nicotine than a cigarette, he would not have bought a JUUL.

60.     Banner understood JUUL's labeling representation that it was an "alternative to cigarettes" to mean that the JUUL was a way to move away from smoking. Had he known that the JUUL could so rapidly foster an uncontrollable addiction to nicotine—a chemical he had been consuming in amounts he found manageable for approximately ten years—he would not have used or purchased a JUUL.

61.     Had Banner known that JUUL's "5% strength" labeling statement meant that Mint pods always contained at least 20% more nicotine than the label disclosed and sometimes nearly 100% nicotine than the label disclosed—he would not have purchased or used a JUUL.

62.     Soon after he started using JUUL, Banner found that he would smoke more than he used to when his JUUL was empty.

63.     Banner also found that his consumption rapidly increased and within a short period of time, he was consuming up to two "Cool" Mint JUULpods a day.

64.     Recognizing that his addiction had spiraled out of control, Banner switched to cigarettes because they were more economical than JUULpods and because he felt like cigarettes allowed him to control his addiction better than a JUUL.

65.     Banner now consumes at least half a JUULpod and one pack of cigarettes every day.

66.     Banner has repeatedly attempted to quit JUULing and smoking with no luck. After seeking medical help from his physician, Banner was prescribed Wellbutrin, which was not effective.

## F.  Tommy Benham

67.     Plaintiff Tommy Benham is a resident of Michigan.

68.     Benham, who is 20 years old, purchased a JUUL starter kit at the age of 18.  He was a smoker prior to his purchase.  Benham decided to try JUUL products based on advertising that he saw in posters, magazines, and Facebook depicting JUUL e-cigarettes as a safe, less addictive alternative to smoking cigarettes. He was smoking a pack of cigarettes a day at the time and thought that the JUUL would help him quit smoking by weaning him from cigarettes.  He also found the variety of flavors appealing, and was attracted to the eye-catching colors and bold fonts used

in the JUUL ads.

69. A number of the ads Benham saw on Facebook are archived on the web page for Stanford University Research into the Impact of Tobacco Advertising ("SRITA"). See http://tobacco.stanford.edu/tobacco_main/images_pods.php? token2=fm_pods_st661.php&token1=fm_pods_img36435.php&theme_file=fm_pods_ mt068.php&theme_name=JUUL&subtheme_name=Facebook (accessed December 17, 2018).

70. Among the JUUL ads that Benham saw were numerous ads placed on Facebook as part of JUUL's "Switch" campaign. These included testimonial ads touting the switch to JUUL as an improvement over cigarette smoking, similar to ADdvertisements 57 ("Switch") and 66 (testimonial). These ads led Benham to believe that using JUUL products would decrease his appetite for nicotine.

71. Benham also saw a number of "Smoking Evolved" ads. See, e.g., Appendix C, Advertisements 69-70. Benham liked the sleek, high tech look of the device and the bright colors of the JUULpods. The tag line "Smoking Evolved" led Benham to believe that the JUULpod had been designed to avoid unhealthy side effects and be less addictive than traditional cigarettes.

72. Benham saw numerous JUUL ads on Facebook touting the various JUULpod flavors, including limited edition flavors such as mango (before it became a "permanent" flavor), menthol, and cool cucumber. Id., Ads 24, 59, 62, and 71-73. The variety of flavors was a major factor in his use of JUUL, and he tried essentially every new flavor that came out. JUUL's use of invitations to comment on "which flavor is your favorite" was also engaging to Benham, who commented on the various flavors in response to those ads. Benham also saw ads framing JUULpod flavors as something to be paired with foods, such as ads with "featured chef" pairings of JUULpod flavors with recipes. Appendix C, Ad 76 ("Save Room for JUUL"

ad).

73.     Benham also saw numerous ads on Facebook that touted limited edition JUUL e-cigarettes in new colors such as Navy and Gold. *Id.*, Ads 74-75. Benham purchased these limited edition e-cigarettes because he felt they had more pizazz than a standard black JUUL e-cigarette.

74.     Benham also saw JUUL ads leveraging the fact that JUUL e-cigarettes would avoid "smelling like an ashtray."

75.     Among the ads discussed above that Benham saw were ads using discounts to promote new styles of e-cigarettes and JUULpod flavors.  He sometime purchased JUUL products at least in part in response to seeing these discounts. See, e.g., *Id.* at Ad 67 (point-of-sale poster with discount, similar to Facebook ads showing discounts).

76.     Benham also saw JUUL ads on Facebook with celebrity images, such as a 2016 ad showing Orlando Bloom and Katy Perry sharing a JUUL e-cigarette. Benham perceived these images as glamorizing JUUL products and making them seem trendy.

77.     Many of the ads that Benham saw, including those circulated prior to November 2017, contained no nicotine warning. Nor did any of the ads disclose the increased potency of nicotine salts or the relatively high concentrations of nicotine in JUULpods compared to other e-cigarette nicotine solutions.

78.     Although Benham thought JUUL would help him quit smoking, he has found it even more addictive than cigarettes, to the point where even tobacco is an inadequate substitute.  Benham now finds that he has to interrupt his routine throughout the day to vape with his JUUL, and that he is consuming at least eight JUULpod packs per week. Benham favors Cool-Mint flavored JUULpods. None of the ads mentioned above informed Benham that JUUL's nicotine salt formulation would

deliver higher, more potent doses of nicotine than cigarettes or other vaping solutions.  Had Benham known that the nicotine salts in JUULpods were more potent and addictive than traditional cigarettes, he would not have purchased JUUL products.

## G. D.C. through his parent and natural guardian Kisha Chandler

79.     D.C. and his mother Kisha Chandler ("Chandler") are residents of Williston Park, New York.

80.     Prior to using a JUUL for the first time in August 2017, at the age of 15, D.C.  D.C. had viewed increasing amounts of JUUL-related content on various social media platforms. He had also seen online JUUL advertisements promoting JUUL flavors.  None of this JUUL messaging disclosed that JUUL products contain at least 59mg/mL of nicotine and deliver nicotine to the bloodstream more effectively than cigarettes.

81.     When D.C. was offered a mango-flavored JUUL by one of his many high school friends who had taken up JUUL use, he had never smoked a cigarette before or used any other tobacco product. D.C. decided to try the JUUL because everything he had seen had led him to believe that JUUL was fun, harmless, and "cool." When Chandler caught her son with JUULpods in his bedroom, D.C. told her JUUL was safe and nicotine-free; he told his mom the JUULpods only contained water vapor.

82.     D.C. enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine hit, and he quickly became addicted to nicotine. D.C. and his friends obtained their JUULpods from nearby gas stations and a small local deli. Initially, the gas stations and deli sold JUUL products directly to D.C. and his friends. Thereafter, D.C. and his friends would approach adults and ask them to purchase the JUULpods for them.

83.     Chandler does not provide D.C. with cash; instead, if D.C. needs to

purchase something, D.C. uses apps on his phone, which are linked to Chandler's bank accounts. Thus, in order to obtain JUULpods, D.C. would trade food for JUULpods (i.e. "I'll give you $20 worth of Wendy's for a JUULpod).

84.    Even though Chandler has confiscated numerous JUUL devices and JUULpods from her son, D.C. has continued to find ways to obtain JUUL products. At his peak consumption, D.C. was consuming two (2) to three (3) JUULpods a day and spending hundreds of dollars each week on JUUL products.

85.    D.C.'s JUUL use has taken a significant toll on his physical and psychological health. Since D.C. started using JUUL, he has developed a chronic cough. D.C. also has severe ADHD. D.C.'s JUUL use counteracted with his ADHD medication to the point where D.C.'s psychiatrist had to increase the level of ADHD medication he was prescribed. Chandler also believes her son's JUUL use has increased his anxiety levels.

86.    Chandler fears D.C. will continue using JUUL when he returns home. D.C. has expressed to his mother that he wants to stop using JUUL, but he cannot because it makes him feel so good.

## H. Bradley Colgate

87.    Plaintiff Bradley Colgate is a resident of California.

88.    In 2017, Bradley Colgate ("Colgate") purchased a JUUL e-cigarette and JUULpods at the age of 24 in an effort to curtail his nicotine addiction and quit smoking.  He had smoked Marlboros for approximately seven years, and hated being a smoker.

89.    In the summer and fall of 2017, Colgate started seeing JUUL ads across social media. He typically used Instagram and Facebook, and recalls seeing many JUUL ads on both platforms. In particular, he remembers seeing a series of Instagram posts that included testimonials from people who had switched from

cigarettes to JUUL. When logging into Instagram, he would see "Instagram sponsored stories," which were short one minute video advertisements, and often, he'd be presented with a JUUL sponsored story that was in the form of a testimonial. These testimonials typically involved people describing how JUUL helped them quit smoking cigarettes. While he did not watch the videos, he often observed the brief caption that appeared beneath the video, which typically encouraged him to "switch" from cigarettes to JUUL. While the precise testimonials that Colgate saw are no longer available online, Colgate recalls seeing testimonials that looked similar to Advertisement 66 of Appendix C. In particular, he recalled seeing in these testimonials phrases that described JUUL as an "alternative" to cigarettes, which he understood to mean not unhealthy and less addictive. He also recalls seeing advertisements on both Instagram and Facebook that simply contained the word "SWITCH," including the advertisement appearing at image 57 of Appendix C.

90. Around that same time, he also began seeing advertisements at stores. He noticed how large the store advertisements were, and was surprised to see the ads on display not just at smoke shops, but at convenience stores and gas stations, such as 7-11. He also noticed that these stores displayed JUUL on the counter, instead of behind it with the other cigarettes.

91. Before Colgate purchased JUUL for the first time, he saw other JUUL advertisements on Facebook and Instagram. In particular, he recalls seeing Instagram advertisements 57 ("Switch"), 58 (JUUL with coffee); 59 (using JUUL like a toy to make cool visual patterns), and 60 (JUULpods displayed as Warhol-inspired pop art), 61 (enjoying a view), 62 (JUUL with coffee, nearly identical to Ad 24) of Appendix C. He also recalls seeing Facebook ads in September 2017 for a "Device Kit" and another on or around October 4, 2017 that encouraged him to "[c]ustomise a plan that fits your lifestyle." *Id.*, Advertisements 63-64. He believed that JUUL

would make it easier to stop being a smoker.

92.     On the basis of JUUL's advertising campaign, including the ads described in the previous paragraph, Colgate decided to purchase JUUL in or around October 2017. While he knew prior to purchasing JUUL for the first time that JUUL contained nicotine, he believed based on the advertisements that it contained less nicotine than cigarettes, and that it was akin to a nicotine chewing gum or other product designed to help people quit smoking. At no time was he informed that it had more nicotine than cigarettes. Had JUUL disclosed in the advertisements that it had more nicotine per pod than a pack of cigarettes, he would not have made the decision to purchase JUUL.

93.     Rather than weaning Colgate off of nicotine, the intense dosage of nicotine delivered by the JUUL products resulted in an increased nicotine addiction, and an increased consumption of nicotine and JUUL products by Colgate. Colgate found JUUL so addictive that he did not subscribe to JUUL's pod service, as he was concerned that by having so many pods in the house, he would smoke more than his typical pod a day due to its addictive nature.  Moreover, not only has the increased nicotine made JUUL harder to quit than regular cigarettes, but because of the way in which JUUL relentlessly continued to advertise to him on social media, Colgate has found quitting JUUL to be even more difficult than quitting cigarettes due to the fact that he is continuously reminded of it.

94.     Had Colgate known the truth of the matter about JUUL, he would not have purchased JUUL products.

**I.  Kaytlin McKnight**

95.     Kaytlin McKnight ("McKnight") is a resident of Arroyo Grande, San Luis Obispo County, California.

96.     In 2017, Class representative Kaytlin McKnight purchased a JUUL e-

cigarette and JUULpods. McKnight subsequently became addicted to nicotine salts. McKnight now consumes several JUULpods each week.

97.     Had McKnight known the truth of the matter about JUUL, she would not have purchased JUUL products.

**J.  Q.C. through his parent and natural guardian Anjie Comer**

98.     Q.C. and his mother and natural guardian Anjie Comer ("Comer") are residents of Fort Worth, Texas. Q.C. began using JUUL around March 2018 at the age of 16.

99.     Before Q.C. even tried JUUL, he viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. Q.C. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted Q.C.'s assessment of, and eventual decision to use, JUUL products.

100.    When Q.C. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the fruit flavors sounded intriguing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Q.C. had seen advertisements for JUUL on social media and was led to believe JUUL did not contain any nicotine.

101.    Q.C. would not have started using JUUL if he knew it contained nicotine. Additionally, Q.C. would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

102.    Peer pressure and JUUL's narcotic effect of nicotine led Q.C. to use his friend's JUUL repeatedly over the course of the next few weeks. Using JUUL became

a social activity that Q.C. engaged with regularly with his friends during and after school.

103.  Comer has noticed that since her son began using JUUL, it has made him experience severe mood swings.

104.  Had Q.C. known the risks of using a JUUL or that the sudden popularity of JUUL was not because the JUUL was "cool" but because JUUL was using deceptive advertising tactics to lure teenagers to its powerfully addictive product, he would not have used a JUUL.

### K.  A.U., and her mother and natural guardian, Lisa Commitante

105.  A.U. and her parent and legal guardian, Lisa Commitante, are residents of New York.

106.  A.U. began JUULing at the age of 14, after purchasing a JUUL and JUULpods at a smoke shop.  A.U. was attracted to the fruit flavors produced by the JUULpods, and did not realize that it contained nicotine.  She subsequently began consuming JUULpods, enticed by the fact that it looked cool and her friends were vaping JUUL products.  She used the JUUL frequently until her mother found and confiscated it.  A.U. would not have purchased the JUUL starter kit if she had known it contained nicotine.

### L.  D.C. and his mother and Natural Guardian Renee Deeter

107.  Plaintiff D.C. and his mother and Natural Guardian Renee Deeter ("Deeter") are residents of Tucson, Arizona.

108.  When D.C. used a JUUL for the first time in 2015, he was 13. He had never smoked or used tobacco products before.  He also did not—and does not—understand that nicotine causes addiction or that he is addicted to nicotine.

109.  Because D.C. is convinced that JUUL use is safe and non-addictive, he does not share details of his use with his parents.

110. D.C. maintains that nicotine is not addictive, even though he suffers withdrawal symptoms when he doesn't use JUUL.

111. Deeter does not know what JUULpod flavor D.C. tried first, but she believes that he only consumes fruit-flavored JUUL products.

112. D.C. actively uses Instagram, Snapchat, and YouTube where he is exposed to JUUL-related content from other adolescents and from JUUL-related accounts.

113. D.C. typically purchases JUUL products from classmates.

114. Other parents inform Deeter that they have seen JUUL-themed Snapchat posts posted by D.C. as well as videos of D.C. smoking JUULs, but Deeter does not have access to D.C.'s account to verify.

115. D.C. begins JUUL within 30 minutes of waking up every morning. His preferred flavor is Fruit Medley. Deeter believes that D.C. consumes at least one JUULpod every two days.

## M. D.D. and C.D., minors, through their Parent and Natural Guardian Joseph DiGiacinto

116. Plaintiffs D.D. and C.D. and their Parent and Natural Guardian Joseph DiGiacinto are residents of Cotati, California.

117. Before D.D. used a JUUL for the first time in 2015, he was not a smoker. As he told C.D. the night before he used a JUUL for the first time, his friends were peer pressuring him into using a JUUL because "everyone was doing it" at D.D.'s high school.

118. D.D. continued using a JUUL and, like many of his classmates, became addicted to nicotine.

119. D.D. eventually convinced C.D. to use a JUUL, too. Before C.D. had ever tried a JUUL, he had seen point-of-sale ("POS") promotional materials for JUUL

devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit."  C.D. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed.  The representations and omissions in JUUL's in-store promotions materially impacted C.D.'s assessment of, and eventual decision to use, JUUL products.




120.    C.D. looked up to his brother D.D. and eventually bought a JUUL from a classmate who had a spare for sale.

121.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached C.D. and D.D.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, C.D. would not have been exposed to, and would not have used, JUUL products.

122.    D.D. and C.D. are both active on Instagram and Facebook.

123.    On Instagram, D.D. and C.D. were exposed to a significant amount of JUUL promotional content from third parties, including the Instagram accounts @Doit4JUUL and @JUULNation.  These accounts led D.D. and C.D. to believe that

JUUL use was "cool," safe, and appropriate for minors. The accounts also encouraged the unlawful purchase and use of JUUL products by youth. On YouTube, D.D. and C.D. saw numerous JUUL-themed videos from Donny Smokes and Supreme Patty. On Snapchat, C.D. saw JUUL-themed content from EonSmoke and OG Nick, and even his own friends. This content was overtly youth-oriented and promoted nicotine abuse, downplayed or normalized addiction risks, encouraged JUUL use in school, provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also sold JUUL products directly through Instagram and promoted websites that sold JUUL products with inadequate age verification procedures, if any at all. C.D. did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction. Had D.D. or C.D. known that they were being targeted by vendors of JUUL products, or that JUUL's own viral marketing had promoted and facilitated these accounts, D.D. and C.D. would have rejected offers to use a JUUL or would have made efforts to stop using JUUL sooner than they did.

124. Although C.D. was, and is, under 18 years of age, he was able to continually acquire and use JUUL products through D.D. and countless other older high school students, and thus maintain his addiction to nicotine. DiGiacinto does not know where D.D. buys JUUL products.

125. Though C.D. is a minor, he has been receiving a steady stream of promotional e-mails from JUUL for months.

126. C.D.'s Instagram and Snapchat streams are bombarded with advertisements for JUUL products and JUUL-related products.



127.    DiGiacinto has enlisted the aid of school administrators and his family doctor in efforts to halt C.D. and D.D.'s nicotine addiction. He has also attempted to keep C.D. and D.D. from associating with friends who use JUULs.  None of these efforts have been successful.

**N.  K.S. though his parent and Natural Guardian Rachelle Dollinger**

128.    K.S. and his mother and Natural Guardian Rachelle Dollinger are residents of Brownsburg, Indiana.

129.    In 2017, K.S. used a friend's JUUL for the first time. K.S. and his friend were both 13-year-olds in the eighth grade. K.S. was not a smoker and had not used tobacco products in the past.

130.    K.S. would not have used a JUUL if he were not offered a product in a candy-like flavor.

131.    Dollinger did not know what a JUUL was until one day K.S. told her. When Dollinger later found out that K.S. was using a

JUUL, K.S. told Dollinger that JUUL use was harmless and safe and did not contain nicotine. K.S. told Dollinger that he had reviewed JUUL's website, and that if Dollinger reviewed the website, she too would learn that JUUL use was harmless and safe.

132.    Although K.S. well below the minimum legal age to buy tobacco products, he is nevertheless able to purchase JUUL products from the local Speedway gas station.

133.    Like many high school students, K.S. is active on social media.  On Instagram and Facebook, he has seen JUUL advertisements inviting him to "start your week with Cool Mint JUULpods," to "experience a new kind of tropical getaway" with Mango JUULpods, or simply to "find your favorite flavor."  Other ads he has seen present JUUL products alongside cell phones, laptops, tablet computers, books and coffee cups, all items familiar to K.S.  None of these ads disclose that JUULpods contain at least 59mg/mL of nicotine and that they deliver nicotine to the bloodstream as effectively or more effectively than cigarettes. Rather, JUUL's ads led K.S. to conclude that JUUL is a tasty indulgence that he can enjoy without consequences.




134.    Dollinger recently found approximately 30 empty JUUL pods while cleaning K.S.'s room.  K.S. claimed that there are videos on YouTube that explain how to refill empty pods.

135.    At 14 years of age, K.S. is addicted to nicotine. According to Dollinger, he has a "meltdown" if he cannot get JUULpods.

## O.  J.D. through his parent and natural guardian Nicole Dramis

136.    Plaintiff J.D. and his parent and natural guardian Nicole Dramis ("Dramis") reside in Miller Place, New York.

137.    J.D. began using JUUL in November 2017, at the age of 14. Prior to this, J.D. did not smoke cigarettes or use other tobacco products.

138.    Before using JUUL for the first time, J.D. had seen numerous JUUL Vaporized images online, which promoted JUULpod flavors and depicted fashionably dressed young people striking playful poses with JUUL devices in hand. See, e.g., Appendix C, Advertisement 46; see also https://inrejuul.myportfolio.com/vaporized. None of the advertisements J.D. saw disclosed the nature or addiction risks of JUUL's products, the existence or amount of nicotine in JUUL's products, or that the JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette.

139.    Before J.D. even tried JUUL, he also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. J.D. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted J.D.'s assessment of, and eventual decision to use, JUUL products.

140.    When offered a JUUL by a friend at school, J.D. accepted because he was interested in trying the fruit flavors. J.D. believed that JUULpods did not contain nicotine but were simply "fruit-flavored juice."

141.    JUUL's use of fruit-based flavors, fruit-based flavor names and fruit-based advertising images was a substantial factor in J.D.'s decision to use and continue using a JUUL. JUUL's fruit-based promotions misled J.D. about the nature of

JUUL's product and distorted the risks JUUL products posed. J.D. would not have started using JUUL if he knew it contained nicotine. Additionally, J.D. would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

142.    Peer pressure was also a significant contributing factor in J.D.'s decision to use and continue using a JUUL. J.D. has conveyed to Dramis that everyone at his high school was using JUUL, and he did not want to be the "odd man out."

143.    J.D. and his friends have purchased JUULpods from older students at school and at vape shops in the area.

144.    At his peak level of consumption, J.D. was consuming up to three JUULpods per day; he began using JUUL within five minutes of waking up in the morning and continued using JUUL throughout the day.

145.    J.D. began using JUUL regularly at school; he would leave class and take extended visits to the bathroom to use JUUL. Because of this, Dramis has received phone calls from J.D.'s teachers informing her of her son's absence from class.

146.    Dramis states J.D.'s JUUL use has had significant psychological and social effects on her son. Dramis says J.D. becomes very nasty and irritated when he cannot consume JUUL due to his severe addiction to nicotine. J.D. enjoys using JUUL because it gives him a high and makes him feel good.

147.    Socially, Dramis says her son has always been a nice, respectful child. However, since using JUUL, J.D. has started hanging out with a different crowd and veers the other way. J.D. has made friends with older kids that have easier access to JUUL.

148.    Dramis has made many efforts to get her son to stop using JUUL.

Dramis has grounded J.D., taken away his spending money, and banned him from hanging out with "bad influences." Dramis would like to send her son to a rehabilitation program in order to treat his addiction to nicotine and put a stop to his JUUL use.

### P. Jillian Furey

149.    Plaintiff Jillian Furey is 20 years old and a resident of Washington, D.C.

150.    Plaintiff Furey started using JUUL in 2018 because she heard of JUUL products as an alternative to cigarettes. JUUL's marketing, including in-store displays and radio advertisements, led her to believe JUUL was less risky and not addictive. She heard a JUUL ad on the radio station DC101 and 97.9FM during the class period telling her she could "switch."

151.    Plaintiff Furey used to smoke Marlboro lights, and she initially used one JUUL pod per week, but now uses up to 1 entire JUUL pod per day.

152.    She has purchased JUUL from gas stations and convenience stores and pays approximately $20 per pack of JUUL pods and up to $30 per day or every other day.

153.    She did not see any warnings in JUUL ads or on JUUL ads in gas stations or convenience stores.

154.    She used to smoke a few cigarettes per day (less than ten) and now smokes significantly more in nicotine in JUUL pods.

155.    She saw the JUUL packages said 5% nicotine, which to her represented a smaller amount of nicotine than cigarettes.

156.    JUUL's flavors played a significant role in her choosing to try JUUL, as she primarily smokes "Cool Mint".

157.    JUUL has increased her dependence on nicotine and aggravated her

addiction. She smokes JUUL within 5 minutes of getting up and finds herself far more addicted than when she smoked cigarettes. She has to use JUUL every 30 minutes.

158.    She has also been coughing significantly more often, and has been feeling sick on a regular basis, exhibiting symptoms such as shortness of breath and breathing issues.

159.    If she does not have her JUUL or cannot find it she becomes more agitated and anxious; she feels more better when she knows she has it on her and can use it at any time.

160.    Jillian would never have tried or purchased JUUL had she known the truth about its nicotine content and delivery, and the nature of its impact on her health.

## Q.  M.H., and her mother and natural guardian, Jennifer Hellman

161.    Plaintiff M.H. and her mother and natural guardian Jennifer Hellman ("Hellman") are residents of New Hope, Pennsylvania but lived in Robbinsville, New Jersey until July 2018.

162.    In 2016, M.H.'s older brother started using a JUUL along with many of his friends in high school.[1]

163.    M.H.'s brother told her what he believed to be true: the JUUL comes in fun flavors and he allowed her to use his JUUL.

164.    Prior to and after using a JUUL, M.H. saw and relied on JUUL's signs and promotions in local gas stations.

165.    When M.H. tried the JUUL, she liked the way it tasted and the buzz from nicotine. Because many of her friends had started using JUULs, too, M.H. found

---

[1] Due to an oversight by counsel, inaccurate allegations had been made in the First Amended Complaint that have now been corrected.

herself using a JUUL.

166. M.H. and her friends are active on social media, where M.H. saw posts from her and her brother's friends about JUUL use, saw posts that encouraged adolescent use of JUUL products and promoted using JUUL products at school. This online content reinforced M.H.'s belief that the JUUL was a harmless product made for teenagers. M.H.'s mother saw posts from her daughter of M.H. using JUUL, mimicking what she had seen on other's social media.




167. Now 17 years old, M.H's spending on JUULpods and JUUL devices has totaled at least $2000, some of which she earned herself and some of which Hellman provided through gifts of money, not realizing that she was funding M.H.'s addiction.

168. All of M.H.'s friends in New Jersey were JUUL addicts. Although many of them are below the legal age to purchase JUUL products, they easily purchased JUULpods from local gas stations and other students at M.H.'s school.

169. Hellman has spent in excess of $7,000 in her efforts to help M.H. with behavioral issues that coincided when M.H. began JUULing. In 2018, Hellman moved the family to Pennsylvania, where JUUL use is just as common in M.H.'s new high school. M.H. has tried cigarettes at times where she could not get JUULpods.

170. Hellman had taught M.H. and her brother that smoking was dangerous, but she did not know to warn them about the JUUL—or what a JUUL

was—until it was too late. Schools educated M.H. and her brother about tobacco though the DARE program, but never addressed JUUL use.

171.    Though M.H. was not a smoker or a nicotine user before using a JUUL, her current consumption of nicotine is consistent and frequent.

172.    M.H. has tried repeatedly to quit JUUL use but has been unable to do so.

**R.  Austin Hester**

173.    Plaintiff Austin Hester ("Hester") lives in Roxboro, North Carolina but resided in St. Louis, Missouri when the transactions below occurred.

174.    . Prior to using a JUUL for the first time in 2016, at the age of 20, Hester did not smoke or use tobacco products because he knew that cigarettes cause addiction and can lead to serious illness or death. He also found the smell of cigarette smoke noxious.

175.    Although he had not yet tried a JUUL, Hester saw and relied on JUUL's point-of-sale ("POS") promotional materials, including JUUL signs and displays. The POS materials Hester saw promoted JUUL's fruit- and dessert-flavored pods. If the materials disclosed the existence or risks of nicotine in JUUL's products, Hester did not see them. The representations and omissions in JUUL's in-store promotions materially impacted Hester's assessment of the nature, risks and benefits of JUUL's products.

176.    When some of Hester's friends back from college offered him a JUUL in the summer of 2016, Hester, like his JUUL-using friends, was unaware of the addiction risks JUUL posed. Hester liked the taste of the Fruit Medley pods and continued to accept puffs from his friends when they socialized, which usually occurred a few times a week.

177.    Over the course of the summer, Hester continued to use his friends'

JUUL when he would see them. And Hester continued to see JUUL promotions in-store and online. JUUL's use of flavor-based nicotine pods and JUUL's flavor-based advertising images played a significant role in Hester's decision to use and continue using a JUUL. Had he known that JUUL's "Fruit Medley" product posed a risk of fostering a life-altering addiction, or could lead to smoking, he never would have used or purchased a JUUL.

178.    Hester also saw JUUL advertising content on @JUULvapor Instagram account and through the account of third parties discussing or promoting JUUL. Hester's friends and peers also posted about JUUL on Instagram and Snapchat. The social media content Hester saw led him to believe that JUUL products were made for non-smokers like him and posed little risk.

179.    When Hester's friends returned to school in the fall of 2016, Hester realized that he had become addicted to nicotine and purchased his own JUUL Starter Kit from the local QuikTrip store.

180.    Hester filled out the registration card that came in his "Starter Pack" and returned it to JUUL. Thereafter, Hester routinely received promotional emails, which, during the time period included discount offers, store locators, and flavor promotions, from JUUL, such as the email below promoting JUUL's Mango:



181.    Hester's budding addiction to nicotine quickly spiraled out of control, and Hester was soon consuming three JUULpods a day.

182.    Hester currently consumes one JUULpod a day.  He takes his first puff of JUUL within 5 minutes of waking up. He finds that the harshness or throat hit of the Mint flavor prevents him from excessive nicotine consumption.

183.    Hester tried the Mango pods but found the smoothness of the vapor, coupled with the flavor, led to an unwanted spike in usage.

**S.  Edgar Kalenkevich**

184.    Plaintiff Edgar Kalenkevich is a resident of Brooklyn, New York. When he used a JUUL for the first time in 2015, at the age of 25, he was a non-smoker.  He had tried cigarettes before but found them disgusting and rough on his throat.

185.   Plaintiff Edgar Kalenkevich is a resident of Brooklyn, New York. When he used a JUUL for the first time in 2015, at the age of 25, he was a non-smoker.  He had tried cigarettes before but found them disgusting and rough on his throat.

186.   Kalenkevich recalls that the JUUL brand appeared out of nowhere in New York City in the summer of 2015. Suddenly, all of his friends had JUUL devices and some of his friends spoke of attending events where free JUUL products were distributed.  Kalenkevich recalls seeing an invitation to a JUUL movie event in 2015 as well, in which JUUL promised free "starter kit" to each attendee.



187.   Although he had not as yet used a JUUL, Kalenkevich had seen advertisements from JUUL's "Vaporized" campaign.  These colorful ads featured fashionably dressed young people striking playful or seductive poses reminiscent of pop music idols, either with JUUL in hand or next to an enlarged image of a JUUL device.  Kalenkevich did not see any warnings about nicotine or addiction in these

ads.

188. Prior to using a JUUL, Kalenkevich had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. Kalenkevich did not see any warnings or disclosures on these POS materials about JUUL's nicotine levels of the risks JUUL posed. Instead, he saw claims that JUUL offered "intensely satisfying vapor" and promotions for fruit- and dessert-flavored pods. These representations and omissions in JUUL's in store promotions materially impacted Kalenkevich's assessment of dessert-flavored JUUL he would later be offered.

189. Kalenkevich also remembers seeing JUUL advertisements on his mobile phone in 2015. None of the JUUL-related content Kalenkevich saw on his phone indicated that the JUUL contained nicotine, could deliver more nicotine than cigarettes, or posed at least the same risks of addiction as cigarettes.

190. Kalenkevich had his first JUUL experience when his friend offered him a puff in a movie theater in the summer of 2015. Kalenkevich enjoyed the Crème Brulee flavor and the feeling it gave him. Although he knew smoking to be dangerous and addictive, he thought that JUUL would not be dangerous, in part because the colorful pods and the sweet, candy-like flavors. Kalenkevich would not have used a tobacco- or menthol-flavored JUUL.

191. After trying a JUUL, Kalenkevich visited JUUL's site where he saw a chart indicating that the JUUL delivered about 20% less nicotine than a cigarette. He assumed this meant that the JUUL was less addictive and less dangerous than a cigarette.



Without nicotine salts, average vapor products (like e-cigarettes) can only accommodate about half of JUUL's nicotine strength - much less than what's in your average cigarette. For us smokers, this leaves something to be desired.

JUUL's nicotine salts allow you to quickly vaporize an amount of nicotine that is closer to what you'd normally receive from a cigarette - 1-2mg of nicotine per 10 puffs.

Voila, breakthrough satisfaction.

Data calculated by PAX Labs, Inc. based on clinical testing
* Based on typical cartridge-based e-cigarette with 24 mg/mL nicotine strength
Actual nicotine consumed may vary by user

192.    Starting in June 2015, Kalenkevish frequently viewed JUUL's posts on Facebook and Instagram JUUL's use of food-based names, food-based advertising images, and food-based flavors was a substantial contributing factor in Kalenkevich's decision to start using and continue using a JUUL. JUUL's food-based promotions misled Kalenkevich about the nature of JUUL's products and distorted the risks JUUL's products posed. But for JUUL's flavorings and flavor-based promotions, Kalenkevich would not have started using a JUUL or would not have continued using a JUUL.

193.    On Facebook, he saw posts encouraging him to "start your week with Cool Mint JUULpods" as well as promotions for Mango pods and other JUUL flavors.

194.    When Kalenkevich's friends began posting or re-posting social media content related to JUUL, Kalenkevich started following some of the JUUL-related accounts, including @JUULnation and @doit4juul. Through these, and other, accounts Kalenkevich saw numerous JUUL-related posts featuring popular cartoon characters, teenagers using JUUL devices, teens combining JUUL with cigarettes, and JUUL as an essential – indeed irresistible – element of young adult life.

195.    JUUL's use of celebrities like Katy Perry and Orlando Bloom also influenced his decision to use JUUL products. These celebrities' endorsement led him to believe that JUUL was a safe product.



196.    Kalenkevich visited JUUL's website in 2015 and 2016 and began receiving promotional emails from JUUL. Nothing in those emails disclosed that JUUL contained at least 59 mg/mL nicotine or that the JUUL could deliver more nicotine per puff than a cigarette.

197.    Kalenkevich's JUUL use caused him to become addicted to nicotine.

Though cigarettes had disgusted him in the past, his addiction to nicotine was so intense that he started smoking when he did not have access to JUUL. Like many non-smokers who are introduced to nicotine through JUUL, Kalenkevich became a user of multiple tobacco products.

198.    Kalenkevich now smokes ten cigarettes and vapes at least half of a Cool Mint or Mango pod a day.  In his experience, the sweeter flavors generate more vapor and are smoother on the throat.

199.    But for JUUL's deceptive and unfair promotional practices, Kalenkevich would have never used a JUUL and would have never become a smoker.

**T.  David Kugler**

200.    Plaintiff David Kugler is a resident of Illinois.

201.    David is 18 years old, he turned 18 in January 2019.

202.    David. is addicted to JUUL, he started at age 15 in the summer of 2016; He had tried a cigarette before.

203.    JUUL seemed trendy or cool and "everyone was doing it" so he tried too.

204.    David Kugler has seen JUUL ads on social media, instagram, at gas stations, and smoke shops during the class period, including this ad and similar ads, which provide no warning:



205.   David Kugler first tried JUUL at a party and one of his classmates offered him to try using a JUUL device and JUUL pod that was "Cool Mint" flavor. D.K. did know what nicotine was and did not try nicotine before that point. There were no warnings on the device or pod.

206.   If David Kugler. had known how addictive JUUL was or how it worked, he would definitely not try it. At peak use in 2017, D.K. was smoking a pack of pods or $20-$25 per week.

207.   David Kugler was consistently struggling with addiction and withdrawl to JUUL, and it hurt his relationship with his parents.

208.   David prefers flavored JUUL pods, including mango. D.K. avoids tobacco or menthol flavored JUUL pods.

209.   David would never have used JUUL had it not been for the flavors.

210.   David had seen JUUL's packaging and advertisements in gas stations and on social media.

211.   David's mother Tracie Kugler does not sleep anymore because of her sons' condition.

212.   David saw online ads for JUUL skins and saw @juulnation on instagram. When mango first came out, he saw a lot of social media promotion over new appealing flavors. He has seen many memes such as people inhaling multiple JUULs at once. He saw a lot of online memes.

213.   David saw a photo of, Baker Mayfield the NFL quarterback, posted a photo with a JUUL devide.

214.   David purchased JUUL from a classmate who purchased pods in bulk off of the JUUL website. He also purchased JUUL pods through gas stations and smoke shops and through the help of some of his classmates who looked older.

215.   David lost weight (11lbs) and visited a physician, who recognized that

nothing was wrong with him except for his nicotine addiction.

216.    David's nicotine addiction has contributed to his slower athletic performance and has now diminished his opportunities to play college soccer.

217.    David had received help from a counselor and was eventually able to recover from his addiction in the summer of 2017. This program cost approximately $2,000.

218.    David would never have used JUUL had it not been for flavors and marketing that made him believe JUUL was safe.

**U.  Tracie Kugler, on behalf of her son, Z.K, a minor.**

219.    Kugler and Z.K. are residents of Illinois.

220.    Z.K., Kugler's son, is 15 years old.

221.    Z.K. is addicted to JUUL. Z.K. started at age 14 in 2017.

222.    Z.K. had ever tried a cigarette before trying JUUL.

223.    Z.K. saw JUUL ads on Facebook advertising JUUL's newest flavor, mango. He specifically saw this ad in early 2017 before he started smoking JUUL, which does not warn of any dangers of using JUUL, or the nature of nicotine content and delivery in the device:



224.    When Z.K. first tried JUUL, it was clear to him that he only liked flavored JUUL pods, including mango.

225.    Z.K. avoids tobacco or menthol flavored JUUL pods, finding them "digusting".

226.    Z.K. became addicted to JUUL in 2017 has been caught using JUUL at school multiple times in the past several years.

227.    Z.K. purchases JUUL on a regular basis through other people who obtain it from gas stations, online, or retailers.

228.    Z.K. has seen JUUL's packaging and advertisements in gas stations and on social media. He did see the 5% nicotine strength as well. None of the ads he saw, including specifically the one below, warned Z.K. of the true harms and nature of JUUL:



229. Plaintiff Kugler does not sleep anymore because of Z.K.'s condition.

230. Z.K. has been caught using JUUL three times in school. He has performed poorly in school due to his addiction, and had to be put in a drug rehab program mandated by the school.

231. Z.K. was also caught using JUUL in a summer school program, after which he was placed in an out patient rehab facility that cost at least $4,000 and therapy that cost $160 per session with approximately 25 visits. Z.K. continued to use JUUL through the program due to his addiction.

232. Z.K.'s mood has significantly changed and his nicotine addiction has contributed to anxiety and depression.

233. Z.K.'s addiction has contributed to negative impacts on his negative health, and conflicts with parents and others.

234. Z.K. would never have used JUUL had it not been for the flavors.

## V. Kacie Ann Lagun (née Durham)

235. Plaintiff Kacie Ann Lagun (née Durham) is a resident of Pennsylvania.

236. Lagun is a U.S. Army veteran and health sciences student.

237. Lagun purchased a JUUL to help her quit smoking and as a healthy alternative to smoking.

238.    Lagun saw JUUL advertisements when she went to purchase cigarettes, which led her to go to the JUUL web site for more information. These ads included discounts, and advertised to switch to JUUL. She also saw point of sale displays for JUUL, presenting a variety of flavors, each with its own bright primary color. Samples of such ads are shown below:





239.   On Defendant's web site, she saw the JUUL as a sleek, portable device with a variety of appealing flavors, particularly menthol. The devices were advertised using bright, primary colors in ads such as the one below:





240.    Lagun did not know at the time she purchased the JUUL that JUULpods deliver more nicotine than a regular cigarette.

241.    Lagun is now addicted to JUULpods.

242.    Had Lagun known that JUULpods were more addictive than cigarettes, she would not have purchased them.

**W. David Langan**

243.    Plaintiff David Langan is a resident of Massachusetts.

244.    Langan, who is now 24 years old, bought his first JUUL from a friend. Langan had been smoking 4-5 years before he purchased his first JUUL and had unsuccessfully tried to quit a few times. He particularly wanted to quit smoking because he had a child on the way, and did not want to smoke around his pregnant wife or infant.

245.    He felt like he had almost quit cigarettes when a friend introduced him to JUULpods in or about March 2017. Shortly afterwards, he purchased his JUUL.

246.    Langan had seen ads from JUUL's "Switch" campaign prior to his

purchase.  He also remembers seeing the slogan "Smoking Evolved."

247.    Langan remembers JUUL coming out of nowhere, and suddenly being everywhere, both in social media ads, gas station/point of sale ads and displays, and being used by friends, as well as many high school students in his neighborhood.  He remembers JUUL advertising being so widespread it became part of the subconscious backdrop of his every day life.

248.    At the time of his early JUUL purchases, Langan was active on Instagram and Facebook. He viewed Instagram "Switch" clips where JUUL users talked about their experiences switching to JUUL.

249.    Langan's first store purchase of JUULpods was a pack of the Cool Mint flavored pods, which was triggered by a poster advertising the Cool Mint flavor at his local gas station.  Langan saw advertising materials describing the fruity and menthol flavors of JUULpods, which influenced his purchase. Langan favors Menthol JUULpods, and has also purchased Mango-flavored and Cool Mint JUULpods that were advertised.

250.    Langan also received ads promoting JUUL from his local smoke shop, in the form of text messages.

251.    Based on what Langan had heard and seen, he was under the impression that JUUL was healthier than cigarettes.  He was also under the impression that JUULpods were not only no more addictive than cigarettes, but were actually useful as a means of weaning himself from nicotine.  He did not know that JUULpods actually contained a higher, more potent dose of nicotine than cigarettes, or that JUUL use would aggravate his nicotine addiction.

252.    Subsequently, he found that his nicotine addition increased significantly. When Langan lost his first JUUL, he could not go without one, so he bought a replacement.  Langan also found that if he did not have a working JUUL on

him, he felt compelled to ask for cigarettes from smokers around him. Had Langan known that the nicotine salts in JUULpods were more potent and addictive than traditional cigarettes, he would not have purchased JUUL products.

253.    If Langan had known the truth of JUULpods' nicotine content and addictiveness, he would not have purchased the products.

## X. Plaintiff Jonathan Mardis

254.    Plaintiff Jonathan Mardis is a twenty-four year old resident of Mississippi.

255.    Plaintiff started using JUUL products in mid-2018. He learned about JUUL from Facebook ads including those contained in JUUL's marketing led plaintiff to believe that using JUUL was healthier than smoking cigarettes.

256.    Plaintiff purchased JUUL from Citco, a convenience store, for approximately $17 for a pack. He did not see any warnings on the JUUL ads and posters in the gas station, including the ads that said "JUUL was sold here" in gas stations in his area.

257.    Plaintiff also saw JUUL content on Snapchat and Facebook, including the images presented at the page http://www.classlawdc.com/2019/01/25/juul-images-2/.

258.    He used to smoke approximately 20 cigarettes every two days, and smoked for 6.5 years before trying JUUL. Now Mardis is smoking a full JUUL pod per day and still craving cigarettes.

259.    He smokes approximately 1.5 JUULpods per day and starts consuming these as soon as he wakes up.

260.    On occasion Plaintiff gets bad headaches when he uses JUUL and other consequences. He has spent a significant amount of money on JUUL and cannot kick his addiction.

261.    Plaintiff only purchased JUUL because he thought it would help him end

his addiction, but instead, his addiction has gotten worse. He would have never purchased JUUL has he known the truth about the nature of its nicotine content, delivery, and the harms that it poses.

**Y. M.C. through his Parent and Natural Guardian Jeannine Manning**

262.    Plaintiff M.C. and his Parent and Natural Guardian Jeannine Manning ("Manning") are residents of Walpole, Massachusetts.

263.    When M.C. used a JUUL for the first time in 2016, at the age of 14, he was not a smoker and had never used tobacco products.

264.    Prior to his first experience with a JUUL, M.C. had seen advertisements from JUUL's "Vaporized" campaign. One of the ads M.C. saw portrayed an attractive young woman with bleached hair, elevated boots, ripped jeans, a distressed denim jacket and a JUUL device in her hand. M.C. did not see any disclosures or warnings about nicotine or addiction in these advertisements.

265.    Prior to using a JUUL, M.C. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. M.C. did not see any warnings or disclosures in these POS materials about the existence or amount of nicotine in a JUUL or the risks nicotine posed. Instead, he saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's in-store promotions materially impacted M.C.'s assessment of the JUUL he would later be offered by a friend at school.

266.    Though he was not a smoker, when M.C.'s classmate offered him his first puff of a JUUL, M.C. accepted it because he thought it would be safe and harmless.

267.    M.C. did not know that JUUL vapor contains nicotine and presents a risk of addiction. To this day, though he is addicted to nicotine, M.C. thinks that JUUL use is "ok" and "safe."

268.    JUUL's use of food-based names, food-based advertising images, and food-based flavors played a substantial contributing factor to M.C.'s decision to start using and continue using a JUUL. JUUL's food-based promotions misled M.C. about the nature of JUUL's product and distorted the risks JUUL products posed. But for JUUL's flavorings and flavor-based promotions, M.C. would not have used a JUUL or would not have continued using a JUUL.

269.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached M.C. and M.C.'s social network and were intended to promote the JUUL brand and products to youth. But for JUUL's social media advertising, M.C. would not have been exposed to and would not have used a JUUL.

270.    M.C. and his friends are active on Instagram and Snapchat and follow a number of JUUL-promoting accounts.  Through these accounts, M.C. has seen content that encourages teenage JUUL use by depicting teens using JUUL, depicting "cool" cultural icons using JUUL and making light of teen dependence on JUUL. M.C. and his friends now post videos of themselves JUULing on SnapChat that are similar to the videos and images they see on Instagram.

271.    M.C. and his friends purchase JUUL products through classmates when they cannot purchase them through stores or online. Manning knows that M.C. has at least once purchased JUUL products online using a Visa gift card that he purchased with cash. But Manning does not know if M.C. bought them from JUUL or from a JUUL reseller. More recently, M.C. admitted to having purchased a JUUL device and 20 pods from a stranger he met on Snapchat.

272.    Like many of his friends and classmates, M.C. supports his JUUL

addiction by selling JUULpods to classmates at a markup.

273.    To date, Manning has confiscated at least 5 JUUL devices from M.C. Each time she does so, M.C. becomes extremely irritable, belligerent and verbally abusive due to nicotine withdrawal. Since he started using a JUUL, M.C.'s health and performance in school have suffered, with M.C. being more withdrawn and moody than he was before he became addicted to nicotine.

274.    MC's physician has not been able to help MC break his addiction. MC now sees a counselor because Manning found that he was vaping marijuana oil through his JUUL device. To date, Manning has spent in excess of $1150 on interventions to address M.C.'s JUUL addiction, but without success.

275.    M.C. currently consumes at least 1 fruit-flavored JUULpod (either Fruit Medley or Mango) per day.

**Z. David Masessa**

276.    Plaintiff David Masessa is an adult citizen of New Jersey and resides in Chatham, NJ.

277.    In 2015, Mr. Masessa began using JUUL products in an effort to cease smoking cigarettes and wean himself from nicotine consumption.  He had been smoking from one half of a pack to a pack of cigarettes each day. He believed the JUUL pods would quench his desire for nicotine, allow him to stop smoking and using e-cigarettes, and allow him to cease consuming all nicotine products altogether.

278.    Prior to consuming JUUL pods, Mr. Masessa was exposed to and did see JUUL advertising, promotional and marketing materials in various online publications (such as Wired, Verge and Engadget), which caused him to believe that JUUL products would allow him to wean himself off of cigarettes and nicotine products. These materials sometimes included the word "Vaporized" and always featured attractive, youthful-

looing models, including specifically the following:



279.    Prior to consuming JUUL pods, he visited the JUUL website in June 2015, where he saw claims and representations about the product. He relied on those claims and representations when he then purchased the JUUL starter kit from the JUUL website. Such claims include the following graph, implying that JUUL contains less nicotine than cigarettes:



280.    At around this time, Mr. Masessa also saw posts on JUUL's Facebook page, including the following ad:



281.    After June 2015 when he purchased the JUUL started kit, he visited or came across additional posts from JUUL's facebook page, including a post that pictured a JUUL crème brulee-flavored pod next to a real crème brulee with the words "this JUULpod lets you indulge in dessert without the spoon", and a post with the word "SWITCH" in large letters across the face of the post along with the words "JUUL was designed with smokers in mind. Have you made the switch?"

282.    After June 2015, he also saw advertisements on social media for rooftop JUUL parties in Brooklyn and Manhattan, which further enticed him to begin using and to continue to use JUUL products. He saw the following ad and several others that were similar:



283.    He saw JUUL's representation of "5% strength" on JUUL packaging and believed that this meant the product contained 5% nicotine.

284.    After June 2015, he also saw JUUL's representation that one JUULpod is equivalent to one pack of cigarettes and believed this to mean that one JUULpod has a nicotine content equivalent to one pack of cigarettes.

285.    He also saw JUUL's representation that JUUL products were an "alternative for adult smokers" and believed this to mean that JUUL products were a smoking-cessation device that was a healthier alternative to cigarettes. Although he ultimately reduced, but did not cease, his consumption of cigarettes, he became addicted to JUULpods, which increased his anxiety and desire for nicotine. He experienced strong withdrawal symptoms when he did not use JUUL.

286.    He relied on these representations in deciding to use JUUL and in continuing to use JUUL.

287.    From the JUUL marketing materials and representations that he saw, he did not know that the JUUL contained 59mg/mL nicotine (6%); that the JUUL could deliver more nicotine per puff than a cigarette; or that the nicotine delivered by the JUUL entered the bloodstream faster than a cigarette. He believed that the nicotine salts in the JUUL broke down in the blood over a longer period of time than nicotine inhaled through a cigarette, and that this was supposed to reduce his desire for nicotine.

288.    He purchased JUUL products at convenience stores and local smoke shops near where he lives.  At those stores and in other locations, he saw JUUL advertisements and in-store signs, promotional materials, sales and discount information, and poster-sized enlargements of the product packaging.  He saw several displays including the following display, none of which warned him of the truth of JUUL's nicotine content and delivery:



289.     He has tried all of the JUUL flavors. He had seen JUUL advertisements touting all of the flavors it offered before trying those flavors, including advertisements that pictured real fruit next to the corresponding JUUL flavor, such as ripe mangoes next to a picture of the mango-flavored JUUL pod, crème brulee-flavored JUUL pods next to a cup of coffee as if those pods were a sweet dessert, and sliced cucumber next to the cucumber-flavored JUUL pod. His favorite flavor is Crème Brulee because it causes him the least amount of irritation and inflammation of his throat and mouth.

290.     Mr. Masessa on average consumed four to six JUUL pods every week.

291.     Since starting to consume JUUL pods, Mr. Masessa became addicted to the nicotine salts they contain. Indeed, JUULing was on his mind more than smoking cigarettes was, and not having a JUUL nearby caused him anxiety. Rather than weaning Mr. Masessa off of cigarettes and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

292.     Mr. Masessa would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself.

## AA.    Ron Minas

293.    Ron Minas ("Minas") is a resident of Lebanon, Connecticut.

294.    Prior to using JUUL, Minas smoked about ten to 20 cigarettes daily.

295.    Minas first learned about JUUL from his brother. He later saw JUUL advertisements online and decided to buy a JUUL device. He hoped that the JUUL would help him stop smoking and break his addiction to nicotine.

296.    Minas first purchased mango-flavored JUULpods. Minas would not have used tobacco- or menthol-flavored JUUL.

297.    Before purchasing JUUL, Minas visited JUUL's website and began receiving promotional emails from JUUL. Neither JUUL's website nor JUUL's emails disclosed that the JUUL easily delivers more nicotine per puff than a cigarette or that the JUUL delivers nicotine to the bloodstream faster than a cigarette.

298.    Minas' nicotine consumption has increased since he switched to JUUL. Minas now consumes at least one JUULpod per day, sometimes more.

299.    Minas believes that using JUUL has only worsened his nicotine addiction, as he can consume JUUL anywhere; the JUUL device is constantly in his hand.

300.    Nothing on JUUL's labeling suggested to Minas that the nicotine levels of a JUUL would exceed those of a cigarette. Minas would not have purchased JUUL products if he had known that the JUUL delivered more nicotine than cigarettes and posed a risk of worsening his addiction to nicotine.

301.    Minas's JUUL use has also impacted his family. Minas once caught his 11-year-old son inhaling his mango-flavored JUULpods. Luckily, Minas was able to stop his son before he became addicted to nicotine, but the situation could have turned out very differently.

302.    Minas says he has tried to stop using JUUL, but he just cannot kick his nicotine addiction. Minas has tried to use a nicotine patch and received treatment at the V.A., as he is a veteran, but he cannot seem to shake it.

303.    If Minas had known how much nicotine JUULpods contained, he would never have started using the product and exposed himself to the risk of developing a more serious nicotine addiction.

## BB.    L.B., and her mother and natural guardian Jill Nelson

304.    L.B. and her mother and natural guardian Jill Nelson are, and at all times relevant hereto were residents of San Diego, San Diego County, California.

305.    L.B. was introduced to JUUL products by her friends at school when she was in the eighth grade. The JUUL device bears no warning labels about nicotine or content, and L.B.'s friends did not warn of her of the risks of JUUL use. Had L.B. known, or understood, the risks that the JUUL posed, she would never have used it.

306.    L.B. would not have tried a JUUL but for the fruit flavors offered to her by her friends. The fruit flavored JUUL product her friends offered her led L.B. to believe that the product was safe to use. She did not know she was ingesting nicotine from a nicotine delivery system that delivered as much—or more—nicotine than a cigarette. She knew not to smoke but did not understand the risks of ingesting nicotine from ENDS.

307.    Through her use of her friends' JUULs, L.B. became addicted to nicotine and eventually purchased a JUUL of her own from an unknown source.

308.    L.B. has reported to Nelson that JUUL use is common at her high school, where older students sell individual pods to younger students for profit.

309.    L.B. told Nelson that the local gas stations readily sell JUUL pods to minors and that one young gas station employee even trades JUUL pods for fast food that children bring him.

310. On at least one occasion, Nelson knows of L.B. purchasing JUULpods from eBay.

311. In October 2017, L.B. also obtained a device directly from JUUL through the company's warranty department.

312. L.B. also received promotional emails from JUUL, starting no later than October 2017.

313. Nelson is unsure how much L.B. uses her JUUL but she constantly finds the orange and green caps of mango and "Cool" Mint JUULpods in L.B.'s room. Nelson has talked to L.B.'s doctor and other medical providers. None of them are trained, or equipped, to treat adolescents with severe addictions to nicotine caused by JUUL products.

314. Since the filing of the First Amended Complaint, L.B. has been subject to disciplinary actions at school for truancy relating to JUUL usage and was put in a court-ordered program called Diversion as a result.

315. In October, Nelson took away L.B.'s smartphone for disciplinary reasons. In doing so, she also removed L.B.'s access to her network of friends who are also addicted to JUUL. L.B.'s anger and panic caused her to flee the house and L.B. was apprehended for erratic behavior in public by the police.

316. Nelson and L.B.'s father put L.B. in a one-month-long inpatient treatment program.

317. The day after she returned from treatment, L.B. acquired another JUUL. She continues to JUUL daily.

318. Because of her extended absence from school, L.B. is unable to complete her freshman year of high school with her classmates. She now attends an alternative school and is attempting to salvage her year.

**CC.  S.G., a Minor, through her Parent and Natural Guardian Ashley Noble**

319.  S.G. and her parent and Natural Guardian Ashley Noble are residents of Ocean Springs, Mississippi.

320.  When S.G. began using e-cigarettes in 2017, at the age of 14, she was not a smoker.  Nor did she understand the risks of ENDS or addiction.

321.  In 2018, JUULing became very popular at S.G.'s high school. When offered a fruit-flavored JUUL, she found that she liked the flavor and the fact that it gave her a far stronger "buzz" than her older brother's 1.8% nicotine ENDS she had used in the past.

322.  JUUL's use of flavors played a substantial contributing factor in S.G.'s decision to take up and continue using a JUUL. But for JUUL's dessert- and fruit-based nicotine flavors, and JUUL's promotion of those flavors, S.G. would not have used a JUUL.

323.  Though S.G. had used ENDS in the past, after her first JUUL experience, S.G. developed an uncontrollable addiction to nicotine, consuming up to 2 JUULpods a day in either "Cool" Mint or Mango flavor.

324.  Because S.G. had used ENDS before using a JUUL, she read and understood JUUL's labeling statement of "5% strength" to mean 5% nicotine by volume.  S.G. did not know that JUUL contained at least 5.9% nicotine—more than three times the potency of the solution she had used before—or that JUUL's Mint pods had been found to contain up to 9.4% nicotine.  JUUL's misleading labels also made it difficult for S.G. to find alternative ENDS to JUUL or understand what lower potency products might exist.

325.  Since becoming taking up a JUUL, S.G. has developed behavioral problems linked to her addiction.

326.  Noble has purchased urine cotinine screens, nicotine patches,

and nicotine gum as part of her efforts to understand and assist S.G. with her addiction. In addition to trying to help S.G. wean herself off of nicotine, Noble has sought professional treatment to no avail. Noble recently took away S.G.'s JUUL. The resulting nicotine withdrawal prompted S.G. to begin smoking cigarettes, which she could access more easily than a new JUUL.

327.    Prior to using a JUUL, S.G. had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. S.G. did not see any warnings or disclosures about JUUL's nicotine levels or the risks a JUUL posed on those POS materials and instead saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions S.G. saw JUUL's in-store materially impacted S.G.'s assessment of the fruit-flavored JUUL she would be offered by a friend at school.

328.    Social media drove the popularity of JUUL at S.G.'s high school. Both before and after taking up JUUL use, S.G. saw a significant amount of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors with JUUL products, distorted and omitted the risks of JUUL use, and omitted or downplayed the nature and risks of JUUL use. These promotions including reached S.G. and S.G.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products.  S.G. has seen viral media content that normalizes the role of JUUL in teen life by, among other things, portraying teens using JUUL, portraying teens dressed in JUUL-themed costumes, depicting JUUL as an element of a "high school starter pack" and giving humorous treatment to teen dependence on JUUL products.  But for JUUL's viral marketing activity, S.G. would not have been exposed to and would not have used a JUUL.




329.    S.G. is very active on Instagram where she followed the account "@Doit4Juul" and "@JUULnation." S.G. routinely saw promoted images of adolescents her age using JUUL products and believed that JUULing was the cool thing to do and would help her fit in with her peers.

330.    On SnapChat, S.G. has seen content from the JUUL influencers DonnySmokes and Supreme Patty. S.G. and her friends and classmates mimic the mannerisms and techniques they observe copying the tricks and content. In effect, they are imitating within their social circles the activity they see on "DoIt4Juul," and similar social media accounts. Through SnapChat, S.G. can also readily purchase JUULpods from classmates or other peers.

331.    S.G. currently consumes at least one Crème Brulee JUULpod a day and smokes cigarettes when she cannot use a JUUL.

## DD.    D.O. through her mother and natural guardian Atoyia Orders

332.    D.O. and his mother and natural guardian Atoyia Orders ("Orders") are residents of London, Ohio.

333.    D.O. began using JUUL around June 2016, at the age of 16.

334.    When D.O. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the

mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. D.O. had seen advertisements for JUUL on social media and was led. to believe JUUL did not contain any nicotine.

335.    Before D.O. even tried JUUL, he also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. D.O. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted D.O.'s assessment of, and eventual decision to use, JUUL products.

336.    D.O. told Orders that smoking JUUL was "smooth and easy" and eased his anxiety.

337.    Shortly after trying his friend's JUUL at school, D.O. purchased a JUUL "starter pack" from a local gas station and consumed all the JUULpods contained therein.

338.    D.O. now consumes two or three JUULpods each day.

339.    D.O. attempted to quit using JUUL. However, because he was highly addicted to nicotine, D.O. turned to cigarettes. Now, D.O. uses JUUL and cigarettes.

340.    Orders says D.O.'s JUUL use has had significant physical, financial, and social effects on her son. D.O. has his JUUL in hand "24/7" and becomes very fidgety and irritated when he cannot use JUUL. D.O. has also lost a significant amount of weight since he started using JUUL.

341.    Financially, D.O.'s JUUL use consumes a large portion of his budget, as he spends a significant amount of money on JUULpods each week. D.O. now works to feed his nicotine addiction, but before he started working, he would steal money

from his mother in order to purchase JUULpods.

342.    Socially, Orders says her son now hangs out with the "wrong crowd," as he spends most of his time with friends that also use JUUL incessantly.

343.    Orders is confident that D.O. would not have started using JUUL if he had known that JUUL contained nicotine and put him at a serious risk of developing a debilitating nicotine addiction.

**EE.    Jack Roberts**

344.    Plaintiff Jack Roberts is a resident of Kentucky.

345.    Before Roberts used a JUUL for the first in November 2017, at the age of 17, he had seen numerous JUUL displays, signs and promotions in local gas stations. These materials promoted JUUL's flavors, JUUL's discounted Starter Kits, and "Limited Edition" JUUL flavors and devices. Roberts does not recall seeing any disclosures or warnings on those promotional materials including disclosures or warnings that the JUUL was an age-restricted product, could deliver larger doses of nicotine than a cigarette, and was at least as pharmacokinetically potent as a cigarette.

346.    When Roberts was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product.  He decided to try a JUUL because the Cool Mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Roberts would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

347.    The JUUL's narcotic effect of nicotine and the peer reinforcement accompanying it led Roberts to use his friend's JUUL repeatedly over the course of the next few weeks. Deciding that he wanted to try different flavors, Roberts bought his own JUUL "Starter Kit" through an 18-year-old classmate. Roberts consumed the

Fruit Medley, Crème Brulee and "Cool" Mint pods included in the Starter Kit over the course of a week. Roberts gave away the Tobacco pod. After finishing his Starter Kit, Roberts bought a box of Mango JUULpods from a classmate and continued purchasing Mango pods from that point forward.

348. When Roberts sent in the registration card for the JUUL device in his Starter Kit, JUUL began sending Roberts promotional emails, including an invitation to combat federal efforts to regulate ENDS flavors by writing the FDA to report how JUUL's flavors played an important role in Roberts' journey as a smoker. The email also contained a survey inviting Roberts to list which JUUL flavors he had used.

349. Roberts saw and relied on JUUL promotional materials, Instagram account, website, and emails heavily promoting JUUL's Mango. Though Roberts knew the JUUL contained nicotine, JUUL's promotion of its flavors led him to believe that JUUL use posed minimal risks and was appropriate for him to use.

350. Roberts quickly developed a pod-a-day nicotine addiction, which cost about $40 a week to maintain. In an attempt to save money, Roberts purchased bottles of nicotine salt e-liquid from a local store, which he used to refill empty JUULpods. Relying on JUUL's labeling, Roberts purchased bottles of 5% nicotine salt e-liquid to refill his empty JUULpods. Because JUULpods contain at least 5.9% nicotine, the third party e-liquids Roberts purchased were not potent enough to satisfy his addiction, leading Roberts to discard the bottle and purchase Defendant's premium-priced JUULpods.

351. Once he turned 18, Roberts, like many other JUUL-addicted seniors in his high school, supported his addiction by legally purchasing packages of JUULpods at local gas stations and reselling the pods to younger students at a markup. Though Roberts deeply regrets this decision now, he justified it at the time as him "helping out" younger classmates in the same way that older classmates had "helped" him

before he turned 18.

352.     On social media, Roberts saw a significant amount of JUUL promotion from third parties, some of which include Instagram accounts by: @Doit4JUUL, @JUUL_break, @JUULwraps,  @Juulzi.co, @DonnyK17, and @SupremePatty. Many of the posts from these accounts promoted or included JUUL's name and hashtags that JUUL promoted, including #juul, #juulvapor, and #juulnation. On SnapChat and YouTube, Roberts followed or saw content from Donny Smokes, including the JUUL Challenge, and other "tricks" that Roberts and his friends mimicked.  All of these JUUL-related promotions created the impression that JUUL was more popular than it was, JUUL was made for teenagers, and that JUUL use was for "cool" kids.

353.     These JUUL-promoting accounts promoted nicotine abuse, downplayed or normalized addiction risks, encouraged JUUL use in school and provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also sold JUUL products directly through Instagram and promoted websites that sold JUUL products with inadequate age verification procedures, if any at all. These accounts also encouraged viral content creation by encouraging viewers to post their own JUUL-related content, including selfies, nicotine abuse "tricks" like inhaling ten JUULs at once, memes normalizing addiction and adolescent use of JUUL products, and imagery suggesting that JUUL use might improve a person's dating prospects.

354.     Roberts did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors whose aim was to promote JUUL use to adolescents and profit off of their addiction. Had Roberts known the truth, he would have rejected offers to use a JUUL or would have attempted to stop using a JUUL far sooner than he did.

355.    JUUL's viral marketing campaign ensnared Roberts, who shared his own JUUL-themed "promposal" in the spring of 2018. Had Roberts known that his creation of JUUL-related content was the result of JUUL's efforts to turn young JUUL users into unpaid youth advertisers for JUUL's products, Roberts would not have posted the content or would not have consented to being used to promote JUUL to other adolescents.



356.    In or around the summer of 2018, Roberts joined "JUUL Talk."  An "exclusive insights community" developed by Defendant, JUUL Talk's welcome email warned that any information shared by JUUL Talk was "<u>confidential</u> (subject to the non-disclosure agreement) and not to be shared with others."

357.    Within days of joining, Roberts received his first JUUL Talk survey

invitation, which was purportedly designed to help JUUL "design activities and experiences that are relevant and valuable to you."

358. On November 20, 2018, after JUUL announced that it would remove flavored JUULpods from gas stations, JUUL Talk sent Roberts the first of three separate emails he would receive, urging him to complete a survey detailing how the removal of Mango and other flavored JUULpods from gas stations would impact him.

359. Had Roberts known the truth about JUUL or its marketing activities, he would not have joined JUUL Talk or submitted any other information about himself to JUUL.

360. Now a freshman in college, Roberts still consumes at least one JUULpod a day. He sleeps with his JUUL next to him on a nightstand and begins using his JUUL as soon as he wakes up each morning. He has been unable to quit or taper down to less potent e-liquids than the JUUL. He estimates that his JUUL addiction has cost him thousands of dollars since 2017.

361. Roberts recently learned that his younger brother, who is a freshman at Roberts' former high school, is now using a JUUL, too.

362. Had Roberts known the risks of using a JUUL or that the sudden popularity of JUUL was not because the JUUL was "cool" but because JUUL was using deceptive advertising tactics to lure teenagers to its powerfully addictive product, he would not have used a JUUL.

## FF.   W.T. and A.R.T., both minors, through their parent and Natural Guardian Tonya Rowan

363. Plaintiffs W.T. and A.R.T, and their mother and Natural Guardian Tonya Rowan ("Rowan"), are residents of Red Wing, Minnesota.

364. W.T. used a JUUL for the first time in 2016 at the age of 13. A.R.T used a JUUL for the first time in 2017 at the age of 16.

365.    Before using a JUUL, neither W.T. nor A.R.T. had ever smoked a cigarette or used other tobacco products.

366.    Prior to their first JUUL use, both W.T. and A.R.T. had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit." Neither W.T. nor A.R.T. saw any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risk of addiction JUUL posed.  The representations and omissions in JUUL's in-store promotions materially impacted W.T. and A.R.T.'s assessment of, and eventual decisions to use, JUUL products.

367.    Both W.T. and A.R.T. had their first JUUL experience when offered a puff from a friend's JUUL device.

368.    Both W.T. and A.R.T. started purchasing their own JUUL products within a short time after their first JUUL experience.

369.    Although W.T. and A.R.T. are still below the minimum legal age to buy tobacco products, they have always been able to buy JUUL products from their friends and classmates.

370.    Both W.T. and A.R.T. became addicted to nicotine within a short time after they started JUULing.

371.    Although they had never smoked before, both W.T. and A.R.T. now smoke cigarettes to satisfy their nicotine addiction when they do not have access to JUUL.

372.    Rowan reports that, without nicotine, W.T. and A.R.T. become "crazy and ornery."

373.    W.T. currently consumes one JUULpod per day and A.R.T. consumes one JUULpod every 2 or 3 days.  They both start JUULing within 5 minutes of waking

up.

**GG.    Amber Royce**

374.    Amber Royce ("Royce") is a resident of Lebanon, Connecticut.

375.    Royce began using JUUL in 2017 after seeing advertisements for JUUL products at gas stations and hearing about JUUL from friends and family. She first tried JUUL her cousin.

376.    Prior to using JUUL, Royce was a daily cigarette smoker. She hoped that the JUUL would help her stop smoking and break her addiction to nicotine.

377.    Initially, Royce believed that JUUL did not contain any nicotine. After she started purchasing JUUL products, she read on JUUL's label that it was "5% strength," but she did not understand this meant JUUL contained at least 59mg/mL nicotine. Royce did not know that JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette.

378.    Royce began purchasing JUUL products online and at local gas stations and vape shops. She started consuming at least (1) JUULpod per day.

379.    Royce believes she is now even more addicted to nicotine than in the past when she was only smoking cigarettes. She uses JUUL continuously throughout the day and night, and the JUUL device is constantly in her hand. There have been occasions where Royce has fallen asleep and later woken up with her JUUL device, still gripped in her hand.

380.    Royce has tried to wean herself off JUUL by using a nicotine patch, but her attempts have been unsuccessful.

381.    If Royce had known how much nicotine JUULpods contained, she would never have started using the product and exposed herself to the risk of developing a more serious nicotine addiction.

**HH.  D.S., a minor, through his Parent and Natural Guardian Amber Selfridge**

382.    Plaintiff D.S. and his mother and Natural Guardian Amber Selfridge ("Selfridge") are residents of Butler, Pennsylvania. When D.S. used a JUUL for the first time in 2018, at the age of 16, he was not a smoker and had never tried cigarettes.

383.    Prior to using a JUUL for the first time, D.S. had seen numerous JUUL advertisements online. Some of these JUUL advertisements depicted fashionably dressed young people striking playful poses with JUUL devices in hand. Other online JUUL ads promoted JUULpod flavors, encouraging D.S. to "start your week with Cool Mint JUULpods" or to "indulge in dessert without the spoon" with Crème Brulee JUULpods. None of the advertisements D.S. saw disclosed the nature or addiction risks of JUUL's products, the existence or amount of nicotine in JUUL's products, or that the JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette.

384.    Prior to using a JUUL, D.S. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. D.S. did not see any warnings or disclosures about JUUL's nicotine levels or the risks a JUUL posed on those POS materials and instead saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's POS promotions materially impacted S.G.'s assessment of the fruit-flavored JUUL he would later be offered.

385.    When offered a JUUL by a friend, D.S. accepted because he was interested in trying the fruit flavors. JUUL's use of food-based flavors, food-based flavor names and food-based advertising images was a substantial contributing factor in S.C's decision to use and continue using a JUUL. JUUL's food-based promotions misled D.S. about the nature of JUUL's product and distorted the risks

JUUL products posed. Were it not for JUUL's flavorings and flavor-based promotions, D.S. would not have used a JUUL or would not have continued using a JUUL.

386.    D.S. liked the sweet flavor of the first JUUL product he used and he continued to take puffs of his friends' JUULs until he purchased his own.

387.    After purchasing his own JUUL device, D.S.'s JUUL consumption increased so rapidly that he soon found himself going through 4 JUULpods a day.

388.    Reasoning that he would not be able to smoke the equivalent of 4 JUULpods a day in combustible tobacco products, D.S. tried to switch from JUUL to cigarettes.

389.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached D.S. and D.S.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, D.S. would not have been exposed to and would not have used a JUUL.

390.    D.S. and his friends followed many of the popular JUUL accounts on Instagram.  Among the posts D.S. saw were those that encouraged, among other things, consuming massive quantities of JUUL vapor, using multiple JUUL devices at the same time and using JUUL in conjunction with combustible cigarettes.

391.    D.S. has posted social media content about JUUL, mimicking the JUUL-related content he has seen on other accounts.

392.    D.S. still consumes more than 1 JUULpod a day, in addition to at least half a pack of cigarettes.  He takes his first puff of JUUL within 5 minutes of waking up.  His favorite JUULpod flavor is Cucumber..

## II. Laura Staller

393.     Plaintiff Laura Staller lives in Germantown, Wisconsin.

394.     Plaintiff began using JUUL in September of 2017 as an alterative to smoking, and saw marketing that led her to believe it was a better alternative and that it would be one way to quit smoking altogether. Around that time and before she started she saw the following in-store display, among others:



395.     Plaintiff Staller believed there would be less nicotine in JUUL than in cigarettes, because she thought the "5% strength" on the label indicated that the amount of nicotine content of JUUL pods was significantly less than a pack of cigarettes.

396.     Before she started, she saw in-store displays and advertisements that indicated the strength but failed to include any warning, including this display:



397.    Plaintiff also heard ads about JUUL on the radio station 97.3FM and saw ads on gas stations, none of which warned her of JUUL's dangerous levels of nicotine or potential harms it could cause.

398.    Plaintiff went on JUUL's website when she first started looking into it. The website indicated that it was a better alternative to smoking and would help her quit smoking.

399.    Plaintiff uses one and one half JUULpods a day which is equivalent to more than a pack and a half of cigarettes a day. When she was using cigarettes, she was using less than a pack a day.  So she is now consuming much more nicotine because of JUUL.

400.    Plaintiff has had unusual fainting spells since using JUUL and has noticed that her ability to take deep breaths and her endurance has decreased since using JUUL. She has had to wear a heart monitor for 48 hours. The only thing in her lifestyle that has changed has been her use of JUUL.

401.    Plaintiff's use of JUUL seems to be affecting her respiratory health worse than when she was smoking.

402.    Plaintiff uses the mango JUULpods, which feel easier to breathe in than a cigarette. She started with Tobacco flavor and didn't like it.

403.   Laura has not been able to quit and it has been over one and a half years. She was hoping to quit in 2018, but she is addicted.

404.   Plaintiff was led to believe JUUL would help her quit her nicotine addiction, instead of becoming more addicted to another product.

405.   Laura saw advertising from JUULs online, which never warned of how addictive it was. Not on the website, or anywhere else.

406.   Laura would never have purchased JUUL if she had known the true nature of nicotine content and delivery.

**JJ. Anthony Smith**

407.   Anthony Smith obtained his first JUUL e-cigarette and JUULpods in an effort to curtail his nicotine addiction and quit smoking.

408.   In early 2015, Smith was 17 and he began seeing JUUL advertised via Twitter and Instagram. In particular, he remembers seeing Advertisement 65 of Appendix C on Twitter. He recalls that many of the ads had images of young people—young enough to be in high school—who often looked like his friends, and they appeared to be having fun, vaping and enjoying a hip, cool activity.

409.   Smith also recalls seeing an ad highly similar to Advertisement 66 (young woman promoting switch to JUUL) of Appendix C on Instagram. In particular, he recalls a young, blond woman that reminded him of a good friend of his, except that the ad he recalls seeing did not include a disclaimer about the nicotine content. It was Smith's typical habit to scroll through images on Instagram quickly, and he rarely paused to open posts to read any content, thus had any such disclaimer been there, he would not have seen it. Because of the model's similarity to his good friend, that ad in particular piqued his curiosity about JUUL. He also began noticing JUUL's ads for their flavored pods, which also made him interested. In general, the ads touted JUUL products as a safe, healthy alternative to smoking,

which Smith believed meant it was delivering less nicotine.

410.    Shortly after viewing the advertisement with the blond woman, Smith visited a Circle K. He saw a large advertisement there for a JUUL starter pack, which included the device and four different flavored pods. The advertisement was similar to Advertisement 67 of Appendix C (poster using discount to promote JUUL starter kit).  However, he did not see any warning that the product contained nicotine, or that one pod contained more nicotine than a pack of cigarettes. He reasoned that a starter pack would allow him to try several flavors for a lower price, so he decided to try it. The starter pack was purchased for approximately $29.

411.    Smith began using the product, noticed that he would get a quick nicotine buzz that was more intense than cigarettes, but he attributed that to the fact that it was a vapor instead of a smoke. Rather than weaning Anthony Smith off of nicotine, the intense dosage of nicotine delivered by the JUUL products resulted in an increased nicotine addiction, and an increased consumption of nicotine and JUUL products, upping his consumption of one JUULpod per day.  The fact that the mint flavor of the JUULpods is pleasant has also played a role in his continued use of JUUL products.

412.    At the age of 18, Anthony Smith switched to use exclusively of JUULpods as a source of nicotine.  Until approximately the spring of 2018, Anthony Smith had consumed JUULpods on a daily basis for over three years, and found it far more addictive than traditional cigarettes, to the point where he spent several years unable to make it through a day without JUULing. At times, he would try to quit, but found it difficult due to the fact that the advertising was continually being delivered to him via social media. At one point, he did quit, and then he saw an ad for a new mango flavored pod, see Appendix C, Advertisement 68, which caused him to purchase more pods and begin using JUUL again.

413.    If Anthony Smith had known that the JUULpods contained a nicotine salt that delivered a more potent dose of nicotine than a traditional cigarette, he would not have purchased the JUUL product.

**KK.    Corey Smith**

414.    Corey Smith is 18 years old, and started consuming JUULpods when he was 17.  Corey Smith saw JUUL advertisements prior to his purchase, especially on social media such Instagram, where he saw ads posted by JUUL.  Corey found the JUUL products appealing based on those advertisements, which did not convey the fact that nicotine salts deliver an effective dose of nicotine higher than a traditional cigarette.  Corey Smith also found the USB-drive shape of the JUUL appealing based on its sleek design. Corey Smith was also attracted by the fruit-like flavors and the Cool Mint flavor in particular. Corey Smith is now addicted to JUULpods, and consumes a pack of JUULpods per week.

415.    If Corey Smith had known that JUUL's use of nicotine salts deliver an effective dose of nicotine higher than a traditional cigarette, he would not have purchase JUUL products.

**LL.    T.B.T. through his parent and Natural Guardian Marlene Thomseth-Belcher**

416.    Plaintiff T.B.T. and his parent and Natural Guardian Marlene Thomseth-Belcher ("Thomseth-Belcher") reside in Minneapolis, Minnesota.

417.    Prior to using a JUUL for the first time in 2017, at the age of 15, T.B.T. had seen JUUL signs and displays in local stores promoting JUUL flavors and offering discounts on JUUL "Starter Kits."  He had also seen online JUUL advertisements promoting JUUL flavors.  None of this JUUL messaging disclosed that JUUL products contain at least 59mg/mL of nicotine and deliver nicotine to the bloodstream more effectively than cigarettes.

418.   In the time leading up to his first JUUL experience, T.B.T. saw increasing amounts of JUUL-related content on the social media platforms Instagram and Snapchat.  This content, which often featured young people performing "tricks" with exhaled JUUL vapor, led T.B.T. to believe that using JUUL was a "cool" activity that would improve his social status.

419.   When one of T.B.T.'s friends offered him a JUUL, he accepted. He enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine hit. He does not recall which flavor he tried first, but he knows it was not tobacco. T.B.T. would not have tried JUUL if it were only available in tobacco flavor.

420.   Shortly after he started using JUUL, T.B.T. began experimenting with marijuana. He continued to use marijuana until late 2018.

421.   Now 17, T.B.T. acknowledges that he is addicted to nicotine.

422.   Despite being below the minimum legal age to purchase JUUL products, T.B.T. is able to buy JUUL products from local stores.  Although Thomseth-Belcher has asked, T.B.T. refuses to disclose which stores sell him JUUL products.

423.   T.B.T. gets money to pay for JUUL products by selling items for cash. He also resells JUUL products to finance his own habit.

424.   T.B.T. has, from time to time, refilled his JUULpods with e-liquid from other manufacturers. However, most commercial e-liquid contains far less nicotine than the e-liquid in JUULpods and thus fails to satisfy T.B.T.'s nicotine addiction. Therefore, T.B.T. continues to use JUULpods with their original JUUL-manufactured e-liquid.

425.   The online social media content that T.B.T. has seen, and continues to see, online normalizes teen JUUL use by, for example, presenting the JUUL device alongside earbuds, cellphones and other common items that comprise a "high school starter pack."

426.    T.B.T.'s spent 5 months in an outpatient addiction program that cost several thousand dollars.  The program proved ineffective and T.B.T. is still addicted to nicotine.

427.    T.B.T. currently consumes more than 1 JUULpod per day.  He starts JUULing within 5 minutes of waking up.

428.    Thomseth-Belcher has asked T.B.T. to move out of the family home so his JUUL and marijuana use will not provide a bad example for his younger sibling.

**MM.   Michael Viscomi**

429.    Plaintiff Michael Viscomi is a citizen of Pennsylvania and resides in Bethlehem, PA.

430.    In 2014, Mr. Viscomi smoked a pack of cigarettes each day, which he started to reduce to a few cigarettes each day. Prior to March, 2018, he had reduced his cigarette consumption down to several cigarettes per day through the use of alternative products, such as nicotine gum, chewing tobacco and non-JUUL vaping products.

431.    On March 1, 2018, Mr. Viscomi switched from smoking cigarettes to consuming JUUL pods in an attempt to quit smoking cigarettes completely and wean himself off of his nicotine addiction. At that time, Mr. Viscomi believed that one JUUL pod would supply him with the same quantity of nicotine as one pack of cigarettes.

432.    Prior to consuming JUUL pods, Mr. Viscomi was exposed to and did see JUUL advertising, promotional and marketing materials, particularly in the form of JUUL Instagram posts featuring young, attractive people using the product. He specifically followed @SupremePatty on Instagram. He also visited the JUUL website and thereafter regularly and consistently received JUUL emails. Specifically, he saw the following image asking him to "Find [His] Favorite Flavor" and others similar ads:



433.    Some of these social media posts show abuse of JUUL and encourage youth to smoke JUUL, or multiple JUULs at once, including these post that Mr. Viscomi saw during the class period:

    

434.    Prior to consuming JUUL pods, Mr. Viscomi was not aware of the actual amount or potency of nicotine that JUUL products would deliver into his body or that the product was developed to maximize the effects on him of the nicotine it contained. He did see JUUL's representation of "5% strength" on its packaging and thought that meant 5% nicotine content. He also saw JUUL's statement that a JUULpod is equivalent to a pack of cigarettes and understood that to mean "equivalent nicotine content." He also saw JUUL's representation that "1 JUULPOD = 1 pack of cigarettes" and "alternative for adult smokers" and believed those to mean that JUUL is a less addictive alternative to cigarettes.

435.    After March 1, 2018, Mr. Viscomi continued to be exposed to and saw

JUUL advertising, promotional and marketing materials in the form of JUUL Instagram posts and radio advertisements.

436. Since that time, Mr. Viscomi began consuming JUUL consistently and constantly at a rate of at least one JUUL pod each day, or taken approximately 200 hits from his JUUL device each day. He has consumed every flavor JUUL offers, including purchasing and consuming a JUUL starter kit, which contains all of the flavors offered.

437. Based on the JUUL marketing, advertisting and promotional mateirals to which he was exposed, Mr. Viscomi was not aware that JUUL could deliver more nicotine per puff than a cigarette, or that the nicotine delivered by the JUUL entered the bloodstream faster than a cigarette

438. In fact, the JUUL marketing Mr. Viscomi saw contained no warnings, either on JUUL's website, in-store displays, or on the packaging itself, including the following ads which Mr. Viscomi saw during the class period, among many others:





439. Since starting to consume JUUL pods, Mr. Viscomi has become addicted to the cool mint JUULpods and the nicotine salts they contain, an addiction he considers worse than his previous addiction to cigarettes. Indeed, JUULing (the commonly used phrase among users of JUUL products to mean the use of JUUL products) is on his mind more than smoking cigarettes was. Rather than weaning Mr. Viscomi off of cigarettes

and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

440. Mr. Viscomi purchases his JUUL products at gas stations, Wawa and Sheetz at an approximate price of $23 per pack of four pods.

**441.** Mr. Viscomi would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself.

**NN.     O.V. through her parent and natural guardian Tanya Viti**

442. O.V. and her mother Tanya Viti ("Viti") are residents of Dedham, Massachusetts.

443. O.V. first started using JUUL at the age of twelve, while in sixth grade. D.C. actively uses Instagram, Snapchat, and YouTube where she is exposed to JUUL-related content from other adolescents and from JUUL-related accounts.

444. On Instagram, O.V. saw a significant amount of JUUL promotional content from third parties, including the Instagram accounts @Doit4JUUL and @SupremePatty. On YouTube and SnapChat, O.V. saw numerous JUUL-themed videos from EonSmoke and Supreme Patty. This content was overtly youth-oriented and encouraged JUUL use, depicting JUULing as the "cool" thing to do. O.V. did not know that much of the content she saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction.

445. Before O.V. even tried JUUL, she also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored, flavored pods. O.V. did not see any warnings or disclosures in these POS materials about JUUL's

nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted O.V.'s assessment of, and eventual decision to use, JUUL products.

446.    After discovering JUUL on social media and in stores, O.V. sought out friends in neighboring towns that were already using JUUL. When O.V. started using JUUL, she had no idea the product contained nicotine. When Viti confronted her daughter about her JUUL use, O.V. told her mother JUULpods were "flavored juice," which is what she was led to believe based on the advertisements she had viewed. Even after Viti informed her daughter that JUUL contained nicotine, O.V. chose to follow her perception of JUUL, cultivated from an overload of advertisements, versus the advice of her mother.

447.    After trying JUUL with friends, O.V. quickly became addicted to nicotine and started using JUUL regularly. Once O.V. entered seventh grade, JUUL use had become rampant in her school. O.V. told her mother that kids in her school would hide JUUL devices in their shoes and try to use them while in class; it was considered "cool" to be able to smoke JUUL in class and get away with it. According to O.V., there are very few students in her school that do not use JUUL.

448.    O.V. and her friends regularly posted photographs of themselves with JUUL on social media. In October 2018, O.V. was suspended from school after her and a friend posted an image of themselves "JUULing" in the bathroom on social media.

449.    O.V. has admitted to her mother that she is addicted to nicotine. Recently, Viti found a jar of nicotine in O.V.'s bedroom.

450.    O.V. has suffered academically due to her JUUL use. In addition to her suspension from school, O.V. went from being an "A-student" to receiving all "F"s.

451.    O.V. has also experienced severe physical, financial, psychological, and social repercussions from her JUUL use and severe nicotine addiction.

452.    Physically, O.V. now experiences acute headaches and stomachaches and becomes visibly irritated and fidgety when she cannot consume nicotine.

453.    Financially, O.V.'s JUUL use has had a significant impact on her parents. O.V. has stolen large quantities of money from her parents to purchase JUUL products.

454.    Viti has confiscated numerous JUUL devices and JUULpods from O.V. Unfortunately, none of her efforts have been successful. O.V. has told her parents that she will just use a friend's JUUL device as soon as she gets to school.

## OO.    S.W. through his parent and natural guardian Joe Weibel

455.    S.W. and his father and natural guardian Joe Weibel ("Weibel") are residents of Chadwicks, New York.

456.    Before S.W. even tried JUUL, he also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. S.W. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted S.W.'s assessment of, and eventual decision to use, JUUL products.

457.    S.W. did not understand the risks of nicotine when he used a JUUL for the first time, or the effects it could have on him. JUUL use is rampant in S.W.'s town and high school. S.W. has told Weibel that his basketball team even uses JUUL in the locker room, which his coaches cannot detect because JUUL products release no odor or visible smoke.

458.    Older students at S.W.'s high school sell individual pods to younger students for profit. S.W.'s older sister has even encouraged S.W. to start selling JUULpods.

459.    Even though Weibel has forbidden S.W. from using JUUL products,

Weibel believes he continues to sneak JUUL. Weibel's 19-year-old daughter is also highly addicted to JUUL; Weibel believes his daughter purchases JUULpods from local gas stations and shares them with S.W. Weibel believes his children spend a significant amount of money on JUUL products each week.

460.   When S.W. started using JUUL, he believed that JUUL products were safe and non-addictive.

461.   S.W. would not have started using JUUL if he knew it contained nicotine. Additionally, S.W. would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

462.   Weibel is confident that had S.W. or his 19-year-old daughter known the risks that the JUUL posed, they would never have used it.

**PP.   J.Y., a Minor, through his Parent and Natural Guardian Barbara Yanucci**

463.   Plaintiff Barbara Yanucci is the mother of J.Y., a minor who is a citizen of Florida, residing in Port St. Lucie.

464.   J.Y. is presently 16 years old and began using JUUL pods at the age of 15 because he thought it was fun.

465.   Prior to using a JUUL, J.Y. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. J.Y. did not see any warnings or disclosures in these POS materials about the existence or amount of nicotine in a JUUL or the risks nicotine posed. Instead, he saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's in-store promotions materially impacted J.Y. assessment of the JUUL he would later try. Specific representations J.Y. saw are available at http://www.classlawdc.com/2019/01/25/juul-images-2/.

466.   When he first tried a JUUL, J.Y., as a minor, could not appreciate the dangers posed by the nicotine and other chemicals contained in the JUUL, and was not

aware how much nicotine a JUUL contained or that the JUUL had specifically been developed to maximize the addictive effects of the nicotine it contained and to put extremely high doses of nicotine into the bloodstream.

467. J.Y. states that many of his friends in high school were consuming JUUL products at the time he began using JUUL and continue to do so. JUUL products were and still are popular, ubiquitous and easy to obtain.

468. J.Y., a minor, has himself purchased JUUL products at a Wawa convenience store.

469. J.Y. now considers himself addicted to JUUL pods and has consumed JUUL pods up to 12 times per day. His favorite flavor is mint. His craving for nicotine has increased while using the JUUL pods, and he now uses vaping devices that deliver even more nicotine than JUUL.

470. J.Y. is not aware of any label on JUUL packaging indicating that the product contains nicotine or warning of the dangers of the nicotine because he does not read the packaging.

471. J.Y. initially concealed his use of JUUL from his mother and Natural Guardian Barbara Yannucci, who, after learning that JUUL products contain nicotine and appreciating the dangers of nicotine, has done and continues to do everything in her power to get her son to quit using JUUL products. She has not been successful to date.

# Appendix B: Charts

**Chart 1**



**Chart 2**



App'x B, 1st Consol. Compl., *In re JUUL Prods. Lit.*

**Chart 3**

FIG. 4



**Chart 4**



App'x B, 1st Consol. Compl., *In re JUUL Prods. Lit.*

**Chart 5**



**Chart 6**



**Figure 3.** Free-base nicotine fraction ($\alpha_{fb}$) in commercial e-liquids as an average using aromatic protons $H_a$ and $H_b$. The ranges between free base values are indicated. Nicotine amounts as indicated to the right of each name were determined by NMR integrations, relative to the PG and GL resonances.

**Chart 7**

|  | Tobacco | Creme brulee | Fruit punch | Mint |
|---|---|---|---|---|
| PG:GLY | 29:71[a] | 31:69[b] | 31:69[b] | 30:70[a] |
|  | (n = 3) | (n = 3) | (n = 3) | (n = 3) |
| Nicotine (μg/puff) | 156.66 ± 47.65 | 169.91 ± 14.46 | 154.41 ± 48.84 | 188.42 ± 24.69 |
|  | (n = 3) | (n = 3) | (n = 3) | (n = 3) |

**Chart 8**



# Appendix C – Advertisements

**Advertisement 1**



**Advertisement 2**



**Advertisement 3**



"A stunning addition to the world of electronic cigarettes" – #OaknIron

Read reviews by WIRED, TechCrunch, The Verge and more:



JUULVAPOR.COM
## Introducing JUUL - Smoking Evolved
Check it out: https://www.JUULvapor.com



**Advertisement 4**



**Advertisement 5**



## Advertisement 6



## Advertisement 7



♡ ◯ ◁

◻

**1,509 likes**

**christinazayas** When smoking cigarettes is not an option, I've turned to @juulvapor. Read why, via the link in my bio! #JUULmoment #ad 🍯

View all 46 comments

In aint

**Advertisement 8**



**Advertisement 9 (reduced smell)**





**Advertisement 10 (reduced smell)**



**Advertisement 11 (Graphic with technology claim)**



**Advertisement 12 (Graphic with technology claim)**



**Advertisement 13 (Billboard with smoke)**



**Advertisement 14 (Billboard with vapor)**



**Advertisement 15 (Colors)**



**Advertisement 16 (Colors)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 17**



**Advertisement 18**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 19**



**Advertisement 20**



**Advertisement 21 (Food)**



**Advertisement 22 (Food)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 23 (Food and relaxation)**



**Advertisement 24 (Food and relaxation)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 25 (Food and relaxation)**



**Advertisement 26 (Food and relaxation)**



**Advertisement 27 (Reduced Smell)**



**Advertisement 28 (Reduced Smell)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 29 (Style & Romance)**



**Advertisement 30 (Style & Romance)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 31 (Food & Relaxation)**



**Advertisement 32 (Food & Relaxation)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 33 (Relaxation after work)**



**Advertisement 34 (Relaxation after work)**



WARNING: This product contains nicotine. Nicotine is an addictive chemical.

**Advertisement 35 (Style & Romance)**



**Advertisement 36 (Style & Romance)**



**Advertisement 37 (Rebellion)**



Las Autoridades Sanitarias advierten que el tabaco
perjudica seriamente la salud.

**Advertisement 38 (Rebellion)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 39 (Relaxation)**



**Advertisement 40 (Relaxation)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 41**



**Advertisement 42**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 43 (Harm reduction through technology)**



**Advertisement 44 (Harm reduction through technology)**



**Advertisement 45 (Style & Beauty)**



**Advertisement 46 (Style & Beauty)**



**Advertisement 47 (Style & Beauty)**



**Advertisement 48 (Style & Beauty)**



**Advertisement 49 (Belonging)**



**Advertisement 50 (Belonging)**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 51**



**Advertisement 52**



**Advertisement 53**

JUUL @JUULvapor · 8 Jun 2016

A satisfying morning brought to you by @_jacobfischer

5 12

**Advertisement 54**

https://www.instagram.com/p/BaaUZ1OFbOI/

https://www.instagram.com/p/BYbB907I_VZ/?taken-by=juulcentral

https://www.instagram.com/p/Bb9_zcAAmsP/?taken-by=juulnation



**Advertisement 55**



**Advertisement 54**



**Advertisement 55**



**Advertisement 56**



**Advertisement 57**



**Advertisement 58**



## Advertisement 59



## Advertisement 60



## Advertisement 61



juulvapor ✔ • Follow
New York, New York

juulvapor Ready to make the switch from cigarettes? We're coming to #NYC October 13th & 14th and we're giving you the chance to experience #JUUL for only $1! See for yourself from 4-8pm both days at select locations. 21+ only. Click link in bio to learn more! #JUULNYC #JUULvapor

WARNING: This product contains nicotine. Nicotine is an addictive chemical. #JUUL #JUULvapor #SwitchToJUUL

View all 38 comments

manbuntrustfundofficial @mich_alicious

329 likes
OCTOBER 6, 2017

Add a comment...

## Advertisement 62



juulvapor ✔ • Follow

juulvapor Nothing goes better with cooler mornings than staying inside and enjoying the simple satisfaction of #JUUL. Cozy up and have a #JUULmoment today. .

WARNING: This product contains nicotine. Nicotine is an addictive chemical. #JUULvapor

View all 45 comments

g.rayray Juul release a blue rasburry flav it's game over

lucascrea I love you guys

acizzzzle When is cool cucumber coming out ?

646 likes
OCTOBER 30, 2017

Add a comment...

**Advertisement 63**

JUUL
September 18, 2017 · ⚙

Back to Basics: Our JUUL Basic Kits (Device + USB Charger) have re-stocked so shop now: http://bit.ly/2fg5sk4



👍❤ 17                    20 Comments  2 Shares

👍 Like          💬 Comment          ↪ Share

**Advertisement 64**

JUUL
October 4, 2017 · ⚙

Customize a plan that fits your lifestyle and get select JUULpod flavors delivered to you every month. Join Auto-ship today and save %15
http://bit.ly/2xbenGt



👍 3                         11 Comments

👍 Like          💬 Comment          ↪ Share

In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

## Advertisement 65

**JUUL** ● @JUULvapor · 4 Jun 2015
JUUL
Vape game is stong #JUUL #Vaporized #LightsCameraVapor



## Advertisement 66



639 likes

**juulvapor** "I'm constantly encouraging people to use this and not smoke your cigarettes."
Learn more about Lauren's #SwitchToJUUL story and share your own with us at
JUUL.com/community .
.
.
WARNING: This product contains nicotine. Nicotine is an addictive chemical. #juul
#juulvapor

**Advertisement 67**



**Advertisement 68**



## Advertisement 69

**JUUL**
June 3, 2015 · ⚙

"For me, they've found the balance -- it gives me the hit I need, with none of the fiddly drawbacks I associate with e-cigs."

Thanks to Aaron Souppouris at Engadget for the review. Read more through the link:



JUULVAPOR.COM
**Introducing JUUL - Smoking Evolved**
Check it out: https://www.JUULvapor.com

👍 11                                                    4 Comments

👍 Like                    💬 Comment                    ↗ Share

## Advertisement 70

**JUUL**
June 30, 2015 · ⚙

"A stunning addition to the world of electronic cigarettes" - #OaknIron
Read reviews by WIRED, TechCrunch, The Verge and more:



JUULVAPOR.COM
**Introducing JUUL - Smoking Evolved**
Check it out: https://www.JUULvapor.com

👍 4                                                    1 Share

👍 Like                    💬 Comment                    ↗ Share

Write a comment...                            😊 📷 🎞 🗨
Press Enter to post.

In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 71**



**JUUL**
January 19, 2017 · ⚙

Introducing our newest flavor, Mango!

Available February 1st online and in select authorized retail locations for a limited time.

Pre-sale begins today at https://www.juulvapor.com/shop-pods/



Try our newest flavor.
Available for a limited time.

# mango

## JUUL

---

👍❤️👏 76                                      74 Comments  6 Shares

👍 Like          💬 Comment          ➦ Share

**Advertisement 72**

**JUUL**
December 6, 2017 · ⚙

With the flavors of vanilla cake, silky custard and of course creme brulée this JUULpod is the perfect evening treat. http://bit.ly/2BCBZqS



# creme brulee
The perfect evening treat.

👍❤️ 20                                      13 Comments

👍 Like          💬 Comment          ➦ Share

In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

## Advertisement 73

JUUL
October 17, 2017 ·

Hey JUUL fans, here's an update from us on the Limited Edition Flavor Cool Cucumber: http://bit.ly/2yS0O41

58 63 Comments 7 Shares

## Advertisement 74

JUUL
March 8 ·

Back online but only while supplies last - purchase Limited Edition Navy: http://bit.ly/2FDhbEv

46 25 Comments 1 Share

Like Comment Share



**Advertisement 75**

JUUL
March 19 ·

Go for the gold. Limited Edition Blush Gold arrives this week at select retailers nationwide. Use our store locator to contact locations near you for availability. http://bit.ly/2polMRt

83 119 Comments 11 Shares

Like Comment Share

**Advertisement 76**

JUUL
January 4, 2016 · San Francisco, CA ·

Read up on what our featured chefs created to pair with our pod flavors in this article by Por Homme. Read up, try them out, enjoy!

PORHOMME.COM
**JUUL's 'Save Room' Campaign Yields 3 Special JUUL Recipes**
JUUL's 'Save Room' campaign features three chefs and three delicious

5 6 Comments

**Advertisement 77**



**Advertisement 78**



In re JUUL Prod. Lit., Appendix C – Plf's 1st Cons. Complaint

**Advertisement 79**



JUUL ✔ @JUULvapor · 4 Jun 2015

Having way too much fun at the #JUUL launch party #LightsCameraVapor #NYC

**Advertisement 80**





**Advertisement 81**



CHART OF 50 STATES AND WASHINGTON D.C.'S DECEPTIVE TRADE PRACTICES STATUTES

*COUNT 1: FALSE ADVERTISING/DECEPTIVE TRADE PRACTICES STATUTES*

| STATE | GENERAL STATUTORY CITATION | ENUMERATED PROHIBITIONS PRESENTED IN THE COMPLAINT | CATCHALL AND/OR BROAD PROHIBITION ON DECEPTIVE CONDUCT | NOTES |
|---|---|---|---|---|
| Alabama | Ala. Code § 8-19-1, *et seq.* | Ala. Code § 8-19-5  (2) Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.  (3) Causing confusion or misunderstanding as to the affiliation, connection, or association with, or certification by another, provided that this section shall not prohibit the private labeling of goods or services.  (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.  (7) Representing that goods or | Ala. Code § 8-19-5  (27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce. | |

| | | services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.<br><br>(9) Advertising goods or services with intent not to sell them as advertised.<br><br>(24) Engaging in the sale, distribution, possession, acquisition, importation, or transportation of any cigarettes that do not comply with all applicable requirements imposed by or pursuant to federal law and federal implementing regulations. | | |
|---|---|---|---|---|
| **Alaska** | **Alaska Stat. Ann. § 45.50.471,** *et seq.* | **Alaska Stat. Ann. § 45.50.471(b)**<br><br>(3) causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval, or another person's affiliation, connection, or association with or certification of goods or services<br><br>(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, | **Alaska Stat. Ann. § 45.50.471**<br><br>(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.<br><br>(b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include the following acts:<br>(11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a | **Alaska Stat. Ann. § 45.50.545**<br><br>In interpreting AS 45.50.471 due consideration and great weight should be given the interpretations of 15 U.S.C. 45(a)(1) (§ 5(a)(1) of the Federal Trade Commission Act). |

| | | affiliation, or connection that the person does not have;

(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) advertising goods or services with intent not to sell them as advertised;

(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged;

(14) representing that an agreement confers or involves rights, remedies, or obligations that it does not confer or involve, or that are prohibited by law; | buyer or a competitor in connection with the sale or advertisement of goods or services; | |
|---|---|---|---|---|
| **Arizona** | **Ariz. Rev. Stat.** | This Arizona statute broadly prohibits deceptive and unfair | **Ariz. Rev. Stat. § 44-1522** | **Ariz. Rev. Stat. § 44-1522** |

| | § 44-1521, *et seq.* | conduct without enumeration. | (A) The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. | (C) It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code sections 45, 52 and 55(a)(1). |
|---|---|---|---|---|
| Arkansas | Ark. Code Ann. § 4-88-101, *et seq.* | **Ark. Code Ann. § 4-88-107(a)**<br><br>(1) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;<br><br>(3) Advertising the goods or services with the intent not to sell them as advertised;<br><br>(8) Knowingly taking advantage of a consumer who is reasonably | **Ark. Code Ann. § 4-88-107(a)**<br><br>(10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade; | **Ark. Code Ann. § 4-88-107**<br><br>(b) The deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state. |

| | | unable to protect his or her interest because of:<br>(A) Physical infirmity;<br>(B) Ignorance;<br>(C) Illiteracy;<br>(D) Inability to understand the language of the agreement; or<br>(E) A similar factor;<br><br>**Ark. Code Ann. § 4-88-108**<br><br>(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or<br><br>(2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission. | | |
| California | **Cal. Civ. Code § 1750, *et seq.*;**<br><br>**Cal. Bus. & Prof. Code § 17200, *et seq.*;**<br><br>**Cal. Bus. & Prof. Code § 17500, *et seq.*** | **Cal Civ. Code § 1770(a)**<br><br>(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services.<br><br>(3) Misrepresenting the affiliation, connection, or association with, or certification by, another.<br><br>(5) Representing that goods or services have sponsorship, approval, | **Bus. & Prof. Code § 17200**<br><br>As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code. | **Cal. Civ. Code § 1780(b)**<br><br>(1) Any consumer who is a senior citizen or a disabled person, as defined in subdivisions (f) and (g) of Section 1761, as part of an action under subdivision (a), may seek and be |

| | | characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.<br><br>(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.<br><br>(9) Advertising goods or services with intent not to sell them as advertised.<br><br>(14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.<br><br>(19) Inserting an unconscionable provision in the contract. | **Bus. & Prof. Code § 17500**<br><br>It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, | awarded, in addition to the remedies specified therein, up to five thousand dollars ($5,000) where the trier of fact does all of the following:<br>(A) Finds that the consumer has suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct.<br>(B) Makes an affirmative finding in regard to one or more of the factors set forth in subdivision (b) of <u>Section 3345</u>.<br>(C) Finds that an additional award is appropriate. |

6

| | | | firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine. | |
|---|---|---|---|---|
| Colorado | Colo. Rev. Stat. § 6-1-101, *et seq.* | **Colo. Rev. Stat. § 6-1-105(1)**<br><br>(b) Knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property;<br><br>(c) Knowingly makes a false representation as to affiliation, connection, or association with or certification by another;<br><br>(e) Knowingly makes a false representation as to the characteristics, ingredients, uses, | | **Colo. Rev. Stat. § 6-1-105**<br><br>(3) The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state. |

| | | | | |
|---|---|---|---|---|
| | | benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;<br><br>(g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;<br><br>(i) Advertises goods, services, or property with intent not to sell them as advertised;<br><br>(u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction; | | |
| **Connecticut** | **Conn. Gen. Stat. § 42-110a,** *et seq.* | This Connecticut statute broadly prohibits deceptive and unfair conduct without enumeration. | **Conn. Gen. Stat. § 42-110b**<br><br>(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the | **Conn. Gen. Stat. § 42-110b**<br><br>(b) It is the intent of the legislature that |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | conduct of any trade or commerce. | in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended. |
|---|---|---|---|---|
| **Delaware** | **Del. Code Ann. tit. 6, § 2511, _et seq._; Del. Code Ann. tit. 6, § 2531, _et seq._** | **Del. Code Ann. tit. 6, § 2532(a)** <br><br> (2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; <br><br> (3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another; <br><br> (5) Represents that goods or services have sponsorship, approval, | **Del. Code Ann. tit. 6, § 2513** <br><br> (a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an | **Del. Code Ann. tit. 6, § 2512** <br><br> The purpose of this subchapter shall be to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this |

| | | characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;<br><br>(7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br><br>(9) Advertises goods or services with intent not to sell them as advertised; | unlawful practice.<br><br>**Del. Code Ann. tit. 6, § 2532(a)**<br><br>(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. | State. It is the intent of the General Assembly that such practices be swiftly stopped and that this subchapter shall be liberally construed and applied to promote its underlying purposes and policies.<br><br>**Del. Code Ann. tit. 6, § 2532**<br><br>(b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.<br><br>(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State. |
|---|---|---|---|---|

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| District of Columbia | D.C. Code § 28-3901, *et seq.* | D.C. Code § 28-3904 | D.C. Code § 28-3904 | D.C. Code § 28-3901 |
|---|---|---|---|---|
| | | (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; | It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to: | (c) This chapter shall be construed and applied liberally to promote its purpose. This chapter establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia. |
| | | (b) represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have; | | |
| | | (d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; | | |
| | | (e) misrepresent as to a material fact which has a tendency to mislead; | | (d) In construing the term "unfair or deceptive trade practice" due consideration and weight shall be given to the interpretation by the Federal Trade Commission and the federal courts of the term "unfair or |
| | | (e-1) [r]epresent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; | | |
| | | (f) fail to state a material fact if such failure tends to mislead; | | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | | |
|---|---|---|---|---|
| | | (f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead;<br><br>(h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;<br><br>(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:<br>(1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;<br>(2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;<br>(3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;<br>(4) that the person contracted for or | | deceptive act or practice," as employed in section 5(a) of An Act To create a Federal Trade Commission, to define its powers and duties, and for other purposes, approved September 26, 1914 (38 Stat. 719; 15 U.S.C. § 45(a)). |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable; and<br>(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors;<br><br>(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not;<br><br>(x) sell consumer goods in a condition or manner not consistent with that warranted by operation of sections 28:2-312 through 318 of the District of Columbia Official Code, or by operation or requirement of federal law. | | |
|---|---|---|---|---|
| **Florida** | **Fla. Stat. § 501.201,** *et seq.* | This Florida statute broadly prohibits deceptive and unfair conduct without enumeration. | **Fla. Stat. § 501.204**<br><br>(1) Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared | **Fla. Stat. § 501.204**<br><br>(2) It is the intent of the legislature that, in construing subsection (1), due consideration and |

| | | | unlawful. | great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017.<br><br>**Fla. Stat. § 501.2077** contains special protections when companies target individuals with disabilities |
|---|---|---|---|---|
| **Georgia** | **Ga. Code Ann. § 10-1-370, *et seq.*;**<br><br>**Ga. Code. Ann. § 10-1-390, *et seq.*** | **Ga. Code Ann. § 10-1-372(a)**<br><br>(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; | **Ga. Code Ann. § 10-1-372(a)**<br><br>(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.<br><br>**Ga. Code. Ann. § 10-1-393**<br><br>(a) Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful. | **Ga. Code Ann. § 10-1-372**<br><br>(b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding. |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | (5)   Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;<br><br>(7)   Represents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;<br><br>(9)   Advertises goods or services with intent not to sell them as advertised.<br><br>**Ga. Code. Ann. § 10-1-393(b)**<br><br>(2)   Causing actual confusion or actual misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(3)   Causing actual confusion or actual misunderstanding as to affiliation, connection, or association with or certification by another;<br><br>(5) Representing that goods or | (b) By way of illustration only and without limiting the scope of subsection (a) of this Code section, the following practices are declared unlawful: | (c) This Code section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this state.<br><br>**Ga. Code. Ann. § 10-1-391**<br><br>(a) The purpose of this part shall be to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state. It is the intent of the General Assembly that such practices be swiftly stopped, and this part shall be liberally construed and applied to promote its underlying purposes and policies. |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;<br><br>(7) Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;<br><br>(9) Advertising goods or services with intent not to sell them as advertised; | | (b) It is the intent of the General Assembly that this part be interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended. |
| **Hawaii** | **Haw. Rev. Stat. § 480,** *et seq.* | This Hawaii statute broadly prohibits deceptive and unfair conduct without enumeration. | **Haw. Rev. Stat. § 480-2**<br><br>(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. | **Haw. Rev. Stat. § 480-2**<br><br>(b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | | Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended. |
|---|---|---|---|---|
| **Idaho** | **Idaho Code § 48-601,** *et seq.* | **Idaho Code § 48-603**<br><br>(2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(3) Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;<br><br>(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have; | **Idaho Code § 48-603**<br><br>(17) prohibits "[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer" | **Idaho Code § 48-604**<br><br>(1) It is the intent of the legislature that in construing this act due consideration and great weight shall be given to the interpretation of the federal trade commission and the federal courts relating to section 5(a)(1) of the federal trade commission act (15 U.S.C. 45(a)(1)), as from time to time amended[.] |

| | | (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br><br>(9) Advertising goods or services with intent not to sell them as advertised;<br><br>(18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C, Idaho Code, provided, however, that the provisions of this subsection shall not apply to a regulated lender as that term is defined in section 28-41-301, Idaho Code;<br><br>**Idaho Code § 48-603C**<br><br>(1) Any unconscionable method, act or practice in the conduct of any trade or commerce violates the provisions of this chapter whether it occurs before, during, or after the conduct of the trade or commerce. | | |
| **Illinois** | 815 Ill. Comp. Stat. Ann. 505/1, *et seq.*; | 815 Ill. Comp. Stat. Ann. 510/2(a)<br><br>(2) causes likelihood of confusion | **815 Ill. Comp. Stat. Ann. 505/2**<br><br>Unfair methods of competition and | **815 Ill. Comp. Stat. Ann. 510/2** |

| | 815 Ill. Comp. Stat. Ann. 510/1, *et seq.* | or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;<br><br>(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;<br><br>(7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;<br><br>(9) advertises goods or services with intent not to sell them as advertised; | unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.<br><br>**815 Ill. Comp. Stat. Ann. 510/2(a)**<br><br>(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding. | (b) In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.<br><br>(c) This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State. |
| **Indiana** | **Ind. Code Ann. § 24-5-** | **Ind. Code Ann. § 24-5-0.5-3(b)** | **Ind. Code Ann. § 24-5-0.5-3** | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | 0.5-1, *et seq.* | (1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.<br><br>(2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.<br><br>(7) That the supplier has a sponsorship, approval, or affiliation in such consumer transaction the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have.<br><br>(11) That the consumer will be able to purchase the subject of the consumer transaction as advertised by the supplier, if the supplier does not intend to sell it.<br><br>**Ind. Code Ann. § 24-5-0.5-10**<br><br>(a) A supplier commits a deceptive act if the supplier gives any of the | (a) A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.<br><br>(b) Without limiting the scope of subsection (a), the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts: | |

|  |  | following representations, orally or in writing, or does any of the following acts: <br> (1) Either: <br> (A) solicits to engage in a consumer transaction without a permit or other license required by law; <br> (B) solicits to engage in a consumer transaction if a permit or other license is required by law to engage in the consumer transaction and the supplier is not qualified to obtain the required permit or other license or does not intend to obtain the permit or other license; or <br> (C) engages in a consumer transaction without a permit or other license required by law. <br> (2) Commits a violation of IC 24-5-10. <br><br> (b) A supplier commits an unconscionable act that shall be treated the same as a deceptive act under this chapter if the supplier solicits a person to enter into a contract or agreement: <br> (1) that contains terms that are oppressively one sided or harsh; <br> (2) in which the terms unduly limit the person's remedies; or <br> (3) in which the price is unduly excessive; |  |  |

| | | | | |
|---|---|---|---|---|
| | | and there was unequal bargaining power that led the person to enter into the contract or agreement unwillingly or without knowledge of the terms of the contract or agreement. There is a rebuttable presumption that a person has knowledge of the terms of a contract or agreement if the person signs a written contract. | | |
| **Iowa** | **Iowa Code § 714H.1,** *et seq.* | This Iowa statute broadly prohibits deceptive and unfair conduct without enumeration. | **Iowa Code § 714H.3**<br><br>(1) A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes. | |
| **Kansas** | **Kan. Stat. Ann. § 50-623,** | **Kan. Stat. Ann. § 50-626(b)** | **Kan. Stat. Ann. § 50-626 (a)** | |

| | *et seq.* | (1)(A): Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;<br><br>(1)(B): the supplier has a sponsorship, approval, status, affiliation or connection that the supplier does not have;<br><br>(1)(D): property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;<br><br>(1)(F): property or services has uses, benefits or characteristics unless the supplier relied upon and possesses a reasonable basis for making such representation;<br><br>(1)(G): use, benefit or characteristic of property or services has been proven or otherwise substantiated unless the supplier relied upon and possesses the type and amount of proof or substantiation represented to exist<br><br>(2) the willful use, in any oral or written representation, of | No supplier shall engage in any deceptive act or practice in connection with a consumer transaction. | |

| | | | | |
|---|---|---|---|---|
| | | exaggeration, falsehood, innuendo or ambiguity as to a material fact;<br><br>(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact;<br><br>(5) offering property or services without intent to sell them;<br><br>(8) falsely stating, knowingly or with reason to know, that a consumer transaction involves consumer rights, remedies or obligations;<br><br>**Kan. Stat. Ann. § 50-627**<br><br>**(a)** No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction.<br>An unconscionable act or practice violates this act whether it occurs before, during or after the transaction. | | |
| Kentucky | Ky. Rev. Stat. Ann.<br>§ 367.110, *et seq.* | | **Ky. Rev. Stat. § 367.170**<br><br>**(1)** Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce | |

| | | | | |
|---|---|---|---|---|
| | | | are hereby declared unlawful.<br><br>**(2)** For the purposes of this section, unfair shall be construed to mean unconscionable. | |
| **Louisiana** | **La. Rev. Stat. § 51:1401, *et seq.*** | This Louisiana statute broadly prohibits deceptive and unfair conduct without enumeration. | **La. Rev. Stat. § 51:1405(a)**<br><br>Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful | |
| **Maine** | **Me. Rev. Stat. Ann. tit. 5 § 205-a, *et seq.*** | This Maine statute broadly prohibits deceptive and unfair conduct without enumeration. | **Me. Rev. Stat. Ann. tit. 5 § 207**<br><br>Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful. | **Me. Rev. Stat. Ann. tit. 5 § 205-a** § 207<br><br>(1) Intent. It is the intent of the Legislature that in construing this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 45(a)(1) of the Federal Trade Commission Act (15 United States Code 45(a)(1)), and from |

| | | | | time to time amended. |
|---|---|---|---|---|
| **Maryland** | **Md. Code. Ann. Com. Law § 13-101,** *et seq.* | **Md. Code. Ann. Com. Law § 13-301**<br><br>Unfair or deceptive trade practices include any:<br><br>(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;<br><br>(2) Representation that: (i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have; . . . (iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;<br><br>(3) Failure to state a material fact if the failure deceives or tends to deceive;<br>(5) Advertisement or offer of | **Md. Code. Ann. Com. Law § 13-303**<br><br>A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division…: | **Md. Code. Ann. Com. Law § 13-105**<br><br>This title shall be construed and applied liberally to promote its purpose. It is the intent of the General Assembly that in construing the term "unfair or deceptive trade practices", due consideration and weight be given to the interpretations of § 5 (a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts. |

| | | consumer goods, consumer realty, or consumer services: (i) Without intent to sell, lease, or rent them as advertised or offered;<br><br>(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) The promotion or sale of any consumer goods, consumer realty, or consumer service . . . . | | |
|---|---|---|---|---|
| Massachusetts | Mass. Gen. Laws. ch. 93A § 1, *et seq.* | Massachusetts broadly prohibits deceptive and unfair conduct without enumeration. | **Mass. Gen. Laws. ch. 93A § 2**<br><br>(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. | **Mass. Gen. Laws. ch. 93A § 2**<br><br>(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine, and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of |

<table>
<tr><td></td><td></td><td></td><td></td><td>the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

**940 Mass. Code Regs. 21.01**

The purpose of 940 CMR 21.00 is to eliminate deception and unfairness in the way cigarettes, smokeless tobacco products, and electronic smoking devices are marketed, sold and distributed in Massachusetts in order to address the incidence of cigarette smoking, the use of smokeless tobacco and electronic smoking devices by youth. 940 CMR 21.00 imposes requirements and restrictions on the sale and distribution</td></tr>
</table>

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | | of cigarettes and smokeless tobacco products and electronic smoking devices in Massachusetts in order to prevent access to such products by underage consumers and accidental injury to children as a result of ingestion of or contact with liquid nicotine. |
|---|---|---|---|---|
| **Michigan** | **Mich. Comp. Laws Serv. § 445.901,** *et seq.* | **Mich. Comp. Laws Serv. § 445.903(1)**<br><br>(a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.<br><br>(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.<br><br>(e) Representing that goods or | | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented.

(n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

(t) Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it.

(x) Taking advantage of the consumer's inability reasonably to protect his or her interests by reason of disability, illiteracy, or inability

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | to understand the language of an agreement presented by the other party to the transaction who knows or reasonably should know of the consumer's inability.<br><br>(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.<br><br>(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. | | |
|---|---|---|---|---|
| **Minnesota** | **Minn. Stat. Ann. § 325D.43,** *et seq.***;**<br><br>**Minn. Stat. Ann. § 325f.68,** *et seq.* | **Minn. Stat. Ann. § 325D.44 subd. 1**<br><br>(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;<br><br>(5) represents that goods or services | **Minn. Stat. Ann. § 325F.69**<br><br>(subd, 1) The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70. | |

| | | have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;<br><br>(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br><br>(9) advertises goods or services with intent not to sell them as advertised; | **Minn. Stat. Ann. § 325D.44 subd. 1**<br><br>(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. | |
|---|---|---|---|---|
| **Mississippi** | **Miss. Code Ann. § 75-24-1, *et seq.*** | **Miss. Code Ann. § 75-24-5(2)**<br><br>(b) Misrepresentation of the source, sponsorship, approval, or certification of goods or services;<br><br>(c) Misrepresentation of affiliation, connection, or association with, or certification by another;<br><br>(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, | **Miss. Code Ann. § 75-24-5**<br><br>(1) Unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce are prohibited. Action may be brought under Section 75-24-5(1) only under the provisions of Section 75-24-9.<br><br>(2) Without limiting the scope of subsection (1) of this section, the following unfair methods of competition and unfair or deceptive trade practices or acts in the conduct of any trade or commerce are hereby | **Miss. Code Ann. § 75-24-3**<br><br>(c) It is the intent of the Legislature that in construing what constitutes unfair or deceptive trade practices that the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of |

| | | affiliation, or connection that he does not have;<br><br>(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br><br>(i) Advertising goods or services with intent not to sell them as advertised; | prohibited: | the Federal Trade Commission Act (15 USCS 45(a)(1)) as from time to time amended. |
|---|---|---|---|---|
| **Missouri** | **Mo. Rev. Stat. § 407.010,** *et seq.* | This Missouri statute broadly prohibits deceptive and unfair conduct without enumeration. | **Mo. Rev. Stat. § 407.020**<br><br>(1) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice. The use by any person, in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable | |

| | | | purpose, as defined in section 407.453, in or from the state of Missouri of the fact that the attorney general has approved any filing required by this chapter as the approval, sanction or endorsement of any activity, project or action of such person, is declared to be an unlawful practice. Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation. | |
|---|---|---|---|---|
| Montana | Mont. Code Ann. § 30-14-101, *et seq.* | This Montana statute broadly prohibits deceptive and unfair conduct without enumeration. | **Mont. Code Ann. § 30-14-103**<br><br>Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. | **Mont. Code Ann. § 30-14-104**<br><br>(1) It is the intent of the legislature that in construing 30-14-103 due consideration and weight shall be given to the interpretations of the federal trade commission and the federal courts relating to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C., 45(a)(1)), as |

| | | | | amended. |
|---|---|---|---|---|
| **Nebraska** | **Neb. Rev. Stat. § 59-1601,** *et seq.***;**<br><br>**Neb. Rev. Stat. § 87-301,** *et seq* | **Neb. Rev. Stat. § 87-302**<br><br>(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, he or she: . . .<br><br>(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;<br><br>(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ;<br><br>(8) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br>(10) Advertises goods or services with intent not to sell them as | **Neb. Rev. Stat. § 59-1602**<br><br>Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful. | |



advertised . . . ;

(16) Uses any scheme or device to defraud by means of: (i) Obtaining money or property by knowingly false or fraudulent pretenses, representations, or promises . . .

(22) In the manufacture, production, importation, distribution, promotion, display for sale, offer for sale, attempt to sell, or sale of a substance:

(i) Makes a deceptive or misleading representation or designation, or omits material information, about a substance or fails to identify the contents of the package or the nature of the substance contained inside the package; or

(ii) Causes confusion or misunderstanding as to the effects a substance causes when ingested, injected, inhaled, or otherwise introduced into the human body.
A person shall be deemed to have committed a violation of the Uniform Deceptive Trade Practices Act for each individually packaged product that is either manufactured, produced, imported, distributed,

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | promoted, displayed for sale, offered for sale, attempted to sell, or sold in violation of this section. A violation under this subdivision shall be treated as a separate and distinct violation from any other offense arising out of acts alleged to have been committed while the person was in violation of this section.<br><br>**Neb. Rev. Stat. § 87-303.01**<br><br>**(1)** An unconscionable act or practice by a supplier in connection with a consumer transaction shall be a violation of the Uniform Deceptive Trade Practices Act. | | |
| --- | --- | --- | --- | --- |
| **Nevada** | **Nev. Rev. Stat. § 598.0903,** *et seq.* | **Nev. Rev. Stat. § 598.0915**<br><br>A person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she: . . .<br><br>2. Knowingly makes a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease.<br><br>3. Knowingly makes a false | **Nev. Rev. Stat. § 598.0915(15)**<br><br>Broadly prohibits knowingly making any other false representation in a transaction. | |

| | | representation as to affiliation, connection, association with or certification by another person.<br><br>5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease . . . .<br><br>7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model.<br><br>9. Advertises goods or services with intent not to sell or lease them as advertised.<br><br>15. Knowingly makes any other false representation in a transaction.<br><br>**Nev. Rev. Stat. § 598.092**<br><br>8. Knowingly misrepresents the legal rights, obligations or remedies of a party to a transaction. | | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

<table>
<tr><td></td><td></td><td>

14. Knowingly takes advantage of another person's inability reasonably to protect his or her own rights or interests in a consumer transaction when such an inability is due to illiteracy, or to a mental or physical infirmity or another similar condition which manifests itself as an incapability to understand the language or terms of any agreement.

**Nev. Rev. Stat. § 598.0923**

A person engages in a "deceptive trade practice" when in the course of his or her business or occupation he or she knowingly: . . .

1. Conducts the business or occupation without all required state, county or city licenses.

2. Fails to disclose a material fact in connection with the sale or lease of goods or services.

3. Violates a state or federal statute or regulation relating to the sale or lease of goods or services.

4. Uses coercion, duress or intimidation in a transaction.
</td><td></td><td></td></tr>
</table>

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | **Nev. Rev. Stat. § 598.0925**<br><br>1 (a) Makes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion; | | |
|---|---|---|---|---|
| **New Hampshire** | **N.H. Rev. Stat. Ann. § 358-A:1,** *et seq.* | **N.H. Rev. Stat. Ann. § 358-A:2**<br><br>II. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>III. Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;<br><br>V. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that such | **N.H. Rev. Stat. Ann. § 358-A:2**<br><br>It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. | **N.H. Rev. Stat. Ann. § 358-A:13**<br><br>It is the intent of the legislature that in any action or prosecution under this chapter, the courts may be guided by the interpretation and construction given Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), by the Federal Trade Commission and the federal courts. |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | person does not have;<br><br>VII. Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br><br>IX. Advertising goods or services with intent not to sell them as advertised. | | |
| New Jersey | N.J. Stat. § 56:8-1, *et seq.* | This New Jersey statute broadly prohibits deceptive conduct without enumeration. | **N.J. Stat. § 56:8-2**<br><br>The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or | |

| | | | publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser. | |
|---|---|---|---|---|
| **New Mexico** | **N.M. Stat. Ann. § 57-12-1,** *et seq* | **N.M. Stat. Ann. § 57-12-2**<br><br>D. "unfair or deceptive trade practice" means an act specifically declared unlawful pursuant to the Unfair Practices Act [57-12-1 NMSA 1978], a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person and includes:<br><br>(2) causing confusion or misunderstanding as to the source, sponsorship, approval or | **N.M. Stat. Ann. § 57-12-3**<br><br>Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful. | **N.M. Stat. Ann. § 57-12-4**<br><br>It is the intent of the legislature that in construing Section 3 [57-12-3 NMSA 1978] of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts. |

<table>
<tr><td></td><td></td><td>

certification of goods or services;

(3) causing confusion or misunderstanding as to affiliation, connection or association with or certification by another;

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have;

(7) representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another;

(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;

(15) stating that a transaction involves rights, remedies or obligations that it does not involve.

**N.M. Stat. Ann. § 57-12-3**

</td><td></td><td></td></tr>
</table>

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful. | | |
|---|---|---|---|---|
| **New York** | **N.Y. Gen. Bus. Law § 349;**<br><br>**N.Y. Gen. Bus. Law § 350** | This New York statute broadly prohibits deceptive conduct without enumeration. | **N.Y. Gen. Bus. Law § 349**<br><br>(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.<br><br>**N.Y. Gen. Bus. Law § 350**<br><br>False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful. | |
| **North Carolina** | **N.C. Gen. Stat. § 75-1,** *et seq.* | This North Carolina statute broadly prohibits deceptive and unfair conduct without enumeration. | **N.C. Gen. Stat. § 75-1.1**<br><br>(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful. | |
| **North Dakota** | **N.D. Cent. Code § 51-15-01,** *et* | This North Dakota statute broadly prohibits deceptive conduct without enumeration. | **N.D. Cent. Code § 51-15-02**<br><br>The act, use, or employment by any | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | | |
|---|---|---|---|---|
| | *seq.* | | person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice. | |
| Ohio | **Ohio Rev. Code. Ann. § 1345.01,** *et seq.***;**<br><br>**Ohio Rev. Code Ann. § 4165.01,** *et seq.* | **Ohio Rev. Code. Ann. § 1345.02(B):**<br><br>(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;<br><br>(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;<br><br>(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have; § 1345.03 also prohibits unconscionable conduct.<br><br>**Ohio Rev. Code Ann. § 4165.02(A)** | **Ohio Rev. Code. Ann. § 1345.02**<br><br>(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.<br><br>(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive: [enumeration of examples of prohibited conduct].<br><br>(C) In construing division (A) of this section, the court shall give due consideration and great weight to | **Ohio Rev. Code. Ann.** § 1345.02 (C)<br><br>In construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended. |

| | | (2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; | federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended. | |
|---|---|---|---|---|
| | | (3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; | | |
| | | (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; | | |
| | | (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; | | |
| | | (11) Advertises goods or services with intent not to sell them as advertised; | | |
| Oklahoma | Okla. Stat. tit. 15, § 751, *et* | Okla. Stat. tit. 15, § 753 | Okla. Stat. tit. 15, § 753 | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | 2. Makes a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction;<br><br>3. Makes a false or misleading representation, knowingly or with reason to know, as to affiliation, connection, association with, or certification by another;<br><br>5. Makes a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith;<br><br>7. Represents, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;<br><br>8. Advertises, knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised; | A person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the person's business, the person: .<br><br>20. Commits an unfair or deceptive trade practice as defined in Section 752 of this title[.]<br><br>**Okla. Stat. tit. 15, § 752**<br><br>13. "Deceptive trade practice" means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person. Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral; | |
|---|---|---|---|---|
| | *seq.* | | | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | | |
|---|---|---|---|---|
| | | 29. Falsely states or implies that any person, product or service is recommended or endorsed by a named third person. | | |
| **Oregon** | **Or. Rev. Stat. § 646.605, *et seq.*** | **Or. Rev. Stat. § 646.608:**<br><br>(b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.<br><br>(c) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another.<br><br>(e) Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have.<br><br>(g) Represents that real estate, goods or services are of a particular | **Or. Rev. Stat. § 646.608**<br><br>(1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: . . .<br><br>(u) Engages in any other unfair or deceptive conduct in trade or commerce. | |

48

|  |  | standard, quality, or grade, or that real estate or goods are of a particular style or model, if the real estate, goods or services are of another;

(i) Advertises real estate, goods or services with intent not to provide the real estate, goods or services as advertised, or with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity.

(t) Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity.

(2) A representation under subsection (1) of this section or ORS 646.607 may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact.

**Or. Rev. Stat. § 646.607**

(1) Employs any unconscionable tactic in connection with selling, renting or disposing of real estate, |  |  |

| | | goods or services, or collecting or enforcing an obligation; | | |
|---|---|---|---|---|
| **Pennsylvania** | **73 Pa. Stat. Ann. § 201-1, _et seq._** | **73 Pa. Stat. Ann. § 201-2(4)**<br><br>**(ii)** Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;<br><br>**(iii)** Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;<br><br>**(v)** Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;<br><br>**(vii)** Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;<br><br>**(ix)** Advertising goods or services with intent not to sell them as advertised; | **73 Pa. Stat. Ann. § 201-2(4)**<br><br>**(xxi)** Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding. | |

| Rhode Island | R.I. Gen. Laws § 6-13.1-1, *et seq.* | R.I. Gen. Laws § 6-13.1-1<br><br>(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;<br><br>(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;<br><br>(vii) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br><br>(ix) Advertising goods or services with intent not to sell them as advertised; | R.I. Gen. Laws § 6-13.1-2<br><br>Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.<br><br>**R.I. Gen. Laws § 6-13.1-1**<br><br>(6) "Unfair methods of competition and unfair or deceptive acts or practices" means any one or more of the following: . . .<br>(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;<br>(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer;<br>(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect[.] | R.I. Gen. Laws § 6-13.1-3<br><br>It is the intent of the legislature that in construing §§ 6-13.1-1 and 6-13.1-2 due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to § 5(a) of the Federal Trade Commission Act. 15 U.S.C. § 45(a)(1), as from time to time amended. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | (xvi) Failure to include the brand name and or manufacturer of goods in any advertisement of the goods for sale…;<br><br>(xvii) Advertising claims concerning safety, performance, and comparative price unless the advertiser, upon request by any person, the consumer council, or the attorney general, makes available documentation substantiating the validity of the claim; | | |
| **South Carolina** | **S.C. Code Ann. § 39-5-10, et seq** | This South Carolina statute broadly prohibits deceptive and unfair conduct without enumeration. | **S.C. Code Ann. § 39-5-20(a)**<br><br>Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. | **S.C. Code Ann. § 39-5-20(b)**<br><br>It is the intent of the legislature that in construing paragraph (a) of this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to § 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time |

| | | | | amended. |
|---|---|---|---|---|
| **South Dakota** | **S.D. Codified Laws § 37-24-1, *et seq.*** | This South Dakota statute broadly prohibits deceptive conduct without enumeration of specific acts that bear on the instant complaint. | **S.D. Codified Laws § 37-24-6**<br><br>It is a deceptive act or practice for any person to: (1) Knowingly act, use, or employ any deceptive act or practice, fraud, pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby. | |
| **Tennessee** | **Tenn. Code Ann. § 47-18-101, *et seq.*** | **Tenn. Code Ann. § 47-18-104(b)**<br><br>(2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services. This subdivision (b)(2) does not prohibit the private labeling of goods and services;<br><br>(3) Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another. This subdivision (b)(3) does not prohibit the private labeling of goods or services; | | |

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;

(7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(9) Advertising goods or services with intent not to sell them as advertised;

(12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law;

(19) Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve; provided, that nothing in this subdivision (b)(19) shall be construed to alter the implied warranty of merchantability | | |
|---|---|---|---|---|

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | | |
|---|---|---|---|---|
| | | as defined in § 47-2-314; | | |
| **Texas** | **Tex. Bus. & Com. Code § 17.41, *et seq.*** | **Tex. Bus. & Com. Code § 17.46(b)**<br><br>**(2)** causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>**(3)** causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;<br><br>**(5)** representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;<br><br>**(7)** representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;<br><br>**(9)** advertising goods or services with intent not to sell them as advertised; | | **Tex. Bus. & Com. Code § 17.44**<br><br>**(a)** This subchapter shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.<br><br>**Tex. Bus. & Com. Code § 17.46 (c)**<br><br>**(1)** It is the intent of the legislature that in construing Subsection (a) of this section in suits |

| | | | | |
|---|---|---|---|---|
| | | **(12)** representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;<br><br>**(20)** representing that a guaranty or warranty confers or involves rights or remedies which it does not have or involve, provided, however, that nothing in this subchapter shall be construed to expand the implied warranty of merchantability as defined in Sections 2.314 through 2.318 and Sections 2A.212 through 2A.216 to involve obligations in excess of those which are appropriate to the goods; | | brought under Section 17.47 of this subchapter the courts to the extent possible will be guided by Subsection (b) of this section and the interpretations given by the Federal Trade Commission and federal courts to Section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C.A. § 45(a)(1)].<br><br>**(2)** In construing this subchapter the court shall not be prohibited from considering relevant and pertinent decisions of courts in other jurisdictions. |
| **Utah** | **Utah Code Ann.**<br>**§ 13-11-1,** *et seq.* | **Utah Code Ann. § 13-11-4.(2):**<br><br>(a) indicates that the subject of a consumer transaction has sponsorship, approval, performance | **Utah Code Ann. § 13-11-4**<br><br>(1) A deceptive act or practice by a supplier in connection with a consumer transaction violates this | |

| | Utah Code Ann. § 13-11a-1, *et seq.* | characteristics, accessories, uses, or benefits, if it has not;<br><br>(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;<br><br>(e) indicates that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;<br><br>(i) indicates that the supplier has a sponsorship, approval, or affiliation the supplier does not have;<br><br>(j)<br>    (i) indicates that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies, or obligations, if the representation is false; or<br>    (ii) fails to honor a warranty or a particular warranty term;<br><br>(s) solicits or enters into a consumer transaction with a person who lacks the mental ability to comprehend the nature and consequences of: | chapter whether it occurs before, during, or after the transaction.<br><br>(2) Without limiting the scope of Subsection (1), a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: [enumerating examples of deceptive practices].<br><br>**Utah Code Ann. § 13-11-2**<br><br>This act shall be construed liberally to promote the following policies: . . .<br><br>(4) to make state regulation of consumer sales practices not inconsistent with the policies of the Federal Trade Commission Act relating to consumer protection;<br><br>(5) to make uniform the law, including the administrative rules, with respect to the subject of this act among those states which enact similar laws[.]<br><br>**Utah Code Ann. § 13-11a-3**<br>•    (1) Deceptive trade practices occur when, in the course of a person's business, vocation, or occupation that person . . . . | |

| | | (i) the consumer transaction; or<br>(ii) the person's ability to benefit from<br>   the consumer transaction;<br><br>**Utah Code Ann. § 13-11-5**<br><br>(1) An unconscionable act or practice by a supplier in connection with a consumer transaction violates this act whether it occurs before, during, or after the transaction.<br><br>**Utah Code Ann. § 13-11a-3**<br><br>(b) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;<br><br>(c) causes likelihood of confusion or of misunderstanding as to affiliation, connection, association with, or certification by another;<br><br>(e) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; | [enumerating deceptive practices, including:]<br>•    (t) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. | |

| | | (g) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(i) advertises goods or services or the price of goods and services with intent not to sell them as advertised | | |
|---|---|---|---|---|
| **Vermont** | **Vt. Stat. Ann. tit. 9, § 2451, *et seq.*** | This Vermont statute broadly prohibits deceptive and unfair conduct without enumeration. | **Vt. Stat. Ann. tit. 9, § 2453**

(a) Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful. | **Vt. Stat. Ann. tit. 9, § 2453**

(b) It is the intent of the Legislature that in construing subsection (a) of this section, the courts of this State will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act as from time to time amended by the Federal Trade Commission and the courts of the United States. |

| Virginia | Va. Code Ann. § 59.1-196, *et seq.* | **Va. Code Ann. § 59.1-200(A)**<br><br>2. Misrepresenting the source, sponsorship, approval, or certification of goods or services;<br><br>3. Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services, with another;<br><br>5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;<br><br>6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;<br><br>8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.<br><br>14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction; | **Va. Code Ann. § 59.1-200(A)**<br><br>14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction; | |
| **Washington** | **Wash. Rev.** | This Washington statute broadly | **Wash. Rev. Code § 19.86.020** | **Wash. Rev. Code** |

| | Code § 19.86.010, *et seq.* | prohibits deceptive and unfair conduct without enumeration. | Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. | **§ 19.86.920**<br><br>The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters and that in deciding whether conduct restrains or |

| | | | | monopolizes trade or commerce or may substantially lessen competition, determination of the relevant market or effective area of competition shall not be limited by the boundaries of the state of Washington. To this end this act shall be liberally construed that its beneficial purposes may be served.<br><br>It is, however, the intent of the legislature that this act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest, nor be construed to authorize those acts |
|---|---|---|---|---|

Appendix D (False Advertising/Deceptive Practice Laws by State), 1st Consol. Compl., In re JUUL Prods. Lit.

| | | | | or practices which unreasonably restrain trade or are unreasonable per se. |
|---|---|---|---|---|
| **West Virginia** | **W. Va. Code § 46A-6-101, *et seq.*** | **W. Va. Code § 46A-6-102(7)**<br><br>(B) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;<br><br>(C) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;<br><br>(E) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;<br><br>(G) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another;<br><br>(I) Advertising goods or services | **W. Va. Code § 46A-6-102(7)**<br><br>(L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;<br><br>**W. Va. Code § 46A-6-104**<br><br>Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. | **W. Va. Code § 46A-6-101**<br><br>(1) The Legislature hereby declares that the purpose of this article is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the Legislature that, in construing this article, the courts be guided by the policies of the Federal Trade Commission and interpretations given by the Federal Trade Commission and the |

| | | with intent not to sell them as advertised;<br><br>(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; | | federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended, and to the various other federal statutes dealing with the same or similar matters. To this end, this article shall be liberally construed so that its beneficial purposes may be served. |
|---|---|---|---|---|
| **Wisconsin** | **Wis. Stat. Ann. § 100.18** | This Wisconsin statute broadly prohibits deceptive and unfair conduct without enumeration. | **Wis. Stat. Ann. § 100.18**<br><br>(1) No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or | |

| | | | obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading. | |
| **Wyoming** | **Wyo. Stat. Ann. § 40-12-101,** *et seq.* | **Wyo. Stat. Ann. § 40-12-105(a)**<br><br>(i) Represents that merchandise has | **Wyo. Stat. Ann. § 40-12-105(a)**<br><br>(xv) Engages in unfair or deceptive | |

| | | a source, origin, sponsorship, approval, accessories or uses it does not have;<br><br>(ii) Represents that he has a sponsorship, approval or affiliation he does not have;<br><br>(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;<br><br>(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false;<br><br>(x) Advertises merchandise with intent not to sell it as advertised; | acts or practices; | |

CHART OF 33 STATES AND WASHINGTON D.C.'S UNFAIR AND UNLAWFUL TRADE PRACTICES STATUTES

*COUNT 15: UNFAIR AND UNLAWFUL TRADE PRACTICES STATUTES*

| STATE | STATUTORY CITATION FOR BROAD PROHIBITION ON UNFAIR CONDUCT | NOTES |
|---|---|---|
| Alabama | Ala. Code § 8-19-1, *et seq.* | |
| Arizona | Ariz. Rev. Stat. § 44-1522 | |
| California | Bus. & Prof. Code § 17200 | |
| Connecticut | Conn. Gen. Stat. § 42-110b | |
| Delaware | Del. Code Ann. tit. 6, § 2512 | |
| District of Columbia | D.C. Code §§ 28-3901, 3904 | |
| Florida | Fla. Stat. § 501.204 | |
| Georgia | Ga. Code. Ann. § 10-1-393 | |
| Hawaii | Haw. Rev. Stat. § 480-2 | |
| Illinois | 815 Ill. Comp. Stat. Ann. 505/2 | |
| Indiana | Ind. Code Ann. § 24-5-0.5-3 | Relevant section for consideration of Defendant's conduct as unlawful (in addition to those cited under other claims):<br><br>IND. CODE § 7.1-7-5-1.1(i) (restriction on marketing as a modified risk product). |
| Iowa | Iowa Code § 714H.3 | |
| Kentucky | Ky. Rev. Stat. § 367.170 | |
| Louisiana | La. Rev. Stat. § 51:405(a) | |

| | | |
|---|---|---|
| **Maine** | **Me. Rev. Stat. Ann. tit. 5 § 207** | |
| **Maryland** | **Md. Code. Ann. Com. Law § 13-303** | |
| **Massachusetts** | **Mass. Gen. Laws. ch. 93A § 2** | Relevant section for consideration of Defendant's conduct as unfair and unlawful (in addition to those cited under other claims):<br><br>940 Mass. Code Regs. 21.04(1)(c); (1)(D).<br><br>940 Mass. Code Regs. 21.04(2)(a); (2)(b).<br><br>940 Mass. Code Regs. 21.04(3) |
| **Michigan** | **Mich. Comp. Laws Serv. § 445.903** | |
| **Mississippi** | **Miss. Code Ann. § 75-24-5** | |
| **Missouri** | **Mo. Rev. Stat. § 407.020** | |
| **Montana** | **Mont. Code Ann. § 30-14-103** | |
| **Nebraska** | **Neb. Rev. Stat. § 59-1602** | |
| **New Hampshire** | **N.H. Rev. Stat. Ann. § 358-A:2** | |
| **New Mexico** | **N.M. Stat. Ann. § 57-12-3** | |
| **North Carolina** | **N.C. Gen. Stat. § 75-1.1** | |
| **Oklahoma** | **Okla. Stat. tit. 15, § 753**<br><br>**Okla. Stat. tit. 15, § 752 (14)** | |
| **Oregon** | **Or. Rev. Stat. § 646.608** | |
| **Pennsylvania** | **73 P.S. § 201-2** | |

| | | |
|---|---|---|
| **Rhode Island** | **R.I. Gen. Laws § 6-13.1-2**<br><br>**R.I. Gen. Laws § 6-13.1-1(6)** | |
| **South Carolina** | **S.C. Code Ann. § 39-5-20(a)** | |
| **Vermont** | **Vt. Stat. Ann. tit. 9, § 2453** | |
| **Washington** | **Wash. Rev. Code § 19.86.020** | |
| **West Virginia** | **W. Va. Code § 46A-6-104** | |
| **Wyoming** | **Wyo. Stat. Ann. § 40-12-101, *et seq.*** | |

Appendix E (Unfair/Unlawful Competition laws by State),
1st Consol. Compl., *In re JUUL Prods. Lit.*

3

## STATE STATUTES ADOPTING U.C.C. § 2-313'S
## PROVISIONS ON EXPRESS WARRANTIES

49 states have adopted U.C.C. § 2-313, which governs Plaintiffs' express warranty claims. Some states, however, arguably require a showing of reliance to demonstrate that the warranty was the basis of the bargain between the warrantor and the consumer. *See, e.g.*, *In re Rust-Oleum Restore Mktg., Sales Practices & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 808 (N.D. Ill. 2016) (grouping states between those that arguably require reliance and those that do not); see also *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 546 (C.D. Cal. 2012); *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *25 (D.N.J. July 29, 2015) (discussing express warranty requirements and finding that New York and Ohio do not require reliance but Utah does). Plaintiffs do not believe any other distinction between express warranty law is likely to impact the Court's analysis materially for purposes of Rule 12 briefing.[1]

---

[1] Although pre-suit notice requirements for express warranty claims vary by state, notice is a question of fact for the jury and inappropriate for resolution on Rule 12 motions. *Rust-Oleum*, 155 F. Supp. 3d at 801–02 (collecting cases); *Caterpillar*, 2015 WL 4591236, at *28.

**STATES THAT MAY REQUIRE RELIANCE**
**FOR EXPRESS WARRANTY CLAIMS**

| STATE | STATUTE ADOPTING U.C.C. § 2-313'S PROVISION ON EXPRESS WARRANTIES | CITATION(S) REGARDING RELIANCE |
|---|---|---|
| Alaska | Alaska Stat. § 45.02.313 | *Cusack v. Abbott Labs., Inc.*, No. 3:16-CV-00166-SLG, 2017 WL 3688149, at *4 (D. Alaska Jan. 17, 2017) (but relying on cases that do not appear to require reliance). |
| Arizona | Ariz. R.S. § 47-2313 | *Raatz v. Dealer Trade Inc.*, 261 F. Supp. 3d 997, 1000 (D. Ariz. 2017) (referring to plaintiff's reliance as satisfying basis-of-the-bargain requirement, though not clarifying what lesser showing might suffice). |
| Arkansas | Ark. Code Ann. § 4-2-313 | *Ciba–Geigy Corporation v. Alter*, 834 S.W.2d 136, 147 (1992); *Brooks v. Remington Arms Co., Inc.*, No. 1:09-CV-01054, 2010 WL 6971894, at *5 (W.D. Ark. Oct. 27, 2010), *report and recommendation adopted sub nom. Rodgers v. Remington Arms Co.*, No. 09-CV-1054, 2011 WL 2746150 (W.D. Ark. July 12, 2011). |
| California | Cal. U. Com. Code § 2313 | *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 546 (C.D. Cal. 2012).<br><br>*But see McVicar v. Goodman Global, Inc.*, 1 F. Supp. 3d 1044, 1057 (C.D. Cal. 2014) (citing *Weinstat v. Dentsply Intern., Inc.*, 103 Cal. Rptr. 3d 614, 625–27 (Cal. Ct. App. 2010)); *Hauter v. Zogarts*, 534 P.2d 377, 383 (Cal. 1975). |
| Colorado | Colo. Rev. Stat. § 4-2-313 | *Porcell v. Lincoln Wood Products, Inc.*, 713 F. Supp. 2d 1305 (D.N.M. 2010) (citing *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 208 (Colo. 1984)).<br><br>*But see Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 645 (10th Cir. 1991) (concluding that Colorado law does not require reliance). |
| Connecticut | Conn. Gen. Stat. § 42a-2-313 | *Criteria, II Ltd. v. Co-Opportunity Precision Wood Prod., Inc.*, No. |

Plf's 1st Consol. Comp., *In re JUUL Prods. Lit.*, Appendix F (State Law Chart; Express Warranty)

| | | CV000803309S, 2001 WL 1178333, at *1 (Conn. Super. Ct. Aug. 30, 2001).<br><br>*But see Pegasus Mgmt. Co. v. Lyssa, Inc.*, 995 F. Supp. 43, 45 (D. Mass. 1998) (Conn. law). |
|---|---|---|
| Delaware | Del. Code Ann. Tit. 6, § 2-313 | *DiIenno v. Libbey Glass Div., Owens–Illinois, Inc.*, 668 F. Supp. 373, 376 (D. Del. 1987). |
| Florida | Fla. Stat. § 672.313 | *Thursby v. Reynolds Metals Co.*, 466 So. 2d 245, 250 (Fla. Dist. Ct. App. 1984); *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 695 (S.D. Fla. 2010), *vacated on other grounds*, 635 F.3d 1279 (11th Cir. 2011).<br><br>*But see Lennar Homes, Inc. v. Masonite Corp.*, 32 F. Supp. 2d 396, 399–400 (E.D. La. 1998) (predicting that Florida courts would not require reliance for express warranty claims); *S. Broad. Grp., LLC v. Gem Broad., Inc.*, 145 F. Supp. 2d 1316, 1324 (M.D. Fla. 2001) (same), *aff'd sub nom. S. Broad. v. GEM Broad.*, 49 F. App'x 288 (Table) (11th Cir. 2002). |
| Iowa | Iowa Code § 554.2313 | *Sharp v. Tamko Roofing Products, Inc.*, 695 N.W.2d 43 (Table), 2004 WL 2579638, at *2 (Iowa Ct. App. 2004). |
| Kentucky | K.R.S. § 355.2-313 | *Overstreet v. Norden Labs., Inc.*, 669 F.2d 1286, 1288 (6th Cir. 1982).<br><br>*But see Prima Int'l Trading v. Wyant*, 68 U.C.C. Rep. Serv. 2d 279 (E.D. Ky. 2009) (quoting U.C.C. comments that "no particular reliance . . . need be shown in order to weave [statements] into the fabric of the agreement."). |
| Maine | Me. Rev. Stat. tit. 11, § 2-313 | *Me. Farmers Exch. v. McGillicuddy*, 697 A.2d 1266, 1268 (Me. 1997). |
| Maryland | Md. Code Ann., Com. Law § 2-313 | *Rite Aid Corp. v. Levy-Gray*, 894 A.2d 563 (Md. 2006) (concluding that a jury could find that consumer relied on statement and thus it constituted a warranty under Maryland law). |
| Massachusetts | Mass. Ann. Laws ch. 106, § 2-313 | *Hiller v. DaimlerChrysler Corp.*, No. 02-681, 2007 WL 3260199, at *4 (Mass. Super. Sept. 25, 2007). |
| Michigan | Mich. Comp. Laws § 440.2313 | *Monte v. Toyota Motor Corp.*, 46 U.C.C. Rep. Serv. 2d 967 (Mich. Ct. App. 2001) (final footnote states that plaintiff's claim would fail for lack of reliance). |

Plf's 1st Consol. Comp., *In re JUUL Prods. Lit.*, Appendix F (State Law Chart; Express Warranty)

| | | |
|---|---|---|
| | | *But see Fire Ins. Exch. v. Electrolux Home Prods.*, 61 U.C.C. Rep. Serv. 2d 181 (E.D. Mich. 2006) ("[T]he Court finds that the Michigan statute does not expressly require reliance."). |
| Mississippi | Miss. Code Ann. § 75-2-313 | *Cf. Austin v. Will-Burt Co.*, 361 F.3d 862 (5th Cir. 2004) (granting summary judgment because no express warranty existed under Mississippi law without proof of reliance on advertisements); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, No. MDL 07-1873, 2008 WL 5217594, at *8 (E.D. La. Dec. 12, 2008) (denying motion to dismiss express warranty claim under Mississippi law because allegation that plaintiffs relied on unspecified "express factual representations" sufficed).<br><br>*But cf. Johnson v. Michaels of Or. Co.*, No. 1:07CV291-M-D, 2009 WL 458570, at *1–2 (N.D. Miss. Feb. 23, 2009) (recognizing that the Mississippi Supreme Court permitted liability even when plaintiff did not read warranty in *Forbes v. Gen. Motors Corp.*, 935 So.2d 869 , 876–78 (Miss. 2006)). |
| Montana | Mont. Code Ann. § 30-2-313 | *Woodahl v. Matthews*, 639 P.2d 1165, 1168 (Mont. 1982) (relying on a 1915, pre-U.C.C. case).<br><br>*But see Glacier Gen. Assur. Co. v. Cas. Indem. Exch.*, 435 F. Supp. 855, 860 (D. Mont. 1977). |
| Nebraska | Neb. Rev. Stat. § 2-313 | *Hillcrest Country Club v. N.D. Judds Co.*, 461 N.W.2d 55, 61 (Neb. 1990). |
| New York | N.Y. U.C.C. Law § 2-313 | *J.C. Const. Mgmt. Corp. v. Nassau-Suffolk Lumber & Supply Corp.*, 789 N.Y.S.2d 903, 903 (N.Y. App. Div. 2005) (stating that reliance is required and citing *Gale v. Int'l Bus. Machines Corp.*, 781 N.Y.S.2d 45, 47 (N.Y. App. Div. 2004).<br><br>*But see Levin v. Gallery 63 Antiques Corp.*, 2006 WL 2802008, at * 11 (S.D.N.Y. Sept. 28, 2006) (listing cases not requiring reliance, including *CBS, Inc. v. Ziff–Davis Publishing Co.*, 553 N.E.2d 997, 1001, (N.Y. 1990)). |

4

Plf's 1st Consol. Comp., *In re JUUL Prods. Lit.*, Appendix F (State Law Chart; Express Warranty)

| North Carolina | N.C. Gen. Stat. § 25-2-313 | *Prichard Enters., Inc. v. Adkins*, 858 F. Supp. 2d 576, 584–585 (E.D.N.C. 2012) (citing *Pake v. Byrd*, 286 S.E.2d 588, 553 (N.C. Ct. App. 1982) for principle that reliance is required, but also noting that "the element of reliance can often be inferred from allegations of mere purchase or use . . . ," quoting *Bernick v. Jurden*, 293 S.E.2d 405, 413 (N.C. 1982)). |
|---|---|---|
| Ohio | Ohio Rev. Code Ann. § 1302.26 | *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products Inc.*, 62 U.C.C. Rep. Serv. 2d 371, 381 n.16 (S.D. Ohio 2007) (effectively requiring reliance although acknowledging that reliance is not a formal element of express warranty claims under Ohio law).<br><br>*But see Norcold, Inc. v. Gateway Supply Co.*, 798 N.E.2d 618, 623–24 (Ohio Ct. App. 2003) (rejecting reliance requirement). |
| Oklahoma | Okla. Stat. tit. 12A, § 2-313 | *Speed Fastners, Inc. v. Newsom*, 382 F.2d 395, 397 (10th Cir.1967) (Oklahoma law). |
| Oregon | Or. Rev. Stat. § 72.3130 | *Newman v. Tualatin Dev. Co.*, 597 P.2d 800, 803 (Or. 1979) (finding, at class certification stage, that plaintiffs' claims for breach of express warranty required individual determinations of reliance where warranty allegedly was made in a sales brochure given to all purchasers); *cf. Strawn v. Farmers Ins. Co. of Oregon*, 258 P.3d 1199, 1213 (Or. 2011) (distinguishing *Newman* and finding that determination of reliance in class action for fraud was susceptible to common evidence where promise appeared in a written insurance contract). |
| Rhode Island | R.I. Gen. Laws § 6A-2-313 | *Ralston Dry-Wall Co. v. United States Gypsum Co.*, 740 F. Supp. 926 (D.R.J. 1990) (stating that express warranty requires reliance under Rhode Island law, but citing *Thomas v. Amway Corp.*, 488 A.2d 716, 720 (R.I. 1985), which relied on pre-U.C.C. caselaw), *aff'd on other grounds*, 926 F.2d 99 (1st Cir. 1991). |
| South Dakota | S.D. Codified Laws § 57A-2-313 | *Schmaltz v. Nissen*, 431 N.W.2d 657, 660 (S.D. 1988).<br><br>*But see Cmty. Television Servs., Inc. v. Dresser Indus., Inc.*, 586 F.2d 637, 640 (8th Cir. 1978) (defendant's provision of a catalog to the plaintiff must be considered basis of the bargain absent clear affirmative proof to |

Plf's 1st Consol. Comp., *In re JUUL Prods. Lit.*, Appendix F (State Law Chart; Express Warranty)

Case 3:MDL-No-02913-WHO Document 140 Filed 07/29/019 Page 432 of 439

| | | the contrary). |
|---|---|---|
| Tennessee | Tenn. Code Ann. § 47-2-313 | *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 969 (M.D. Tenn. 2002), *aff'd,* 89 F. App'x 927 (6th Cir. 2003); *Smith v. Bearfield*, 950 S.W.2d 40,41 (Tenn. Ct. App. 1997). |
| Texas | Tex. Bus. & Com. Code § 2.313 | *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 99 (Tex. 2004). |
| Utah | Utah Code Ann. § 70A-2-313 | *Mgmt. Comm. of Graystone Pines Homeowners Ass'n on Behalf of Owners of Condominiums v. Graystone Pines, Inc.*, 652 P.2d 896, 900 (Utah 1982). |
| Washington | Wash. Rev. Code § 62A.2-313 | *Reece v. Good Samaritan Hosp.*, 953 P.2d 117, 123 (Wash. Ct. App. 1998).<br><br>*But cf. Baughn v. Honda Motor Co.*, 727 P.2d 655, 669 (Wash. 1986) (reliance unnecessary but buyer must be aware of seller's statement). |
| Wyoming | Wyo. Stat. Ann. §34.1-2-313 | *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 90 (Wyo. 1989). |

**STATES THAT DO NOT REQUIRE RELIANCE
FOR EXPRESS WARRANTY CLAIMS**

| STATE | STATUTE ADOPTING U.C.C. § 2 313'S PROVISION ON EXPRESS WARRANTIES | CITATION(S) REGARDING RELIANCE |
|---|---|---|
| Alabama | Ala. Code § 7-2-313 | *Neff v. Kehoe*, 708 F.2d 639, 644 (11th Cir. 1983) (Ala. law); *Massey-Ferguson, Inc. v. Laird*, 432 So. 2d 1259 (Ala. 1983). |
| Georgia | Ga. Code Ann. § 11-2-313 | *Horn v. Boston Scientific Neuromodulation Corp.*, No. Civ. 409–074, 2011 WL 3893812, at *11 (S.D.Ga. Aug.26, 2011). |
| Hawaii | Haw. Rev. Stat. § 490:2-313 | *Torres v. Northwest Eng'g Co.*, 949 P.2d 1004, 1013 (1997). |
| Idaho | Idaho Code § 28-2-313 | *Keller v. Inland Metals All Weather Conditioning, Inc.*, 76 P.3d 977, 981 (Idaho 2003). |
| Illinois | 810 Ill. Comp. Stat. 5/2-313 | *Felley v. Singleton*, 705 N.E.2d 930, 934 (Ill. App. Ct. 1999) (holding |

Plf's 1st Consol. Comp., *In re JUUL Prods. Lit.*, Appendix F (State Law Chart; Express Warranty)

| | | that reliance is not required, and acknowledging but disagreeing with opposite statement in *Coryell v. Lombard LincolnMercury Merkur, Inc.*, 544 N.E.2d 1154, 1158 (Ill. App. Ct. 1989)).<br><br>But see *Pressalite Corp. v. Matsushita Elec. Corp.*, 50 U.C.C. Rep. Serv. 2d 410 (N.D. Ill. 2003) (citing *Coryell* on reliance). |
|---|---|---|
| Indiana | Ind. Code Ann. § 26-1-2-313 | *Carpetland U.S.A. v. Payne*, 536 N.E.2d 306, 308 (Ind. Ct. App. 1989). |
| Kansas | Kan. Stat. Ann. § 84-2-313 | *Unified Sch. Dist. No. 500 v. U.S. Gypsum Co.*, 788 F. Supp. 1173, 1177 (D. Kan. 1992) (citing *Young & Cooper, Inc. v. Vestring*, 521 P.2d 281, 291 (Kan. 1974)).<br><br>But see *Land v. Roper Corp.*, 531 F.2d 445, 448–49 (10th Cir. 1976) (holding that reliance is required, but relying on primarily pre-U.C.C. sources). |
| Minnesota | Minn. Stat. § 336.2-313 | *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) (citing *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52–53 (Minn. 1982) (listing elements of warranty claims without reliance)); *Drobnak v. Andersen Corp.*, 67 U.C.C. Rep. Serv. 2d 487 (D. Minn. 2008) (distinguishing *Hendricks v. Callahan*, 972 F.2d 190, 194 (8th Cir. 1992), which required reliance for common-law warranty claims), *aff'd on other grounds*, 561 F.3d 778 (8th Cir. 2009). |
| Missouri | Mo. Rev. Stat. § 400.2-313 | *Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257, 261 (Mo. Ct. App. 1976) (concluding that the U.C.C. had abandoned the concept of reliance, but noting that a brochure or advertisement must at least have been read to have been part of the basis of the bargain); *Power Soak Sys., Inc. v. Emco Holdings, Inc.*, 482 F. Supp. 2d 1125, 1134 (W.D. Mo. 2007) (concluding that no reliance is required and citing *Interco*). |
| Nevada | Nev. Rev. Stat. § 104.2313 | *Allied Fid. Ins. Co. v. Pico*, 656 P.2d 849, 850 (Nev. 1983). |
| New Hampshire | N.H. Rev. Stat. Ann. § 382-A:2-313 | *Werner v. Montana*, 378 A.2d 1130, 1136 (N.H. 1977); *cf. Kelleher v. Marvin Lumber & Cedar Co.*, 152 N.H. 813, 891 A.2d 477, 502 (N.H. 2002) (adopting an intermediate approach in which plaintiff need not show reliance but must have been aware of the affirmation of fact or |

| | | promise during the bargaining process). |
|---|---|---|
| New Jersey | N.J. Stat. § 12A:2-313 | *Smith v. Merial Ltd.*, No. CIV. 10-439, 2011 WL 2119100, at *7 (D.N.J. May 26, 2011). |
| New Mexico | N.M. Stat. Ann. § 55-2-313 | *Porcell v. Lincoln Wood Prods., Inc.*, 713 F. Supp. 2d 1305, 1318–19 (D.N.M. 2010). |
| North Dakota | N.D. Cent. Code, § 41-02-30 | *Cf. Alligood v. Taurus Int'l Mfg., Inc.*, No. CV 306-003, 2009 WL 8387645, at *4 (S.D. Ga. Mar. 4, 2009) ("the courts of North Dakota have not clearly articulated a position on either privity or reliance"). |
| Pennsylvania | 13 Pa. Con. Stat. § 2313 | *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 24–25 (Pa. 2011). |
| South Carolina | S.C. Code Ann. § 36-2-313 | *Jones v. Ram Med., Inc.*, 807 F. Supp. 2d 501, 508 (D.S.C. 2011). |
| Vermont | Vt. Stat. Ann. Tit. 9A, § 2-313 | *Allen v. Am. Honda Motor Co.*, 264 F.R.D. 412, 430 (N.D. Ill. 2009), *rev'd on other grounds*, 600 F.3d 813 (7th Cir. 2010) (stating that Vermont does not require reliance without analysis); *Alligood v. Taurus Int'l Mfg., Inc.*, No. CV 306-003, 2009 WL 8387645, at *4 (S.D. Ga. Mar. 4, 2009) (noting plaintiffs' representation that Vermont does not require reliance without analysis). |
| Virginia | Va. Code Ann. § 8.2-313 | *Martin v. Am. Med. Sys., Inc.*, 116 F.3d 102 (4th Cir. 1997) (citing *Daughtrey v. Ashe*, 413 S.E.2d 336, 338 (Va. 1992)); *Yates v. Pitman Mfg., Inc.*, 5 14 S.E.2d 605, 607 (Va. 1999). |
| West Virginia | W. Va. Code § 46-2-313 | *Michael v. Wyeth, LLC*, No. CIV.A. 2:04-0435, 2011 WL 2150112, at *8 (S.D. W. Va. May 25, 2011) (predicting that West Virginia courts would create a rebuttable presumption that a seller's affirmations relating to goods are part of the basis of the bargain); *Allen v. Am. Honda Motor Co.*, 264 F.R.D. 412, 430 (N.D. Ill. 2009), *rev'd on other grounds*, 600 F.3d 813 (7th Cir. 2010) (stating that West Virginia does not require reliance without analysis). |
| Wisconsin | Wis. Stat. § 402.313 | *Ewers v. Eisenzopf*, 276 N.W.2d 802, 805 (Wis. 1979). *But see Selzer v. Brunsell Bros., Ltd.*, 652 N.W.2d 806, 811 (Wis. Ct. App. 2002) (listing reliance as an element, but citing only a case under a pre-U.C.C. statute that explicitly required reliance). |

Plf's 1st Consol. Comp., *In re JUUL Prods. Lit.*, Appendix F (State Law Chart; Express Warranty)

**STATE STATUTES ADOPTING U.C.C. § 2-314's
PROVISIONS ON IMPLIED WARRANTIES**

49 states have adopted U.C.C. § 2-314, which governs Plaintiffs' implied warranty claims. Some states, however, require privity of contract in order to recover for economic loss. *See, e.g., In re Rust-Oleum Restore Mktg., Sales Practices & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 806 (N.D. Ill. 2016) (grouping states between those that require privity and those that do not).[1] Plaintiffs do not believe any other distinction between implied warranty law is likely to impact the Court's analysis materially.

**STATE STATUTES REQUIRING PRIVITY OF CONTRACT**

| STATE | STATUTE ADOPTING U.C.C. § 2-314'S PROVISION ON IMPLIED WARRANTIES | CITATIONS AND NOTES REGARDING PRIVITY REQUIREMENT |
|---|---|---|
| Alabama | Ala. Code § 7-2-314 | *Rampey v. Novartis Consumer Health, Inc.*, 867 So. 2d 1079, 1089 (privity requirement for cases of economic injury). |
| Arizona | Ariz. R.S. § 47-2314 | *See Adelman v. Rheem Mfg. Co.*, No. 2:15-CV-00190 JWS, 2015 WL 4874412, at *4 (D. Ariz. Aug. 14, 2015) (citing *Flory v. Silvercrest Indus.*, 633 P.2d 383, 387 (Ariz. 1981)). |
| California | Cal. U. Com. Code § 2314 | *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023–24 (9th Cir. 2008) (but an exception "when the plaintiff relies on written labels or advertisements of a manufacturer"). |
| Connecticut | Conn. Gen. Stat. § 42a-2-314 | *Source One Fin. Corp. v. Rd. Ready Used Cars, Inc.*, No. CV136034341S, 2014 WL 1013121, at *6 (Conn. Super. Ct. Feb. 14, 2014). |
| Florida | Fla. Stat. § 672.314 | *Brisson v. Ford Motor Co.*, 349 F. App'x 433 (11th Cir. 2009) (Fla. law). |

[1] Plaintiffs respectfully note that their research regarding the states that require privity varies slightly from the list provided in *Rust-Oleum*. In particular, caselaw suggests that Arizona, Connecticut, Kentucky, Oregon, and Wisconsin require privity, while Indiana does not.

| Georgia | Ga. Code Ann. § 11-2-314 | *Gill v. Blue Bird Body Co.*, 147 F. App'x 807, 809 (11th Cir. 2005). |
|---|---|---|
| Idaho | Idaho Code § 28-2-314 | *Am. W. Enterprises, Inc. v. CNH, LLC*, 316 P.3d 662, 668 (Idaho 2013); *Nelson v. Anderson Lumber Co.*, 99 P.3d 1092, 1101 (Idaho Ct. App. 2004). |
| Illinois | 810 Ill. Comp. Stat. 5/2-314 | *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516 (7th Cir. 2003); *but see Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028 (Ill. 1988). |
| Kentucky | K.R.S. § 355.2-314 | *Compex Int'l Co. v. Taylor*, 209 S.W.3d 462, 465 (Ky. 2006) ("[T]he legislature expressly established the privity requirement"). |
| New York | N.Y. U.C.C. Law § 2-314 | *In re Scotts EZ Seed Litig.*, 80 U.C.C. Rep. Serv. 2d 935 (S.D.N.Y. 2013); *Hole v. Gen. Motors Corp.*, 83 A.D.2d 715 (N.Y.S.2d. 1981). |
| North Carolina | N.C. Gen. Stat. § 25-2-314 | *Energy Inv'rs Fund, L.P. v. Metric Constructors, Inc.*, 525 S.E.2d 441, 446 (N.C. 2000). |
| Ohio | Ohio Rev. Code Ann. § 1302.27 | *Curl v. Volkswagen of Am., Inc.*, 871 N.E.2d 1141 (Ohio 2007). |
| Oregon | Or. Rev. Stat. § 72.3140 | *Davis v. Homasote Company*, 574 P.2d 1116 (Or. 1978). |
| Tennessee | Tenn. Code Ann. § 47-2-314 | *First Nat'l Bank v. Brooks Farms*, 821 S.W.2d 925 (Tenn. 1991). |
| Washington | Wash. Rev. Code § 62A.2-314 | *Baughn v. Honda Motor Co.*, 727 P.2d 655, 669 (Wash. 1986). |
| Wisconsin | Wis. Stat. § 402.314 | *St. Paul Mercury Ins. Co. v. Viking Corp.*, 539 F.3d 623 (7th Cir. 2008). |

## STATE STATUTES NOT REQUIRING PRIVITY OF CONTRACT

| STATE | STATUTE ADOPTING U.C.C. § 2-314'S PROVISION ON IMPLIED WARRANTIES | CITATION REGARDING PRIVITY REQUIREMENT |
|---|---|---|
| Alaska | Alaska Stat. § 45.02.314 | *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279, 289-91 (Alaska 1976) (cited in *Czuchaj v. Conair Corp.*, No. 13-CV-1901-BEN (RBB), 2016 WL 1240391, at *2 (S.D. Cal. Mar. 30, 2016)). |
| Arkansas | Ark. Code Ann. § 4-2-314 | *Mack Trucks of Arkansas, Inc. v. Jet Asphalt & Rock Co.*, 437 S.W.2d 459, 462 (Ark. 1969). |
| Delaware | Del. Code Ann. Tit. 6, § 2-314 | *S&R Assocs., L.P. v. Shell Oil Co.*, 725 A.2d 431, 437 (Del. Super. Ct. 1998). |
| Hawaii | Haw. Rev. Stat. § 490:2-314 | *Am. Auto. Ins. Co. v. Hawaii Nut & Bolt, Inc.*, No. CV 15-00245 ACK-KSC, 2016 WL 8677213, at *9 (D. Haw. Dec. 16, 2016). |
| Indiana | Ind. Code Ann. § 26-1-2-314 | *Hyundai Motor America v. Goodin*, 822 N.E.2d 947, 959 (Ind. 2005). |
| Iowa | Iowa Code § 554.2314 | *Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 762 N.W.2d 463, 476 (Iowa 2009). |
| Kansas | Kan. Stat. Ann. § 84-2-314 | *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1244 (D. Kan. 2007). |
| Maine | Me. Rev. Stat. tit. 11, § 2-314 | *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144, 1147 n.4 (Me. 1983). |
| Maryland | Md. Code Ann., Com. Law § 2-314 | *Pulte Home Corp. v. Parex, Inc.*, 923 A.2d 971, 999 (Ct. Spec. App. Md. 2007). |
| Massachusetts | Mass. Ann. Laws ch. 106, § 2-314 | *Jacobs v. Yahama Motor Corp.*, 649 N.E.2d 758, 762 (Mass. 1995). |
| Michigan | Mich. Comp. Laws § 440.2314 | *Cova v. Harley Davidson Motor Co.*, 182 N.W.2d 800, 802, 804 (Mich. 1995). |
| Minnesota | Minn. Stat. § 336.2-314 | *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 565 N.W.2d 16, 19–21 (Minn. 1997). |
| Mississippi | Miss. Code Ann. § 75-2-314 | *Watson Quality Ford Inc. v. Casanova*, 999 So.2d 830, 845 |

| | | (Miss. 2009). |
|---|---|---|
| Missouri | Mo. Rev. Stat. § 400.2-314 | *Smith v. Old Warson Development Co.*, 479 S.W.2d 795, 798 (Mo. 1972) (citing *Morrow v. Caloric Appliance Corp.*, 372 S.W.2d 41, 55-56 (Mo. 1963) (en banc)). |
| Montana | Mont. Code Ann. § 30-2-314 | *Whitaker v. Farmhand, Inc.*, 567 P.2d 916 (Mont. 1977); *Plant Food Co-op v. Wolfkill Feed and Fertilizer* 633 F.2d 155 (9th Cir. 1980). |
| Nebraska | Neb. Rev. Stat. § 2-314 | *Peterson v. N. Am. Plant Breeders*, 354 N.W.2d 625 (Neb. 1984). |
| Nevada | Nev. Rev. Stat. § 104.2314 | *Cosgriff Neon Co. v. Mattheus*, 371 P.2d 819, 820 (Nev. 1962). |
| New Hampshire | N.H. Rev. Stat. Ann. § 382-A:2-314 | *Lempke v. Dagenais,* 130 N.H. 782, 788, 547 A.2d 290, 294 (N.H. 1988). |
| New Jersey | N.J. Stat. § 12A:2-314 | *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 489 A.2d 660, 663 (N.J. 1985). |
| New Mexico | N.M. Stat. Ann. § 55-2-314 | *Badilla v. Wal-Mart Stores E. Inc.*, 357 P.3d 936, 940 (N.M. 2015). |
| North Dakota | N.D. Cent. Code, § 41-02-31 | *Hagert v. Hatton Commodities, Inc.,* 350 N.W.2d 591 (N.D.1984); *Air Heaters, Inc. v. Johnson Electric, Inc.,* 258 N.W.2d 649 (N.D.1977). |
| Oklahoma | Okla. Stat. tit. 12A, § 2-314 | *Old Albany Estates, Ltd. v. Highland Carpet Mills, Inc.*, 604 P.2d 849, 852 (Okl. 1979). |
| Pennsylvania | 13 Pa. Con. Stat. § 2314 | *Spagnol Enterprises, Inc. v. Digital Equip. Corp.*, 568 A.2d 948, 951 (Pa. 1989). |
| Rhode Island | R.I. Gen. Laws § 6A-2-314 | *Rousseau v. K.N. Const., Inc.*, 727 A.2d 190, 193 (R.I. 1999). |
| South Carolina | S.C. Code Ann. § 36-2-314 | *JKT Co. v. Hardwick*, 265 S.E.2d 510, 512 (S.C. 1980). |
| South Dakota | S.D. Codified Laws § 57A-2-314 | *Horizons, Inc. v. Avco Corp.*, 551 F. Supp. 771 (D.S.D. 1982), *affirmed in part, reversed in part* 714 F.2d 862 (8th Cir. 1983). |
| Texas | Tex. Bus. & Com. Code § 2.314 | *Church & Dwight Co., Inc. v. Huey*, 961 S.W.2d 560 (Tex. Ct. App. 1997). |
| Utah | Utah Code Ann. § 70A-2-314 | Utah Code Ann. § 70A-2-318 |
| Vermont | Vt. Stat. Ann. Tit. 9A, § 2-314 | *Deveny v. Rheem Mfg. Co.*, 319 F.2d 124 (2d Cir. 1963). |

| Virginia | Va. Code Ann. § 8.2-314 | *Genito Glenn, Ltd P'ship v. Nat'l Hous. Bldg. Corp.*, 50 Va. Cir. 71 (1999). |
|---|---|---|
| West Virginia | W. Va. Code § 46-2-314 | *Louk v. Isuzu Motors, Inc.*, 479 S.E.2d 911 (W. Va. 1996). |
| Wyoming | Wyo. Stat. Ann. § 34.1-2-314 | *W. Equip. Co. v. Sheridan Iron Works, Inc.*, 605 P.2d 806, 808 (Wyo. 1980). |

Appendix E (State Laws; Implied Warranty), 1st Consol. Comp., In re JUUL Prods. Lit.