# EXHIBIT 6

ADRMOP,CONSOL,RELATE

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:18-cv-06808-WHO

VISCOMI et al v. JUUL LABS, INC. et al
Assigned to: Judge William H. Orrick
Lead case: 3:18-cv-02499-WHO
Member case: (View Member Case)
Relate Case Cases:  3:18-cv-06776-WHO
                    3:18-cv-02499-WHO
Case in other court:  Pennsylvania Eastern, 5:18-cv-03760
Cause: 28:1332 Diversity-Product Liability

Date Filed: 11/09/2018
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Federal Question

**Plaintiff**

**MICHAEL VISCOMI**                          represented by **Russell D. Paul**
                                                           BERGER and MONTAGUE PC
                                                           1622 LOCUST STREET
                                                           PHILADELPHIA, PA 19102
                                                           215-875-3000
                                                           Email: rpaul@bm.net
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **AARON J. FREIWALD**
                                                           FREIWALD LAW, P.C.
                                                           1500 WALNUT STREET
                                                           18TH FLOOR
                                                           PHILADELPHIA, PA 19102
                                                           215-875-8000
                                                           Email: ajf@freiwaldlaw.com
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Barbara A Podell**
                                                           Berger Montague PC
                                                           1818 Market Street, Suite 3600
                                                           Philadelphia, PA 19103
                                                           215-875-3000
                                                           Fax: 215-875-4604
                                                           Email: bpodell@bm.net
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Christina Monique Black**
                                                           Berger and Montague, PC
                                                           1622 Locust St
                                                           Philadelphia, PA 19103

215-875-3001
Email: cblack@bm.net
*ATTORNEY TO BE NOTICED*

**Sherrie R Savett**
BERGER & MONTAGUE
1622 LOCUST ST
PHILADELPHIA, PA 19103
215-875-3000
Fax: 215-875-3000
Email: ssavett@bm.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Masessa**                    represented by **Russell D. Paul**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **AARON J. FREIWALD**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Barbara A Podell**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Christina Monique Black**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Sherrie R Savett**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MATTHEW PEDECINE**                 represented by **Russell D. Paul**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **AARON J. FREIWALD**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Barbara A Podell**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Christina Monique Black**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R Savett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAVID LECHTZIN**                        represented by   **Russell D. Paul**
*INDIVIDUALLY AND ON BEHALF OF*                            (See above for address)
*THOSE SIMILARY SITUATED*                                  *LEAD ATTORNEY*
*TERMINATED: 11/14/2018*                                   *ATTORNEY TO BE NOTICED*

**AARON J. FREIWALD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Barbara A Podell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christina Monique Black**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrie R Savett**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Juul Labs, Inc.**                       represented by   **Austin V. Schwing**
Gibson Dunn & Crutcher LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
415-393-8200
Email: aschwing@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Austin Van Schwing**
Gibson, Dunn & Crutcher LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105-2933

415-393-8210
Fax: 415-374-8458
Email: aschwing@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MELANIE L. KATSUR**
GIBSON DUNN CRUTCHER LLP
1050 CONNECTICUT AVE NW STE
200
WASHINGTON, DC 20036
202-887-3636
Email: mkatsur@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAX Labs, Inc.**
*TERMINATED: 09/18/2018*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/31/2018 | 1 | COMPLAINT against JUUL LABS, INC., PAX LABS, INC. ( Filing fee $ 400 receipt number PPE184100.), filed by MICHAEL VISCOMI, DAVID MASESSA, DAVID LECHTZIN, MATTHEW PEDECINE, JURY DEMAND. (Attachments: # 1 CASE FORMS)(jl, ) (Entered: 09/05/2018) |
| 08/31/2018 | | 2 Summons Issued as to JUUL LABS, INC., PAX LABS, INC.. Forwarded To: RUSSELL PAUL on 9/5/18 (jl, ) (Entered: 09/05/2018) |
| 08/31/2018 | | DEMAND for Trial by Jury by DAVID LECHTZIN, DAVID MASESSA, MATTHEW PEDECINE, MICHAEL VISCOMI. (jl, ) (Entered: 09/05/2018) |
| 09/07/2018 | 2 | NOTICE of Appearance by AARON J. FREIWALD on behalf of DAVID LECHTZIN, DAVID MASESSA, MATTHEW PEDECINE, MICHAEL VISCOMI (FREIWALD, AARON) (Entered: 09/07/2018) |
| 09/11/2018 | 3 | WAIVER OF SERVICE Returned Executed by MICHAEL VISCOMI, DAVID MASESSA, DAVID LECHTZIN, MATTHEW PEDECINE. JUUL LABS, INC. waiver sent on 9/5/2018, answer due 11/5/2018. (PAUL, RUSSELL) (Entered: 09/11/2018) |
| 09/11/2018 | 4 | NOTICE of Appearance by SHERRIE R. SAVETT on behalf of DAVID LECHTZIN, DAVID MASESSA, MATTHEW PEDECINE, MICHAEL VISCOMI (SAVETT, SHERRIE) (Entered: 09/11/2018) |
| 09/11/2018 | 5 | NOTICE of Appearance by BARBARA A. PODELL on behalf of DAVID LECHTZIN, DAVID MASESSA, MATTHEW PEDECINE, MICHAEL VISCOMI (PODELL, BARBARA) (Entered: 09/11/2018) |
| 09/18/2018 | 6 | |

| | | STIPULATION of Dismissal *Without Prejudice of Defendant PAX Labs, Inc.* by DAVID LECHTZIN, DAVID MASESSA, MATTHEW PEDECINE, MICHAEL VISCOMI. (PAUL, RUSSELL) (Entered: 09/18/2018) |
|---|---|---|
| 09/18/2018 | 7 | STIPULATION AND ORDER THAT THE COURT HEREBY ADOPTS THE STIPULATION AND ORDERS THE DISMISSAL WITHOUT PREJUDICE OF PLAINTIFFS' CLAIMS AGAINS PAX LABS, INC. SUBJECT TO THE CONDITIONS OF THE PARTIES' JOINT STIPULATION. SIGNED BY HONORABLE EDWARD G. SMITH ON 9/18/18. 9/19/18 ENTERED AND COPIES E-MAILED.(mas, ) Modified on 9/19/2018 (mas, ). (Entered: 09/19/2018) |
| 10/12/2018 | 8 | NOTICE of Appearance by MELANIE L. KATSUR on behalf of JUUL LABS, INC. with Certificate of Service(KATSUR, MELANIE) (Entered: 10/12/2018) |
| 10/12/2018 | 9 | Statement *re Corporate Disclosure Under Rule 7.1* by JUUL LABS, INC.. (KATSUR, MELANIE) (Entered: 10/12/2018) |
| 10/12/2018 | 10 | STIPULATION *and Proposed Order to Postpone Obligation to Respond to Complaint Pending Resolution of Forthcoming Motion* by JUUL LABS, INC.. (KATSUR, MELANIE) Modified on 10/15/2018 (lvj, ). (FILED IN ERROR BY ATTORNEY; FORWARD TO JUDGE FOR APPROVAL) (Entered: 10/12/2018) |
| 10/12/2018 | 11 | MOTION to Dismiss , MOTION to Transfer , MOTION to Stay filed by JUUL LABS, INC..Memorandum, Declaration, Certificate of Service. (Attachments: # 1 Memorandum In Support Of Motion, # 2 Text of Proposed Order Granting Motion, # 3 Declaration of Danna McKay In Support of Motion, # 4 Exhibit A to McKay Declaration, # 5 Declaration of Austin V. Schwing In Support of Motion, # 6 Exhibit 1 to Schwing Declaration, # 7 Exhibit 2 to Schwing Declaration)(KATSUR, MELANIE) (Entered: 10/12/2018) |
| 10/12/2018 | | Disclosure Statement Form pursuant to FRCP 7.1 by JUUL LABS, INC.. (SEE #9 FOR ATTACHMENT)(lvj, ) (Entered: 10/15/2018) |
| 10/16/2018 | 12 | STIPULATION AND ORDER THAT THE PARTIES HEREBY AGREE AND STIPULATE AS FOLLOWS: JUUL LABS SHALL FILE ITS FIRST-FILED RULE MOTION ON OR BEFORE NOVEMBER 5, 2018. JUUL LABS' OBLIGATION TO OTHERWISE ANSWER OR RESPOND TO THE COMPLAINT UNDER RULE 12 IS STAYED PENDING RESOLUTION OF JUUL LABS' FIRST-FILED RULE MOTION. IN THE EVENT THAT THE COURT DENIES JUUL LABS' FIRST-FILED RULE MOTION IN ITS ENTIRETY, JUUL LABS SHALL ANSWER OR RESPOND TO THE COMPLAINT UNDER RULE 12 NO LATER THAN 30 DAYS FOLLOWING ENTRY OF THE COURT'S ORDER DENYING JUUL LABS' FIRST-FILED RULE MOTION. THIS STIPULATION SHALL NOT SERVE TO WAIVE ANY RIGHT, DEFENSE, AFFIRMATIVE DEFENSE, OR OBJECTION, INCLUDING THE FILING OF AN AMENDED PLEADING, LACK OF SUBJECT MATTER JURISDICTION, LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, AND FAILURE TO STATE A CLAIM. SIGNED BY HONORABLE EDWARD G. SMITH ON 10/16/18. 10/16/18 ENTERED AND COPIES E-MAILED.(mas, ) (Entered: 10/16/2018) |

| 10/17/2018 | 13 | APPLICATION for Admission Pro Hac Vice of Austin V. Schwing by JUUL LABS, INC.. ( Filing fee $ 40 receipt number 0313-13116801.). (KATSUR, MELANIE) (Entered: 10/17/2018) |
|---|---|---|
| 10/22/2018 | 14 | ORDER THAT THE APPLICATION OF ATTORNEY AUSTIN V. SCHWING TO PRATICE IN THIS COURT PURSUANT TO LOVAL RULE OF CIVIL PROCEDURE 83.5.2(b) IS GRANTED. SIGNED BY HONORABLE EDWARD G. SMITH ON 10/22/18. 10/22/18 ENTERED AND COPIES MAILED TO ATTORNEY ALONG WITH ECF REGISTRATION FORM AND E-MAILED.(mas, ) (Entered: 10/22/2018) |
| 10/24/2018 | 15 | MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss MOTION to Transfer MOTION to Stay filed by DAVID LECHTZIN, DAVID MASESSA, MATTHEW PEDECINE, MICHAEL VISCOMI.Certificate of Service, Certificate of Counsel. (Attachments: # 1 Text of Proposed Order)(PAUL, RUSSELL) (Entered: 10/24/2018) |
| 10/24/2018 | 16 | ORDER OF 10/24/2018 THAT AFTER CONSIDERING PLAINTIFFS' UNOPPOSED MOTION FOR AN EXTENSION OF TIME TO FILE A RESPONSE TO THE MOTION TO DISMISS, TRANSFER, OR STAY FILED BY THE DEFENDANT, JUUL LABS, INC., (DOC. NO. 15); AND FOR GOOD CAUSE SHOWN, IT IS HEREBY ORDERED AS FOLLOWS: THE PLAINTIFFS' MOTION FOR AN EXTENSION OF TIME TO FILE A RESPONSE TO JUUL LABS, INC.'S MOTION TO DISMISS, TRANSFER, OR STAY (DOC. NO. 15) IS GRANTED. THE PLAINTIFFS SHALL HAVE UNTIL NO LATER THAN NOVEMBER 9, 2018, TO FILE A RESPONSE TO THE MOTION TO DISMISS, TRANSFER, OR STAY. JUUL LABS, INC., SHALL HAVE A PERIOD OF TWELVE (12) DAYS AFTER THE PLAINTIFFS FILE A RESPONSE TO THE MOTION TO DISMISS, TRANSFER, OR STAY, TO FILE A REPLY BRIEF. SIGNED BY JUDGE: EDWARD G. SMITH. 10/24/2018 ENTERED AND COPIES E-MAILED. (DT) (Entered: 10/24/2018) |
| 11/06/2018 | 17 | STIPULATION AND ORDER THAT THE CLERK OF COURT IS DIRECTED TO TRANSFER THIS ACTION TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA. JUUL LABS' FIRST-FILED RULE MOTION (DKT. 11 ) IS DENIED WITHOUT PREJUDICE AS MOOT. THIS STIPULATION SHALL NOT SERVE TO WAIVE ANY RIGHT, DEFENSE, AFFIRMATIVE DEFENSE, OR OBJECTION, INCLUDING LACK OF SUBJECT MATTER JURISDICTION, LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, AND FAILURE TO STATE A CLAIM. THE CLERK OF COURT SHALL MARK THIS CASE CLOSED FOR STATISTICAL PURPOSES. SIGNED BY HONORABLE EDWARD G. SMITH ON 11/5/18. 11/6/18 ENTERED AND COPIES MAILED TO ATTORNEY AND E-MAILED. (mas, ) Modified on 11/6/2018 (mas, ). (Entered: 11/06/2018) |
| 11/09/2018 | 18 | Case transferred in from District of Pennsylvania Eastern; Case Number 5:18-cv-03760. Original file certified copy of transfer order and docket sheet received. Modified on 11/13/2018 (fabS, COURT STAFF). (Entered: 11/13/2018) |

| 11/09/2018 | 19 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 1/31/2019. Initial Case Management Conference set for 2/7/2019 11:00 AM in San Francisco, Courtroom B, 15th Floor. (fabS, COURT STAFF) (Filed on 11/9/2018) (Entered: 11/13/2018)** |
|---|---|---|
| 11/13/2018 | 20 | CLERK'S NOTICE Re: Consent or Declination: Plaintiffs/Defendants shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. **Consent/Declination due by 11/27/2018.** (ejkS, COURT STAFF) (Filed on 11/13/2018) (Entered: 11/13/2018) |
| 11/14/2018 | 21 | NOTICE of Appearance by Christina Monique Black (Black, Christina) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/14/2018 | 22 | NOTICE of Voluntary Dismissal : *Plaintiff David Lechtzin's Voluntary Dismissal Of His Claims Without Prejudice Under F.R.C.P. 41(a)(1)(A)* by DAVID LECHTZIN (Black, Christina) (Filed on 11/14/2018) (Entered: 11/14/2018) |
| 11/21/2018 | 23 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by JUUL Labs, Inc... (Schwing, Austin) (Filed on 11/21/2018) (Entered: 11/21/2018) |
| 11/21/2018 | 24 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.

ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.

*This is a text only docket entry; there is no document associated with this notice.* (ejkS, COURT STAFF) (Filed on 11/21/2018) (Entered: 11/21/2018) |
| 11/23/2018 | 25 | **ORDER, Case reassigned to Judge Saundra Brown Armstrong. Magistrate Judge Laurel Beeler no longer assigned to the case.. Signed by Executive Committee on 11/23/18. (haS, COURT STAFF) (Filed on 11/23/2018) (Entered: 11/23/2018)** |
| 11/26/2018 | 26 | **CASE MANAGEMENT SCHEDULING ORDER FOR REASSIGNED CIVIL CASE. Signed by Judge Saundra Brown Armstrong on 11/26/18. Case Management Statement due by 1/10/2019. Initial Case Management Conference set for 1/17/2019 02:30 PM. (jjoS, COURT STAFF) (Filed on 11/26/2018) (Entered: 11/26/2018)** |
| 11/26/2018 | 27 | |

|            |    |                                                                                                                                                                                                                                                                                                                                                                                                              |
|------------|----|----|
|            |    | **ORDER OF RECUSAL. Signed by Judge Saundra Brown Armstrong on 11/26/18. (jjoS, COURT STAFF) (Filed on 11/26/2018) (Entered: 11/26/2018)** |
| 11/26/2018 | [28](#) | **ORDER REASSIGNING CASE. Case reassigned to Judge Maxine M. Chesney for all further proceedings. Judge Saundra Brown Armstrong no longer assigned to the case. This case is assigned to a judge who participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and http://cand.uscourts.gov/cameras. Signed by Executive Committee on 11/26/2018. (Attachments: # [1](#) Notice of Eligibility for Video Recording) (jmlS, COURT STAFF) (Filed on 11/26/2018) (Entered: 11/26/2018)** |
| 11/26/2018 | [29](#) | **CASE MANAGEMENT SCHEDULING ORDER FOR REASSIGNED CIVIL CASE:Initial Case Management Conference set for 1/25/2019 10:30 AM in San Francisco, Courtroom 07, 19th Floor. Case Management Statement due by 1/18/2019. Signed by Judge Maxine M. Chesney on 11/26/18. (Attachments: # [1](#) MMC Standing Order, # [2](#) All Judges Standing Order)(mllS, COURT STAFF) (Filed on 11/26/2018) (Entered: 11/26/2018)** |
| 11/27/2018 | [30](#) | **ORDER TO RELATE ACTIONS PURSUANT TO CIVIL LOCAL RULES 3-12 AND 7-11 AND TO CONSOLIDATE ACTIONS. This case is found to be related to and will be consolidated with Case No. 3:18cv2499-WHO. Signed by Judge William H. Orrick on 11/27/2018. (jmdS, COURT STAFF) (Filed on 11/27/2018) (Entered: 11/27/2018)** |
| 11/28/2018 | [31](#) | Case reassigned to Judge William H. Orrick. Judge Maxine M. Chesney no longer assigned to the case. This case is assigned to a judge who participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and http://cand.uscourts.gov/cameras (haS, COURT STAFF) (Filed on 11/28/2018) (Entered: 11/28/2018) |
| 06/18/2019 | [32](#) | **Order by Judge William H. Orrick granting (121) Motion to Relate Case and Consolidate Cases into case 3:18-cv-02499-WHO. Associated Member Cases: 3:18-cv-06776-WHO and 3:18-cv-06808-WHO. (jmdS, COURT STAFF) (Filed on 6/18/2019) (Entered: 06/18/2019)** |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/29/2019 08:26:49 | | | |
| **PACER Login:** | gd0026LA:2553426:4036719 | **Client Code:** | 46522-00004 |
| **Description:** | Docket Report | **Search Criteria:** | 3:18-cv-06808-WHO |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL VISCOMI, DAVID MASESSA,
MATTHEW PEDECINE AND DAVID
LECHTZIN, individually and on behalf of
those similarly situated,

**Case No.** 5:18cv3760

**CLASS ACTION COMPLAINT**

       Plaintiffs,

**JURY TRIAL DEMAND**

v.

JUUL LABS, INC. and PAX LABS, INC.

       Defendants

**FILED**

AUG 31 2018

KATE BARKMAN, Clerk
By_____ Dep. Clerk

## CLASS ACTION COMPLAINT

### I.   INTRODUCTION

1.     Plaintiffs Michael Viscomi, David Masessa, Matthew Pedecine and David Lechtzin (collectively, "Plaintiffs") bring this action against Defendants JUUL Labs, Inc. ("JUUL") and PAX Labs, Inc. ("PAX," and collectively with JUUL, "Defendants"), on behalf of themselves and those similarly situated, for violation of the Pennsylvania and New Jersey Consumer Protection laws [73 Pa. Cons. Stat. §§ 201-2 & 201-3, et seq. and N.J. Stat. 56:8-2 et seq.], fraud, unjust enrichment, failure to warn, breach of implied and express warranties, and negligence. Plaintiff Michael Viscomi and David Lechtzin bring this action on behalf of a class of all persons who purchased and used a JUUL e-cigarette and/or JUUL Pods in Pennsylvania, including minors. Plaintiffs David Masessa and Matthew Pedecine bring this action on behalf of a class of all persons who purchased and used a JUUL e-cigarette and/or JUUL Pods in New Jersey, including minors.

2.     Plaintiffs' allegations are based upon their information and belief, except those allegations concerning themselves which are based on personal knowledge. Plaintiffs' information and belief are based on the investigation conducted by their attorneys which included, among other



things, review and analysis of public statements, news articles and other reports about Defendants and other publicly available information.

3.     This case arises out of Defendants' false and deceptive sale, marketing, labelling and advertising of JUUL e-cigarette devices and JUUL pods which came into the market in 2015. This device has been called the "health problem of the decade." E-cigarettes, also known as vapes, are battery-operated devices that heat up liquid nicotine to generate an aerosol that users inhale.

4.     Although Defendants claim that the device is intended exclusively for adult use, the devices appeals to youth because it can be easily charged on a laptop, its decal covers come in colorful designs, and the pods are available in flavors such as mango, mint and crème brûlée. Moreover, using e-cigarettes is more discreet and easier to hide than traditional cigarettes, particularly for teens at school or at home and young adults.

5.     To use one JUUL pod, the nicotine cartridge is inserted into the device and heated. It delivers about 200 puffs, which delivers approximately as much nicotine as a pack of cigarettes, according to the product website. Thus, if a teen consumes one pod a week, in five weeks, it is equivalent to about 100 cigarettes (5 packs of cigarettes). This makes the teen equivalent to an established smoker.[1]

6.     Medical professionals and public health advocates say that the e-cigarette trend reminds them of the heyday of cigarettes, when smoking behind school buildings and in parking lots was in vogue. However, the risks here are magnified because, unlike traditional cigarettes, JUUL can be used indoors without anyone noticing. It also packs a more powerful nicotine punch

---

[1] Ana B. Ibarra et al., *The Juul's So Cool, Kids Smoke It In School,* WASH. POST (Mar. 26, 2018), *available at* https://www.washingtonpost.com/national/health-science/the-juuls-so-cool-kids-smoke-it-in-school/2018/03/26/32bb7d80-30d6-11e8-b6bd-0084a1666987_story.html?utm_term=.d664213cde10.

than traditional cigarettes because JUUL contains roughly twice the nicotine concentration as cigarettes and other vape pens.

7.      Senate democratic whip Dick Durbin (D-IL) and 10 other Senators sent two letters to JUUL saying that their products "are undermining our nation's efforts to reduce tobacco use among youth."[2]

8.      Plaintiffs allege that Defendants knew that JUUL e-cigarettes were not safe under any circumstances for non-smokers and posed a risk of aggravating nicotine addiction in those already addicted to nicotine. Defendants also knew that JUUL's nicotine solution could deliver more nicotine into the bloodstream than a cigarette, and did so more quickly than a cigarette. Defendants were under a duty to disclose these material facts, but never did so.

9.      Instead, they continued to disseminate false, misleading and deceitful information to Plaintiffs and the public on JUUL's website, in interviews, advertisements and through social media. Defendants created an online culture and community targeted to young people and designed to encourage JUUL use.

10.      Defendants' advertisements have been wildly successful in disseminating false information, primarily to teens and young adults on social media platforms. For example, there are 194,825 posts using the #juul hashtag and 16,500 using the #juulnation hashtag on Instagram, and the JUULvapors profile on Instagram has 62,000 followers. A video taunting "How many hits can you do?" had more than 230,000 view and 380 comments in seven weeks. Young people are flocking to this enticing and dangerous device.

---

[2] Erin Brodwin, *Experts are calling out a vape pen with 'scary' nicotine levels that teens love · here's how it affects the brain*, BUSINESS INSIDER (Apr. 19, 2018), *available at* https://www.businessinsider.com/vaping-brain-effects-juul-2018-4.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(d) because: (i) there are 100 or more members of each class; (ii) the aggregate amount in

controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and

Defendant are citizens of different states. This Court has supplemental jurisdiction over the state

law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants regularly

transact and solicit business in this District.

## III.    PARTIES

### A.     PLAINTIFFS

#### 1.     Plaintiff Michael Viscomi – Pennsylvania

13.     Plaintiff Michael Viscomi is a citizen of Pennsylvania and resides in Bethlehem,

PA.

14.     In 2014, Mr. Viscomi smoked a pack of cigarettes each day, which he started to

reduce to a few cigarettes each day.

15.     On March 1, 2018, Mr. Viscomi switched from smoking cigarettes to consuming

JUUL pods in an attempt to quit smoking cigarettes completely and wean himself off of his

nicotine addiction. At that time, Mr. Viscomi believed that one JUUL pod would supply him with

the same quantity of nicotine as one pack of cigarettes.

16.     Since that time, Mr. Viscomi has consistently and constantly consumed at least one

JUUL pod each day, or taken approximately 200 hits from his JUUL device each day.

17.     Prior to consuming JUUL pods, Mr. Viscomi was exposed to and did see JUUL

advertising, promotional and marketing materials, particularly in the form of JUUL Instagram

4

posts. He also visited the JUUL website and thereafter regularly and consistently received JUUL emails.

18.     After March 1, 2018, Mr. Viscomi continued to be exposed to and saw JUUL advertising, promotional and marketing materials in the form of JUUL Instagram posts and radio advertisements.

19.     Prior to consuming JUUL pods, Mr. Viscomi was not aware of the actual amount or potency of nicotine that JUUL products would deliver into his body or that the product was developed to maximize the effects on him of the nicotine it contained.

20.     Since starting to consume JUUL pods, Mr. Viscomi has become addicted to the nicotine salts they contain. Indeed, Juuling (the commonly used phrase among users of JUUL products to mean the use of JUUL products) is on his mind more than smoking cigarettes was. Rather than weaning Mr. Viscomi off of cigarettes and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

21.     Mr. Viscomi purchases his JUUL products at gas stations, Wawa and Sheetz at an approximate price of $18 to $20 per pack of four pods.

22.     Mr. Viscomi would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself.

### 2.     Plaintiff David Masessa - New Jersey

23.     Plaintiff David Masessa is a citizen of New Jersey and resides in Chatham, NJ.

24.     In 2015, Mr. Masessa began using JUUL products in an effort to cease smoking cigarettes. He had been smoking from one half of a pack to a pack of cigarettes each day. He

5

believed the JUUL pods would quench his desire for nicotine, allow him to stop smoking and using e-cigarettes, and ultimately wean him off of all nicotine products.

25.     Mr. Masessa believes that he became addicted to the JUUL pods. He experienced strong withdrawal symptoms when he did not use JUUL.

26.     Mr. Masessa on average consumed one JUUL pod every two to four days.

27.     Prior to consuming JUUL pods, Mr. Masessa was exposed to and did see JUUL advertising, promotional and marketing materials in various online publications (such as Wired, Verge and Engadget), which caused him to believe that JUUL products would allow him to wean himself off of cigarettes and nicotine products. He also visited the JUUL website where he saw claims and representations about the product. He then purchased the JUUL products.

28.     He also saw advertisements on social media for rooftop JUUL parties in Brooklyn and Manhattan, which further enticed him to begin using and to continue to use JUUL products.

29.     He purchased JUUL products at convenience stores and local smoke shops near where he lives.

30.     Since starting to consume JUUL pods, Mr. Masessa became addicted to the nicotine salts they contain. Indeed, Juuling was on his mind more than smoking cigarettes was, and not having a JUUL nearby caused him anxiety. Rather than weaning Mr. Masessa off of cigarettes and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

31.     Mr. Masessa would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself.

6

3.      **Plaintiff Matthew Pedecine – New Jersey**

32.      Plaintiff Matthew Pedecine is a citizen of New Jersey and resides in Montclair, NJ.

33.      Mr. Pedecine started consuming JUUL pods in 2016. For the six years prior to that, he had been smoking 4 or 5 cigarettes a day. Mr. Pedecine switched from smoking cigarettes to consuming JUUL pods in an attempt to quit smoking cigarettes completely and wean himself off of his nicotine addiction.

34.      Since that time, Mr. Pedecine has consistently and constantly consumed at least one JUUL pod each day.

35.      Prior to consuming JUUL pods, Mr. Pedecine was exposed to and did see JUUL advertising, promotional and marketing materials on the JUUL website, from which he learned that JUUL would help him stop smoking cigarettes.

36.      After starting to consume JUUL pods, Mr. Pedecine continued to be exposed to and saw JUUL advertising, promotional and marketing materials at locations where JUUL products are sold and on JUUL's direct marketing emails.

37.      Prior to consuming JUUL pods, Mr. Pedecine was not aware of the actual amount of nicotine that JUUL products would deliver into his body or that the product was developed to maximize the effects on him of the nicotine it contained.

38.      Since starting to consume JUUL pods, Mr. Pedecine has become addicted to the nicotine salts they contain. Indeed, Juuling is on his mind more than smoking cigarettes was. Rather than weaning Mr. Pedecine off of cigarettes and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

39.      Mr. Pedecine purchases his JUUL products at gas stations and convenience stores near his residence.

40.     Mr. Pedecine would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself.

### 4.     Plaintiff David Lechtzin – Pennsylvania

41.     Plaintiff David Lechtzin is a resident of Pennsylvania and resides in Huntingdon Valley, PA.

42.     Mr. Lechtzin is presently 18 years old and began using JUUL pods at the age of 17 when he was introduced to it by a friend at a party while in high school.

43.     When he first tried a JUUL, Mr. Lechtzin was not aware that a JUUL contained nicotine, how much nicotine a JUUL contained, or that the JUUL had specifically been developed to maximize the addictive effects of the nicotine it contained and to put extremely high doses of nicotine into the bloodstream.

44.     Mr. Lechtzin states that all of his friends in high school were consuming JUUL products and none of them knew that the JUUL pods contained nicotine. Now, as a freshman in college, nearly all of his peers own a JUUL device and consume JUUL products.

45.     Prior to turning 18, Mr. Lechtzin was using other people's JUUL devices or bought JUUL pods from 18 year old friends. JUUL products were popular, ubiquitous and easy to obtain. After he tuned 18, he bought JUUL products himself from Wawa convenience stores. His flavor of choice is mint.

46.     At the Wawa near his residence, Mr. Lechtzin saw stickers on the front door proclaiming "We now sell JUUL pods" or words to that effect. This is where he first began purchasing JUUL pods.

8

47.     Mr. Lechtzin now considers himself addicted to JUUL pods and consumes roughly 4 pods per week. He is attempting to wean himself off of JUUL pods, but experiences symptoms of withdrawal when he doesn't consume them.

48.     He has seen posts on Instagram that portray JUUL as "cool."

49.     Because the JUUL device and JUUL packaging did not bear any warnings about nicotine content and his peers did not inform him that the JUUL device contained nicotine when he first started using JUUL, David was unaware that the JUUL pods contained nicotine or that the JUUL was specifically designed to put extremely high doses of nicotine into the bloodstream.

50.     Mr. Lechtzin has only recently, as recently as a few months ago, seen a label on JUUL packaging indicating that the product contains nicotine.

51.     David would not have tried JUUL or continued to use JUUL products shortly thereafter had he known it contained nicotine. He did not learn it contained nicotine until several months after using the product.

**B.      DEFENDANTS**

52.     Defendant Juul Labs, Inc. ("JUUL") is incorporated in Delaware, with its principal place of business in San Francisco, California.  Prior to 2017, when much of the conduct alleged herein occurred, JUUL was known as PAX Labs, Inc.,

53.     Defendant PAX Labs, Inc. ("PAX") is incorporated in Delaware, with its principal place of business in San Francisco, California.

54.     Each of the Defendants was an agent, servant, representative, officer, director, partner or employee of the other Defendant and acted within the scope and course of its authority as an agent, servant, representative, officer, director, partner or employee, of the other.

55.     Each of the Defendants was a member of a joint venture, partnership and common enterprise and acted within the scope of such joint venture, partnership and common enterprise.

9

56.     Defendants ratified each and every act or omission alleged herein in proximately causing the injuries and damages alleged herein.

## IV.    CLASS ALLEGATIONS

57.     Plaintiffs Michael Viscomi and David Masessa bring this action against Defendants on behalf of themselves and all other similarly situated purchasers and users of JUUL products in Pennsylvania (the "PA Class").

58.     Plaintiffs David Masessa and Matthew Pedecine bring this action against Defendants on behalf of themselves and all other similarly situated purchasers and users of JUUL products in New Jersey (the "NJ Class").

59.     Excluded from the PA Class and NJ Class are Defendants herein, the officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.     The members of the PA Class and NJ Class are so numerous that joinder of all members is impracticable.  While the exact number of Pennsylvania and New Jersey Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least thousands of members in each proposed Class.

61.     Plaintiffs' claims are typical of the claims of the members of their respective Classes as all members of each Class are similarly affected by Defendants' wrongful conduct alleged herein.

62.     Plaintiffs will fairly and adequately protect the interests of the members of their respective Classes and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to or in conflict with those of their respective Classes.

63. Common questions of law and fact exist as to all members of each Class and predominate over any questions solely affecting individual members of each Class. Among the questions of law and fact common to each Class are:

a. Whether Defendants' advertising and marketing deceived Class Members;

b. Whether Defendants intentionally omitted material information from JUUL's advertising, marketing and packaging materials;

c. Whether Defendants' alleged conduct is knowing, reckless, or negligent;

d. The amount of revenues, profits and benefits Defendants received as a result of the alleged such wrongdoing and whether it is unfair for them to retain such benefits;

e. Whether Class Members are entitled to compensatory, punitive and/or treble damages; and

f. Whether Class Members are entitled to injunctive and other equitable relief.

64. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of each of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.   FACTUAL ALLEGATIONS

65. The JUUL e-cigarette is about the size and shape of a pack of chewing gum. It resembles a USB flash drive. It consists of a rectangular enclosure containing a rechargeable battery and heating element and a pre-filled pod of JUUL's patented nicotine solution, which slides into the end of the JUUL device.

66. The JUUL e-cigarette is a proprietary system that is incompatible with other e-cigarette components or liquids.



67. Nicotine is a highly addictive substance. It is a stimulant that affects the central nervous system, and, when ingested, can accelerate blood pressure, pulse, affect mood, increase circulating levels of hormones, increase metabolic rate, constrict blood vessels of the heart and skin, and cause muscle relaxation.

68. Although marketed as a safer alternative to smoking, Defendants' JUUL e-cigarettes and JUULpods still deliver dangerous toxins and carcinogens to teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.

69. Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys.

70. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders.

71. Because vaping still introduces foreign substances into the lungs, prolonged use of vaping products is likely to produce chronic obstructive pulmonary disease, just like traditional cigarette smoke.

72. Vaping also triggers immune responses associated with inflammatory lung diseases.

12

73.     There is also evidence that nicotine can affect neurological development in adolescents, and that exposure to nicotine during adolescence can produces an increased vulnerability to nicotine addiction.

74.     Despite making numerous revisions to its packaging since 2015, JUUL has not added nicotine warnings to the JUUL device, the JUULpods, or their product labels, until very recently, when the exterior packaging was changed to add the following warning:

**WARNING:**

**This product contains nicotine.  Nicotine is an addictive chemical.**

75.     The new exterior packaging also contains a statement in small print: "The Alternative for Adult Smokers."

76.     These recent exterior packaging changes are an admission of the inadequacy of previous labels, but they are too little, too late, and are completely insufficient to warn JUUL users of the real dangers of this product.

77.     The recently–added warning fails to disclose the highly addictive attributes of the product itself, including, inter alia, that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine, that JUUL is delivering doses of nicotine that are several times higher than those allowed in normal cigarettes, that the efficiency with which the product delivers nicotine into the bloodstream increases its addictiveness, that it can be more addictive than traditional cigarettes and that it poses serious health risks.



(Spring, 2018 to present)



(2015 – Spring, 2018)

## A. JUUL PRODUCTS DELIVERS A FAR MORE POTENT DOSE OF NICOTINE THAN TRADITIONAL CIGARETTES

78.     Cigarettes contain nicotine, a highly addictive stimulant. As described by the

National Institutive of Drug Abuse:

> Most smokers use tobacco regularly because they are addicted to nicotine. Addiction is characterized by compulsive drug-seeking and use, even in the face of negative health consequences. The majority of smokers would like to stop smoking, and each year about half try to quit permanently. Yet, only about 6 percent of smokers are able to quit in a given year. Most smokers will need to make multiple attempts before they are able to quit permanently. Medications including varenicline, and some antidepressants (e.g. bupropion), and nicotine-replacement therapy, can help in many cases . . . A transient surge of endorphins in the reward circuits of the brain causes a slight, brief euphoria when nicotine is administered. This surge is much briefer than the "high" associated with other drugs. However,

14

like other drugs of abuse, nicotine increases levels of the neurotransmitter dopamine in these reward circuits, which reinforces the behavior of taking the drug. Repeated exposure alters these circuits' sensitivity to dopamine and leads to changes in other brain circuits involved in learning, stress, and self-control. For many tobacco users, the long-term brain changes induced by continued nicotine exposure result in addiction, which involves withdrawal symptoms when not smoking, and difficulty adhering to the resolution to quit.[3]

79.     JUUL products contain nicotine. As compared to cigarettes, JUUL products deliver a significantly potent dosage of nicotine.

80.     Through Patent No 9,215,895 ("the JUUL patent"), PAX obtained a patent for "[a] nicotine Salt liquid formulation for generating an inhalable aerosol in an electronic cigarette comprising nicotine salt that forms about 0.5% to about 20% nicotine is provided."

81.     More specifically, the JUUL patent claims, inter alia, "[a] method of delivering nicotine to a user comprising deploying an electronic cigarette comprising a nicotine formulation that comprises nicotine, an acid, wherein the acid comprises pyruvic acid, salicylic acid, sorbic acid, lauric acid, levulinic acid, or benzoic acid, and a biologically acceptable liquid carrier…"

82.     The JUUL patent included a blood plasma study comparing the pharmacokinetic effects of nicotine benzoate though an e-cigarette as compared to nicotine through a Pall Mall traditional cigarette.

83.     The study revealed that ingesting nicotine benzoate though an e-cigarette substantially increases nicotine delivery as compared to a traditional cigarette, *i.e.* that the e-cigarette delivered higher amounts of nicotine than a traditional cigarette.

84.     JUUL is delivering doses of nicotine that are several times higher than those allowed in normal cigarettes. Blood test results in JUUL's 2014 patent application show that JUUL's nicotine solution delivers more nicotine to the bloodstream than a Pall Mall cigarette,

---

[3]  NIDA, *Is nicotine addictive?*, *available at* https://www.drugabuse.gov/publications/research-reports/tobacco-nicotine-e-cigarettes/nicotine-addictive.

creates a peak nicotine blood concentration that is 36% higher than a Pall Mall cigarette and increases the heart rate faster than a Pall Mall cigarette. Yet Defendants have failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

85.    JUUL also repeatedly represented that a single JUULpod contains an amount of nicotine "about" equal to a pack of cigarettes. This statement is materially misleading because it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream (*i.e.* absorption or bioavailability), that determines the product's narcotic effect, risk of addiction, and therapeutic use.

86.    In short, Defendants have materially misrepresented the pharmacokinetic effect of JULL products.

## B.    JUUL'S MARKETING AND PROMOTIONAL EFFORTS FOCUSED ON SOCIAL MEDIA PLATFORMS FREQUENTED BY CHILDREN

87.    From its launch, JUUL has engaged in a highly successful marketing and promotional campaign for its products.

88.    Rather than relying on traditional advertising, JUUL elected to primarily focus upon establishing a pervasive social media presence.

89.    JUUL maintains a website at http://www.juul.com/, which was previously located at http://www.juulvapor.com/.

90.    JUUL maintains a Facebook account with the username @JUULvapor. JUUL's Facebook account has approximately 8,350 "likes" and 8,800 "followers." Upon information and belief, JUUL launched its Facebook account in April 2015.

91. JUUL maintains a Twitter account with the username @JUULvapor. JUUL's Twitter account has approximately 18,400 followers. Upon information and belief, JUUL launched its Twitter account in June 2015.

92. JUUL maintains an Instagram account with the username @JUULvapor. JUUL's Instagram account has approximately 67,300 followers. Upon information and belief, JUUL launched its Instagram account in November 2017.

93. Through its social media platforms, JUUL has attempted to cultivate a youthful, contemporary, sexy, and energetic image for its products.

94. For example, JUUL posted the following statuses on its Twitter account on June 4, 2015:





95.     In addition to posts on its social media platforms, JUUL has heavily benefited from individuals' promotion of JUUL products on their own social media platforms, such as by discussing usage of JUUL products and sharing images and videos of usage of JUUL products.

96.     JUUL is aware that teenagers and others under 18 discuss and promote their usage of JUUL products on social media platforms, such as Instagram and Twitter

97.     JUUL encourages users to discuss and depict their usage of JUUL products on social media platforms.

98.     For example, as of April 2015, the JUUL website promoted a hashtag of #JUULvapor, encouraged individuals to "Join the conversation," and highlighted social media posts that utilized the #JUULvapor hashtag.

99.     JUUL's website has also promoted the use of other hashtags over time, including #JUUL, #JUULpod, and #JUULpods.

100.    The present version of the JUUL website contains hyperlinks to JUUL's Instagram, Twitter, and Facebook accounts.

101.    On Instagram, there are approximately 195,000 posts using the #juul hashtag, approximately 29,600 posts using the #juulvapor hashtag, and approximately 16,400 posts using the #juulnation hashtag.  Many of these posts contain images or videos of individuals under 18 using JUUL products.

102.    As it continues to encourage individuals to promote their usage of JUUL products on social media platforms, JUUL is well aware that many of the individuals doing so are under 18.

103.    In addition to its above-described social media presence, JUUL has utilized its website to cultivate a youthful, contemporary, sexy, trendy and energetic image of its products with the goal of appealing to a younger demographic.

104.    For example, as of October 2015, the following images appeared on the JUUL website:











105.    To announce JUUL's release in June 2015, JUUL launched a multimillion-dollar "Vaporized" advertising campaign that was aimed at a youth audience. JUUL's Vaporized campaign used images that conveyed the same themes that tobacco companies used to prey on youth, including "independence, adventurousness, sophistication, glamour, . . . social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool.'"





106.    A 2018 study concluded that JUUL's marketing strategy is heavily dependent on its social media presence catering to a youthful demographic:

> [O]ur study shows that the growth of JUUL was accompanied by innovative marketing across a variety of new media platforms. The marketing of other major retail e-cigarette brands, at least in their early stages, relied heavily on either advertising on TV (eg, Blu and Njoy) or promotional expenditures to retailers and consumers (eg, Vuse and MarkTen), or both. However, JUUL was one of the first major retail e-cigarette brands that relied heavily on social media to market and

21

promote its products. In particular, we found the number of JUUL-related tweets was highly correlated with quarterly retail sales of JUUL. In addition to Twitter, JUUL was heavily marketed and promoted on Instagram and YouTube. The official JUUL account on Instagram, for example, used a variety of marketing and promotional schemes to attract, engage with and retain followers. The account used artsy, professional-grade photographs to display its products and evoke lifestyle feelings such as relaxation, freedom and sex appeal. Those posts also heavily emphasised JUUL's variety of flavours.[4]

107.    In January 2016, the Centers for Disease Control and Prevention ("CDC") issued a

report finding that "[a]bout 7 in 10 middle and high school students – more than 18 million young

people – see e-cigarette advertising in stores, online, in newspapers and magazines, or on television

and in movies."[5]

108.    The report explained:

E-cigarette ads use many of the same themes – independence, rebellion, and sex – used to sell cigarettes and other conventional tobacco products. Advertising of tobacco products has been shown to cause youth to start using those products. The unrestricted marketing of e-cigarettes and dramatic increases in their use by youth could reverse decades of progress in preventing tobacco use among youth.

*Id.*

109.    At the time, CDC Director Dr. Tom Frieden said:

The same advertising tactics the tobacco industry used years ago to get kids addicted to nicotine are now being used to entice a new generation of young people to use e-cigarettes[.] I hope all can agree that kids should not use e-cigarettes.

*Id.*

110.    In April 2018, the Food and Drug Administration ("FDA") announced an

investigation of, *inter alia*, JUUL's marketing to youth.

---

[4] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market* (2018), *available at* https://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382 (footnotes omitted).

[5] CDC, *E-cigarette ads reach nearly 7 in 10 middle and high-school students* (Jan. 5, 2016), *available at* https://www.cdc.gov/media/releases/2016/p0105-e-cigarettes.html.

111.     As the FDA explained in announcing the investigation:

We need to examine all the available information to understand why kids are
finding these products so appealing – and address it.
That's why today, the FDA also sent an official request for information directly to
JUUL Labs, requiring the company to submit important documents to better
understand the reportedly high rates of youth use and the particular youth appeal of
these products. The information we're requesting includes: documents related to
product marketing; research on the health, toxicological, behavioral or physiologic
effects of the products, including youth initiation and use; whether certain product
design features, ingredients or specifications appeal to different age groups; and
youth-related adverse events and consumer complaints associated with the
products. We don't yet fully understand why these products are so popular among
youth. But it's imperative that we figure it out, and fast. These documents may help
us get there.[6]

112.     Exposure to nicotine as a youth has a profound effect on nicotine addiction.

113.     According to the CDC, "[n]early 9 out of 10 cigarette smokers first tried smoking

by age 18, and 98% first tried smoking by age 26."[7]

114.     Adolescents experience symptoms of dependence at lower levels of nicotine

exposure than adults, and adolescents who become addicted to nicotine as teens are more likely to

become life-long addicts than those who start smoking in their 20s or later.

115.     JUUL sells its JUULpods in a variety of sweetened flavors. The use of flavors that

appeal to youth hooks underage "vapers."[8]

116.     In 2009, the FDA banned cigarettes with characterizing flavors other than menthol

(e.g., cherry, chocolate), which are known to appeal to youth and young adults.[9]

---

[6] FDA, *Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth
Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes* (Apr. 24, 2018),
*available                                                                                          at*
https://www.fda.gov/downloads/TobaccoProducts/Labeling/RulesRegulationsGuidance/UCM605490.pdf.

[7]     CDC,         *Youth         and         Tobacco         Use,        available        at*
https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm.
[8] *Juuling: What is the trendy vape pen becoming popular among teens,* ABC NEWS (Aug. 31, 2018),
*available at,* https://abcnews.go.com/Nightline/video/juuling-trendy-vape-pen-popular-teens-56192940.
[9] FDA, *Menthol and Other Flavors in Tobacco Products, available at*

23

117.    Defendants are using the same strategy to addict underage users to their products that cigarette companies previously used.

118.    JUUL products are priced to appeal to minors. A pack of four JUULpods, which, according to JUUL is the equivalent of four packs of cigarettes, cost approximately $19.99 in Pennsylvania and in New Jersey.  By contrast, a single pack of cigarettes in Pennsylvania costs approximately $6.85 and $8.20 in New Jersey.

## C.    JUUL E-CIGARETTES AND JUULPODS ARE HIGHLY ADDICTIVE

119.    Defendants never disclosed to consumers that JUUL e-cigarettes and JUULpods are at least as addictive as, if not more addictive than, traditional cigarettes and pose serious health risks.

120.    Instead, Defendants marketed the JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are a healthy alternative to cigarette use.

121.    Defendants' deceitful advertising campaign has proven successful, as use of JUUL products is widespread, particularly among vulnerable youth.

122.    Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes from Plaintiffs and Class Members while simultaneously disclosing false or misleading evidence concerning nicotine content.

123.    Defendants concealed material information regarding the effect of JUUL e-cigarettes and made misrepresentations from the time the JUUL e-cigarette was announced to this day. Defendants still have not disclosed the truth about JUUL e-cigarettes.

124.    JUUL represents that purchasers may cancel their "auto ship" order on JUUL's subscription service "anytime," but this is highly deceptive because nicotine is addictive.  Once

---

https://www.fda.gov/tobaccoproducts/labeling/productsingredientscomponents/ucm2019416.htm.

addicted, JUUL product users are unable to cancel subscription service because of their nicotine

cravings.

## VI.    CAUSES OF ACTION

### COUNT I

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT NJSA 56:8-1 *ET. SEQ.* (on behalf of the NJ Class)

125.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

126.    This Count does not sound in fraud.

127.    As set forth above, Defendant violated the New Jersey Consumer Fraud Act, N.J.

Stat. §56:8-1, et. seq., when they engaged in unconscionable commercial practices, deception,

fraud, false pretense, false promise, misrepresentation, and knowing concealment or omission of

material facts with the intent that others rely on such, in connection with the sale and advertisement

of JUUL products. See N.J. Stat. 56:8-2.

128.    Defendants' acts in violation of the laws of New Jersey include, but are not limited

to:

- selling JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes;

- failing to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUUL pod refills;

- failing to disclose to Plaintiffs that the nicotine benzoate salts in JUUL pods delivered nicotine to blood plasma at a rate four times higher than a smoked Pall Mall cigarette, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with cigarettes or other e-cigarette products;

- developing and marketing a product that contained nicotine levels far in excess of what smokers need to comfortably switch from cigarettes, with the intention of creating and fostering long-term addiction to JUUL products;

25

- falsely and deceptively marketing, advertising and selling JUUL e-cigarettes and JUULpods by misrepresenting their nicotine content, nicotine pharmacokinetics, and suitability as an "alternative" to cigarettes, when in fact, JUUL is likely to aggravate nicotine addiction;

- falsely and deceptively marketing, advertising and selling JUUL's "autoship" service as something consumers could cancel "anytime" without disclosing to consumers how addiction associated with use of JUUL ecigarettes would interfere with their ability to cancel the JUUL pod subscription;

- creating advertising that lured underage non-smokers into using JUUL e-cigarettes, and disseminating that advertising through unregulated social media platforms commonly used by most youth in the United States; and

- setting the price of JUUL pods at a low price that is intended to and does attract underage users to purchase JUUL products.

129.    This conduct violated the New Jersey Consumer Fraud Act, as set forth in N.J. Stat.

§56:8-2, described above.

130.    Defendants knowingly engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits.

131.    Plaintiffs and the NJ Class would not have purchased JUUL products but for the misleading representations made about it by Defendants.  In other words, if Defendants had marketed JUUL products truthfully, Plaintiffs and the Class would not have purchased and consumed JUUL products.

132.    Plaintiffs, and the NJ Class, relied to their detriment on Defendants' fraudulent omissions. Had Plaintiffs, and the NJ Class, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (1) not purchasing a JUUL e-cigarette or JUUL pod; (2) not subscribing to Defendants' "autoship" service; or (3) purchasing and using different, less addictive nicotine products.

133.    Plaintiffs and members of the NJ Class suffered ascertainable losses as a direct result of Defendants' wrongful conduct when they purchased JUUL products. N.J. Stat. §56:8-19.

26

Plaintiffs and the NJ Class would not have purchased JUUL products had they known the truth. Thus, they are entitled to refunds of all monies paid for JUUL products, as well as other damages suffered (N.J. Stat. §56:8-2.12), including treble damages. N.J. Stat. §56:8-19.

134.    Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein, and an order requiring Defendants to correct Defendants' misrepresentations, which have been disseminated through social media and other platforms.

## COUNT II

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 PA. CONS. STAT. §§ 201-2 & 201-3, *ET SEQ*. (on behalf of the PA Class)

135.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

136.    This Count does not sound in fraud.

137.    As set forth above, Defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-2 & 201-3, et seq., when they engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce, represented that goods or services have characteristics, ingredients, uses, benefits or quantities that they do not have, and engaged in any other fraudulent or deceptive conduct which creates a likelihood of confusion and misunderstanding.

138.    Defendants knowingly engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits.

139.    Defendants' acts in violation of the laws of Pennsylvania include, but are not limited to:

- selling JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes;

27

- failing to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUUL pod refills;

- failing to disclose to Plaintiffs that the nicotine benzoate salts in JUUL pods delivered nicotine to blood plasma at a rate four times higher than a smoked Pall Mall cigarette, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with cigarettes or other e-cigarette products;

- developing and marketing a product that contained nicotine levels far in excess of what smokers need to comfortably switch from cigarettes, with the intention of creating and fostering long-term addiction to JUUL products;

- falsely and deceptively marketing, advertising and selling JUUL e-cigarettes and JUULpods by misrepresenting their nicotine content, nicotine pharmacokinetics, and suitability as an "alternative" to cigarettes, when in fact, JUUL is likely to aggravate nicotine addiction;

- falsely and deceptively marketing, advertising and selling JUUL's "autoship" service as something consumers could cancel "anytime" without disclosing to consumers how addiction associated with use of JUUL e-cigarettes would interfere with their ability to cancel the JUUL pod subscription;

- creating advertising that lured underage non-smokers into using JUUL e-cigarettes and disseminating that advertising through unregulated social media platforms commonly used by most youth in the United States; and

- setting the price of JUUL pods at a low price that is intended to and does attract underage users to purchase JUUL products.

140. Plaintiffs, the PA Class and Defendants are "persons" within the meaning of section 201-2(2) of the PA UTPCPL, which includes all "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities."

141. Plaintiffs, and members of the PA Class, relied to their detriment on Defendants' fraudulent omissions. Had Plaintiffs, and members of the PA Class, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (1) not purchasing a JUUL e-cigarette or JUUL pod; (2) not subscribing to Defendant JUUL's "autoship" service; or (3) purchasing and using different, less addictive nicotine products.

142.    Plaintiffs and members of the PA Class suffered losses as a direct result of Defendants' wrongful conduct when they purchased JUUL products. Plaintiffs and the PA Class would not have purchased JUUL products had they known the truth. Thus, they are entitled to refunds of all monies paid for JUUL products, as well as other damages suffered, including statutory and treble damages and treble damages.

143.    Plaintiffs seek, on behalf of themselves and members of the PA Class, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein, and an order requiring Defendants to correct Defendants' misrepresentations, which have been disseminated through social media and other platforms.

## COUNT III

### FRAUD
### (on behalf of the PA Class and the NJ Class)

144.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

145.    Defendants fraudulently and deceptively:

- sold JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendants knew it to be untrue;

- failed to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing and consuming were highly addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUUL pod refills;

- informed Plaintiffs that they would be able to cease purchasing JUUL pods "anytime," when they knew it to be untrue; and

- failed to disclose to Plaintiff that the nicotine benzoate salts in JUUL pods delivered nicotine to blood plasma at a rate four times higher than a smoked Pall Mall cigarette, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with cigarettes or other e-cigarette products.

146.    Defendants made each of these fraudulent misrepresentations and omissions to Plaintiffs and members of the NJ Class and PA Class. These acts occurred during the time period

29

relevant to and the dates set forth in this Complaint and within the three years prior to the filing of this Complaint.

147.     Each of these misrepresentations and omissions were material at the time they were made in that they were essential to the analysis undertaken by Plaintiffs, and members of the PA Class and the NJ Class, as to whether to purchase a JUUL e-cigarette and JUUL pods.

148.     Defendants knew that these misrepresentations and omissions were false and intended that Plaintiffs and members of the NJ Class and the PA Class rely on these misrepresentations and omissions to purchase JUUL products.

149.     Plaintiffs and members of the NJ Class and the PA Class justifiably and reasonably relied on these misrepresentations and omissions to their detriment in that they purchased the JUUL products and were thereby damaged in the amount that they paid. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (1) not purchasing a JUUL e-cigarette or JUUL pod; (2) not subscribing to Defendants' "autoship" service; or (3) purchasing and using different, less addictive nicotine products.

### COUNT IV

**UNJUST ENRICHMENT**
**(on behalf of the PA Class and the NJ Class)**

150.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

151.     Plaintiffs bring this claim on their own behalf and on behalf of the NJ Class and the PA Class.

152.     The relevant common law in NJ and PA is materially uniform for purposes of this claim.

153. Pleading in the alternative, Defendants have been unjustly enriched through their sale of JUUL products based on material misrepresentation and omissions, false advertising and fraud.

154. Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and each member of the NJ Class and PA Class by Defendants' wrongful conduct, as alleged herein. Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the PA Class and NJ Class. It would be inequitable to allow Defendants to retain these benefits and funds, which rightfully belong to Plaintiffs and each member of the NJ Class and PA Class.

155. Plaintiffs and each member of the NJ Class and PA Class are therefore entitled to recover from Defendants, as restitution, all money they paid for JUUL products, any benefit received by Defendants as a result of such charges, plus interest thereon from the time of payment.

156. A constructive trust should be established over the funds created by the aforementioned funds, interest and benefits generated in connection with the sale of JUUL products in violation of applicable laws. Restitution and disgorgement of such amounts should be ordered. Plaintiffs and members of the NJ Class and PA Class have no adequate remedy at law.

## COUNT V

### STRICT PRODUCT LIABILITY – FAILURE TO WARN
### (on behalf of the PA Class and the NJ Class)

157. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

158. Defendants manufactured, distributed and sold JUUL devices and JUUL pods. Defendants were aware that the JUUL devices, when used in conjunction with the JUUL pods, had potential risks that were known and knowable in light of scientific and medical knowledge that

31

was generally accepted in the scientific community at the time of design, manufacture, distribution and sale of JUUL devices and JUUL pods.

159. The JUUL devices and pods were designed, manufactured and sold by Defendants in the regular course of business and were expected to and did reach Plaintiffs and Class members without substantial change in the condition in which they were manufactured, sold and distributed.

160. Plaintiffs and Class members received the JUUL products in the same conditions in which they were sold, and used their JUUL devices and pods in a manner reasonably intended by Defendants.

161. Defendants had no reason to believe that consumers of its JUUL products would be aware of the foreseeable harm associated with use of them.

162. The risks and defects of the JUUL products is unknowable and unacceptable to the average or ordinary consumer. The ordinary consumer would not reasonably anticipate the danger that the JUUL products posed.

163. The use of JUUL devices and JUUL pods presented a substantial danger of causing nicotine addiction when a JUUL device was used or misused with a JUUL pod in an intended or reasonably foreseeable way.

164. Plaintiffs and Class members would not have recognized the potential risks of using a JUUL device with a JUUL pod because Defendants intentionally downplayed, misrepresented, or failed to warn of the risks of nicotine addiction that the JUUL device and JUUL pods posed and failed to disclose and warn that the product contained nicotine, the amount of nicotine or the absorption rates of that nicotine.

165. Defendants failed to adequately warn or instruct foreseeable users of JUUL devices and JUUL pods of the risks of nicotine addiction that their products posed.

32

166.    As a direct and proximate result of Defendant's failure to warn of the defective and unreasonably dangerous condition and design of the JUUL products and the risk they posed, Plaintiffs and Class members suffered property damage and other incidental and consequential damages.

167.    Defendants' failure to warn and lack of sufficient instructions or warnings were a substantial factor in causing harm that resulted to Plaintiffs.

## COUNT VI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (on behalf of the PA Class and the NJ Class)

168.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

169.    The Uniform Commercial Code § 2-314, as adopted in New Jersey (2013 New Jersey Revised Statutes, Title 12A, Section 12A:2A-212) and Pennsylvania (13 Pa. C.S.A. § 2314), provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

170.    To be "merchantable," goods must "run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved," "are adequately contained, packaged, and labeled as the agreement may require," and "conform to the promise or affirmations of fact made on the container or label if any."

171.    The implied warranty of merchantability included with the sale of each JUUL product meant that Defendants warranted that its devices and pods would be merchantable, fit for the ordinary purposes for which they are used, pass without objection in the trade, be of fair average quality, and conform to promises and affirmations of fact made on the container and label. This implied warranty of merchantability is part of the basis for the bargain between Defendants and Plaintiffs and Class members.

33

172.    At the time of delivery however, Defendants breached the implied warranty of merchantability because its devices and pods were defective as alleged above, posed serious safety risks at the time they were sold, would not pass without objection, were not equivalent in terms of nicotine content, pharmacokinetics, and puff-count to cigarettes, and failed to conform to the standard performance of like products (cigarettes and e-cigarettes) used in the trade.

173.    Defendants are merchants with respect to the good which were sold to Plaintiff and the PA Class and NJ Class, and there was an implied warranty that those goods were merchantable.

174.    JUUL e-cigarettes are not fit for their intended purposes of offering an alternative to cigarettes because JUUL e-cigarettes, when used as intended or reasonably foreseeable, worsen or aggravate users' underlying nicotine addiction.

175.    As a direct and proximate result of Defendants' breach of their implied warranties, Plaintiffs and Class members have been damaged and seek damages in an amount to be determined at trial.

## COUNT VII

### BREACH OF EXPRESS WARRANTY
### (on behalf of the PA Class and the NJ Class)

176.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

177.    Pennsylvania Statutes Title 13 Pa.C.S.A. Commercial Code § 2313 and 2013 New Jersey Revised Statutes Title 12A - COMMERCIAL TRANSACTIONS, Section 12A:2-313, each provide for the following:

(a) General rule--Express warranties by the seller are created as follows:

(1)    Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

34

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description...

178. Defendants issued express warranties in connection with their sale of JUUL devices and JUUL pods that JUUL use caused the same or less nicotine to enter the bloodstream than a cigarette, that JUUL pods contained about as much nicotine as a pack of cigarettes, and that 10 puffs of a JUUL was equivalent to smoking a cigarette, which were stated on the JUUL website and other media.

179. In the marketing of its JUUL products, the affirmations of fact and promises that Defendants made and set forth directly above became part of the basis of the bargain between Defendants and Plaintiffs and all Class members. This created express warranties that the JUUL products would conform to Defendants' affirmations of fact, representations, promises, and descriptions.

180. Defendants breached their express warranties because JUUL pods and JUUL devices deliver more nicotine and more potent nicotine into the bloodstream than a cigarette, each JUUL pod contains more nicotine than a pack of cigarettes, and fewer than 10 puffs of a JUUL are equivalent to smoking a cigarette with respect to nicotine ingestion.

181. Plaintiffs and the Class members were injured as a direct and proximate result of Defendants' breach of express warranty because: (a) they would not have purchased JUUL products at all, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for JUUL products as a result of Defendants' false warranties and misrepresentations; and (c) they purchased products that did not have the characteristics, qualities, or value promised by Defendants.

## COUNT VIII

### NEGLIGENCE
#### (on behalf of the PA Class and the NJ Class)

182.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

183.    Defendants owed a duty to Plaintiffs and Class members to design, manufacture, produce, test, inspect, market, distribute, and sell the JUUL products with reasonable care and in a workmanlike fashion, and had a duty to protect Plaintiffs and Class members from foreseeable and unreasonable risk of harm.

184.    Defendants breached that duty by, among other things, as alleged above, misrepresenting the pharmacokinetics of JUUL e-cigarettes, the nicotine content of JUUL pods, the comparative nicotine content of JUUL pods and competing products, and the role of benzoic acid in JUUL pods..

185.    Defendants unreasonably failed to provide appropriate and adequate warnings and instructions about its products, and this failure was a proximate cause of the harm for which damages are sought.

186.    In addition, at the time the JUUL products left their control, Defendants knew, or in the exercise of reasonable care should have known, the products posed a substantial risk of harm to the life and health of its customers.

187.    Defendants knew, or in the exercise of reasonable care should have known, the JUUL products they designed, manufactured, produced, tested, inspected, marketed, distributed, and sold, created an unreasonable safety risk and that the products were marketed and sold with material misrepresentations and omissions of material facts. When making these statements, Defendants were aware that these representations were false or made them without knowledge of their truth or veracity.

188.    The negligent misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and all Class members to purchase the products at issue.

189.    Defendants had a duty to disclose to the Plaintiffs and Class members the serious safety risks posed by JUUL products and that JUUL pods and JUUL devices deliver more nicotine into the bloodstream than a cigarette, each JUUL pod contains more nicotine than a pack of cigarettes, and more than 10 puffs of a JUUL are equivalent to smoking a cigarette.

190.    Defendants also had a duty to prominently display on all JUUL packaging and promotional and marketing materials at all times that JUUL contained nicotine, which is an addictive chemical and to disclose the true risks of using JUUL products.

191.    Defendants failed to exercise reasonable care with respect to the design, manufacture, production, testing, inspection, marketing, advertising, packaging, distribution and sale of its products.

192.    Defendants also failed to exercise reasonable care in failing to warn or to warn adequately and sufficiently, either directly or indirectly, Plaintiffs and Class members of the addictive nature and negative health consequence of their products.

193.    Plaintiffs and Class members are entitled to damages and other legal and equitable relief as a result.

## COUNT IX

### PUBLIC NUISANCE
### (on behalf of the PA Class and the NJ Class)

194.    The Defendants herein have engaged in systematic deceptive marketing and promotion of JUUL products, as described above. . This misconduct has created, caused and/or substantially contributed to the public nuisance.

37

195.     Defendants' misconduct as set forth above has created or contributed to a substantial and unreasonable interference with rights common to the general public, including the right to be free of an unreasonable interference with public health, safety and peace.

196.     Defendants' interference with the public health, safety and peace through their misconduct has been unreasonable, as established by the following circumstances as more fully alleged previously herein:

a.     Defendants' misconduct is responsible for minors becoming addicted to nicotine and significantly interfered with public health, safety and peace;

b.     Defendants' misconduct is responsible for adults continuing to be addicted to nicotine and to become increasingly dependent on nicotine, rather than weaning themselves from nicotine, and significantly interfered with public health, safety and peace;

c.     Defendants' misconduct has produced a permanent or long-lasting effect and will continue unless the Defendants reveal the complete truth about their products, including the serious safety and health risks posed by JUUL products, that JUUL pods and JUUL devices deliver more nicotine into the bloodstream than a cigarette, that each JUUL pod contains more nicotine than a pack of cigarettes, and that more than 10 puffs of a JUUL are equivalent to smoking a cigarette. Defendants knew or had reason to know that their misconduct has had and continues to have a significant adverse impact on public health, safety and peace;

d.     Defendants' conduct is and was unlawful, including, without limitation, pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S.

38

§ 201-1 to 201-9.3) and the New Jersey Consumer Fraud Act, N.J. Stat. §56:8-1, et. seq., as more fully set forth herein; and

e.      Defendants' interference with rights common to the public is and was unreasonable based on the totality of the circumstances.

197.    The unreasonableness of Defendants' conduct and the resulting substantial harm imposed and the infringement of their rights is evident from the gravity of the harm, *e.g.,* nicotine addiction and its negative health consequences, and from the accompanying serious effects that interfered with and degraded, and continues to interfere with and degrade, the public health and safety.

198.    The deterioration of public health and safety caused by the JUUL products tears at the social and economic fabric of society; its impact is not limited to JUUL consumers adversely affected by the negative health consequences of nicotine and the other JUUL ingredients, but have been socialized and ultimately borne by the community as a whole.

199.    Defendants' JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to its users, including teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems. Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys. Exposure to nicotine produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Because vaping introduces foreign substances into the lungs, prolonged use of JUUL products may produce chronic obstructive pulmonary disease, just like traditional cigarette smoke. Vaping also triggers immune responses associated with inflammatory lung disease

200.     The negative effects of addicting minors to nicotine and continuing the nicotine addictions of adults who are attempting to wean themselves from nicotine on the public health, safety and peace are substantial and community-wide, and include, but are not limited to, increased costs for medical care, increased health insurance costs for members of the public, an increased strain on the medical system which affects the quality and cost of medical care available to the public, reduced productivity and economic output of JUUL consumers because of time spent vaping, which affects the economy as a whole, the cost to society of supporting nicotine ingestion cessation programs, increased life insurance rates for all, increased social services, increased disability benefits and others.

201.     Defendants had sufficient control over, and responsibility for, the public nuisance they created, as alleged more fully herein. Defendants were in control of the "instrumentality" of the nuisance, including the process of marketing and promotion and creation and maintenance of the demand for JUUL products at all relevant times, which included control of the misleading representations they conveyed through marketing and product promotion.

202.     Defendants could have ameliorated, at least in part, the public nuisance by ceasing their improper marketing of JUUL products and their dissemination of misleading information about the safety and efficacy of their products, and by disseminating corrective statements that informed consumers and others about the true risks of JUUL products.

203.     Defendants are not immune from public nuisance claims because they produced and marketed otherwise and/or allegedly legal products. Lawful conduct of businesses, like lawful conduct of individuals, has long been held to constitute a public nuisance if it unreasonably interferes with public health, safety, or peace. In any event, Defendants' conduct- and the deceptive

40

marketing and product promotion and misrepresentations and omissions embodied therein - was unlawful.

204. The injury, damage and costs to society from Defendants' misconduct were both significant and either known or wholly foreseeable to Defendants. While reaping millions of dollars in revenues and profits through their misconduct, the Defendants improperly shifted the burden, harm and costs of their public nuisance to the community as a whole, and its residents, which the community has and will continue to have to address to its detriment.

205. Plaintiffs have suffered and continue to suffer special harm that is different in kind and degree from that suffered by individual residents of Pennsylvania and New Jersey as alleged herein.

206. Plaintiffs sue in their public capacity for all appropriate injunctive and mandatory relief to abate the ongoing public nuisance, restore the public health, safety and peace, and recover all appropriate damages, expenses, costs and fees.

207. Plaintiffs also sue in their private capacity to recover the additional costs they have incurred or will incur as a result of Defendants' nuisance and other appropriate damages, expenses, costs and fees.

Defendants also are liable for punitive damages to reflect the aggravating circumstances of their intentional, willful, wanton, malicious and oppressive conduct as set forth herein. Defendants acted or failed to act knowingly, willfully and deceptively, with gross negligence, maliciously, and/or wantonly with conscious disregard of the public's health, safety, and welfare.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs pray for judgment as follows:

1.     That this Court certify this action as a Class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), and appoint Plaintiffs and their counsel to represent the NJ Class and the PA Class;

2.     That this Court enter judgment and award damages in favor of Plaintiffs and the NJ Class and the PA Class, and against Defendants under the theories alleged herein;

3.     That this Court enjoin Defendants from their unlawful conduct;

4.     That this Court order Defendants to refund all monies obtained by means of their violations of the New Jersey Consumer Fraud Act pursuant to N.J.S.A. 56:8-2.11, including trebling such damages;

6.     That this Court order Defendants to refund all monies obtained or statutory damages, whichever is greater, by means of their violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-2 & 201-3, et seq., including trebling such damages;

7.     That this Court award Plaintiffs all attorneys' fees, expenses and costs of this suit to the fullest extent allowed by law;

8.     That this Court award Plaintiffs punitive and tremble damages to the fullest extent allowed by law;

9.     That this Court award Plaintiffs pre-judgment and post-judgment interest at the maximum rate allowable by law, compounded daily; and

10.    That this Court grant such other, further, and different relief that the Court deems necessary, just, and proper.

42

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all

issues and claims so triable.

Dated: August 31, 2018

**BERGER MONTAGUE P.C.**
Sherrie R. Savett (PA Bar No. 17646)
Barbara A. Podell (PA Bar No. 28583)
Russell D. Paul (PA Bar No. 71220)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Email: ssavett@bm.net
        bpodell@bm.net
        rpaul@bm.net

**FREIWALD LAW**
Aaron J. Freiwald (PA Bar No. 28583)
1500 Walnut Street, 18th Floor
Philadelphia, PA 19102
Tel.: 215.875.8000
Email: ajf@freiwaldlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

Kal8031870

FILED

AUG 31 2018

KATE BARKMAN, Clerk
By_____ Dep. Clerk

43